## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| **HANNAH SABATA, et al.,** | **Case No. 4:17-cv-03107-RFR-MDN** |
| **Plaintiffs,** | |
| **v.** | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION** |
| **NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al.,** | |
| **Defendants.** | |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................4

I.     The Nebraska Correctional System is Centrally Controlled and Operated by NDCS ....................................................................................................................4

     A.     The Nebraska Correctional System is One of the Most Overcrowded Correctional Systems in the Country and is Facing a Significant Staffing Crisis ..........................................................................................5

     B.     NDCS Defendants Exercise Complete Control Over the Constitutionally Deficient Health Care Provided to NDCS Prisoners ..................................7

         1.     Medical Care ........................................................................................8

         2.     Dental Care ........................................................................................11

         3.     Mental Health Care ...........................................................................14

     C.     NDCS Defendants Exercise Complete Control Over the Use of Isolation............16

     D.     NDCS Defendants Exercise Complete Control Over Disability-Related Accommodations and Fail to Identify, Track, or Have Any System in Place to Provide Reasonable Modifications to Prisoners with Disabilities ..........21

II.     Defendant BOP Operates a Centralized System For Administering Parole Reviews and Hearings and Has Abdicated Its Responsibilities to Provide Disability-Related Accommodations ..............................................................................26

ARGUMENT......................................................................................................................27

I.     The Governing Legal Standards for Plaintiffs' Claims ...................................27

II.     Legal Standard for Class Certification...........................................................29

III.     Plaintiffs, the Proposed Class, and Proposed Subclasses Satisfy the Requirements

i

of Rule 23(a) ........................................................................................................30

A.      The Proposed NDCS Class and Subclasses Are Sufficiently Numerous ..............30

B.      The Commonality Requirement of Rule 23(a)(2) is Satisfied Because the
        Claims of the Class and Subclasses Present Common Issues of Fact and
        Law That Are Capable of Common Resolution ....................................................32

C.      The Typicality Requirement of Rule 23(a)(3) is Satisfied Because the
        Named Plaintiffs Have Claims Sufficiently Typical of the Class and
        Subclasses They Seek to Represent ......................................................................37

D.      The Proposed Class Representatives and Class Counsel Will Fairly and
        Adequately Represent the Interests of the Class and Subclasses.........................39

        1.      Proposed Class Representatives.................................................................40

        2.      Plaintiffs' Counsel Meet the Requirements of Rule 23(g) and
                Should Be Appointed Class Counsel .........................................................40

IV.   Plaintiffs and the Proposed Class and Subclasses meet the Requirements of Rule
      23(b)(1) and (b)(2) ..........................................................................................................42

A.      Certification Is Appropriate Under Rule 23(b)(1) ...............................................42

B.      Certification Is Appropriate Under Rule 23(b)(2) ...............................................44

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Alpern v. UtiliCorp United, Inc.*,
  84 F.3d 1525 (8th Cir. 1996) ........................................................... 38

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ......................................................................... 40

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ......................................................................... 29

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) .............................................. 32, 33, 37

*Ashker v. Governor of State of California*,
  2014 WL 2465191 (N.D. Cal. June 2, 2014) ................................... 42

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ......................................................... 44

*Baby Neal for and by Kanter v. Casey*,
  43 F.3d 48 (3rd Cir. 1994) .............................................................. 44

*Beckmann v. CBS, Inc.*,
  192 F.R.D. 608 (D. Minn. 2000) ................................................ 33, 39

*Berry v. Baca*,
  226 F.R.D. 398 (C.D. Cal. 2005) ..................................................... 43

*Bradley v. Harrelson*,
  151 F.R.D. 422 (M.D. Ala. 1993) .................................................... 44

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016) .................................................... 33

*Brown v. Plata*,
  563 U.S. 493 (2011) ..................................................................... 6, 28

*Caroline C. ex rel. Carter v. Johnson*,
  174 F.R.D. 452 (D. Neb. 1996) ....................................................... 30

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal.1995) ................................................. 43

*Cotton v. Douglas Cty. Dep't of Corr.*,
  No. 8:16-cv-153, 2016 WL 5816993 (D. Neb. Oct. 5, 2016) ........... 29

*DeBoer v. Mellon Mortg. Co.*,
  64 F.3d 1171 (8th Cir. 1995) ........................................................... 38

*Dockery v. Fischer*,
   253 F. Supp. 3d 832 (S.D. Miss. 2015), *petition for appeal pursuant to Rule 23(f)*
   *denied*, No. 15-90110, slip op. (5th Cir. Nov. 2, 2015) ............................................. 30, 31

*Donaldson v. Pillsbury Co.*,
   554 F.2d 825 (8th Cir. 1977) ........................................................................................ 38

*E.E.O.C. v. UPS Supply Chain Sols.*,
   620 F.3d 1103 (9th Cir. 2010) ...................................................................................... 24

*Ebert v. General Mills, Inc.*,
   823 F.3d 472 (8th Cir. 2016) ........................................................................................ 33

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ...................................................................................................... 28

*Franklin v. Barry*,
   909 F. Supp. 21 (D.D.C. 1995) ..................................................................................... 43

*Harris v. Thigpen*,
   941 F.2d 1495 (11th Cir. 1991) .................................................................................... 28

*Helling v. McKinney*,
   509 U.S. 25 (1993) ........................................................................................................ 28

*Hernandez v. Cty. of Monterey*,
   305 F.R.D. 132 (N.D. Cal. 2015) .................................................................................. 40

*Hilton v. Wright*,
   235 F.R.D. 40 (N.D.N.Y. 2006) ................................................................................... 43

*In re Zurn Pex Plumbing Prod. Liab. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ........................................................................................ 29

*Ingles v. City of New York*,
   2003 WL 402565 (S.D.N.Y. Feb. 20, 2003) ................................................................ 43

*New Directions Treatment Servs. v. City of Reading*,
   490 F.3d 293 (3d Cir. 2007) .......................................................................................... 40

*Pa. Dep't of Corr. v. Yeskey*,
   524 U.S. 206 (1998) ...................................................................................................... 36

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ................................................................................... 32, 34

*Paxton v. Union Nat. Bank*,
   688 F.2d 552 (8th Cir. 1982) ........................................................................................ 38

*Peebles v. Potter*,
   354 F.3d 761 (8th Cir. 2004) ........................................................................................ 29

*Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 (8th Cir. 2018) ....................... passim

*Postawko v. Missouri Dep't of Corr.*,
    No. 2:16-CV-04219-NKL, 2017 WL 3185155 (W.D. Mo. July 26, 2017), *aff'd*,
    910 F.3d 1030 (8th Cir. 2018) ................................................................ 28, 33

*Randolph v. Rodgers*,
    170 F.3d 850 (8th Cir. 1999) .............................................................................. 28

*Riley v. Nevada Supreme Court*,
    763 F. Supp. 446 (D. Nev. 1991) ....................................................................... 43

*Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*,
    821 F.3d 992 (8th Cir. 2016) .............................................................................. 32

*Unknown Parties v. Johnson*,
    163 F. Supp. 3d 630 (D. Ariz. 2016) ................................................................. 33

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................... 32, 33, 37

*Yates v. Collier*,
    868 F.3d 354 (5th Cir. 2017) ............................................................................. 33

## STATUTES

42 U.S.C. § 12132 ............................................................................................ 28, 36

Fed. R. Civ. P. 23 ..................................................................................... passim

Neb. Rev. Stat. § 83-170 ......................................................................... 17, 18, 31

Neb. Rev. Stat. § 83-171 ............................................................................. 4, 7, 34

Neb. Rev. Stat. § 83-173 ............................................................................. 4, 7, 34

Neb. Rev. Stat. § 83-176 ...................................................................................... 4

Neb. Rev. Stat. § 83-179 ...................................................................................... 9

Neb. Rev. Stat. § 83-181 ............................................................................. 4, 7, 34

## REGULATIONS

28 C.F.R. § 35.130(b)(7) ...................................................................................... 37

28 C.F.R. § 35.152(b)(1) ...................................................................................... 36

28 C.F.R. § 35.152(b)(2)-(3) ................................................................................. 37

28 C.F.R., Pt. 35, App. A ..................................................................................... 36

## <u>OTHER AUTHORITIES</u>

1 H. Newberg & A. Conte, *Newberg on Class Actions* § 4.34 (5th ed. 2016 update)..................45
   § 4:11 (5th ed.)........................................................................................................... 42

William Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. June 2018 Update)...................30

Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776.1 (3d ed. 2017 update)...........................45

# INTRODUCTION

This case arises from systemic deficiencies in Defendants' policies, procedures and practices, the effects of which are significantly worsened by severe overcrowding and staffing shortages across all facilities operated by the Nebraska Department of Correctional Services (NDCS).  As a result of these systemic failures, Nebraska state prisons are in a state of perpetual crisis that endangers the health, safety, and lives of prisoners and staff alike on a daily basis. Prisoners are consistently deprived of constitutionally adequate medical, dental, and mental health care, and are denied meaningful access to programs, services, and activities due to their disabilities.  Prisoners, including those with serious mental illnesses, suffer in conditions of extreme isolation for months and even years at a time.  These deficiencies have been extensively and publicly documented—yet Defendants have been, and continue to be, deliberately indifferent to these systemic failures and the inhumane conditions at their facilities.

The policies and procedures at issue affect all prisoners held in NDCS facilities and Defendants' continued deliberate indifference puts all prisoners at substantial risk of serious harm in violation of the Eighth Amendment to the United States Constitution.  Furthermore, Defendants' systemic failure to have even minimal policies and procedures in place to ensure prisoners with disabilities have meaningful access to NDCS services, programs, and activities, as well as to the parole process administered by the Board of Parole (BOP), violates federal disability anti-discrimination laws.

This case seeks only injunctive and declaratory relief and presents the kinds of systemic legal and factual issues for which class certification was intended.  Prisons are unique facilities because every aspect of a prisoner's daily life is heavily and centrally controlled across facilities including: intake; medical, dental, and mental health care; placement in isolation; conditions in isolation units; housing of prisoners, including in accessible cells; movement of prisoners

1

between services and programs including access to outside yards, recreation, and exercise facilities, and rehabilitative and vocational programs; access to assistive devices, auxiliary aids including sign language interpreters, and other reasonable accommodations for prisoners with disabilities; grievance and request processes; and the parole process.  Unlike in the outside world, prisoners cannot access any of these services independently and must rely on the prison system to plan for and provide essential services such as health care, safe living conditions, and disability-related accommodations.

There is no dispute that Defendants control the provision of these services through centralized policies and procedures that are applicable to all NDCS prisons.  These policies and procedures include Administrative Regulations, Medical Protocols and Nursing Protocols promulgated by NDCS, and rules promulgated by BOP.

Plaintiffs seek certification of the following class and subclasses:

(1) an NDCS Class composed of all persons who are now, or will in the future be, subjected to the health care (including medical, mental health and dental care) policies and practices of NDCS (all named plaintiffs);

(2) an Isolation Subclass composed of all NDCS prisoners who are now, or will in the future be, subjected to conditions of confinement that provide limited contact with other prisoners, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week (named plaintiffs Sabata, Cardeilhac, Galle, Gunther, Griswold, Norris, R.P.,[1] Reeves, and Rena); and,

(3) a Disability Subclass composed of all persons with disabilities who are now, or will in the future be, confined at any NDCS facility (named plaintiffs Sabata, Cardeilhac, Curtright, Galle, Griswold, Gunther, Norris, R.P., Reeves, and Sweetser).

Plaintiffs meet the standard for class certification.  Numerosity is met because the proposed NDCS class consists of over 5,000 current prisoners and untold numbers of future prisoners.  The proposed Isolation and Disability subclasses similarly consist of hundreds of

_____

[1] R.P. has been released from NDCS custody but the Court has not yet ruled upon Defendants' Suggestion of Mootness and Motion to Dismiss Claims of Named Plaintiff R.P., Filing No. 204.

current prisoners and untold numbers of future prisoners.  Commonality is met because Plaintiffs challenge the legality of Defendants' systemwide policies and practices, which raise common questions capable of common answers through the systemwide injunctive relief Plaintiffs seek. Typicality is met because the named Plaintiffs are all subject to the same deficient policies, procedures and practices as the class members.  The named Plaintiffs and class counsel will fairly and adequately protect the interests of the proposed class and subclasses.  Lastly, class certification is warranted (1) because the prosecution of separate actions by individual prisoners would (a) create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants and (b) would be dispositive of the interests of other prisoners or would substantially impair or impede their ability to protect their interests; and (2) because Defendants have acted, and refused to act, on grounds that apply generally to the class such that final injunctive and declaratory relief is appropriate as to the class as a whole.

This case is not about the care provided to any specific prisoner and Plaintiffs do not seek relief for individual prisoners.  Rather, this case is about whether the conditions in Nebraska's state prisons create a substantial risk of serious harm to all NDCS prisoners in violation of the Eighth Amendment, and whether NDCS and BOP have systemically failed to provide prisoners with disabilities meaningful access to NDCS and BOP programs, services, and activities by failing to put into place systems to consistently provide such access.  To address such common, systemic issues through thousands of individual prisoner lawsuits would be grossly inefficient and unnecessary when the injunctive and declaratory relief requested in this matter would resolve these issues on behalf of all prisoners.

Because the named Plaintiffs, the NDCS Class, the Isolation and Disability Subclasses, and Plaintiffs' counsel satisfy all requirements of Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (g)(1) and (4), class certification should be granted.

## STATEMENT OF FACTS

### I.    The Nebraska Correctional System is Centrally Controlled and Operated by NDCS

The NDCS Defendants are responsible for all aspects of operation of all NDCS facilities,

including the medical care, dental care, mental health care, and disability-related needs of the

approximately 5,358 prisoners held in NDCS facilities.  Filing 249-75 (NDCS Quarterly Data

Sheet October-December 2018); Neb. Rev. Stat. §§ 83-171 (NDCS duties include maintaining

and administering facilities, and developing policies and programs for persons committed to

NDCS); 83-173(3), (6) (NDCS Director shall "establish and administer policies and programs

for the operation of the facilities in the department and for the custody, control, safety,

correction, and rehabilitation of persons committed to the department" and "adopt and

promulgate rules and regulations for the management, correctional treatment, and rehabilitation

of persons committed to the department, the administration of facilities, and the conduct of

officers and employees under his or her jurisdiction"); 83-181 (each person committed to NDCS

shall have regular medical and dental care).

NDCS governs its facilities[2] through a system of centralized policies and procedures,

referred to as Administrative Regulations (ARs), which are intended to "guide the operations of

the Department" and "apply to all persons, Central Office, programs and institutions within the

jurisdiction of NDCS."  Filing 249-77 (AR 001.01).  While individual facilities may set their

---

[2] The NDCS system consists of ten facilities.  The Diagnostic and Evaluation Center (DEC)
processes all male prisoners upon intake.  The Nebraska Correctional Center for Women
(NCCW) houses female prisoners and processes all females upon intake.  The Nebraska
Correctional Youth Facility (NCYF) houses male prisoners up to the age of 21 years and 10
months.  The Community Corrections Centers in Lincoln and Omaha (CCC-L and CCC-O)
house male and female prisoners who are eligible for work release.  All other male prisoners are
housed in one of the other five facilities: Lincoln Correctional Center (LCC), Omaha
Correctional Center (OCC), Nebraska State Penitentiary (NSP), Tecumseh State Correctional
Institution (TSCI), and Work Ethic Camp (WEC).  NDCS may transfer prisoners from one
facility to another at any time.  Neb. Rev. Stat. § 83-176.

own policies, referred to as Operational Memorandum (OMs), these OMs must "be consistent in scope and intent with their authorizing AR." *Id.* "[A]ny change in the content of an AR shall produce a like change in corresponding OMs." *Id.*

A.   **The Nebraska Correctional System is One of the Most Overcrowded Correctional Systems in the Country and is Facing a Significant Staffing Crisis**

NDCS is one of the most overcrowded state prison systems in the country and, as of September 2018, was operating at approximately 158.75% of design capacity. Filing 249-75 (NDCS Quarterly Data Sheet October-December 2018); Filing 249-47 Declaration of Eldon Vail (Vail Decl.) ¶ 19. For the same time period, several facilities within NDCS were even worse, with CCC-O operating at 188.88% of design capacity, NSP operating at 187.46% of design capacity, and WEC operating at 173% of design capacity. *Id.* DEC and OCC are the most overcrowded facilities, with DEC operating at a staggering 336.25% of design capacity and OCC operating at 196.96% of design capacity. *Id.*; Filing 249-47, Vail Decl. ¶¶ 21-22. The severe overcrowding in NDCS facilities significantly exacerbates the harm caused by Defendants' systemically deficient policies and procedures. Filing 249-47, Vail Decl. ¶¶ 16-17, 19-22, 27-38, 61-62, 71-73, 76-77, 87.

The overcrowding problem is also exacerbated by a significant staffing crisis, which is caused by high staff turnover and vacancies. Filing 249-91 (2017/2018 OIG Report) at 27; Filing 249-47, Vail Decl. ¶¶ 39-52, 56-60. NDCS previously testified to the legislature that turnover rates in excess of 15% "may indicate instability and create management difficulties." Filing 249-91 (2017/2018 OIG Report) at 19-20. Yet, according to data released in the 2018 State Personnel Almanac, the turnover rate for NDCS was more than double that—30.8% for 2017. *Id.* at 20.

NDCS has had significant difficulty filling positions and, as of June 2018, had 294 vacant

positions, including 29 vacant behavioral health clinical positions and 28 vacant Division of

Health Services positions including 23 vacant nursing positions.  Filing 249-91 (2017/2018 OIG

Report) at 24; *see also* Filing 249-47, Vail Decl. ¶ 59 (noting that this high number of vacancies

for funded NDCS positions "does not include the additional 138 protective services positions

that the 2016 [NDCS] staffing analysis identified as necessary (or the additional 254 positions

that the staffing analysis initially recommended)").  As detailed in a 2016 assessment of NDCS

by the Vera Institute of Justice, "[u]nderstaffing and high turnover reduce the department's

ability to provide needed mental health services, heighten the risk of disruptions to treatment or

failure to meet the needs of individuals, and add stress to staff that may have multiple competing

responsibilities."  Filing 249-91 (2017/2018 OIG Report) at 28.

    The combination of overcrowded conditions and lack of staff directly contributes to the

overuse of isolation and systematically impairs Defendants' ability to provide a constitutional

level of health care.  Filing 249-47 (Vail Decl.) ¶¶ 18, 61-62, 71-73, 76-77; Filing 249-42

Declaration of Craig Haney (Haney Decl.) ¶¶ 46-47; Filing 249-53 Declaration of Jay Shulman

(Shulman Decl.) ¶¶ 8, 70-77; Filing 249-38 Declaration of Pablo Stewart (Stewart Decl.) ¶¶ 24-

30; Filing 249-58 Declaration of Marc Stern (Stern Decl.) ¶ 34.  In 2011, the United States

Supreme Court addressed comparable levels of overcrowding, including an intake facility

operating at 300% capacity, in the California state prison system and found that "[o]vercrowding

has overtaken the limited resources of prison staff; imposed demands well beyond the capacity of

medical and mental health facilities; and created unsanitary and unsafe conditions that make

progress in the provision of care difficult or impossible to achieve."  *Brown v. Plata*, 563 U.S.

493, 502 (2011) (finding that overcrowding in the California state prison system was the

"primary cause of the violation of a Federal right…specifically the severe and unlawful

mistreatment of prisoners through grossly inadequate provision of medical and mental health

care" and affirming relief ordered by the lower court, including a population limit).

The overcrowded conditions and lack of staff also compound the overcrowding problem because prisoners are unable to access and complete programming to assist them in reentering society and obtain parole due to extensive wait lists.  Filing 249-47 (Vail Decl.) ¶¶ 53-56, 60. NDCS offers six programs[3] which can be required to be considered for parole and, as of June 2018, there were 1,380 prisoners on waitlists for these programs, 147 of whom had passed their parole eligibility date but were still waiting to access required programming.  *Id.* ¶ 54; Filing 249-76 (NDCS Quarterly Data Sheet April-June 2018).  As a result, due to the lack of staffing resources for programs that are required to earn parole, prisoners in NDCS are staying in prison for longer than they would if sufficient staff were available to operate those programs.  Filing 249-47 (Vail Decl.) ¶¶ 53-56, 60.

### B. NDCS Defendants Exercise Complete Control Over the Constitutionally Deficient Health Care Provided to NDCS Prisoners

The NDCS Defendants exercise absolute control over the health care provided in NDCS facilities.  Neb Rev. Stat §§ 83-171, 83-173, 83-181; Filing 249-82 (AR 115.01); Filing 249-58 (Stern Decl.) ¶ 17.  Defendant Deol is NDCS' medical director and oversees all aspects of health care, including medical, mental health, pharmacy, nursing, and dental.  Filing 249-80, Transcript of 30(b)(6) Deposition of Harbans Deol (Deol Depo.) at 16:23-17:2.  Defendant Deol is responsible for, among other things, (1) defining the scope of health care services; (2) developing mechanisms to assure that the scope of services is provided and properly monitored; (3) developing operational health policies and procedures; (4) identifying the type of health care

---

[3] These programs include: (1) the Violence Reduction Program (VRP), (2) Anger Management, (3) Residential Substance Abuse, (4) Non-residential Substance Abuse, (5) Inpatient Sex Offender Program (iHelp), and (6) Outpatient Sex Offender Program (oHelp). Filing 249-93, Transcript of 30(b)(6) Deposition of Rosalyn Cotton (Cotton Depo.) at 124:3-12; Filing 249-76 (NDCS Quarterly Data Sheet April-June 2018).

providers needed to provide the determined scope of services; (5) establishing systems for the coordination of care among multidisciplinary health care providers; (6) developing a quality management program; and (7) establishing measurable goals and objectives with internal reviews by designated health care professionals.  Filing 249-82 (AR 115.01) at § VII.  To the extent that prisoners receive medical, dental, and mental health care, they receive it pursuant to centralized systemwide policies, including ARs, Medical Protocols (MPs), and Nursing Protocols, promulgated by the NDCS Defendants.  Filing 249-82 (AR 115.01); Filing 249-83 (AR 115.04); Filing 249-58 (Stern Decl.) ¶ 17.

### 1.      Medical Care

Medical care at NDCS is centrally governed by AR 115.01, which "establishes authority, responsibility, and procedures for health care services" and is "applicable to all institutions," Filing 249-82 (AR 115.01), and by AR 115.04, which governs prisoners' access to health care services and similarly "applies to all institutions," Filing 249-83 (AR 115.04).

The medical care NDCS provides is systemically deficient, resulting in a broken medical system that creates a substantial risk of serious harm for all NDCS prisoners.  Filing 249-58 (Stern Decl.) ¶¶ 13, 17-20, 44, 46, 61, 70, 86, 89, 92, 95, 116, 117, 137, 145.  These systemwide flaws include (1) dangerous staffing practices, that include allowing inmates to provide medical care for other inmates, and requiring licensed practical nurses to perform duties outside their qualifications; (2) delayed and flawed intake screenings; (3) problems with access to care; (4) fundamental flaws in medication administration; (5) insufficient medical records; and (6) deficient management (including a poor quality monitoring and system improvement; and poor leadership and oversight).  *Id.* at ¶¶ 13-14.  These practices put all prisoners at NDCS at a substantial risk of serious harm.  *Id.*  The problems are documented in detail by Plaintiffs' expert

Dr. Marc F. Stern,[4] who toured NDCS institutions and reviewed numerous medical records.  Dr. Stern's declaration, Filing 249-58, points to specific class members whose safety has been jeopardized by the deficiencies described here.

NDCS facilities deploy medical staff in an ineffective and dangerous manner.  NDCS relies heavily upon Licensed Practical Nurses (LPNs), who according to their Nebraska licensure may not independently assess or develop nursing care plans for patients, instead of Registered Nurses (RNs), who are permitted to undertake those duties.  LPNs within NDCS routinely make clinical assessments that they are not qualified or certified to make regarding the health status and care of prisoners.  *Id.* ¶¶ 21-27.  These policies and practices permeate nearly all aspects of medical care at NDCS facilities, are out of step with the standard of care, and put prisoners at a substantial risk of serious harm.  *Id.* ¶ 21.  By official policy, NDCS also relies on inmate porters and corrections officers to provide aspects of health care and make medical judgments for which they are not qualified. *See, e.g.*, *id.* ¶¶ 28-30, 61-65.

The medical intake screening process is also critical to prisoner safety.  NDCS' flawed intake process exposes all incoming prisoners to a substantial risk of serious harm.[5]  Initial medical screenings at NDCS are governed by AR 115.05, which "applies to all institutions."

---

[4] Dr. Stern is the former Assistant Secretary for Health Services of the Washington State Department of Corrections, and a former Regional Director for the New York State prison system.  He has served as a consultant on correctional health care to the United States Department of Justice and to many local jurisdictions.  He serves as the court-appointed expert on prison medical care in the class action *Parsons v. Ryan,* No. CV-12-00601 – PHX-ROS (D. Ariz).  Filing 249-58 (Stern. Decl.) ¶¶ 2-3.

[5] All prisoners go through an intake process that includes the same four steps:  (1) an officer administers a health intake screening; (2) a nurse conducts an additional health screening; (3) a psychologist conducts a mental health screening; and (4) a medical practitioner, either a physician, nurse practitioner, or physician assistant, conducts a physical exam.  Filing 249-80 (Deol Depo.) at 72:19-79:15.  This same process applies to individuals who are readmitted after being released on parole for at least six months.  *Id.* at 78:15-19; 79:16-18; *See also* Neb. Rev. Stat. § 83-179 ("Upon initial admission to a facility, each person committed to the department shall be given a physical examination and a thorough evaluation.").

Filing 249-84 (AR 115.05).  NDCS fails to promptly conduct intake screenings to identify whether prisoners are healthy enough to be admitted and to begin any needed treatment.  Filing 249-58 (Stern Decl.) ¶¶ 45-46.  These screenings are vital, and failure to perform them within minutes to a very few hours after arrival at the facility is dangerous.  *Id.* ¶¶ 36-37.  However, NDCS policy allows up to *24 hours* for completion of intake screening and Dr. Deol estimates that 10% of newly admitted prisoners are not even evaluated within 24 hours—a highly dangerous practice that puts the lives of prisoners significantly at risk.  *Id.* ¶ 45.  NDCS also fails, in policy and practice, to screen properly for tuberculosis, further putting prisoners at substantial risk of serious harm.  *Id.* ¶¶ 41-44, 46.

There are also significant systemic problems with emergency care.  Filing 249-58 (Stern Decl.) ¶¶ 49-58.  Due to the problems with staff deployment at NDCS, there are frequently not enough medical professionals on site to respond to life-threatening medical emergencies.  For example, at NSP there is only one medical professional, a nurse, on night duty 6 out of 7 nights per week.  *Id.* ¶ 51.  That nurse is always required to remain in the skilled nursing facility, and as a result, no medical professional is available 6 nights a week to respond to medical emergencies in the units.  *Id.*  Instead, prisoners must be transported by correctional staff to the skilled nursing facility, which can cause life-threatening delays in receipt of emergency medical care.  *Id.*  When medical professionals are actually available to respond to emergencies in the units, they routinely do not have the necessary equipment to allow them to properly do so.  *Id.* ¶ 52.  NDCS' practice of treating LPNs and RNs interchangeably is particularly dangerous in emergency situations.  *Id.* ¶ 54.  LPNs who are forced to respond alone to an emergency will have no choice but to make independent medical decisions without assistance from RNs or practitioners.  *Id.*

When attempting to access urgent and non-urgent care, prisoners also face significant obstacles that routinely put them at substantial risk of serious harm.  Filing 249-58 (Stern Decl.)

¶¶ 59-70; 71-86.  Such systemic deficiencies include (1) the inability to get the attention of custody staff in order to request care, (2) failure of custody staff to properly notify medical staff of requests for care, (3) improper reliance on unqualified LPNs to triage complaints and conduct initial evaluations, (4) failure to conduct medical assessments in person, and (5) excessive delays before in-person visits.  *Id.*  All of these deficiencies put prisoners at substantial risk of serious harm, including deterioration of their medical conditions, which may be irreversible.  *Id.* ¶¶ 70, 86.

All of the above-listed systemic deficiencies are further exacerbated by Defendants' poor record keeping practices.  NDCS medical records are incomplete, inaccurate, illegible, and kept in a highly disorganized fashion.  *Id.* ¶¶ 117-123.  The systemic failure to keep proper records significantly impairs medical professionals' ability to assess patients' history of symptoms, which precludes safe patient care for all prisoners at NDCS.  *Id.*

### 2.    Dental Care

Dental care at NDCS is centrally overseen by Defendant Deol, who is responsible for dental administration, dental policies, and clinical responsibilities including supervision of all NDCS dentists.[6]  Filing 249-80 (Deol Depo.) at 18:10-20.  The primary policy covering the provision of dental care at all NDCS facilities is MP 18, the stated purpose of which is to "establish and maintain *uniform guidelines* for Dental Services provided to patients incarcerated within NDCS."  Filing 249-81 (MP 18) at 1 (emphasis added); Filing 249-80 (Deol Depo.) at 40:20-41:11.  Several systemic deficiencies are apparent on the face of this policy which, among other deficiencies, put prisoners at substantial risk of serious harm.  Filing 249-53 (Shulman Decl.) ¶¶ 8, 78-102, 104, 141, 180, 191.  These deficiencies are explained in detail, with specific

---

[6] NDCS should have a Chief of Dentistry, but that position has been vacant for about two years. Filing 249-80 (Deol Depo.) at 18:16-19:18.

patient examples, in the Declaration of Dr. Jay D. Shulman, Filing 249-53.[7]

First, the priority system used to provide dental care puts prisoners at substantial risk of serious harm.  Filing 249-53 (Shulman Decl.) ¶¶ 8, 78-102, 104, 141, 180, 191.  MP 18 classifies dental services as Priority I (emergency care),[8] Priority II (urgent care),[9] Priority III (routine care),[10] and Priority IV (partial or full denture construction or repair).[11]  Non-covered services include (a) elective procedures, (b) orthodontics, fixed bridgework or cast crowns for cosmetic purposes, (c) implants, (d) dentures for new prisoners that have not yet served 24 months or the earliest parole or mandatory discharge release date is more than six months away,[12] (e) extracting asymptomatic third molars, and (f) periodontal diagnosis and treatment.  *Id.* ¶ 78.  Priority IV care is not provided when there are staffing shortages.  *Id.* ¶ 79; Filing 249-80 (Deol Depo.) at 42:19-43:11.

Also, prisoners who have been at NDCS for less than a year are ineligible for non-urgent care (Priorities III and IV).  Filing 249-53 (Shulman Decl.) ¶ 81.  The effect of this policy is to

---

[7] Dr. Shulman has served as a consultant on correctional dental services to numerous government entities and the United States Department of Justice.  He has served as a court-appointed expert in several systemwide correctional dental cases, including *Perez v. Tilton* (California Department of Corrections and Rehabilitation), *Fussell v. Wilkinson* (Ohio state prison system), *Lippert v. Baldwin* (Illinois).  Filing 249-53 (Shulman Decl.) ¶¶ 1-6.

[8] "Incapacitating pain, facial swelling, oral-facial trauma, suspected serious pathological conditions, and profuse bleeding."  Filing 249-53 (Shulman Decl.) ¶ 78.

[9] "Extraction of non-restorable, symptomatic teeth, placement of sedative restorations in grossly decayed teeth, pulpotomy or pulpectomy, prescription of medications as appropriate, and gross scaling and debridement of calculus."  Filing 249-53 (Shulman Decl.) ¶ 78.

[10] "Routine non-acute care for conditions that are not of an urgent nature."  Filing 249-53 (Shulman Decl.) ¶ 78.

[11] "Partial or full denture construction, repair or reline partial or full dentures.  May be scheduled after all are met or as medically indicated. Prosthodontic care (dentures) is reserved for patients with NDCS length of stay greater than two (2) years and mandatory release date is no more than six (6) months."  Filing 249-53 (Shulman Decl.) ¶ 78.

[12] Exceptions may be granted by the Chief of Dental Services or designee.  Filing 249-53 (Shulman Decl.) ¶ 78.

impose an arbitrary one-year ban for all prisoners from receiving treatment for dental disease until the conditions worsen to the extent they cause pain. *Id.* Moreover, prisoners released on parole and then re-incarcerated must satisfy the one-year restriction period all over again. *Id.*; Filing 249-80 (Deol Depo.) at 44:18-45:9. There is no clinical basis for this ban—which only serves to cause prisoners to experience unnecessary pain and deterioration of their dental health. Filing 249-53 (Shulman Decl.) ¶¶ 82, 84, 141. Defendant Deol stated that he believed the ban is inappropriate and admitted, on behalf of NDCS, that he did not know why it was imposed. *Id.* ¶ 82; Filing 249-80 (Deol Depo.) at 46:19-21 ("Q: And my question is: what is the purpose of that restriction? A: I'm not quite sure") 48:7-10 ("Q: Have you ever expressed the [view] that this, either orally or in writing, that this restriction is inappropriate? A: To my dentists, yes.").

Second, pursuant to MP 18, NDCS refuses to provide prisoners with any periodontal care, which is vital to preventing dental disease and decay. By considering periodontal care to be a non-covered service, the NDCS dental program has grossly deviated from the standard of care and subjects prisoners to a substantial risk of serious harm because prisoners have no choice but to wait until periodontal issues have worsened to the point of causing bone destruction and tooth loss before they can be seen. Filing 249-53 (Shulman Decl.) ¶¶ 89-98, 118-121. There is no clinical basis for this restriction, which causes prisoners to experience unnecessary pain and deterioration of their dental health. *Id.* Defendant Deol again admitted that this policy was inappropriate and was unaware of the purpose behind it. *Id.* ¶ 92; Filing 249-80 (Deol Depo.) at 53:16-54:22 ("Q: Have you ever expressed a view, either orally or in writing, that this restriction, the ineligibility for periodontal diagnosis and treatment, is inappropriate? A: Yes.").

Third, NDCS' MP 18 imposes a cruel and entirely unnecessary two-year waiting period before prisoners can receive dentures, which is re-imposed on prisoners that were released on parole and then re-incarcerated. Filing 249-53 (Shulman Decl.) ¶¶ 85-88; Filing 249-80 (Deol

Depo.) at 48:21-49:5.  There is no clinical justification for such a waiting period.  Filing 249-53

(Shulman Decl.) ¶¶ 85-88.  Although MP 18 purports to allow for a waiver of this waiting

period, it fails to describe what the basis for a waiver could be, there is no indication that the

waiver process is communicated to patients in writing or otherwise, and Defendants have never

received, nor granted, any waiver requests.  *Id.* ¶ 86; Filing 249-80 (Deol Depo.) at 50:23-52:6.

Without dentures prisoners are put at substantial risk of serious harm and may be unable to eat

and suffer gratuitous pain.  Filing 249-53 (Shulman Decl.) ¶¶ 51, 180, 191.

Following the initial intake exam, NDCS provides no proactive dental care and prisoners

must fill out a request in order to be seen.  Filing 249-80 (Deol Depo.) at 39:22-40:8.  When

asked how a prisoner can know that they are developing dental problems before they reach the

point of causing pain, Defendant Deol responded "they don't."  Filing 249-80 (Deol Depo.) at

40:16-19; Filing 249-53 (Shulman Decl.) ¶ 95 (patients with undiagnosed periodontal disease

due to Defendants' policy prohibiting periodontal diagnosis will not be able to request care if

they are not told they are affected).  Finally, as with medical records as a whole, NDCS' dental

record keeping system is disorganized, records are incomplete and illegible, and NDCS lacks a

system for tracking patients to ensure they receive needed care.  Filing 249-53 (Shulman Decl.)

¶¶ 193-199.

### 3.    Mental Health Care

Mental health care at NDCS is dangerously haphazard and understaffed.  The severity of

the problems are evidenced by the fact that NDCS prisons have a suicide rate far above the

national average, and NDCS' own review of recent suicides has shown the harms of

understaffing because the decedents' mental health care was subject to numerous delays in spite

of warning signs and requests for help.  Filing 249-38 (Stewart Decl.) ¶¶ 24-25, 30, 80.  The

failures of the mental health system are addressed, with specific class member examples, in the

Declaration of Pablo Stewart, MD,[13] Filing 249-38.  Mental health care at NDCS is centrally overseen by Defendant Deol, who directly supervises NDCS' Director of Behavioral Health and is responsible for behavioral health and mental health coverage as well as certain aspects of programming.  Filing 249-80 (Deol Depo.) at 17:5-10.

Mental health care services at NDCS are insufficient to meet the needs of the population, and put prisoners at substantial risk of serious harm stemming both from deficient policies and from a systemic failure to ensure implementation of mental health services across NDCS facilities.  Filing 249-38 (Stewart Decl.) ¶¶ 24-25.  NDCS' policies and practices for identification and screening of prisoners upon arrival and after transfers are dangerously lacking because initial screenings are performed by custody staff with no medical qualifications whatsoever and incoming prisoners are routinely not screened by medical staff for weeks after their arrival.  *Id.* ¶ 31.  Systemic deficiencies include (a) a shortage of mental health staff, (b) structural deficiencies in the provision of mental health treatment, including a failure to implement a mental health array with distinct levels of care, and (c) inadequate provision of psychiatric medications, including using improper dosages and formulations and improperly prescribing anti-psychotic medications to prisoners with no diagnosis or symptoms of psychosis. *Id.* ¶¶ 24-30, 32-50, 58-77.

Any minimally adequate correctional mental health care system must include discretely defined and available levels of care sufficient to meet the needs of its population.  Filing 249-38 (Stewart Decl.) ¶¶ 32-37, 42-43.  Yet, NDCS fails to implement a mental health service array with distinct levels of care sufficient to meet the needs of the prisoner population.  *Id.* ¶¶ 32-43.

---

[13] Dr. Stewart is a psychiatrist with over 30 years of correctional experience.  Dr. Stewart has extensive clinical, research, and academic experience in forensic mental health, including consultations involving prison and jail systems in other jurisdictions.  He is serving as the neutral expert monitor in the Illinois statewide prison mental health class action, *Rasho v. Baldwin,* 07-CV-1298-MMM-JEH (C.D. Ill.).  Filing 249-38 (Stewart Decl.) ¶¶ 2-19.

NDCS's failure to implement any standardized levels of care disregards the mental health needs of all prisoners and puts them at substantial risk of serious harm due to inappropriately keeping high-need prisoners in a lower level of care, and keeping prisoners who no longer require high levels of care in inappropriately restrictive settings. *Id*.

NDCS also fails to maintain an organized or coherent system of documenting and coordinating mental health treatment for prisoners and does not have an effective means for prisoners to make their mental health needs known to qualified staff in a timely manner. Filing 249-38 (Stewart Decl.) ¶¶ 44-57. In particular, NDCS relies in part on the use of telepsychiatry to provide psychiatric care, but the telepsychiatry providers are not provided with access to prisoners' medical files. *Id.* ¶ 54-57. This exposes prisoners to a substantial risk of serious harm because the telepsychiatry provider is unable to have a full picture of the patient's medical record to ensure proper care and avoid medical complications caused by multiple medications or conditions. *Id.* Mental health records are disorganized, incomplete, and sometimes internally contradictory. *Id.* ¶¶ 51-57. Finally, as discussed further below, NDCS systemically disregards the devastating effect that isolated confinement has upon individuals with serious mental illnesses. *Id.* ¶¶ 78-81. All of these systemic failures are consistent across NDCS facilities and put all prisoners at substantial risk of serious harm. *Id.* ¶¶ 81-84.

### C.    NDCS Defendants Exercise Complete Control Over the Use of Isolation

The use of isolation, which NDCS calls "restrictive housing," is governed by AR 210.01, which controls placement of prisoners in restrictive housing, sets forth the conditions in restrictive housing for all prisoners in NDCS, and establishes the process for reviewing placement of prisoners in long-term restrictive housing. Filing 249-90 (AR 210.01); Filing 249-89, Transcript of 30(b)(6) Deposition of Robert Madsen (Madsen Depo.) at 22:22-24:25; 31:8-24; Filing 249-80 (Deol Depo.) at 296:16-298:17; Filing 249-47 (Vail Decl.) ¶¶ 63-64. The term

"restrictive housing" is defined by statute as "conditions of confinement that provide limited

contact with other offenders, strictly controlled movement while out of cell, and out-of-cell time

of less than twenty-four hours per week."  Neb. Rev. Stat. § 83-170; Filing 249-90 (AR 210.01).

However, the Office of Inspector General has found that "nearly every inmate who is placed in

restrictive housing receives an average of less than one hour out of their cell each day."  Filing

249-91 (2017/2018 OIG Report) at 59.  Several of Plaintiffs' experts have assessed NDCS' over-

reliance on segregation, including psychiatrist Dr. Stewart, identified above, as well as

psychologist Dr. Craig Haney[14] (Filing 249-42), and former Washington State secretary of

corrections, Eldon Vail[15] (Filing 249-47).

Isolation units at NDCS are highly restrictive and subject prisoners to severe social and

other deprivations, including small, cramped cells, "exercise" areas consisting of fenced-in cages

with little to no exercise equipment, severe idleness, and extreme limits on visitation and

property.  Filing 249-42 (Haney Decl.) ¶¶ 15, 49-70; Filing 249-47 (Vail Decl.) ¶¶ 65-66.  The

damaging effects of isolation or solitary confinement are well established, and place all prisoners

housed in them at substantial risk of serious psychological harm, even those without pre-existing

mental illness.[16]  Filing 249-42 (Haney Decl.) ¶¶ 15, 18-43; Filing 249-38 (Stewart Decl.) ¶¶ 24,

---

[14] Dr. Haney is a Professor of Psychology and former Chair of the Department of Psychology at the University of California at Santa Cruz who has studied and published about institutional environments, including prisons, for over 40 years.  Dr. Haney has toured, inspected, and analyzed conditions of confinement at numerous state and federal prisons across the country and around the world.  Dr. Haney has been qualified and has testified as an expert in various state and federal courts.  Filing 249-42 (Haney Decl.) ¶¶ 1-7.

[15] Eldon Vail is a former correctional administrator with 35 years of experience administering adult institutions.  Mr. Vail served as warden of three Washington state prisons, and as Secretary of the Washington Department of Corrections.  Mr. Vail has consulted and testified regarding overcrowding and reliance on segregation in numerous cases involving prison and jail systems. Filing 249-47 (Vail Decl.) ¶¶ 2-10.

[16] Plaintiffs use the terms "isolation," "solitary confinement" and "restrictive housing" interchangeably, unless otherwise noted, to refer to "conditions of confinement that provide

49, 78-79; Filing 249-47 (Vail Decl.) ¶¶ 61-62, 65-70.  The long-term absence of meaningful

human contact and social interaction, the enforced idleness and inactivity, and oppressive

security and surveillance procedures in these units all combine to create starkly deprived

conditions of confinement, which have devastating effects on prisoners.  Filing 249-42 (Haney

Decl.) ¶¶ 18-43.  These effects can include appetite and sleep disturbances, anxiety, panic, rage,

loss of control, paranoia, hallucinations, self-mutilation, and suicide.  *Id.*  Dr. Haney's interviews

and file reviews revealed "multiple instances of suicidality or extreme acting out by prisoners

who were nonetheless kept in—or routinely returned to—harsh solitary confinement units, where

they were once again placed at an especially significant risk of grave harm."  Filing 249-42

(Haney Decl.) ¶¶ 58-64.  Dr. Haney reviewed the incident reports from two recent NDCS

suicides in restrictive housing, and stated that:

> These two cases tragically illustrate the type of serious risks to
> which prisoners are subjected in restrictive housing, including
> receiving inadequate care for their serious mental illnesses,
> suffering mental deterioration caused by severe forms of prison
> isolation (especially for prisoners with pre-existing psychological
> vulnerabilities), and failing to receive meaningful oversight and
> monitoring by staff.

*Id.* ¶¶ 65-67; *see also* Filing 249-38 (Stewart Decl.) ¶ 80.

NDCS uses two primary types of restrictive housing, Immediate Segregation (IS) and

Longer-Term Restrictive Housing (LTRH).  IS a short-term placement of thirty days or less with

the possibility to extend such segregation to sixty days.  Filing 249-90 (AR 210.01) at 7.  There

is no limit on how long an individual may be placed in LTRH.  Filing 249-92 (2018 Restrictive

Housing Report) at 3; Filing 249-90 (AR 210.01) at 3, 7-11.  Individuals on IS and LTRH status

are housed in the same restrictive housing units, but if they have a serious mental illness and are

---

limited contact with other offenders, strictly controlled movement while out of cell, and out-of-
cell time of less than twenty-four hours per week".  Neb. Rev. Stat. 83-170(13); Filing 249-42
(Haney Decl.) ¶ 18; Filing 249-47 (Vail Decl.) ¶ 61, n. 70.

deemed to require residential mental health treatment, they are, by policy, to be housed in the
Secure Mental Health Unit (SMHU) located at LCC.  Filing 249-42 (Haney Decl.) ¶ 49; Filing
249-90 (AR 210.01) at 3.  Conditions in the SMHU resemble those in the other restrictive
housing units, making it particularly ineffective and dangerous when used as a substitute for a
mental health treatment facility.  Filing 249-42 (Haney Decl.) ¶ 50; Filing 249-38 (Stewart Decl.)
¶ 40.

The conditions of confinement in these restrictive housing units are extraordinarily
severe.  The cells are small and, with only a few exceptions, the outdoor exercise areas consist of
individual fenced-in cages with little to no exercise equipment.  Filing 249-42 (Haney Decl.)
¶ 51.  Prisoners are afforded extremely limited out-of-cell time; they only have to be let out of
their cells for one hour a day, five days a week for exercise, and three times a week to shave and
shower, and they may have their ability to exercise curtailed even further, to just three times a
week.  *Id.* ¶ 52; Filing 249-47 (Vail Decl.) ¶ 65.  There is limited programming available for
prisoners in restrictive housing and most of what is available consists of "programs" that a
prisoner completes alone in his or her cell, which may be repeated many times.  Filing 249-42
(Haney Decl.) ¶¶ 49-55.  Prisoners are afforded very limited property and have extremely limited
access to visitation from family and loved ones.  *Id.* ¶ 53.  Conditions in the general population
restrictive housing units and the SMHU are nearly identical, and constitute isolation or solitary
confinement as those terms are routinely defined.  *Id.* ¶¶ 51, 57.  The combination of
overcrowding, overuse of restrictive housing, and understaffing yields shocking scenes like what
Dr. Haney observed in the "South Forty" unit at NSP, with men held in small filthy cells behind
windowless metal doors.  *Id.* ¶ 68.  Conditions in these units are desperate not only for prisoners,
but also for staff.  Mental health staff in the South Forty are reduced to navigating the pipe
chases behind cells in order to be able to talk to their patients through small openings in the

walls.  *Id.*

Despite the awareness of NDCS policy makers that overreliance on restrictive housing is dangerous, the number of prisoners held in these units has continued to increase.  Filing 249-42 (Haney Decl.) ¶¶ 47-48; Filing 249-47 (Vail Decl.) ¶¶ 66-76.  As of August 2018, there were 414 prisoners in restrictive housing units, an increase of 22% since 2014.  Filing 249-91 (2017/2018 OIG Report) at 56.  The average daily population in restrictive housing has increased by over 15% since 2017 and, on average, approximately 404 people were held in restrictive housing on any given day in 2018.  Filing 249-92 (2018 Restrictive Housing Report) at 5.  The number of prisoners held in restrictive housing for more than 180 consecutive days has more than doubled in the past two years, from 62 in September 2016 to 158 in August 2018.  Filing 249-91 (2017/2018 OIG Report) at 56; Filing 249-42 (Haney Decl.) ¶ 47.  The mean length of time prisoners spent in restrictive housing in 2018 was 48.39 days, but approximately 70 prisoners have been held in LTRH for *over a year*.  Filing 249-92 (2018 Restrictive Housing Report) at 10. Recently a prisoner was discharged from NDCS to the community without supervision after spending 878 days in LTRH.  *Id.* at 32.

The level of overcrowding at NDCS and high rates of turnover and staffing shortages contribute significantly to the increasing number of prisoners held in isolation and to the highly dangerous practice of placing two prisoners into one isolation cell.  Filing 249-47 (Vail Decl.) ¶¶ 61-87.  Without sufficient staff, correctional facilities, including NDCS, end up relying on overuse of isolation in an effort to manage prisoners.  *Id.* ¶¶ 61-62, 72-76, 87.  These practices are not only counterproductive to good prison security, but put all prisoners at a substantial risk of serious harm.  *Id.* ¶¶ 61-87.

**D.     NDCS Defendants Exercise Complete Control Over Disability-Related Accommodations and Fail to Identify, Track, or Have Any System in Place to Provide Reasonable Modifications to Prisoners with Disabilities**

Defendants systemically fail to provide prisoners with disabilities with access to NDCS services, programs, and activities.  Disability-related accommodations at NDCS are primarily governed by two centralized policies: AR 4.01 (ADA Policy), which governs disability related accommodations, and AR 200.3 (ASL Policy) which governs provision of sign language interpreters.  Filing 249-87 (AR 4.01); Filing 249-88 (AR 200.3).  These policies, however, fail to address identification of prisoners with disabilities, provision of assistive devices and auxiliary aids, and housing-related accommodations.  Filing 249-50 (Schlanger Decl.) ¶¶ 10-11.  NDCS' ADA policy further relies entirely on written requests for disability-related accommodations, even where individuals are blind or have other disabilities that impair their ability to understand and/or complete written forms.  Filing 249-87 (AR 4.01) § II(B).  Plaintiffs' expert, Professor Margo Schlanger,[17] has evaluated the NDCS policies, procedures and practices regarding prisoners with disabilities.  *See* Filing 249-50 (Schlanger Decl.).

Defendants have no written policies or procedures to enable Defendant NDCS to identify individuals with disabilities at intake as they are processed through DEC.  Filing 249-50 (Schlanger Decl.) ¶¶ 11, 38-39.  Defendant Deol testified that nursing staff conduct disability assessments at intake but there is no written policy to guide them in doing so, and NDCS' ADA Coordinator, who was speaking on behalf of NDCS regarding identification of individuals with disabilities, testified that she has never seen such a written policy.  Filing 249-80 (Deol Depo.) at

---

[17] Professor Schlanger has served since 2015 as the court-appointed settlement monitor in *Adams & Knights v. Kentucky Department of Corrections*, No. 3:14-cv-00001 (E.D. Ky.), a state-wide case about deaf and hard-of-hearing prisoners' access to programs, services, and activities offered by the Kentucky Department of Corrections, and previously served as the Officer for Civil Rights and Civil Liberties at the United States Department of Homeland Security.  She has consulted for numerous government agencies on correctional policies concerning persons with disabilities.  Filing 249-50 (Schlanger Decl.) ¶¶ 1-7.

82:18-83:8; Filing 249-86 December 5, 2018 Deposition of 30(b)(6) Lisa Mathews (Mathews 12/5/18 Depo.) at 32:13-19.  Defendant Deol stated that, in practice, individuals identified as needing ADA "requirements" during intake would be referred to the ADA Coordinator.  But NDCS' ADA Coordinator testified that she has never received such a referral.  Filing 249-50 (Schlanger Decl.) ¶¶ 63-67; Filing 249-80 (Deol Depo.) at 82:18-83:18; Filing 249-86 (Mathews 12/5/18 Depo.) at 41:24-42:2.

Furthermore, NDCS has no written policy to ensure deaf prisoners are provided with effective communication at intake.  Filing 249-80 (Deol Depo.) at 90:2-91:19.  NDCS' Staff Training Academy does not provide NDCS staff with any training regarding how to communicate with prisoners who are deaf or hard of hearing and provides no training to NDCS staff on the use auxiliary aids.  Filing 249-96, Transcript of 30(b)(6) Deposition of Kenneth Sturdy at 103:20-104:8.  Defendant Deol did not know whether sign language interpreters are provided for deaf prisoners at intake and testified that they use TDD machines to communicate. Filing 249-80 (Deol Depo.) at 90:2-17.  But TDD machines are intended to be used with a telephone to place calls using a relay service or by connecting to another TDD machine using a phone line, and are not intended to provide effective communication in an in-person setting. Filing 249-50 (Schlanger Decl.) ¶¶ 96-97.

Defendants also have no written policies governing the provision of assistive devices at intake besides a cursory reference in AR 4.01 to the fact they will be "prescribed and approved by health services subject to medical necessity, safety and security."  *Id.* ¶ 11; Filing 249-87 (AR 4.01); Filing 249-86 (Mathews 12/5/18 Depo.) at 45:11-46:1.  However, Defendants have no written policies defining what "medical necessity" means in the context of disability-related accommodations and similarly have no written policies or guidelines for intake staff to apply to ensure decisions are made in a consistent justifiable manner.  Filing 249-50 (Schlanger Decl.)

¶ 11; Filing 249-80 (Deol Depo.) at 19:19-20:6.  Instead, NDCS relies on intake medical staff to visually spot disabilities on an ad hoc basis and hopes that they provide devices immediately, without any written policy or process to ensure that actually occurs.  Filing 249-80 (Deol Depo.) at 86:15-87:20.

To the extent prisoners with disabilities are identified at intake, Defendants have no tracking system to ensure housing unit staff know what accommodations are needed and provide them.  Filing 249-50 (Schlanger Decl.) ¶¶ 11-12, 70-75; Filing 249-86 (Mathews 12/5/18 Depo.) at 51:7-24.  NDCS maintains no central list, electronic or otherwise, of prisoners with disabilities and the accommodations they require.  Filing 249-50 (Schlanger Decl.) ¶ 71; Filing 249-86 (Mathews 12/5/18 Depo.) at 51:7-13.  Information regarding an individual's disability-related needs is kept within his or her ADA file, which is not accessible to correctional or medical staff.  Filing 249-50 (Schlanger Decl.) ¶¶ 71,74-75; Filing 249-85, Transcript of August 23, 2018 Deposition of Lisa Mathews (Mathews 8/23/18 Depo.) at 86:3-87:8.  Without a clear tracking system, there is no way to ensure NDCS staff are aware of the disability-related needs of prisoners on their units.  Filing 249-50 (Schlanger Decl.) ¶¶ 73-74.

Defendants also lack an effective ADA request process and an effective grievance process for prisoners with disabilities.  *Id.* ¶¶ 99-103.  Pursuant to AR 4.01, all requests for disability-related accommodations must be made in writing.  Filing 249-87 (AR 4.01) at § II(B).  Prisoners who are blind or have cognitive or other disabilities that affect their ability to complete written forms must rely on other prisoners to help them because they cannot make requests orally.  Filing 249-86 (Mathews 12/5/18 Depo.) at 58:21-59:21.  Having to rely on other prisoners for assistance puts persons with disabilities at risk of exploitation, requires them to disclose sensitive information to other prisoners or staff, and can cause unnecessary delay as prisoners with disabilities have to find someone who is willing and available to help them.

Filing 249-50 (Schlanger Decl.) ¶¶ 87-88.

NDCS lacks effective policies to ensure effective communication with prisoners who have disabilities that affect communication—including hearing, vision, speech, learning, developmental, cognitive, or psychiatric disabilities. *Id.* ¶¶ 10, 12.  While NDCS sometimes provides sign language interpreters, there is no written policy governing how to request a sign language interpreter, and sign language interpreters are not provided for critical encounters. NDCS' AR 200.03 covers both language interpretation for Spanish speakers and American Sign Language (ASL) interpretation services.  Although Section II of AR 200.03 sets out a process for requesting language interpretation for Spanish speakers it fails to similarly establish a process for deaf prisoners to request ASL services, particularly those who rely exclusively on ASL to communicate.  Filing 249-88 (AR 200.03); Filing 249-86 (Mathews 12/5/18 Depo.) at 78:2-80:8.[18]  Additionally, NDCS limits the availability of ASL interpreters to only certain communication-related events, which do not include religious communications or education or vocational programs, and requires prisoners to go through an unexplained process to obtain Warden approval for use of an ASL interpreter outside of the specifically enumerated categories. Filing 249-88 (AR 200.03) at § III(C).

Defendants have also refused to provide prisoners who use sign language with a videophone to allow them to communicate with deaf family and friends, even when NDCS was informed that such a service could potentially be provided at no cost and even though NDCS provides electronic tablets capable of video calling to hearing prisoners.  Filing 249-86 (Mathews 12/5/18 Depo.) at 89:13-91:6.  Instead, NDCS relies on outdated TTY technology which requires

---

[18] ASL is not simply a visual representation of English.  Rather, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1105 (9th Cir. 2010) (citations omitted)); Filing 249-50 (Schlanger Decl.) ¶ 93 n. 36.

that the prisoner be able to read and type in English and which cannot be used to communicate directly with deaf family members or friends unless they also have a TTY/TDD machine.  Filing 249-50 (Schlanger Decl.) ¶ 97; Filing 249-86 (Mathews 12/5/18 Depo.) at 26:22-27:11 (stating TTY is "a very old technology" and describing how it works).

There are also significant physical barriers at various NDCS facilities.  For instance, the entirety of the LCC, which houses NDCS' only secure mental health unit for men, is completely inaccessible to prisoners who cannot navigate stairs due to physical disabilities.  Filing 249-97, Transcript of 30(b)(6) Deposition of Jerry Pohlmann (Pohlmann Depo.) at 135:12-137:15.  The only substance abuse unit at NSP is similarly inaccessible to persons with mobility disabilities.  Filing 249-98 (2019-2021 Budget Requests) at NDCS 177564 (listing physical barriers in Housing Unit 6 at NSP and noting "this housing unit is the only place that inmates are offered substance abuse treatment"); Filing 249-97 (Pohlmann Depo.) at 205:20-207:15.  NDCS has admitted that many of its facilities have physical barriers and are not accessible to persons with mobility disabilities as required by the ADA, including but not limited to barriers that affect access to showers, housing, and educational, vocational, and rehabilitative programming.  Filing 249-98 (2019-2021 Budget Requests) at NDCS 177594-577 (Housing Units K, J1, J2, gymnasium in Building H, and program areas in Buildings B, C, F, D, E at CCC-O not accessible); NDCS 177576-177549 (Visitation, gymnasium, Housing Units 1, 2, 3, 4, and 6 library, chapel, soap factory, counseling, and mental health clinic at NSP not accessible); NDCS 177550 (education, gymnasium, and visiting areas at LCC not accessible); NDCS 177544 (visiting, housing, and gymnasium areas at DEC not accessible); NDCS 177540 (shower and restroom areas in the work release unit at CCC-O not accessible); Filing 249-102, Transcript of 30(b)(6) Deposition of Michelle Capps at 90:11-91:7 (NSP's Housing Unit 5, which contains the Veterans Unit and the Prison Fellowship Unit, and NSP's Close Management Unit are not

accessible to prisoners who cannot climb stairs).  Furthermore, NDCS has not conducted an assessment of physical accessibility since at least 1996, and has not made any such assessment available to the officials in charge of ADA compliance and structural accessibility.  Filing 249-97 (Pohlmann Depo.) at 42:6-43:25; Filing 249-86 (Mathews 12/5/18 Depo.) at 98:20-99:15.

## II.    Defendant BOP Operates a Centralized System For Administering Parole Reviews and Hearings and Has Abdicated Its Responsibilities to Provide Disability-Related Accommodations

The Nebraska Board of Parole (BOP) is governed by the Nebraska Board of Parole Rules (BOP Rules), which are adopted and promulgated in accordance with the Nebraska Revised Statutes, and lay out the multi-step parole and parole revocation processes.  Filing 249-94 (BOP Rules); Filing 249-93 (Cotton Depo.) at 33:7-34:20.  The BOP has denied, and continues to deny, each Disability Subclass Named Plaintiff and all members of the proposed Disability Subclass the benefits of its services, programs, and activities because of their disabilities, by denying them the same opportunity to prepare for and participate in its parole and parole revocation processes as is given to prisoners without disabilities, and by failing to ensure that prisoners with disabilities are provided the reasonable modifications and accommodations that they require to have meaningful access to BOP's parole and parole revocation processes.  Filing 249-50 (Schlanger Decl.) ¶¶ 13, 119-122.

The BOP Rules contain no policies or procedures for providing reasonable modifications or auxiliary aids or services to prisoners with disabilities, and no policies or procedures for prisoners with disabilities to request reasonable modifications and/or auxiliary aids or services that they require to meaningfully access the BOP's parole and parole revocation processes— including for Prisoner Reviews, Key Reviews, Prisoner Interviews and Parole Hearings, and for Preliminary Probable Cause Hearings and Review of Parole Hearings.  Filing 249-50 (Schlanger Decl.) ¶ 120; Filing 249-93 (Cotton Depo.) at 84:23-86:3.  The BOP also does not have a system

26

to enable it to track the disabilities and disability accommodation needs of the prisoners and paroles who participate in its processes.  Filing 249-93 (Cotton Depo.) at 95:16-18 ("Q: Does the Board of Parole track in any way the needs of prisoner or paroles with disabilities?  A: We do not").  The BOP mails hardcopy materials to prisoners in preparation for their parole hearings, but fails to make any such materials available in accessible formats—such as large print, braille, or audio—to prisoners who are blind.  Filing 249-93 (Cotton Depo.) at 102:9-103:9.  The BOP has no formal mechanism for prisoners to request accommodations from the BOP and instead assumes that such accommodations are provided by NDCS, despite having no formal or even informal agreement with NDCS to provide such accommodations.  Filing 249-50 (Schlanger Decl.) ¶ 120; Filing 249-93 (Cotton Depo.) at 86:5-89:21, 104:15-19.

Additionally, the factors used by the BOP to determine whether to grant or deny parole also facially discriminate on the basis of disability by allowing consideration of the prisoner's personality, intelligence, conduct, behavior and "mental or physical makeup including any disability or handicap which may affect his or her conformity to the law," as factors weighing against parole.  Filing 249-50 (Schlanger Decl.) ¶ 121.  The BOP also fails to consider whether disciplinary issues are disability-related in its decisionmaking because it does not receive such information.  *Id.*

## ARGUMENT

### I. <u>The Governing Legal Standards for Plaintiffs' Claims</u>

Plaintiffs' claims are based on violations of the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act (ADA), and the Rehabilitation Act of 1973 (RA).  Filing No. 1 ¶¶ 241-276.

The Eighth Amendment is violated when prison officials, acting with "deliberate indifference," expose prisoners to "a substantial risk of serious harm." *Farmer v. Brennan*, 511

U.S. 825, 828 (1994).  In a case seeking only injunctive relief, it is the risk itself that violates the

Eighth Amendment; the prisoner need not await bodily injury before seeking relief.  *See Helling*

*v. McKinney*, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm

to inmates is not a novel proposition.").  A prison official acts with deliberate indifference when

she "knows of and disregards an excessive risk to inmate health or safety…."  *Farmer*, 511 U.S.

at 837.  In class actions challenging a prison's healthcare systems, "systemic deficiencies can

provide the basis for a finding of deliberate indifference."  *Postawko v. Missouri Dep't of Corr.*,

No. 2:16-CV-04219-NKL, 2017 WL 3185155, at *7 (W.D. Mo. July 26, 2017), *aff'd*, 910 F.3d

1030 (8th Cir. 2018) (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)).

Deliberate indifference to prisoners' health needs may be shown "by proving that there are such

systemic and gross deficiencies in ... procedures that the inmate population is effectively denied

access to adequate medical care."  *Id.* (internal citations and quotations omitted)*; see also Brown*

*v. Plata,* 563 U.S. 493, 505 at n.3 (2011) ("Plaintiffs rely on systemwide deficiencies in the

provision of medical and mental health care that, taken as a whole, subject sick and mentally ill

prisoners in California to 'substantial risk of serious harm'….").

     The ADA and RA prohibit persons with disabilities from being "excluded from

participation in or be[ing] denied the benefits of the services, programs, or activities of a public

entity, or be[ing] subjected to discrimination [due to their disabilities] by any such entity."  42

U.S.C. § 12132; *see also Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) ("The ADA

and the RA are similar in substance and, with the exception of the RA's federal funding

requirement, cases interpreting either are applicable and interchangeable.") (internal quotation

marks and citations omitted).  The "ADA and RA require that otherwise qualified individuals

receive 'meaningful access' to programs and activities."  *Randolph*, 170 F.3d at 858 (finding no

"credible evidence to support a finding that [deaf plaintiff] enjoyed meaningful access to the

prison's internal disciplinary process, even if he was capable of limited participation" due to the lack of sign language interpreter.)  ADA and RA claims based on a failure to make reasonable accommodations are "framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Cotton v. Douglas Cty. Dep't of Corr.*, No. 8:16-cv-153, 2016 WL 5816993, at *5 (D. Neb. Oct. 5, 2016) (quoting *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004)).

## II.    Legal Standard for Class Certification

"A decision to certify a class is far from a conclusive judgment on the merits of the case." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 (8th Cir. 2018) (citing *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (internal quotations omitted)). "For that reason, 'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'" *Postawko*, 910 F.3d at 1037 (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013)).  The court's "primary task is not to determine the final disposition of a plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution."  *Id.*; *see also Amgen Inc.*, 568 U.S. at 466 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

For the Court to certify a class, plaintiffs must satisfy the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and show that the class fits within at least one of three categories of class actions listed under Rule 23(b).  Fed. R. Civ. P. 23; *see also Postawko,* 910 F.3d at 1036.  The NDCS Class and the Isolation and Disability Subclasses satisfy the requirements of Rule 23(a) and meet the requirements of Rule 23(b)(1) and (b)(2) and, as such, should be certified.

## III.    Plaintiffs, the Proposed Class, and Proposed Subclasses Satisfy the Requirements of Rule 23(a)

### A.    The Proposed NDCS Class and Subclasses Are Sufficiently Numerous

The proposed NDCS Class, Isolation Subclass and Disability Subclass satisfy Rule 23(a)(1)'s numerosity requirement, as they are each "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A class or subclass with "40 or more members raises a presumption of impracticability based on numbers alone."  William Rubenstein, *Newberg on Class Actions* § 3:12 (5th ed. June 2018 Update).  Courts have routinely found that numerosity is satisfied where, as here, the proposed class comprises current and future prisoners who seek only declaratory and injunctive relief.  *See Postawko,* 910 F.3d at 1037-1038 (affirming certification of a class of "at least 2,000" prisoners with Hepatitis C); *Dockery v. Fischer,* 253 F. Supp. 3d 832, 853 (S.D. Miss. 2015), *petition for appeal pursuant to Rule 23(f) denied,* No. 15-90110, slip op. (5th Cir. Nov. 2, 2015) (finding "joinder would not be practical in this case because the population at [the prison] is subject to change as prisoners are transferred into and out of that facility."); *see also Caroline C. ex rel. Carter v. Johnson,* 174 F.R.D. 452, 463 (D. Neb. 1996) ("Since there is no way now of determining how many of these future plaintiffs there may be, their joinder is impracticable.") (internal citations and quotation marks omitted).

The proposed NDCS Class is sufficiently numerous that joinder of all members would be impractical and infeasible.  The NDCS Class consists of "all persons who are now, or will in the future be, subjected to the health care (including medical, mental health, and dental care) policies and practices of NDCS."  Filing 1 ¶ 214.  From October to December 2018 (the most recent time period for which statistics are available), NDCS held an average daily population of 5,358 men and women in facilities designed to hold no more than 3,375 individuals.  Filing 249-75 (NDCS Quarterly Data Sheet October-December 2018).  Each of the over 5,000 prisoners in NDCS custody are subject to the same systemwide policies and practices challenged in this lawsuit.

Filing 249-77 (AR 001.01).  As a result, the NDCS Class includes all 5,358 current prisoners,

and an untold number of future prisoners, and clearly satisfies the numerosity requirement.

The Isolation Subclass is also sufficiently numerous that joinder would be impractical

and infeasible.  The definition of the Isolation Subclass mirrors NDCS' statutory definition of

"restrictive housing" and consists of all NDCS prisoners who are now, or will in the future be,

subject to conditions of confinement that provide limited contact with other prisoners, strictly

controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per

week.  Neb. Rev. St. 83-170(13); Filing 249-42 (Haney Decl.) ¶ 18.  Over the course of NDCS'

fiscal year 2018, 1,856 prisoners were held in restrictive housing for at least one day, and all

prisoners in the custody of NDCS are potentially subject to isolation.  Filing 249-92 (2018

NDCS Restrictive Housing Report) at 10.  These numbers are more than enough to establish

numerosity.  *See Dockery,* 253 F. Supp. 3d at 853 (finding isolation subclass of 150 prisoners

sufficiently numerous).

The proposed Disability Subclass is also sufficiently numerous.  The Disability Subclass

consists of "all persons with disabilities who are now or will be in the future confined at any

NDCS facility."  Dkt. No. 1 ¶ 232.  Because Defendants do not maintain a record of prisoners

with disabilities in NDCS facilities, it is impossible to know with certainty the total size of the

Disability Subclass.  However, according to data from the 2013-2017 American Community

Survey 5-Year Estimate conducted by the United States Census, of the total civilian

noninstitutionalized population, an estimated 198,830 Nebraskans over the age of 16 have a

disability (nearly 14% of the state's population at the time of the survey).  Filing 249-50

(Schlanger Decl.) ¶ 29.  Assuming an approximately equivalent incidence of disabilities in

Nebraska's prison population of 5,358, there are approximately 750 individuals with disabilities

in NDCS facilities at any given time.  These numbers are more than enough to satisfy

numerosity; moreover, this is likely an underestimate of the subclass size, because persons with disabilities are overrepresented in correctional facilities.  Filing 249-50 (Schlanger Decl.) ¶¶ 29-30.

> **B.    The Commonality Requirement of Rule 23(a)(2) is Satisfied Because the Claims of the Class and Subclasses Present Common Issues of Fact and Law That Are Capable of Common Resolution**

To meet the commonality requirement, there must be "questions of law or fact common to the class," *Fed. R. Civ. P. 23(a)(2)*, and class members must "have suffered the same injury," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal citation and quotation marks omitted) (hereinafter "*Dukes*").  "To satisfy Rule 23(a)(2), plaintiffs must show their claims involve a common question or contention 'of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Postawko,* 910 F.3d at 1038 (quoting *Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 998 (8th Cir. 2016)).  What matters is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (citations and emphasis omitted).  Differences among class members with respect to the specific incidents of inadequate health care, adverse effects of isolation, or disability discrimination they have suffered do not undermine commonality.  *See Postawko*, 910 F.3d at 1039 (quoting *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("although a presently existing risk may ultimately result in different future harm for different inmates … every inmate suffers exactly the same constitutional injury when he is exposed to a *single … policy or practice that creates a substantial risk of serious harm*") (emphasis added)); *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (rejecting defendant's argument that class was improperly certified in prison case alleging several forms of systemic disability discrimination).  Nor is it necessary that all questions be common.  *Postawko*

*v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 3185155, at *6 (W.D. Mo. July 26, 2017), *aff'd*, 910 F.3d 1030 (8th Cir. 2018) ("In *Ebert v. General Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016), the Eighth Circuit reaffirmed that 'a single common question 'will do' for purposes of Rule 23(a)(2).'"); *Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do") (internal quotation marks and alterations omitted).

"The commonality requirement is satisfied as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation." *Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 614 (D. Minn. 2000). In civil rights cases, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members," *Armstrong*, 275 F.3d at 868, even if the challenged policy or practice will affect individual class members in different ways. *See, e.g.*, *Postawko*, 910 F.3d at 1038-1039 (finding commonality satisfied where "all class members share the common question of whether Defendants' policy or custom … constitutes deliberate indifference to a serious medical need" and while the "physical symptoms eventually suffered by each class member may vary … the question asked by each class member is susceptible to common resolution.") (internal quotation marks and alterations omitted); *Yates v. Collier*, 868 F.3d 354, 365 (5th Cir. 2017) (finding commonality where prison's heat mitigation measure either "mitigated the risk of high temperature for all class members *or for none of them.*") (emphasis in original); *Braggs v. Dunn*, 317 F.R.D. 634, 656 (M.D. Ala. 2016) (finding "case law supports a finding of commonality here, because being subjected to a substantial risk of serious harm is an actionable constitutional injury, even when a prisoner's physical or mental condition has not yet been detrimentally impacted."); *Unknown Parties v. Johnson,* 163 F. Supp. 3d 630, 637 (D. Ariz. 2016) ("[T]he question of whether Defendants have violated the applicable

legal standard with respect to the treatment of immigration detainees held overnight in Tucson Sector Border Patrol facilities unquestionably lends itself to classwide resolution."); *Parsons v. Ryan*, 289 F.R.D. 513, 521 (D. Ariz. 2013) *aff'd*, 754 F.3d 657 (9th Cir. 2014) ("It matters not that each inmate may suffer from different ailments or require individualized treatment because commonality may be met where the claims of every class member are based on a common legal theory, even though the factual circumstances differ for each member.") (internal quotations omitted).

Common questions capable of common answers suffuse this entire lawsuit. The major questions related to liability for the NDCS Class' Eighth Amendment claims are common to all class members. NDCS' system of medical, mental health, and dental care is centrally controlled and operated by NDCS. Neb Rev. Stat §§ 83-171, 83-173, 83-181; Filing 249-82 (AR 115.01). As detailed in Section I, Plaintiffs have identified multiple deficiencies in NDCS' systemic policies and practices which place the named Plaintiffs and the proposed NDCS Class at substantial risk of serious harm. *Postawko*, 910 F.3d at 1038 (whether a policy or custom "constitutes deliberate indifference to a serious medical need" is a question to which the answer "will resolve an issue central to the validity of each of the class members' claims.") (internal quotations omitted); *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified statewide [prison] policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent.").

The following questions related to liability for the NDCS Class' Eighth Amendment claims are common to all class members:

- Are the NDCS Defendants deliberately indifferent to the NDCS Class Members' health and safety?

- Do the NDCS Defendants, through their medical policies and practices, or lack thereof (including but not limited to intake and screening, requests for health care, diagnostic testing, medical facilities, chronic care, medication administration, record keeping, outside referrals, emergency response, post-operative treatment, quality management, staffing, and training) expose prisoners to a substantial risk of serious harm?

- Do the NDCS Defendants, through their dental policies and practices, or lack thereof (including intake and screening, record keeping, outside referrals, requests for dental care, quality management, staffing, and training) expose prisoners to a substantial risk of serious harm?

- Does the NDCS Defendants' policy of refusing to provide non-emergent dental care until a prisoner has been in NDCS for at least one year expose prisoners to a substantial risk of serious harm?

- Does the NDCS Defendants' policy of refusing to provide dentures until the prisoner has been in NDCS for at least two years expose prisoners to a substantial risk of serious harm?

- Does the NDCS Defendants' policy of refusing to provide periodontal care expose prisoners to a substantial risk of serious harm?

- Does the NDCS Defendants' lack of any systematic mechanism to track and log prisoner requests for dental care, medical care, and mental health care expose prisoners to a substantial risk of serious harm?

- Do the NDCS Defendants, through their mental health care policies and practices, or lack thereof (including but not limited to intake and screening, staffing, suicide prevention, use of isolation, mental health care facilities, requests for mental health care treatment, medication administration and monitoring, provision of inpatient care, continuity of care, quality management, and training), expose prisoners to a substantial risk of serious harm?

The NDCS Defendants' use of isolation is similarly governed by a central set of policies and practices which place the named Plaintiffs and the proposed Isolation Subclass at substantial risk of serious harm.  Filing 249-90 (AR 210.01); Filing 249-42 (Haney Decl.) ¶¶ 8-78; Filing 249-47 (Vail Decl.) ¶¶ 61-88.  The following questions related to liability for the Isolation Subclass' Eighth Amendment claims are common to all class members:

- Do the NDCS Defendants, through their isolation policies and practices, or lack thereof (including lack of monitoring of prisoners in isolation) expose prisoners in isolation to a substantial risk of serious harm?

- Do the conditions in isolation units (including extreme social isolation and sensory deprivation and extremely limited out-of-cell time) expose prisoners in isolation to a substantial risk of serious harm?

- Does the NDCS Defendants' failure to impose any limit on the length of time a prisoner may be held in isolation expose prisoners in isolation to a substantial risk of serious harm?

The members of the Disability Subclass also share common questions capable of common answers.  Pursuant to Title II of the ADA, a "qualified individual with a disability" cannot, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.152(b)(1) (specifically applying this mandate to correctional facilities).  Because of the unique nature of correctional facilities, in which prison staff control nearly all aspects of prisoners' daily lives, most everything provided to prisoners is a public service, program, or activity, including: eating, showering, toileting, communicating with those outside of NDCS by mail and telephone, exercising, safety and security, NDCS' administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, the library, educational, vocational, substance abuse, and anger management classes, and discharge services.  *See* 28 C.F.R., Pt. 35, App. A (U.S. Department of Justice Guidance, explaining that "correctional facilities are unique facilities under title II" because prisoners "cannot leave the facilities and must have their needs met by the corrections system," which "include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities"); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners.…").

In order to comply with the ADA, public entities must, among other things, "make reasonable modifications in policies, practices, or procedures when the modifications are

necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).  Prisons

must also ensure that prisoners with disabilities are housed in "the most integrated setting

appropriate to the needs of the individuals" and in cells "with the accessible elements necessary

to afford the inmate access to safe, appropriate housing." 28 C.F.R. § 35.152(b)(2)-(3).

Correctional facilities must also implement "some form of [disability] tracking system … in

order to enable [them] to comply with the [ADA]." *Armstrong*, 275 F.3d at 876.  Based on the

clear language of the ADA and its implementing regulations, questions common to the Disability

Subclass include, but are not limited to, the following:

- Do the NDCS Defendants, through their disability-related policies and practices, or lack thereof (including but not limited to: tracking and identification; housing; provision of assistive devices and auxiliary aids; access to programming including exercise, religious services, educational, vocational, and rehabilitative programs; effective communication; and disability related request and grievance process) deny qualified prisoners with disabilities access to NDCS programs, services and activities or otherwise discriminate against qualified prisoners with disabilities?

- Do the BOP Defendants, through their disability-related policies and practices, or lack thereof (including but not limited to: tracking and identification; provision of reasonable modifications; provision of accessible alternative formats; use of disability-related criteria as basis for denying parole; physical accessibility of facilities used for parole-process related events; effective communication; and disability related request process) deny qualified prisoners with disabilities access to BOP programs, services and activities or otherwise discriminate against qualified prisoners with disabilities?

All of the questions listed above depend on common contentions and are not affected by

the circumstances of any individual class member.  Thus, such questions are capable of

generating common answers and hence are appropriate for class-wide resolution. *Dukes*, 564

U.S. at 350.

> **C.** **The Typicality Requirement of Rule 23(a)(3) is Satisfied Because the Named Plaintiffs Have Claims Sufficiently Typical of the Class and Subclasses They Seek to Represent**

To meet the typicality requirement, the claims of the named plaintiffs must be "typical of

the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The Rule "requires a

demonstration that there are other members of the class who have the same or similar grievances

as the plaintiff." *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562 (8th Cir. 1982) (quoting

*Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)).  "Typicality 'is fairly easily met

so long as other class members have claims similar to the named plaintiff.'" *Postawko*, 910 F.3d

at 1039 (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)).  "Factual

variations in the individual claims will not normally preclude class certification if the claim

arises from the same event or course of conduct as the class claims, and gives rise to the same

legal or remedial theory."  *Id.* (quoting *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th

Cir. 1996)).   Further, in a "suit for prospective injunctive and declaratory relief, the potential for

minor factual variations does not undermine the … conclusion that the violation allegedly

suffered by the Named Plaintiffs is typical of that suffered by the class as a whole." *Postawko*,

910 F.3d at 1039 (internal quotations omitted).  Here, the named Plaintiffs' claims and the class

claims arise from the same course of conduct: Defendants' centralized policies and practices

regarding health care, mental health care, dental care, use of isolation, and disability access,

including in the context of the parole process.

The claims of the Named Plaintiffs meet the typicality requirement, as they have all

suffered the same injuries as the absent class members that they seek to represent, and those

injuries have been, and continue to be, caused by the same policies and practices of Defendants

that harm the class and subclasses as a whole.  The 11 Plaintiffs are 8 men and 3 women.  They

have been housed in most, if not all, NDCS facilities.  *See* Filing 249-1, Declaration of Dylan

Cardeilhac ("Cardeilhac Decl.") ¶ 2; Filing 249-2, Declaration of Isaac Reeves ("Reeves Decl.")

¶ 2; Filing 249-3, Declaration of Richard Griswold ("Griswold Decl.") ¶ 2; Filing 249-4,

Declaration of Michael Gunther ("Gunther Decl.") ¶ 2; Filing 249-12, Declaration of Zoe Rena

("Rena Decl.") ¶ 2; Filing 249-15, Declaration of Hannah Sabata ("Sabata Decl.") ¶ 2; Filing

249-21, Declaration of James Curtright ("Curtright Decl.") ¶ 3; Filing 249-26, Declaration of

Jason Galle ("Galle Decl.") ¶ 3; Filing 249-34, Declaration of Brandon Sweetser ("Galle Decl.")

¶ 3; Filing No 160-24, Declaration of Angelic Norris in Support of Plaintiffs' Opposition to

Defendants Motion for Summary Judgment (Norris MSJ Decl.) ¶ 2.  Collectively, they have been

injured by every systemic deficiency discussed herein, including in the contexts of medical care,

mental health care, dental care, use of isolation, and in the provision of reasonable modifications

for prisoners with disabilities.  *See* Filing 249-1 (Cardeilhac Decl.) ¶¶ 2-20; Filing 249-2 (Reeves

Decl.") ¶¶ 2-19; Filing 249-3 (Griswold Decl.) ¶¶ 2-24; Filing 249-4 (Gunther Decl.) ¶¶ 2-20;

Filing 249-12 (Rena Decl.) ¶¶ 2-14; Filing 249-15 (Sabata Decl.) ¶¶ 2-14; Filing 249-21

(Curtright Decl.) ¶¶ 2-30; Filing 249-26 (Galle Decl.) ¶¶ 2-25; Filing 249-34 (Sweetser Decl.)

¶¶ 2-26; Filing 160-24 (Norris MSJ Decl.) ¶¶ 12-13, 15-17; Filing 160-25 (Norris Affidavit) ¶¶

2-8.  As discussed in Section I and II, Defendants NDCS and BOP's policies and procedures, or

lack thereof, apply equally to all prisoners across all NDCS facilities.  All of the named Plaintiffs

and the putative class and subclass members share a common injury of having these centralized

policies and practices applied to them and, as a result, all are exposed to the same substantial risk

of serious harm.  Named Plaintiffs' claims are therefore typical because they are each exposed to

the same risks of harm as the class they seek to represent.  *Id.*

### D. The Proposed Class Representatives and Class Counsel Will Fairly and Adequately Represent the Interests of the Class and Subclasses

The final requirement of Rule 23(a) is that the representative parties will fairly and

adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement

is met where: "(1) the representatives and their attorneys are able and willing to prosecute the

action competently and vigorously; and (2) each representative's interests are sufficiently similar

to those of the class that it is unlikely that their goals and viewpoints will diverge." *Beckmann v.*

*CBS, Inc.*, 192 F.R.D. 608, 614 (D. Minn. 2000). This requirement "serves to uncover conflicts

39

of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

### 1.      Proposed Class Representatives

The named Plaintiffs, the Class, and the Subclass raise the same claims giving rise to common questions of fact and law.  As this case seeks only injunctive and declaratory relief, no named Plaintiffs have interests that are antagonistic to the interests of the Class or the Subclasses.  *See Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 160 (N.D. Cal. 2015) ("Class representatives have less of risk of conflict with unnamed class members when they seek only declaratory and injunctive relief."); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("Conflicts of interest are rare in Rule 23(b)(2) class actions seeking only declaratory and injunctive relief.").

All of the named Plaintiffs share a common interest with members of the proposed NDCS Class of ensuring that prisoners in the custody of NDCS receive adequate health care, including adequate medical, dental, and mental health care.  Further, the named Plaintiffs share a common interest with members of the proposed Isolation Subclass of limiting the use of isolation and amelioration of its well-documented harmful effects.  Finally, all named Plaintiffs with disabilities share a common interest of ensuring NDCS and BOP provide legally required reasonable modifications to allow prisoners with disabilities to enjoy meaningful access to NDCS and BOP programs, services, or activities.  There are no conflicts between the named Plaintiffs and the proposed NDCS Class, Isolation Subclass, or Disability Subclass, and the named Plaintiffs will fairly and adequately protect the interests of the Class and the Subclasses.

### 2.      Plaintiffs' Counsel Meet the Requirements of Rule 23(g) and Should Be Appointed Class Counsel

Rule 23(g) requires that the district court appoint class counsel for any class that is certified.  *See* Rule 23(g)(1).  The attorneys appointed to serve as class counsel must "fairly and

adequately represent the interests of the class." Rule 23(g)(1)(B). The appointed class counsel must be listed in the Court's class certification order. Rule 23(c)(1)(B). The Rule identifies four factors that the Court must consider in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." Rule 23(g)(1)(A).

Adequacy of class counsel is met here because the undersigned attorneys' experience ensures that they will fairly and adequately protect the interests of the class. Plaintiffs' counsel includes four non-profit organizations—the ACLU National Prison Project, the ACLU of Nebraska, Nebraska Appleseed, and the National Association of the Deaf—as well as two private law firms, DLA Piper LLP (US) and Rosen Bien Galvan & Grunfeld, LLP. Plaintiffs' counsel has significant experience with class action lawsuits generally, and with large class action lawsuits regarding conditions in correctional facilities, including in the contexts of healthcare, isolation, and the rights of prisoners with disabilities. Filing 249-62, Declaration of David Fathi ("Fathi Decl.") ¶¶ 2-4; Filing 249-64, Declaration of Amy Miller ("Miller Decl.") ¶¶ 2-5; Filing 249-66, Declaration of Christopher Young ("Young Decl.") ¶¶ 2-5; Filing 249-68, Declaration of Anna Bitencourt ("Bitencourt Decl.") ¶¶ 2-7; Filing 249-70, Declaration of Robert McEwen ("McEwen Decl.") ¶¶ 2-6; Filing 249-72, Declaration of Ernest Galvan ("Galvan Decl.") ¶¶ 2-4. Plaintiffs' counsel have already committed, and will continue to commit, considerable resources to identifying issues, investigating potential claims, and prosecuting this action. Filing 249-62 (Fathi Decl.) ¶ 5; Filing 249-64 (Miller Decl.) ¶ 5; Filing 249-66 (Young Decl.) ¶ 5; Filing 249-68 (Bitencourt Decl.) ¶ 7; Filing 249-70 (McEwen Decl.) ¶ 6; Filing 249-72 (Galvan Decl.) ¶ 4. Further, no conflicts or collusion exist between counsel,

Plaintiffs, and the proposed class members that would compromise their ability to represent the class. Filing 249-62 (Fathi Decl.) ¶¶ 2-5; Filing 249-64 (Miller Decl.) ¶¶ 2-5; Filing 249-66 (Young  Decl.) ¶¶ 2-5; Filing 249-68 (Bitencourt Decl.) ¶¶ 2-7; Filing 249-70 (McEwen Decl.) ¶¶ 2-6; Filing 249-72 (Galvan Decl.) ¶¶ 2-4.

IV.   **Plaintiffs and the Proposed Class and Subclasses meet the Requirements of Rule 23(b)(1) and (b)(2)**

In addition to satisfying Rule 23(a), a class action must meet the requirements of one of the provisions of Rule 23(b).  While the Plaintiffs need only satisfy one of Rule 23(b)'s subsections, the Court here can certify the Class and Subclasses under either Rule 23(b)(1) or (b)(2).

A.    **Certification Is Appropriate Under Rule 23(b)(1)**

Plaintiffs seek certification under Rule 23(b)(1)(A) and 23(b)(1)(B). Under 23(b)(1)(A), class certification is appropriate if the prosecution of separate actions by individual members of the class would create the risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A).  A "core example" of such an action is a "situation in which many individuals, all challenging a single government policy, bring separate suits for injunctive relief."  Newberg on Class Actions § 4:11 (5th ed.).

Here, there are over 5,000 individual prisoners incarcerated in NDCS facilities at any given time who are affected by the challenged policies and each one could file suit for injuries arising from these systemwide policies.  Thus, certification is appropriate under 23(b)(1)(A) because if each member of the proposed class litigated their claims individually there would be a risk that each individual case would impose a different standard on Defendants.  S*ee, e.g., Ashker v. Governor of State of California*, 2014 WL 2465191, at *7 (N.D. Cal. June 2, 2014) (certifying prisoner class under Rule 23(b)(1)(A) to avoid risk of inconsistent judgments); *Franklin v.*

*Barry*, 909 F. Supp. 21, 31 (D.D.C. 1995) (same); *see also Berry v. Baca,* 226 F.R.D. 398, 405-06 (C.D. Cal. 2005) (noting that certification of prisoner class under Rule 23(b)(1)(A) is appropriate to avoid inconsistent adjudications in individual suits, but denying class certification without prejudice based on lack of numerosity). Accordingly, the requirements for certification under 23(b)(1)(A) are met.

Certification under 23(b)(1)(B) is appropriate when prosecuting "separate actions by or against individual class members would create a risk of … adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). This rule has been applied in actions by prisoners challenging the conditions of their confinement. *See Hilton v. Wright*, 235 F.R.D. 40, 53 (N.D.N.Y. 2006) (certification of prisoner class challenging prison's Hepatitis C treatment policy under 23(b)(1)(B)); *Ingles v. City of New York*, 2003 WL 402565, at *7-8 (S.D.N.Y. Feb. 20, 2003) (certification under 23(b)(1)(B) of class of prisoners challenging prison's use of force policy and seeking injunctive relief); *Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal.1995) (certification of prisoner class challenging prison's mental health care policies under 23(b)(1)(B)).

Here, the NDCS Class and Isolation and Disability Subclasses seek injunctive relief that, if granted, would affect the rights of similarly situated potential plaintiffs who are affected by the same systemwide policies. If Plaintiffs do not succeed on their claims, the ability of future plaintiffs to challenge the same practice will be inhibited under stare decisis. *See Riley v. Nevada Supreme Court*, 763 F. Supp. 446, 453 (D. Nev. 1991) (certifying class of prisoners sentenced to death challenging state court policies under 23(b)(1)(B) because "collateral estoppel would not bind a subsequent plaintiff to a finding of constitutionality. However, if the

43

subsequent plaintiff ended up in this particular court, our previous finding of constitutionality would bind the subsequent plaintiff as a practical matter because of *stare decisis*.").

Accordingly, the requirements for certification under 23(b)(1)(B) are met.

### B.      Certification Is Appropriate Under Rule 23(b)(2)

This case also fits squarely within Rule 23(b)(2), which authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2).  Although a Rule 23(b)(2) class is not required to satisfy the additional predominance and superiority requirements of Rule 23(b)(3), "the class claims must be cohesive." *Postawko*, 910 F.3d at 1039 (citing *Avritt v. Reliastar Life Ins. Co.,* 615 F.3d 1023, 1035 (8th Cir. 2010)) (internal quotation marks omitted).

Rule 23(b)(2) "is almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994); *see also Postawko,* 910 F.3d at 1039-1040 (finding district court did not abuse its discretion in "holding that sufficient evidence of a common policy existed to comply with Rule 23(b)(2)" in case involving "claims that the Defendants [Missouri Department of Corrections] uniformly applied a screening and treatment policy for HCV [Hepatitis C Virus] that was so inadequate that it amounted to a constitutional violation as to each and every incarcerated person who either suffered or will suffer from HCV"); *Bradley v. Harrelson*, 151 F.R.D. 422, 427 (M.D. Ala. 1993) (subsection (b)(2) "is particularly applicable to suits … involv[ing] conditions of confinement in a correctional institution.").  Indeed, cases where a group of prisoners seek to challenge the lawfulness of prison policies are so well suited for Rule 23(b)(2) class treatment that the leading class-action and federal-practice treatises both use it as the exemplar of a case fitting within that subsection:  "For example, if a prisoner in a prison conditions lawsuit secures a ruling that a

prison policy violates the Constitution, the court-ordered injunctive relief will necessarily apply to all other prisoners." 1 H. Newberg & A. Conte, *Newberg on Class Actions* § 4.34 (5th ed. 2016 update); *see also* Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776.1 (3d ed. 2017 update) (same).

Here, Defendants' policies apply generally to the NDCS Class, and to the proposed Isolation and Disability Subclasses, such that the requested injunctive and declaratory relief would provide relief to all class and subclass members. Plaintiffs have produced significant evidence demonstrating the broken nature of Nebraska's prison system and parole process. Pursuant to Defendants' policies and practices, or lack thereof: (1) the NDCS Class is subjected to a health care system that places them at substantial risk of serious harm, including unnecessary injury, illness, and death (*see* Section I(B)); (2) the Isolation Subclass is similarly put at substantial risk of serious harm due to Defendants' use of isolation (*see* Section (I)(C)); and (3) the Disability Subclass is denied meaningful access to vital programs, services, and activities of the NDCS and BOP on the basis of their disabilities (*see* Sections I(D), II). To remedy these constitutional and statutory violations, Plaintiffs seek only injunctive and declaratory relief, as outlined in Plaintiffs' prayer for relief. Filing No. 1 ¶¶ 278-284. Accordingly, the requirements of Rule 23(b)(2) are met.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the Proposed

Order Granting Plaintiffs' Motion for Class Certification and appointing the undersigned as class

counsel.

Submitted February 19, 2019.

**ACLU NATIONAL PRISON PROJECT**
**ACLU OF NEBRASKA**
**DLA PIPER LLP (US)**
**NATIONAL ASSOCIATION OF THE DEAF**
**NEBRASKA APPLESEED**
**ROSEN BIEN GALVAN & GRUNFELD LLP**

By: */s/ Kara Janssen*
Kara Janssen (Cal Bar No. 274762)
*Admitted Pro Hac Vice*
Attorney for Plaintiffs
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, 6th Floor
San Francisco, California  94105-2235
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104
Email:  kjanssen@rbgg.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2019, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, causing notice of such filing to be served upon all parties registered on the CM/ECF system.


By:   */s/ Kara Janssen*