1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEBRASKA

3
     HANNAH SABATA, et al.,          )Case No.:
4                                    )4:17-cv-03107-RFR-MDN
                                     )
5                   Plaintiffs,  )
                                     )DEPOSITION TAKEN IN
6            vs.                     )
                                     )BEHALF OF PLAINTIFFS
7    NEBRASKA DEPARTMENT OF          )
     CORRECTIONAL SERVICES, et al., )
8                                    )
                    Defendants.  )
9

10

11

12

13

14   DEPOSITION OF:  **DR. HARBANS DEOL**

15   DATE:  November 30, 2018

16   TIME:  8:58 a.m.

17   PLACE:  ACLU, 134 South 13th Street, Lincoln, Nebraska

18

19

20

21

22

23

24

25

1   regarding effective communication with patients who

2   are either non-English speaking or deaf?

3   A.   That's correct.

4   Q.   How are prisoners supposed to access routine

5   health care?

6   A.   They can -- they can ask for it by filling out

7   the kite, the IIR sheet that we have.

8   Q.   I'm sorry, what was the acronym?

9   A.   IIR.

10   Q.   IIR, do you know what that stands for?

11   A.   Inmate interview request.

12   Q.   Also known as a kite?

13   A.   Yes.

14   Q.   So say I'm a prisoner and I have a routine

15   non-emergency health care need and I want to request

16   care using this process, walk me through how that

17   would work.

18   A.   So they would be asking for the request, the

19   form request from staff members and the staff would

20   provide the form.  They can fill it out and put it in

21   the box which would be picked up by medical staff and

22   refer to those.

23   Q.   And is the process you've just described the

24   same process for medical, mental health and dental?

25   A.   Yes.

1    Q.   Now, you referred to the patient filling out the

2    form and putting it in the box, tell me about those

3    boxes.

4    A.   Every housing unit has a box for the request or

5    any kind of communication device that they would

6    have, and they would put it in those.

7    Q.   Is the box locked?

8    A.   Some are, I'm not sure they all are locked or

9    not.

10   Q.   How long have these boxes been in existence?

11   A.   Since I've been here, I'm not sure, with the

12   Department of Corrections in Nebraska, I'm sure they

13   have been there for a while.

14   Q.   Have they been here since you -- the entire time

15   you've been medical director?

16   A.   Some, some units they do, some have not.  And

17   sometimes they will hand it off to director, to the

18   medical staff and/or the officers.

19   Q.   Are there units where there's no box for kites?

20   A.   I have not seen any, but I believe there might

21   be some place where there are not boxes there.

22   Q.   So in that case, what would the patient do when

23   he's completed the kite?

24   A.   He will give it to the officer and/or any of the

25   medical staff.

1    Q.    Is there policy on what the patient is supposed

2    to do with the completed kite?

3    A.    I think there's a policy on that with the

4    general NDCS policies.

5    Q.    But not a health care specific policy?

6    A.    No.

7    Q.    If the patient gives the kite to an officer,

8    what happens next?

9    A.    Officer, if it's medically related, he will give

10   it to the nursing staff or the mental health staff.

11   Q.    Who specifically is the officer supposed to give

12   it to?

13   A.    Any medical staff.  I'm not designating any

14   specific person, 'cause eventually it will get you to

15   the nursing station and will sort out the process.

16   Q.    Is the officer permitted to read the kite?

17   A.    I do not believe so.

18   Q.    Is there a policy saying that the officer is not

19   to read the kite?

20   A.    No.

21   Q.    So how do officers know they're not supposed to

22   read the kite?

23   A.    I'm sure part of the training is from the STA to

24   talk discussion about when there's a medical request,

25   they're not supposed to read and give to medical

1   A.   Correct.

2   Q.   A separate skilled nursing facility record?

3   A.   Correct.

4   Q.   And also some behavioral health data recorded in

5   NICAMS, correct?

6   A.   Correct.

7   Q.   And is the optometry record separate or is it

8   part of the medical and mental health chart?

9   A.   It's part the medical chart.

10   Q.   Why is medical information kept in so many

11   different places?

12   A.   That's what we trying to improve.  I like to

13   have the ones -- everything in one place.

14   Q.   Okay.  But is there a reason why it's kept in so

15   many different places?

16   A.   I don't know.  That was one of the things that I

17   came on board, talked about it, consolidating all the

18   records.

19   Q.   In your view, would it be better if the records

20   were more consolidated?

21   A.   Absolutely.

22   Q.   Would it be better for patient care?

23   A.   Yes.

24   Q.   Would it be better for patient safety?

25   A.   Yes.

1    Q.    Have you taken steps to bring about a

2    consolidated medical record?

3    A.    Yes, we have.

4    Q.    What are those steps?

5    A.    Well, we have, right now we trying to

6    consolidate the medical and mental health records

7    into one and the behavioral health site has certain

8    sensitive documentation that counseling relies on,

9    for example, they might be sensitive, they're still

10   kept in the NICAM with restricted access to certain

11   staff members.

12         The dental we try to consolidate into medical

13   portion as well, we taking steps on that one.  We

14   have not been successful yet, but we are working on

15   it.  And trying to ultimately really looking at the

16   electronic health record to consolidate all the

17   charts.  I mean, that's going to be our ideal system

18   to look at it.

19         So as we talked about earlier, we have the RFI

20   for EHR already process and we have some vendors

21   already looking at it and we already had requested

22   through our budget funding for EFR.  And I'm hopeful

23   that will be done in the next 12 months or so.

24   Q.    But that request has not yet been funded?

25   A.    No.  But we have a support from some of

```
1    A.    Right.

2    Q.    Okay.  At any time since you had been medical

3    director and since you became medical director in

4    2017, did corrections officers ever distribute

5    medications to patients?

6    A.    Yes, they do.

7    Q.    Is that still going on today?

8    A.    Yes, they are and they all have been certified

9    for med-aide classes.

10   Q.    At which facilities are corrections officers

11   distributing medications to patients?

12   A.    We have couple of facilities at NSP, LCC, that

13   I'm aware of.

14   Q.    Were -- was there a time that officers were

15   distributing medications at facilities other than NSP

16   and LCC?

17   A.    They might have, I'm not aware of that prior, in

18   prior years.

19   Q.    Okay.  So are you aware of any change in the

20   practice of officers distributing medications to

21   patients that occurred since you've been medical

22   director?

23   A.    No.  And these are all officers who have been

24   certified in med-aide classes, right?  We not talking

25   about the officers who are not certified with giving
```

1    them pills, so they all have the certification.

2    Q.   Okay.  So your testimony is that all officers

3    who distribute medication to patients have some

4    certification?

5    A.   Yes.

6    Q.   Okay.  Tell me about that certification.

7    A.   The certification class is about three hours

8    that it was provided by a health educator of the

9    process of what needs to be done, how pills are to be

10   distributed, how they are documented.  They need to

11   document on the M-A-R sheet and if there are any

12   refusals, they need to document those as well.

13   Q.   You said that training is provided by a health

14   educator?

15   A.   Yes.

16   Q.   And what are those person's credentials?

17   A.   I don't know offhand.

18   Q.   And you said the training takes three hours?

19   A.   Yes.

20   Q.   Is it a one-time thing or does it have to be

21   repeated?

22   A.   It has to be repeated, be recertified every two

23   years.

24   Q.   And the requirement that officers who distribute

25   medications be certified in this way, is that written

1    down anywhere?

2    A.    Yes.

3    Q.    Where is it written down?

4    A.    I'm not sure where the protocol is but there is

5    one.

6    Q.    Now, you mentioned MARs; again, just for the

7    record, what are MARs?

8    A.    Medication administration records.

9    Q.    And could you just describe briefly what they

10   are?

11   A.    So that's a list of, the form actually describes

12   the medication that is given, how often they have to

13   be given and there's a column that goes across the

14   page, talks about who actually signed off, check off

15   to say yes the person took the medication, if they

16   refuse, they put the "R" for refusal and the nursing

17   staff sign off on those.

18   Q.    Since you became medical director in 2017, have

19   MARs been consistently used at all NDCS facilities?

20   A.    Yes.  But we also did an audit recently that we

21   found that they were not being used, so we took some

22   provisions to make that change.  And one of the

23   provisions that I did discuss with the director is to

24   move towards electronic monitoring and we just

25   implement that process in the last couple of months.

1    and it reads, quote, these requests are triaged daily

2    by health professionals per a priority system that

3    addresses routine urgent and emergency complaints,

4    end of quote.

5        Do you see that language?

6    A.    Yes.

7    Q.    Are LPNs included within the definition of the

8    term health professionals in this sentence?

9    A.    Yes.

10   Q.    And I believe you already testified that sick

11   call requests are sometimes triaged by LPNs?

12   A.    Yes.

13   Q.    Okay.

14                    MR. FATHI:  Is this a good time

15       for break?

16                    MR. POST:  Yes.

17       (Whereupon, at 12:04 p.m., a luncheon recess was

18   taken and the deposition resumed at 12:47 p.m.)

19       (Exhibit No. 7, marked for identification.)

20   Q.    (BY MR. FATHI) Doctor, this morning you talked

21   on a few occasions about policies that you're

22   thinking of changing but you would like to revise.

23       Since you have been medical director, have you

24   actually changed any written policies?

25   A.    Yes.

```
 1      Q.    Which ones?

 2      A.    So one of the policies I came on board quickly

 3      was a restraint policy, where the restraint were, I

 4      felt new guidelines have changed quite a bit and so I

 5      changed the restraint policy to maximum four hours

 6      and a minimum two, definitely the person is

 7      deescalated then we should be able to take the

 8      restraint off.  So then we changed that policy.

 9            And the other one we developed more defining the

10      levels of care for mental health.  And right now we

11      have SM --

12            (Court reporter interrupted for clarification.)

13      A.    SMHU, secure mental health housing unit, and

14      there's really the process there is current center

15      base rather than the level of care process we have to

16      treat people who have mental illnesses, but the SMIs

17      were admitted to the patient, that's severe mental

18      illness, so we chanced that policy.

19            We also included in our chronic care policy, the

20      SMI was not defined to say how often do we see

21      somebody with a severe mental illness, so my

22      recommendation was to see everybody sees psychology

23      every 30 days, psychiatrist at a minimum of 90 days.

24            We also changed some policies on the diabetics

25      because the diabetic lab studies that needs to be
```

1    prisoners are receiving medication for mental health?

2    A.    That's right.

3    Q.    And the number of -- and 70 to 80 percent of

4    prisoners are receiving mental health care of any

5    kind?

6    A.    That's correct.

7    Q.    Are there different levels of mental health care

8    within NDCS?

9    A.    Treatment incentive based for the level of care

10   that we talked about earlier, there's a policy that

11   we have adopted in developing levels of care.

12   There's acute level of care, there's chronic,

13   intensive outpatient and outpatient.

14   Q.    And that policy currently exists in written

15   form?

16   A.    Yes.

17   Q.    And do you recall what it's -- the title or the

18   number?

19   A.    I don't recall the number of it, but we try to

20   implement that policy as we speak, make some changes

21   in the system to implement that.

22   Q.    So is that policy currently implemented?

23   A.    We have drafted it and we're going to admit it

24   December 17th.

25   Q.    Okay, so the answer to my question is no?

1    Q.   Is it ever more than three to four per hour?

2    A.   There might be some more for the no-shows, so

3    they might book more people and sometimes no-shows

4    and people don't show up so, 'cause might be in the

5    schedule but typically only, don't see more than

6    three or four.

7    Q.   Tell me what kind of access the telepsych

8    provider has to the patient's medical record?

9    A.   They have access to NICAMS.

10   Q.   And how does that physically, how does it occur?

11   How does the doctor in Chicago get access to NICAMS?

12   A.   By V, VPN system.  So he go log in to the VPN

13   and have direct access to or DOC NICAMS.

14   Q.   Do the telepsych providers have access to the

15   patient's paper medical record?

16   A.   Physically since they're located at remote site,

17   not really, no.

18   Q.   Does the telepsych provider have access to the

19   MARs?

20   A.   Yes.

21   Q.   How does that happen?

22   A.   Electronically, since we implemented the

23   electronic MARs, so...

24   Q.   And when were the electronic MARs implemented?

25   A.   Over the summer.

240

1    Q.   Of 2018?

2    A.   Yes.

3    Q.   And are they now fully implemented at every

4    facility?

5    A.   Every facility except for NSP and DEC.

6    Q.   And are patients at NSP or DEC ever seen by

7    telepsych?

8    A.   No, we have two part-time psychiatrists who

9    provide coverage at NSP.

10   Q.   So patients at NSP and DEC are never seen by

11   telepsych?

12   A.   Correct.

13   Q.   Does the telepsych provider have access to the

14   patient's kites or other requests for health care?

15   A.   They would if they're directed to them, if they

16   would have access to those kites.

17   Q.   How would they have access?

18   A.   We would electronically send it to them.

19   Q.   How would that happen?

20   A.   E-mail or when they have a session conducted we

21   have somebody else on the other side with the patient

22   and they will talk about what the visit has been,

23   what the kites are.

24   Q.   Other than NICAMS and the MARs, is there any

25   other portion of the medical record that is

1    making that call and then call the nursing, the

2    nurse.

3    Q.   Call the nurse at home?

4    A.   Well no, that would be in the facility site, we

5    would not have an LPN left alone on the site, so

6    there's always one nurse available.

7    Q.   So is your testimony that every facility has at

8    least one RN on site 24 hours a day?

9    A.   That's correct.

10   Q.   Is there a written policy that governs this

11   situation, a patient having what appears to be an

12   acute psychotic episode?

13   A.   No, we don't, not at this time.

14   Q.   What does the department do with patients who,

15   whose mental health needs exceed what the department

16   can provide, who need an inpatient level of care?

17   A.   I think the training that we have, the

18   psychiatrist, I believe that we can handle most of

19   the levels of care that we can provide.  But if they

20   exceed that level of care, we do collaborate with

21   LRC, Lincoln Regional Center, and we'll transfer the

22   patients over there.

23   Q.   I remember reading in some document that the

24   department can't transfer patients to LRC; is that

25   correct?

1    A.    They can't not?

2    Q.    Cannot.

3    A.    No, that's not true, we can.

4    Q.    Does LRC have the right to refuse them?

5    A.    Sure.

6    Q.    Does LRC -- does it ever happen that you want to

7    transfer someone and LRC refuses them?

8    A.    Not in the last two years that I know of.

9    Q.    In the last two years, about how many NDCS

10    patients have been transferred to LRC?

11    A.    We have not transferred anyone.  We had the

12    inclination to actually do the collaborative work

13    with LRC so their psychiatrist came over to see the

14    patient at DEC and we do the treatment plan together.

15    Q.    So no NDCS patients have been transferred to LRC

16    since you've been medical director?

17    A.    No, there hasn't been the need.

18    Q.    Have any NDCS patients been transferred to any

19    inpatient facility since you've been medical

20    director?

21    A.    No.

22    Q.    Do you have any transfer options besides LRC?

23    A.    UN -- the UNMC would be the only other option

24    that we go with.

25    Q.    The what?

 1     A.    They are tracked on NICAMS.  They would be

 2     entering the progress notes and the data on there and

 3     that's where it would be tracked at.

 4     Q.    So if I wanted to know how many different

 5     prisoners received individual therapy last month,

 6     that report could be run on NICAMS?

 7     A.    Yes.

 8     Q.    And if I wanted to know the total number of

 9     hours of individual therapy provided, that report

10     could be run on NICAMS?

11     A.    We that could be provided from NICAM as well.

12     Q.    How long has that capability existed in NICAMS?

13     A.    I believe since last year or so, I'm not sure.

14     Q.    Since 2017 or 20 --

15     A.    2017.

16     Q.    Is the patient's access to individual therapy

17     affected in any way if he or she is in restrictive

18     housing?

19     A.    No.

20     Q.    Okay.  Let's take a break.

21           (Whereupon at 2:38 p.m., a recess was taken and

22     deposition resumed at 2:50 p.m.)

23     Q.    (BY MR. FATHI) Doctor, before the break, you

24     testified that you haven't asked for any additional

25     positions to be allocated, to be funded by the

```
1   legislature any additional health care position; is

2   that correct?

3   A.   That's correct.

4   Q.   Have you ever asked in any context for the

5   ability to increase the compensation of health care

6   staff?

7   A.   Yes.

8   Q.   Tell me about that.

9   A.   I brought it up to our director we got

10  compensation for health care staff, especially

11  nursing and dentist, dental assistants, dental

12  hygienist, tried to be comparable to the marketplace.

13       We had some conversation with HR who also had

14  conversation with HR in the capitol, Jason Jackson to

15  talk about since we have nursing staff who are

16  uniquely qualified to do lots of different functions,

17  you know, their skill sets are actually a lot more

18  unique compared to what hospitalization is, so they

19  have to be ER nurses at times, they have to be trauma

20  nurses at times, they have to be palliative nurse at

21  times, have to be post operative nurses at times,

22  hospice nurses, and we end up getting some of the

23  nurses, initially we train them and then they end up

24  leaving us because that's partly due to the salary

25  issues.
```

1          And I know they, a couple years ago they had a

2     meeting with the state trying to look at the

3     compensation for nursing and somehow the psychiatric

4     nurses LRC look at special cases and their

5     compensation was much more than our nurses.  We we've

6     been having this ongoing dialogue and part of the

7     issue is the nurses have been represented by the

8     bargaining unit, so we cannot change the union rules

9     so that's the process we have to go through.

10         But, you know, the director has actually gone to

11    legislature and talked about those issues as well to

12    bringing it to the attention that at least we should

13    have same playing level field so we can recruit some

14    nurses.

15         We go through contract nurses obviously paying a

16    higher rate and does not a morale boost for our staff

17    nurses.  So the things we have done, we advertise, we

18    try to look at some of the collaboration with some of

19    the universities, the colleges.

20         We recently, we actually even thought about

21    going to international nursing.  We just recruited

22    two nurses who are going to be starting this week

23    from Kenya, with the intention that they -- we will

24    train them here, they will work here for a while and

25    on contract for two years and then hopefully they

1    will pay back to the state with the DOC for two

2    years.  So it's been an ongoing conversation with

3    anybody who will listen to me.

4    Q.   Have you had any success in your efforts to

5    increase compensation for health care staff?

6    A.   I had some success and some failures, obviously.

7    I was able to recruit for compensation for nurse

8    supervisors, so that was about -- talking about a

9    year and a half, which just happened about two months

10   ago.  But I was not able to get some compensation

11   with director of nursing, two or three ADONs.

12        I continue doing, advocating for other staff

13   too.  Salaries are so low for dental hygienist, it's

14   12 bucks an hour.  Nobody's going to work for that.

15   And trying to tell, that's basically minimum wage

16   anymore, so some places how do we -- provide some

17   either compensation and/or some benefits, or some

18   tuition reimbursement for processes, so those are

19   being all looked into.

20   Q.   Have you been able to secure any increased

21   compensation for nurses?

22   A.   No, partly because I think I'm told that since

23   they're part of the bargaining unit, so they have to

24   follow the union contract.  And we do tell the nurses

25   to go tell the union to fight for you, the numbers

1    A.    Yes.

2    Q.    What if a patient sends in a kite and describes

3    a medical emergency, what happens?

4    A.    That person would be seen immediately.

5    Q.    And how do patients request to be seen

6    immediately if they believe they have a medical

7    emergency?

8    A.    If, if the kite is sent to medical staff, they

9    would go and do the assessment.

10   Q.    Are you familiar with what's called an emergency

11   grievance?

12   A.    Yes.

13   Q.    Could they also use that process?

14   A.    Yes.

15   Q.    What if a patient notify a correctional officer

16   of a medical emergency?

17   A.    And he's obligated to provide that information

18   to the medical staff and the medical staff will

19   follow up with that.

20   Q.    Are you aware of any instances where a

21   correctional officer was provided that information

22   and did not notify medical staff?

23   A.    Not that I am aware of.

24   Q.    Earlier you also mentioned that you cannot train

25   a correctional officers in diagnosis of medical

1      more programming in the restricted housing.

2      Q.    So individuals in restrictive housing can and do

3      receive group therapy?

4      A.    Yes.

5      Q.    Would you like to provide them more group

6      therapy?

7      A.    Yes, definitely.

8      Q.    Again, as we talk about restrictive housing, do

9      mental health and medical staff, I guess it would be

10     mental health staff, do they do walk-through

11     counseling sessions?

12     A.    No.

13     Q.    So if you've heard that phrase, what do you

14     think it's referring to?

15     A.    What I hear going through walk-through is door

16     to door, they really just doing a wellness check,

17     talking about are you taking the medication and

18     medication effective, is there other issue we need to

19     address, are you having any side effects, but if they

20     need to talk about any specific counseling questions

21     they have, that's -- they will actually be taking to

22     patient out in a space, a private room to talk about

23     it.

24     Q.    Are there instances where the patient -- they're

25     unable to take the patient out into a private room?

342

```
 1    Deposition of DR. HARBANS DEOL

 2

 3                   _____
                        Herbans Deol
 4                   Signature of witness

 5

 6

 7    STATE OF Nebraska_____)

 8                             : SS.

 9    COUNTY OF Lancaster_____)

10

11

12

13                   Subscribed and sworn to before me this

14    10th day of January___, 20 19_

15

16

17

18    _____
            Konda G. Young
19              GENERAL NOTARY PUBLIC

20

21    DATE:   November 30, 2018

22      [GENERAL NOTARY - State of Nebraska
         KONDA G. YOUNG
23       My Comm. Exp. November 13, 2022]

24

25
```

Christine M. Salerno, RPR
Latimer Reporting, Lincoln, Nebraska
(402) 476-1153

343

| 1 | DEPOSITION OF DR. HARBANS DEOL |
| 2 | |

| 3 | PAGE & LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 4 | 4 | 22 | Kupkowski To Kautzky. | Correct spelling |
| 5 | 82 | 12 | Change "within 14 days" | Correct after |
| 6 | " | " | to "Dental screen within | reviewing ACA |
| 7 | " | " | 7 days, and exam within | standards. |
| 8 | " | " | 30 days. | |
| 9 | 82 | 10 | "Seven to Five". | Corrected after |
| 10 | 82 | 11 | " 20 to 25" | reviewing retention |
| 11 | | | | schedule 92. |
| 12 | 82 | 17 | Add "retention schedule | Clarify after |
| 13 | " | " | 92 and AR 115.03". | reviewing policies |
| 14 | 89 | 15 | Change "No" To "AR 200.03" | Corrected |
| 15 | | | | after reviewing |
| 16 | | | | policies |
| 17 | 91 | 19 | Change "No" to | Corrected after |
| 18 | " | " | "AR 200.03" | reviewing policies. |
| 19 | 94 | 6 | "No" to "AR 115.04" | Corrected after |
| 20 | | | | reviewing policies |
| 21 | 245 | 16 | "No" to "A6 and A4 | Corrected after |
| 22 | " | " | in Nursing procedures". | reviewing policies |
| 23 | 52 | 16 | "Console" to "Consult" | Spelling Correction |
| 24 | 66 | 2 | "Console" to "Consult" | Spelling Correction |

25  DATE:  November 30, 2018

343

| | | DEPOSITION OF DR. HARBANS DEOL |

1   DEPOSITION OF DR. HARBANS DEOL

2

3   PAGE & LINE          CHANGE              REASON FOR CHANGE

4   70      12 | "problem" to "Program"    So Transcript

5              |                            reflects what I said

6   202     10 | "fasting" to "staffing"      "    "    "

7   235      4 | "O'Reagan" to "Organ".   Spelling

8   336      6 | "TAB" to "TB"            So Transcript reflects

9              |                          what I said.

10  338     17 | "Laparotomy" to          So Transcript

11             |   "Operatory"            reflects what I said

12             |

13             |

14             |

15             |

16             |

17             |

18             |

19             |

20             |

21             |

22             |

23             |

24             |

25  DATE:   November 30, 2018

Christine M. Salerno, RPR
Latimer Reporting, Lincoln, Nebraska
(402) 476-1153