IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HANNAH SABATA, et al.,<br><br>**Plaintiffs,**<br><br>v.<br><br>NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al.,<br><br>**Defendants.** | Case No. 4:17-CV-3107<br><br>**DECLARATION OF BARRY MARANO IN SUPPORT OF DEFENDANTS' OPPOSITION TO CLASS CERTIFICATION** |

I, Barry Marano, declare as follows:

1. I am a 40 year veteran of the Virginia Department of Corrections. I was appointed as the agency Americans with Disabilities Act (ADA) Coordinator in 2015 after serving as the facility coordinator at the Powhatan Correctional Center since 2008. I began my career as a Correctional Officer in 1978 and became a counselor in 1987. I have provided case management services to the offenders in the General Population, Restrictive Housing, as well as Medical and Mental Health Units.

2. In 2006, I was assigned to provide case management and accommodation services to the Deaf and Hard of Hearing population at the Powhatan Correctional Center. This assignment mandated that I supervise the installment and operation of the videophone and video remote interpreting (VRI) communication systems for deaf offenders as well as TTY access and voice carry-over (VCO) communication for the Hard of Hearing population. In 2008, as the Senior Case Management Counselor and facility

ADA Coordinator, I became responsible for accommodations for all disabled offenders at that facility.

3. Since 2015, I have conducted surveys and disability assessments as well as training to facility ADA Coordinators and Parole/Probation Districts for the Virginia Department of Corrections. Probation and Parole are both under the umbrella of Corrections. I am the appointed contact for disability issues within the Department of Corrections and for outside agencies. I provide assistance to the Attorney General's Office with legal settlement efforts. I have presented educational classes for the Mid-Atlantic ADA (of the ADA National Network) and have produced a Webinar on Effective Communications in a Correctional Environment for correctional staff, as well as other trainings for Virginia's correctional staff.

4. In my position as the ADA Coordinator, I also investigate and respond to allegations from the DOJ's Office of Civil Rights, on behalf of the Virginia Department of Corrections. I have testified before as a fact witness in depositions for the Virginia Department of Corrections and as a witness under Federal Rule 30(b)(6) on its behalf.

5. The Nebraska Department of Correctional Services (NDCS) reached out to me through our Director, Harold Clarke. They invited me to make recommendations to improve NDCS's ADA compliance, and as part of that I visited several NDCS facilities. In forming my opinions, I relied on the documents listed in Exhibit 1 and on the knowledge I gained from the tours of certain NDCS facilities.

6. My opinions as stated in this declaration are partial and preliminary, and my full opinion will be set forth in my later expert report.

2

7. I have reviewed Margo Schlanger's expert declaration dated February 18, 2019. I understand that she has not visited any of the NDCS facilities.

8. As I toured the NDCS facilities, I did introduce myself to some of the inmates and I was not inundated with accommodations requests or ADA complaints.

9. Based on what I have seen and heard, it is my opinion that the Defendants have recognized areas where they can and should improve on their ADA compliance based at least partly on my recommendations, and they are committed to making improvements. The Defendants are motivated to make progress in this area, and I have not encountered resistance to suggestions I have made to improve ADA compliance. In fact, many of the criticisms in Ms. Schlanger's declaration are already in the process of being addressed by the Defendants.

10. NDCS has already made progress in its ADA compliance, including by: (a) appointing an ADA coordinator for each facility, providing ADA contact information, and planning training for those ADA coordinators; (b) beginning to survey the existing inmate population to determine who may have a disability and what disability or disabilities they may have; (c) obtaining communications equipment I suggested, the UbiDuo2, for NDCS's three intake facilities to help effectively communicate with deaf and hard of hearing inmates; (d) requiring closed captioning and/or English subtitles on all facility televisions in all locations; (e) contracting to obtain videophones for at least DEC and OCC, where NDCS is aware that deaf inmates are housed; and (f) instituting weekly meetings between ADA staff and NDCS executive team members. See Exhibit 2, NDCS 350996-350998, email from L. Mathews to B. Marano with attachment.

11. I am also aware that NDCS is planning additional actions related to ADA compliance, including: (a) adding a new Administrative Assistant II position to be an ADA coordinator for the institutions; (b) changing current training relating to ADA and implementing additional training on the ADA requirements for all staff; (c) providing information related to the ADA and ADA contact information at inmate orientation at all facilities; (d) ensuring that all inmates are aware of the ADA facility coordinator and overall ADA coordinator; (e) revising the ADA policy; and (f) signing a contract for video remote interpreting (VRI) for at least DEC and OCC medical. See Exhibit 2.

12. Nebraska's Board of Parole (Board) is also making progress on its ADA compliance, based at least partly on my recommendations. They are adding a non-discrimination statement to their policy and are also putting into policy what was generally already happening. That is, when Board members review an inmate's records to prepare for a parole review or hearing (and in the future they will be able to more easily access ADA information of NDCS, once NDCS finishes putting new processes into place), if there is a notation about disabilities or accommodations needed, they will work with and rely on NDCS in providing necessary accommodations. See Exhibit 3, NDCS 351001-351002, email from N. Miller to B. Marano with attachment.

13. In her declaration, Ms. Schlanger appears to make many assumptions based generally on her view of the ADA issues that can occur in prisons, along with her review of NDCS policies. Often, she does not point to any specific incidents related to NDCS or the Board where the harm she is concerned about has actually occurred.

4

## SCHLANGER'S CRITICISMS OF NDCS

14. Ms. Schlanger's primary criticism of the Defendants seems to be that their policies relating to disability (specifically disabled inmates) are limited and do not address necessary issues relating to disability. In her opinion, NDCS policies do not substantively address identification of prisoners with disabilities, reasonable modifications including assistive devices, or effective communication. She also criticizes NDCS for allegedly not taking affirmative steps to inform inmates about the ADA or how to request an accommodation from the ADA coordinator. She also criticizes the training on ADA that is provided.

15. As I mentioned above, NDCS and the Board of Parole are already working on or planning to work on their policies and practices related to disability. NDCS has been very open to my suggestions and recommendations related to ADA compliance. For example, I recommended that NDCS undertake a survey and assessment of the needs of the offender population. NDCS is already working on a way to track inmates' disability-related information. That process has begun with an inmate survey at DEC. The facility ADA coordinators that have been named and the additional ADA coordinator for institutions will be able to help with that sort of ADA-related task. Facility ADA coordinators and an additional ADA coordinator position added will help with a variety of issues that Ms. Schlanger identifies in her declaration as problems (or possible problems).

16. Ms. Schlanger more specifically criticizes NDCS policies relating to intake for not including guidance on disability-related information. Again, NDCS is already

planning changes to its ADA policy and staff training. Part of Ms. Schlanger's criticism also relates to identification of disabled individuals outside of intake. As has been stated above, NDCS has started to survey the inmate population to identify inmates with disabilities.

17. Ms. Schlanger's declaration includes a section related to inmate orientation, where she states that the orientation materials she has reviewed did not include ADA-related information. In the materials I reviewed, I also did not find information related to the ADA included in inmate orientation – but, again, NDCS is already planning to add ADA information to inmate orientations at every institution. See Exhibit 2.

18. Ms. Schlanger also criticizes the training of NDCS staff as not including enough information related to the ADA for inmates. For example, she says that staff should be trained to know signs of disabilities. I recommended revised and additional training for staff on ADA compliance. NDCS is already beginning the process of revising training related to ADA. See Exhibit 2.

19. Ms. Schlanger criticizes NDCS for not including the ADA coordinator in some decisions such as interpretation and housing. I have recommended that NDCS coordinate more – for example, making sure that property is aware of who is using a wheelchair. As I said, NDCS has taken all of my suggestions well and it looks like they are beginning to coordinate, as there is now a weekly meeting between ADA staff and executive staff. The facility coordinators and additional ADA coordinators will also be able to help with coordination efforts. See Exhibit 2.

20. Ms. Schlanger states that NDCS does not appear to have a way to track and notify staff of an inmate with a disability. As I said above, NDCS is working on a tracking system already. I also spoke with Lisa Mathews, the ADA coordinator, about Virginia's system where inmates have ID cards with special notations (if they want). I also suggested that if an inmate wants, NDCS should try adding cell door signs to identify the inmate's disability, particularly if the inmate is deaf/hard of hearing, or blind/visually impaired. I also recommended that as long as they have to keep paper medical records, they add some sort of identifying sticker especially to files of deaf/hard of hearing inmates, who may need a sign language interpreter for medical appointments. Because I have so many years of experience as an ADA coordinator at the Virginia Department of Corrections, I have knowledge of practical solutions that have worked in other prisons. NDCS has appeared to find that type of practical knowledge especially helpful, and as I said my suggestions have been well-received at NDCS.

21. Although Ms. Schlanger criticizes NDCS's policies for lacking information related to effective communication, NDCS is already beginning to make changes. I recommended that NDCS get an UbiDuo for intake, so that deaf/hard of hearing inmates who are literate can have another avenue of communication that is faster and easier than writing notes back and forth. They have already purchased machines for their three facilities that have intake. NDCS is also already changing or planning changes to ADA policy and practice that will help with effective communication. Those changes also include adding video remote interpreting to one of their existing contracts so that at the least, DEC and OCC will have it in their medical areas in case it's needed. NDCS is also

adding videophones in facilities where they know deaf inmates are housed. In addition, NDCS would provide training to staff and inmates with disabilities on how to utilize the accommodations provided (like the UbiDuo). Documentation of these efforts will be maintained. See Exhibit 2.

22. Ms. Schlanger's declaration includes a section where she says prisoners with disabilities often end up in restrictive housing or special housing that is like restrictive housing. She does not say that NDCS isolates prisoners with disabilities. NDCS does not have a policy to segregate inmates with disabilities. I also didn't see any evidence of that problem when I toured NDCS facilities. I didn't see any inmates with disabilities who were housed in situations where they were denied most prison privileges, programs, activities, and services. I am not aware of any NDCS facilities that have housing specifically for inmates with disabilities. Ms. Schlanger also does not cite to any incidents where she could say that there was not a reasonable modification to a program or policy to accommodate a prisoner with a disability.

### SCHLANGER'S CRITICISMS OF PAROLE BOARD

23. To the extent that Ms. Schlanger criticizes the Board as not having any ADA policies, the Board is already planning to change its policies to include an antidiscrimination statement. That change is in line with my recommendations. See Exhibit 3.

24. The language of the Parole Board's rules that Ms. Schlanger objects to in paragraph 121 of her declaration is: "In making its determination...the Board of Parole shall take into account...The offender's mental or physical makeup, including any

8

disability or handicap which may affect his or her conformity to law." But that language is actually part of the Nebraska statute on parole. Moreover, based on my experience, that type of language is not intended to discriminate against people with disabilities but is meant to help ensure that a parolee is successful. Ms. Schlanger also does not point to any instances where she found that language resulted in discrimination against a person with disabilities.

### ADA REQUIRES AN INDIVIDUALIZED ASSESSMENT

25. There are a wide variety of conditions that can rise to the level of a disability, including mobility impairments, intellectual disabilities, blindness, deafness, diabetes, cancer, epilepsy, and others. An answer for one may not work for another. Even when looking at two people with the same disability, one might need something very different than the other. For example, if you compare two deaf people, one person might use sign language while one might not, and one might be illiterate while one might be literate so be able to use written communication.

26. Responding to the needs of an inmate with a disability is done on a case-by-case basis, and an individualized assessment is key. One size does not fit all. The accommodations process requires an interactive process of communicating with the inmate to determine what he or she needs and wants, as well as whether anything hasn't worked for him or her in the past. Ms. Schlanger even says something similar in her declaration. See Schlanger Decl. at pp. 29-30.

27. There is no "typical" request for an accommodation or modification, because it all depends on the inmate.

This declaration is submitted pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed on May 9 2019 in Richmond, Virginia.

*Barry Marano*