## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| **HANNAH SABATA, et. al,** | **Case No. 4:17-cv-03107-RFR MDN** |
| **Plaintiffs,** | **CLASS ACTION** |
| v. | |
| **NEBRASKA DEPARTMENT OF** | **EXPERT DECLARATION OF DEAN** |
| **CORRECTIONAL SERVICES, et. al,** | **AUFDERHEIDE, M.A., PH.D.** |
| **Defendants.** | |

I, Dean Aufderheide, M.A., Ph.D., declare:

## I.   EXPERT QUALIFICATIONS

1.     For the past fifteen years, I have served in the position of Director of Mental Health Services for the Florida Department of Corrections (FDC).  My responsibility is policy development/implementation and oversight of a mental health delivery system, which includes defined levels of care and 1,0000 inpatient bed capacity, for approximately 100,000 inmates.  Prior to my appointment to the Director position, I served as a Senior Psychologist at an FDC prison, a Regional Mental Health Director, and Assistant Director of Mental Health Services.

2.     I received a bachelor's degree in Psychology from San Diego State University, a master's degree in Theology from Fuller Theological Seminary and a Ph.D. in Clinical Psychology from the Fuller Graduate School of Psychology. I am a licensed clinical and forensic psychologist in the state of Florida.

3.     I was commissioned as a Captain in the U.S. Army in 1987 and completed my clinical psychology internship at Walter Reed Medical Center in Washington, D.C. During the Persian Gulf War, I served as Chief of Psychology at an Army hospital, where

I conducted psychological assessments, including neuropsychological and fitness for duty evaluations.

4.      I am a former President of the International Association of Correctional & Forensic Psychology and the current Executive Director of the American Board of Correctional Psychology. I have been an appointed member of several national correctional committees including the Performance-Based Standards Committee for the ACA, Education Committee for the National Commission on Correctional Health Care (NCCHC), and the Mental Health, Substance Use and Health Care Committees for the ACA.

5.      I have been the National Mental Health Expert (NMHE) for the American Correctional Association (ACA), which is the oldest association developed specifically for practitioners in the correctional profession, since 2013. As the NMHE, I participate in the development and review of behavioral health initiatives, including policy, training, education, expected practices and professional development.  For the past several years, I have served on the Editorial Board of the Corrections Mental Health Report and the Editorial Board of the Journal of Correctional Health Care.

6.      I was appointed by the Governor to the state of Florida's Board of Psychology, where I served from 2010 to 2018, and by the Chief Justice to the Florida Supreme Court Mental Health and Substance Abuse Task Force, where I served from 2017 to 2014.  Since 2014, I have served on the Florida Reception Medical Center Hospital Board of Governors.

7.      My specialties are policy and procedure development, quality assurance, program evaluation and planning, suicide and self-injury prevention and program

innovation. I have developed evidence-based treatment models, including a Residential Mental Health Continuum of Care comprising specialized residential units for diversion and step-down that provide protective housing and augmented treatment for inmates with serious mental impairment associated with a historical inability to successfully adjust to living in the general inmate population.;  a Mental Health Ombudsman program that is the first in the nation in a prison system that is dedicated solely to inmates with severe mental illness in inpatient level of care; a  self-injury profiling system (SIPS) that identifies common personality traits and patterns of behavior for inmates involved in serial self-injurious behaviors; suicide prevention program that had an average suicide rate of half the national rate of state prisons between 2004 and 2010;  a re-entry program using an electronic web-based referral system in a prison system for mentally ill inmates to access the public mental health system after release from prison; a multi-disciplinary team orientation to treatment of mental illness and an inter-disciplinary approach to management of behavioral disorders; a mental health classification system based on behavioral functioning for improved allocation of staffing resources within defined levels of care and; implementation of a mental health program for mentally ill inmates in Extended Restrictive Housing that resulted in successful termination of a Settlement Agreement pursuant to class action litigation.

8.     I have published numerous professional articles and book chapters on topics such as articles in peer-reviewed journals on self-injurious behavior in correctional settings, violence and sexual risk assessment, conducting the psychological autopsy in correctional settings and; book chapters on communication in correctional psychiatry,

interdisciplinary collaboration in correctional practice in correctional mental health, and developing comprehensive correctional plans.

9.      I have presented nearly 100 peer-reviewed seminars at national conferences on correctional mental health topics such as the psychological effects of solitary confinement, suicide and self-injury prevention, conducting a psychological autopsy, psychotropic medications, the psychopathic personality, trauma-informed care, continuity of care, veterans with mental illness, crisis intervention, mental health leadership, sex offenders and mental health re-entry planning.

10.     I am the President of one of only two doctoral psychology internships in a state prison system accredited by the American Psychological Association (APA) and President of a residency program that is the only one in a correctional setting accredited by the APA.

11.     I have provided consultation/training for the following agencies and correctional systems: 1) Association of State Correctional Administrators (2018); 2) National Institute of Corrections (2016); 3) Minnesota Department of Corrections (2016 and 2009); 4) Delaware Department of Corrections (2015); 5) Washington, D.C. Department of Corrections (2014); 6) American Correctional Association (2013-Present); 7) United Arab Emirates Department of Punishment and Rehabilitation (2012); 8) North Carolina Department of Public Safety-Adult Corrections (2012-2014); 9) Oklahoma Department of Corrections (2012); 10) U.S. Department of Homeland Security Immigration & Customs Enforcement (2010); 11) United States Navy (2010); 12) Illinois Department of Corrections (2010) and; 13) Wyoming Criminal Justice Association (2010).

12.     A copy of my curriculum vitae is attached to this Declaration as **Exhibit 1.**

## II.     SCOPE AND BASIS OF EXPERT OPINION

13.     I have been retained by the Nebraska Department of Correctional Services (NDCS) to review the policies, procedures and practices pertinent to the delivery of mental health services and provide expert opinion on whether they comprise acceptable standards of care.  Although it is arduous to determine definitively what may be constitutionally acceptable mental health care, I rely on the six acceptable components of what is needed for an acceptable mental health program outlined in the ruling in the landmark case of *Ruiz v. Estelle* (503 F Supp. 1265 (S.D. Tex. 1980): 1) There must be a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment; 2) treatment must entail more than segregation and close supervision of the inmate patients; 3) treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders; 4) accurate, complete, and confidential records of the mental health treatment process must be maintained; 5) prescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluations, is an unacceptable method of treatment and; 6) A basic program for the identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program.

14.     I also rely on additional components that have emerged since *Ruiz v. Estelle* for consideration in ensuring a sound mental health system: 1) The physical

resources - whether adequate facilities and equipment are available to meet inmate treatment needs and afford confidentiality; 2) specialized mental health training; 4) contemporary policy and procedures; 5) defined levels of care; 6) definition of serious mental illness (SMI); 8) individualized treatment and services plan developed with the inmate by a multidisciplinary treatment team; 9) quality assurance program for monitoring of compliance with program requirements; 10) management information system; 11) pre-release continuity of care planning for mentally ill inmates inmate and; 12) access to care—the process by which inmates get to mental health services.

## III.   BACKGROUND

15.     Since the 1970s, the correctional population in the United States has grown by 700 percent.  The public mental health system has had disparities in the availability of, and access to, its services more than other areas of health and medicine. As a result of "deinstitutionalization" to reduce and close publicly operated mental health treatment facilities, and the failure to adequately fund community mental health programs, hundreds of thousands of individuals with serious mental illness have been "trans-institutionalized" into America's jail and prison systems.

16.     Today, individuals with severe mental illness are three times more likely to be in a jail or prison than in a mental health facility, and 40% of individuals with a severe mental illness will have spent some time in their lives in either jail, prison, or community corrections.  Consequently, the number of incarcerated individuals with mental illness has increased steadily, with many state prison systems experiencing exponential growth in their mentally ill population over the past two decades.  In the California Department of California Department of Corrections and Rehabilitation, for

example, over 30 percent of the inmates currently receive treatment for a serious mental disorder, an increase of 150 percent since 2000.

17.      As individuals suffering with mental illness poured into America's prisons, correctional officials have had to confront a disconcerting reality: Prison systems are now the nation's major mental health facilities, serving a purpose for which they were never designed or intended.  Compared to inmates with no mental illness, inmates with mental illness have more difficulty following prison rules and adjusting to the incarceration environment.  They often have multiple disorders, including substance abuse, and are stigmatized by their illness. Some become overly passive, withdrawn and dependent during incarceration, while others may become agitated, episodically violent, or engage in self-injurious behaviors.  Often sanctioned for dysfunctional behaviors, prisoners with mental illness often have extensive disciplinary histories. With over half of all incarcerated individuals having symptoms of mental illness and experiencing mental health problems and up to 20% of prison inmates having a serious mental illness, America's correctional institutions are not an "either/or" prison-versus-treatment facility dichotomy, but rather have evolved into a "both/and" reality.

18.      The NDCS has not been immune to the transition of the nation's prison system to an incarceration/treatment system.  On July 6, 2018, 5,209 individuals were housed at facilities in the NDCS. Of those incarcerated, about half (49.78%) of the population were diagnosed with a mental disorder; 17.31% were diagnosed with a serious mental illness, which in this instance is defined as psychotic, bipolar and major depressive disorders and any diagnosed mental disorder (excluding substance use disorders) that currently and substantially interferes with the person's ability to meet the

ordinary demands of living; 14.13% were diagnosed with a severe an persistent mental illness, which in this instance is defined as psychotic, bipolar or major depressive disorders and; 1835 inmates were prescribed psychotropic medication compared to 1873 inmates on the same date in 2015 and; the percentage of inmates with mental illness in restrictive housing in FY 2018 was 67.68% compared to 58.38% in FY 2015.

## IV.   METHODOLOGY OF REVIEW

19.    The following sources of information were utilized in accomplishing the review: 1) Tour and visual examination of six NDCS facilities (because I was accompanying Dr. Stewart, the tours were restricted to the units/areas and allocated time in accordance with his itinerary; 2) review of policies and procedures pertinent to the provision of necessary mental health treatment and services for the youthful offender and adult populations in the NDCS; 3) brief and informal discussion with line staff; 4) brief observation of inmate interviews by Dr. Stewart and; 5) review of various documents provided by the NDCS to include, but not limited to, mental health staffing, patient population demographics, excerpts from treatment records and audit reports.

20.    I toured the Tecumseh State Correctional Institution (TSCI) on October 29, 2018. The inmate population on July 6, 2018 was 1,348.  TSCI is a maximum and medium custody institution housing  general population inmates, restrictive housing Status inmates, residential patient substance abuse inmates and protective management inmates.

21.    A stand-alone Special Management Unit (SMU) is able to accommodate about 200 inmates. In addition to housing inmates on death row, this unit also houses inmates placed in immediate segregation pending classification or disciplinary action.

Within the SMU, there is a Long-Term Restricted Housing Unit (LTRH). Self-study modules are provided to inmates who have the opportunity to progress through an incentives program based upon their compliance with behavioral expectations. Staff assigned to the SMU undergo additional training specific to the security and safety needs of those inmates housed here.

22.     According to the most recent ACA audit, the staff assigned to provide mental health services include one mental health supervisor, three psychologists, six mental health counselors and one staff assistant. Psychiatric services are provided by a part-time psychiatric practitioner and telemedicine. Mental health services include, but are not limited to, crisis intervention, individual counseling, group therapy, psychoeducational groups and medication management. In the units toured, the facility appeared to be clean, adequately lighted and temperatures within comfort zones.

23.     I toured the Lincoln Correctional Institution (LCC) on October 30, 2018. The inmate population on July 6, 2018 was 466. The original facility opened as part of the Diagnostic and Evaluation Center (DEC), but now operates as a separate facility. LCC and DEC continue to operate with shared services, and there is a tunnel constructed between the two facilities providing a secure passageway for transporting inmates between the two facilities and staff access. Several of the housing units in the institution are mission specific, including restrictive housing, protective custody, sex offender programming, and a structured therapeutic community in D-Unit designed to provide services to inmates with chronic mental health issues, developmental disabilities and/or social deficits. LCC is a designated regional mental health facility for male inmates in the NDCS.

24.     According to the most recent ACA audit, the following full-time mental
health staff are assigned to LCC: one Psychiatrist, one Psychiatrist (APRN), three
Psychologists, eleven Counselor/Therapists and one Social Worker. Part-time staff
include: one Substance Abuse Counselor, six Behavior Health Case Workers, one
Therapist and one Social Worker.  Staggered schedules (6:00 a.m. to 2:00 p.m. and 2:00
p.m. to 10:00 p.m.) provide expanded services opportunities. On-call staff and necessary
after-hours services are provided by DEC staff. Mental health services include, but are
not limited to, crisis intervention, individual counseling, group therapy,
psychoeducational groups, medication management and sex offender treatment.

25.     The LCC has a "Control Unit", which is a self-contained 16-bed restrictive
housing unit that has an incentive program for transitioning the inmates to the C-Unit (which
is also restrictive housing, but to a lesser degree) to a general population or to D-Unit for
inmates with serious mental illness. In the units toured, the facility appeared be clean,
adequately lighted and temperatures within comfort zones.

26.     I toured the Nebraska State Penitentiary (NSP) on November 1, 2018. The
inmate population on July 6, 2018 was 1348. NSP operates with an "internal" and
"external" configuration, having restrictive housing and the maximum and medium
general housing located "internally", and the minimum inmates housed in the "external"
location. The two custody levels are prevented from intermingling by internal fencing.

27.     The NSP has a Skilled Nursing Facility (SNF). There are ten rooms/cells
that can house up to twelve inmates, and an elevator is available for non-ambulatory or
restricted ambulatory inmates. There is also a hospice unit, a four-station home dialysis

unit, and a housing unit for those with geriatric and other medical needs. The SNF is staffed 24 hours each day, seven days a week.

28.     According to the most recent ACA audit, there are two full-time psychologists and five mental health counselors assigned to NSP.  Psychiatric services are available part-time. Mental health services available at NSP include crisis intervention, short-term counseling, group therapy, sex offender treatment, and psychoeducational groups (anger management, violence reduction programming, etc.). Substance abuse treatment is also available.  There is also a Residential Treatment Community (RTC) in a 100-bed unit for the provision of substance abuse treatment. In the units toured, the facility appeared be clean, adequately lighted and temperatures within comfort zones.  The exception would be the Control Unit (a restrictive housing unit), which may be best described as outdated and needing renovation.

29.     I toured the Nebraska Correctional Center for Women (NCCW) on November 1, 2018.  The inmate population on July 6, 2018 was 293.  NCCW is the only state level intake and correctional facility for housing females. It is an all-female minimum/medium/maximum facility with a capacity of 275 inmates from the ages of 19 to 74.

30.     Treatment and services include, but are not limited to, crisis intervention, individual counseling, group therapy and extensive psychoeducational groups. According to the most recent ACA audit, there are two full-time psychologists, one part-time psychologist, and two mental health counselors are assigned to provide mental health treatment and services. Psychiatric services are provided by a part-time practitioner and supported by telepsychiatry.

31.     The NCCW has a housing unit that appears to be like a residential treatment unit called STAR (Strategic Treatment and Reintegration) for inmates with serious mental health and/or substance abuse disorders. A "blue room" is available in the STAR unit for inmates to practice mindfulness skills in a palliative environment. In the units toured, the facility appeared be clean, adequately lighted and temperatures within comfort zones.

32.     I toured the Diagnostic Evaluation Center (DEC) in the morning of November 2, 2018. The inmate population on July 6, 2018 was 450. The DEC, which is connected to the LCC by a secure tunnel, is the intake facility for adult male inmates entering the NDCS.  Nursing staff completes an intake screening of each arriving inmate.  Inmates are referred for appointments in accordance with their assessed needs. Nursing staff is trained to identify issues requiring a mental health referral. For issues requiring immediate attention, mental health staff is notified for immediate response.

33.     All new arrivals are given information on how to access mental health care.  Information is available in English and Spanish. Inmates that are illiterate are advised on how to access mental health care via personal instruction or DVD. Each newly arriving inmate also receives an inmate handbook (English or Spanish), which contains further details on how to access health care services.  Nursing staff is present to address concerns and answer questions.

34.     The DEC has a Skill Nursing Facility (SNF) comprising are nine cells, each designed as single cell living units and handicap accessible. There are two negative pressure cells and four mental health observation rooms.  Nursing staff is available to inmates in the SNF 24 hours per day, seven days per week.

35.     According to the most recent ACA audit, the following full-time mental health staff are assigned to the DEC: one psychologist, one consult psychiatrist, and four mental health counselors. Mental health services include, but are not limited to, crisis intervention, individual counseling, group therapy, psychoeducational groups, psychological evaluation and medication management.

36.     I toured the Nebraska Correctional Youth Facility (NCYF) in the afternoon of November 2, 2018. The inmate population on July 6, 2018 was 63.  NCYF houses youthful offenders (YO) adjudicated as adults and is the intake facility for YOs entering the NDCS. The YOs remain at NCYF until they are 21 years and ten months, at which time they may be transferred to an adult facility.

37.     According to the most recent ACA audit, the following full-time mental health staff are assigned to the NCYF:   one psychologist and two mental health counselors. They are on call for Mental health services include, but are not limited to crisis management, individual counseling, group therapy, psychoeducational groups and medication management via telepsychiatry.

38.     All the facilities I toured are accredited by the American Correctional Association (ACA), which is the oldest correctional membership organization in the United States. The ACA's national standards and accreditation process aspires to ensure services, programs, and operations essential to effective correctional management maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Accreditation by the Commission on Accreditation for Corrections is for three years and includes health and mental health standards.

## V.   OPINIONS AND RESPECTIVE BASES

39.     My opinions are based on the limited information I have available at present. Although I have visited the six NDCS facilities referenced in section IV. 21-40 of my declaration, reviewed the policies and procedures pertinent to the delivery of mental health services, excerpts from mental health records, and various documentation and reports (including but not limited to the Mental Health System Consultation report by Dr. Bruce Gage in July of 2015; the Nebraska Department of Correctional Services' Behavioral Health Needs Assessment report in December of 2015; the Clinical Programs Evaluation-Phase 1 report of July 2016; Department of Correctional Services Special Investigative Committee LR34 (2015) dated December 22, 2016 and; the Declaration of Pablo Stewart dated February 14, 2019), I have not had the opportunity to conduct clinical interviews with the inmates or a random review of inmate records.  During my tours of the NDCS facilities, I shadowed Dr. Stewart and sat in on most of his interviews, which probably averaged about 10 minutes and lacked the structure and content of a clinical interview. Consequently, I did not have the opportunity to speak with many of the inmates, nor could I conduct staff interviews other than brief and informal discussions. My opinions, therefore, should be considered preliminary with the prerogative for amendment as additional information becomes available. Accordingly, I shall restrict my opinions to the subjects identified in Dr. Stewart's declaration.

## VI.   STAFFING

40.     Sufficient human resources, both in quantity and quality, are necessary to ensure access to care in a prison system.  Mental health staff should be appropriately licensed and/or credentialed and function in a multi-disciplinary manner.  Although

section IV 21-40 of my declaration documents staffing allocations at the six NDCS

facilities when they were audited by the American Correctional Association, a staffing

report (Position Control Report), was provided by the NDCS (**Exhibit 2**).  The report

indicates there are 92.5 positions assigned to the mental health program.  There are

eighteen licensed psychologist positions, three psychologist I positions, one psychologist

associate position, twenty-five mental health practitioner II positions, seven mental health

practitioner supervisor positions, six psychiatric provider positions (psychiatrist/nurse

practitioner), five certified master social worker positions and other clinical and nursing

staff to provide and or supervise the delivery of mental health treatment and services. Six

psychiatric providers for approximately 1800 inmates receiving psychotropic medication

would translate to a staffing ratio of about 1:300, which is well within an adequate

staffing range (except for a 100-bed residential treatment unit, which NDCS does not

currently have, should be about 1:100.  On July 6, 2018, nearly half the inmate

population (49.78%) had a diagnosed mental disorder.  With about sixty clinical staff to

provide and/or supervise mental health treatment and services, the ratio of clinical staff to

the mentally ill population is about 1:40, which is well within the range of acceptable

staffing ranges.  The twenty-nine Behavioral Health clinical vacancies referenced by Dr.

Stewart in section A. 27 of his declaration, may be misleading since it may include staff

assigned to substance abuse, sex offender and other specialized programs (except for

necessary medical care e.g. detoxification and perhaps treatment for a co-occurring

mental and substance use disorder, I am not aware of any constitutional right to substance

use disorder treatment in correctional settings).  Even with the vacancies documented on

the NDCS Position Control Report documented in Exhibit 2, which indicated 14 clinician

vacancies assigned to the institutions, the staffing ratios would still be in an acceptable range for prison systems.

41.     In my opinion, the issue is not a staffing shortage. Although I organized the Position Control Report to reflect the locations to where the staff were assigned (**Exhibit 3**), it is not possible to calculate staffing needs for each institution (except for the (DEC) in the absence of a mental health classification system and defined levels of care with attendant treatment requirements (e.g. frequency of individual psychotherapy, group therapy, psychoeducational groups, activity therapy, rounds, periodic evaluations at scheduled intervals, case management services, psychiatric contacts, etc.).

42.     The conclusion by Dr. Stewart that the inmate death referenced in section A. 30 of his declaration is subject to the post hoc, ergo propter hoc fallacy ("after this, therefore because of this") i.e. if the time frame between the inmate's request and staff response was not clinically appropriate, or that the provider did not enter the mental health diagnosis into NiCAMS, therefore because of this, the inmate's death was a result of a staffing shortage. There is no assertion in Dr. Stewart's declaration that a staff shortage was the de facto reason for the death.

43.     Problematic for the calculations necessary to establish an accurate staffing matrix is definitional. For example, it is challenging to differentiate "behavioral health" from "mental health" staff when evaluating staffing matrices. It appears that the behavioral health staff include staff assigned for substance abuse treatment and other specialized programs, which may include inmates that are not mentally ill.

## VII.   IDENTIFICATION AND SCREENING

44.   Prison systems must have in place mechanisms to identify inmate care needs and offer necessary treatment in accordance with their identified needs.  There are three basic elements for adequate identification and screening of mental health needs: 1) Receiving mental health screening – done immediately on admission through brief observation and a structured interview and is a "wide angle" screening that includes inquiry about suicide risk, symptoms suggestive of significant impairment associated with active serious mental illness, history of psychiatric hospitalization, etc.; 2) Intake screening – trained staff make further inquiry into concerns identified in the receiving mental health screening and other relevant factors, usually as part of a more comprehensive health evaluation and; 3) Evaluation – a comprehensive needs assessment by a mental health professional, which is usually occurs if there are elements in the receiving mental health screening and/or intake screening or if the inmate if the inmate presents with clear symptoms of a serious mental illness and the  receiving mental health screening and/or intake screening were omitted.

45.   In response to Dr. Stewart's observation in section B. 31 of his declaration, that "Initial screenings are performed by custody staff with no medical qualifications", it is my opinion that it is acceptable that the initial screening, which is a structured "wide angle" interview, can be completed by a correctional staff that is trained in conducting a receiving mental health screening.  However, it is my understanding that initial screenings are conducted by nursing staff, and inmates with identified suicide risk factors, symptoms of acute decompensation and/or impairment in behavioral functioning associated with a serious mental illness would be seen by mental health staff sooner than

weeks after arrival. Dr. Stewart's assertion that, "Many attempted and completed suicides occur in these first days and hours" may be accurate for jails, but it is not factual for prisons. Although there are many variables associated with suicide risk in a prison system, I am not aware that the temporal proximity of arrival at an institution.

## VIII.  LEVELS OF CARE

46.     I concur with Dr. Stewart's observation in section C. 32-33 of his declaration that incarcerated individuals "…need to be assessed, treated and monitored on a timely and regular basis…" and that "A correctional mental health system must include discreetly defined and available, levels of care sufficient to meet the needs of its population". A mental health classification system with defined levels of care is essential for prison officials and staff to know what mental health treatment and services are needed for whom; defined levels of care for where, when, how and to what extent they need to be delivered and; the necessary staffing resources to provide the level of care. Accordingly, I forwarded to the NDCS a draft outline for consideration of a mental health classification system and defined levels of care (Exhibit 4).

47.     Whereas I agree with Dr. Stewart, in section C. 39 of his declaration, that prison infirmaries are not mental health units, I disagree that a prison infirmary area, as well as designated observation cells outside the infirmary area, cannot be used to provide temporary crisis intervention/treatment. If there is a defined mental health level of care associated with its use in policy (e.g. "Urgent Mental Health Care" in section II. 2 of Exhibit 4), infirmaries and observation cells can be used to provide temporary housing where safety and mental health care protocols can be implemented. I understand the NDCS has drafted a policy that is currently under review.

## A. ACCESS TO CARE

48.     Access to necessary medical care is grounded in an inmate's Eighth

Amendment legal right to care, which was established in Estelle v. Gamble 429 U.S.

(1976) and, in subsequent federal court decisions, defined to include access to mental

health care for psychological/psychiatric conditions.  Access to mental health care is

dynamic and includes a number of components including, but not limited to: 1) Intake

screening and evaluation; 2) sufficient and qualified staff resources; 3) a suicide

prevention program and policy; verbal and written orientation for inmates on how to

access mental health services; 4) staff  training and a mechanism(s) for staff to make

referrals for inmates that may need mental health care; 5) rounds and periodic evaluations

of inmates in high-risk settings (e.g. restricted housing); 6) written treatment plans with

routinely scheduled reviews and; 7) a mechanism(s) for inmate's to make self-referrals

e.g. self-declared mental health emergencies, inmate requests, etc.).

49.     In prison systems, inmates routinely access mental health services to

address specific concerns and issues that may emerge between regularly scheduled

contacts with mental health staff via an inmate request mechanism.  I do not agree with

Dr. Stewart's insinuation that the "...inmate's lack of access to care...", in section D. 45

of his declaration, was the definitive variable in the inmate's death.  In fact, Dr. Stewart

acknowledges that mental health staff conducted a mental status examination "...not long

before his suicide...", which demonstrates occasion of access to care.

50.     In section D. 46, I concur with Dr. Stewart in his declaration that the

Inmate Interview Request Form should not be triaged, if that is occurring, by security

staff, but rather submitted directly form the inmate to a health or mental health staff or placed in secure location where health or mental health staff can collect them.

51.     I disagree with Dr. Stewart's assertions in section D. 47 of his declaration. The process for inmates filing grievances should be covered in the orientation and/or in some prison systems, outlined in an inmate handbook.  It is not uncommon for inmates to seek, and may prefer, assistance from other inmates in the filing of grievances.  Other than a process for inmates to file grievances, I am not aware of any standard of care that requires mental health staff to provide direct assistance in the filing of a grievance.

52.     Regarding Dr. Stewart's observations in section D. 48 of his declaration, my review of some of the Inmate Interview Request Forms suggest the need for increased definition in the process.  For example, it is clinically appropriate for inmates experiencing acute deterioration or behaviors suggestive of self-harm risk to access mental health services via an emergency staff referral vis-à-vis the inmate interview request.  Conversely, it is counterproductive for inmates to use the inmate interview request process as conversational correspondence requesting mental health staff to intervene with other staff on issues not germane mental health treatment and services.

## B.  MEDICAL RECORDS

53.     A necessary component of minimally adequate care is the maintenance of complete and accurate medical records.  In evaluating the efficacy of a correctional mental health system, it is necessary that the mental health record is organized and the documentation allows for a determination whether there is a consequential relationship between the clinical assessment, diagnosis, treatment and continuity of care for an inmate.

54.     Although I generally concur with Dr. Stewart's observations in section E. 51-52 and, in section E. 54 of his declaration for psychiatric care for inmates on special management status and for inmates requiring intensive psychiatric services, for routine care, many prison systems are actively incorporating telepsychiatry services into their mental health delivery systems.

55.     Although I concur with Dr. Stewart's observation in E. 56 of his declaration regarding the structural and organizational deficiencies in the records, I disagree that the physical health and mental health professionals cannot have access to the same information. Although discommodious, staff have access to the inmate's complete record via NiCAMS for mental health and the paper record for physical health until the NDCS completes the transition to a unified electronic health record

56.     I disagree with Dr. Stewart's conclusion in section E. 57 of his declaration that the incorporation of telepsychiatry services, with the current record keeping, will likely result in an inability for the provider to formulate a sufficient treatment plan. Telepsychiatry providers have not only the prerogative, but it is their professional obligation, to request any and all additional clinical information that they deem necessary to complete the clinical assessment, diagnosis and treatment of an inmate.

## C. MEDICATION

57.  I do not agree with Dr. Stewart's observations in section F. 63 of his declaration. For correction of the statistics cited in section F. 58 of his declaration, of the 5,209 individuals housed at facilities in the NDCS on July 6, 2018, 35% were prescribed psychotropic medication, which is the same percentage prescribed psychotropic medication three years earlier on July 6, 2015. Regarding section F. 59 of his declaration, it is my understanding that

Nebraska statutes permit Advanced Practice Registered Nurses (APRN) to practice independently, thereby obviating the need for supervision of the administration of psychotropic medications by a psychiatrist. It would, however, be beneficial for the NDCS to have at least a part-time psychiatric consultant in its Central Office to provide oversight/monitoring of its psychiatric services/practices. As the preponderance of observations by Dr. Stewart in section F. of his declaration are outside the scope of my expertise, I shall refrain from articulating further observations applicable to psychotropic medication management.

## D. ISOLATED CONFINEMENT

58.    In the NDCS, the percentage of inmates with mental illness in restrictive housing in FY 2018 was 67.68% compared to 58.38% in FY 2015, and the average length of stay in FY 2018 was 57.46 days compared to 66.02 days in FY 2015. Using input from the Vera Institute of Justice and other sources, the NDCS policy, AR 210.01 Restrictive Housing, appears to be comprehensive in its approach to providing care and management of the inmates. I did not conduct a review of the restrictive housing individual treatment plans or behavior/programming plan, so I cannot comment on their sufficiency, but the policy suggests that treatment and services must be structured in such a way to ameliorate adaptive functioning for mentally ill inmates. Director Frakes should be commended for incorporating into policy the privilege for inmates in restrictive housing to have access to earbuds and a small television, which moderates sensory deprivation.

## E.  SUICIDE PREVENTION

59.     Suicide rates for both incarcerated and non-incarcerated individuals have been increasing.  The suicide rate in state prisons in CY 2017, for example, was 20/100,000 (BJS 2016).  Since one death in one year would result in a suicide rate of about 20/100,000 in prisons with similarly small inmate populations, it would be more appropriate to review the number of suicides in the NDCS over a range of years to ascertain if the rate is congruent with national rates in similar sized prison systems.

60.     I concur with Dr. Stewart's observation in section H. 80 of his declaration that confinement units are the predominant settings for suicides in prison systems, but correlation is not causation and there are many variables involved in suicide risk (e.g. mental illness, substance abuse, prior suicide attempts, hopelessness, etc.) besides staff errors.  However, linking staff shortage with the death is again subject to the post hoc, ergo propter hoc fallacy i.e. after there was a problem with the safety checks, therefore because of that problem, the inmate's death was a result of a staffing shortage and lack of treatment resources. There is no assertion in Dr. Stewart's declaration that a staff shortage was the de facto reason for the death.

61.     The effective management of inmates at risk for suicide or serious self-injuries is among the most important challenges facing correctional professionals.  Not all suicides in correctional settings are preventable and some suicides are going to occur despite the best efforts of corrections staff members. The majority of jails and prisons in the United States have established suicide prevention programs for the inmates. Essential components of any suicide prevention plan, include: 1) Prevention training for correctional, medical and mental health staff; 2) intake screening, procedures for referral

to mental health and/or medical personnel; 3) re-assessment of inmates following a crisis

period; 4) effective communication between staff members involved with the inmate; 5)

supervision and safe housing options for suicidal inmates; 6) timely medical intervention

and 7) proper reporting. Suicide prevention and intervention training is provided to all

new NDCS employees initially during as part of the pre-service training at the staff

training academy. Annual training on suicide prevention and intervention is required for

all NDCS employees. It is my opinion that he NDCS policy, AR 115.30 Suicide

Prevention/Intervention, meets the basic requirements of an acceptable suicide prevention

program in a prison setting.

## F.  CONCLUSION

62.    As described in section II. 13 of my declaration, I was retained by the

NDCS to review the policies, procedures and practices pertinent to the delivery of mental

health services and provide expert opinion on whether they comprise acceptable

standards of care.   Whereas I have reviewed the policies and procedures, my evaluation

of the practices has been restricted to informal discussion with a limited number of staff,

observation of Dr. Stewart's brief interactions with inmates, and review of excerpts from

inmate records.  Accordingly, my professional opinion, therefore, on whether the NDCS

poses a risk of harm to inmates that require mental health care, is tentative.

63.    In my opinion, by way of adopting a distinctive mission statement for

mental health services (reference example in Exhibit 5), establishing a mental health

classification system with defined levels of care (reference Exhibit 4) with attendant

treatment, services and documentation requirements in policy and practice, and offering

sufficient structured and unstructured out-of-cell hours for inmates with a serious mental

illness (as defined in Nebraska statute (Neb. Rev. Stat. 44-792) in extended restrictive housing, the NDCS would not pose a substantial risk of serious harm to inmates that require mental health treatment and services. I understand that the NDCS is actively revising their policies and/or working on the development of policies for a mental health classification system, defined levels of care and enhanced treatment planning.

64.    A structural re-organization of the behavioral health delivery system and development of a quality assurance program and management information system will ensure more efficient and effective delivery and oversight of mental health treatment and services in the NDCS.  The planned consolidation of LCC and DEC to create a Reception and Treatment Center (RTC) comprising two new buildings with a total capacity of 400 beds will also advance efficiencies.

This declaration is submitted pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration is executed on this 8th day of May, 2019.


Dean Aufderheide, M.A., Ph.D.