## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **HANNAH SABATA, et al.,** | **Case No. 4:17-CV-3107** |
| **Plaintiffs,** | |
| **v.** | **BRIEF IN OPPOSITION TO** |
| | **CLASS CERTIFICATION** |
| **NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al.,** | |
| **Defendants.** | |

## INTRODUCTION

Plaintiffs ask this Court, under the pretext of the Eighth Amendment, Americans with Disabilities Act, and Rehabilitation Act, to confer upon itself jurisdiction to assert control over the operation of the Nebraska Department of Correctional Services and Board of Parole and to judicially decree the individualized treatment, accommodation, and classification decisions with regard to thousands of inmates.

Plaintiffs seek to certify classes of diverse inmates with a variety of personal histories and backgrounds, complications, medical histories, mental health histories, dental histories, risk profiles based on their lifestyles, street drug use, behavioral issues, and disabilities, each relevant to each inmate's individual claims, under one umbrella. Then when Plaintiffs identify a medical, mental health, dental, restrictive housing, or ADA policy or practice they dislike, they claim such policy or practice both

applies to the composite plaintiff they have constructed and presents a risk of harm to all inmates.

Plaintiffs' composite plaintiff—and the myriad harms he has either suffered or is at substantial risk of suffering—simply does not exist in Nebraska's prison system. More specifically, Plaintiffs' class certification motion rests on allegations, not proof. Plaintiffs allege a diverse assortment of "systemic" shortcomings, none of which affect all proposed class members. Such a diffuse, varied, and indefinite class would be impossible to administer and should not be certified. Plaintiffs cannot establish commonality because they cannot show that all class members—or, indeed, even any discernible subset thereof—have suffered the same injury. Discovery has revealed that several Plaintiffs have suffered no injury at all, and none which can be traced to any single set of policies or practices.

Moreover, class membership is neither typical nor ascertainable, and the proposed superclass and subclasses are so broadly defined that they include inmates with no medical, mental, dental, disability, or restrictive housing injuries whatsoever. This renders it impossible for the Court to concretely identify the classes, and the effective result would be that the entire Nebraska prison population would be brought into their ambit. This would be a radical departure from the well-delineated parameters of representative litigation and would place this Court as a supervisor not over a discrete, readily-defined component of prison administration, but over virtually every aspect of healthcare delivery, disability accommodations, and restrictive housing.

2

At best, this group of Plaintiffs includes a handful of people who *may* have colorable—though not meritorious—malpractice or negligent-equivalent claims. But the evidence reveals that none could individually make out a successful federal law claim, much less one shared commonly with thousands of their fellow inmates. That evidence fails to present the Court with a common question, much less an opportunity for the Court to provide a common answer. It thus falls short of the fundamental requirements of Rule 23.

## TABLE OF CONTENTS

Statement of Facts ................................................................................................... 6

   I.  Nebraska Department of Correctional Services ................................................. 6

   II. Low Incarceration Rate and 103% Operational Capacity by 2022 .................. 9

   III.Increased Investment in Staffing ................................................................... 12

   IV.Comprehensive Health Services .................................................................... 14

   V.  Restrictive Housing, not Isolation or Solitary Confinement ......................... 25

   VI.Non-discrimination Toward all Individuals with Disabilities ....................... 35

   VII. The Importance of Parole…………………………………………........ 38

Legal Standards ..................................................................................................... 42

Argument .............................................................................................................. 45

   I.   Plaintiffs' Superclasses are Overbroad, Unworkable, and
      Contain Members Who Lack Standing ........................................................ 45

     A. The Proposed Superclasses are Overbroad and Unworkable ................... 46

     B. The Proposed Superclasses Contain Numerous Members who Lack
        Standing ..................................................................................................... 49

         i.    Eighth Amendment ............................................................................ 49

         ii.   Americans with Disabilities Act and Rehabilitation Act ............... 53

   II. Class Certification Here Would Violate Established Principles of
      Federalism .................................................................................................... 54

   III. Failure to Satisfy Rule 23(a) ...................................................................... 58

     A. No Common Questions or Answers ........................................................... 58

         i.    Eighth Amendment ............................................................................ 61

         ii.   ADA and Rehabilitation Act ............................................................ 71

iii.   *Parsons* ................................................................ 72

B. No Plaintiff Could Typify Members of Such Sprawling Classes .............. 75

C. Inadequate Plaintiffs Who Lack Credibility, Knowledge of the Suit, and
Standing ............................................................................... 78

i.   Plaintiffs Lack Credibility ................................. 80

ii.   Lack of Knowledge and Abdication of Role as Class
Representative .................................................... 89

iii.   Plaintiffs Failed to Provide Proof of Standing .................. 96

D. Failure to Prove the Proposed Class and Subclasses are Sufficiently
Numerous .............................................................................. 99

IV. The Proposed Class and Subclasses Fail to Meet the Requirements
of Rule 23(b) ....................................................................... 100

A. Failure to Satisfy Rule 23(b)(1) .................................................. 101

B. Failure to Satisfy Rule 23(b)(2) .................................................. 104

V. The Requested Relief Would Violate Rule 65(d) .......................................... 105

Conclusion ................................................................................... 107

## STATEMENT OF FACTS[1]

### I.   Nebraska Department of Correctional Services.

NDCS is the second-largest cabinet-level state agency with 2,400 positions and an operating budget of more than $215 million. Filing 316-23 at 9. NDCS maintains and administers "facilities required for the custody, control, correctional treatment, and rehabilitation of persons committed to the department and for the safekeeping of such other persons as may be remanded to [NDCS]" Neb. Rev. Stat. § 83-171.

The NDCS system consists of ten facilities that house more than 5,000 inmates. The Diagnostic and Evaluation Center ("DEC") processes all adult male prisoners upon intake. The Nebraska Correctional Center for Women ("NCCW") houses female prisoners and processes all females upon intake. The Nebraska Correctional Youth Facility ("NCYF") houses male prisoners up to the age of 21 years and 10 months and processes all male youth/adolescents upon intake. The Community Corrections Centers in Lincoln and Omaha ("CCC-L" and "CCC-O") house male and female prisoners who are eligible for work release. All other male prisoners are housed in one of the other five facilities: Lincoln Correctional Center ("LCC"), Omaha Correctional Center ("OCC"), Nebraska State Penitentiary ("NSP"), Tecumseh State Correctional Institution ("TSCI"), and Work Ethic Camp ("WEC").

---

[1] Defendants submit this factual background to aid in the Court's understanding of the operation of NDCS and BOP since this Court must consider the factual and legal theories of Plaintiffs' Complaint as part of its "rigorous analysis" required under Fed. R. Civ. P. 23. But because "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013), and "a decision to certify a class is far from a conclusive judgment on the merits of the case," *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 (8th Cir. 2018), Defendants do not provide an exhaustive refutation of the merits of Plaintiffs' claims or individual factual allegations unrelated to Rule 23's requirements.

NDCS is accountable to multiple state and federal requirements and oversight agencies. NDCS is accredited by the American Correctional Association ("ACA"). Filing 316-23 at 9. The ACA utilizes a nationally recognized and accepted audit process for correctional institutions and programs. *Id.* All facets of facility operations are scrutinized and impacted by this process. *Id.* Each facility is audited by ACA auditors once every three years. *Id.* NDCS was one of the first state departments of corrections to receive the prestigious Eagle Award signifying that all programs and facilities are accredited. *Id.* NDCS maintains that standing today with all 10 facilities, Central Office, and the Staff Training Academy accredited. *Id.*

All NDCS facilities undergo health inspections and are inspected by the State Fire Marshal. *Id.* The federal Prison Rape Elimination Act (PREA) requires states to meet a set of standards that include providing resources, investigative standards, national reporting and all facilities are audited for compliance. *Id.*

NDCS is also subject to extensive oversight from the Nebraska Legislature. In addition to the Judiciary Committee, beginning in 2014, the Legislature formed a series of special investigative or oversight committees including the LR 424 Special Investigative Committee, the LR 34 Special Investigative Committee, and the LR 127 Special Oversight Committee to investigate, identify, and study the system-wide programs and policies relating to the justice system. Moreover, the Legislature's Office of the Public Counsel (also known as the State Ombudsman's Office) investigates and resolves complaints relating to NDCS. Neb. Rev. Stat. §81-8,245. And the Office of Inspector General ("OIG") of the Nebraska Correctional System was

established in 2015 by the Legislature in order to provide for increased accountability and oversight of the Nebraska correctional system. Neb. Rev. Stat. §47-904. The OIG identifies and examines systemic issues of the Nebraska Department of Correctional Services and also investigates incidents resulting in death or serious injury that occur within the Nebraska correctional system.

As part of Nebraska's commitment to improving NDCS, all three branches of state government are actively involved in the Justice Reinvestment Act ("LB 605") of 2015, which has, in part, worked to reduce prison sentences, increase the use of problem solving courts, improve probation, parole, and post-release supervision, and invest in programming and staffing at NDCS. Filing 316-23 at 8; Filing 316-28 at 2.

A key component has been a significant increase in appropriations. A review of NDCS' General Fund budget shows Governor Ricketts and the Legislature have invested meaningfully in NDCS over the last four years. Filing 316-23 at 9.



*Id.;* Filing 316-28 at 12. In addition to these increases in the General Fund budget for NDCS, $152 million has been allocated for construction projects to address capacity and infrastructure needs. Filing 316-28 at 2.

## II.    Low Incarceration Rate and 103% Operational Capacity by 2022.

Nebraska does not over incarcerate. According to the most recent data from the U.S. Department of Justice, Bureau of Justice Statistics, Nebraska has the 13th lowest incarceration rate per capita in the nation and incarcerates 31% fewer residents than the national average, which is 397 persons per 100,000 residents. Filing 316-27 at 11. Compare Nebraska's incarceration rate to its neighbors:



But as state population increased between 2004 and 2017, new prison beds were not constructed. Filing 316-28 at 2. In 2017, Nebraska had the 9th fewest prison beds per capita in the nation. Filing 316-27 at 25. At 215 operational capacity beds per 100,000 residents, Nebraska had 42% fewer prison beds per capita than the national average. And fewer per capita beds than every neighboring state. Filing 316-27 at 25 (MO: 534; SD: 513; WY: 392; KS: 359; CO: 265; IA: 230).

9

NDCS responded by opening 100 beds in 2017, opening 160 beds in 2019, has 164 additional beds under construction, and another 384 beds that have cleared first round approval by the Legislature. Filing 316-28 at 2; Filing 316-19; Filing 316-20; Filing 316-21; Filing 316-22; Filing 316-24.



Once constructed, NDCS will have reduced its percent of design capacity from over 160% to 135%. *Id.* And <u>operational capacity will be reduced to 103% by 2022</u>. This work is in conjunction with Nebraska's implementation of LB 605 to reduce Nebraska's incarceration rate below its already low levels.

Capacity is a term which can be used in many ways. The capacity of a facility is defined by any of a number of combinations of the inmates housed and the ability of the supporting services within the prison to support those inmates and the buildings which house them.

The design capacity of a facility is the original capacity the facility was intended to serve, when core and bed space were aligned by original design intent. It

is the historical practice of NDCS to adjust the design capacity of a facility *only* when new housing units are designed and constructed. The adjustment is based on the design capacity of the new housing. For example, a facility designed decades ago to house one inmate per cell would report a percent of design capacity of 200% if two inmates were in a cell, regardless of subsequent infrastructure, treatment, staffing, or programming improvements at the facility. And regardless of whether the square footage per inmate met or exceeded legal standards or ACA accreditation.

As a result, design capacity is not the only metric. Because prisons are buildings with relatively long lifespans, changes to expand the operational capacity are common over time. Measuring by design capacity by itself, therefore, can present a skewed view of the operational stress under which a facility may be operating, and does not present a full picture of the needs of the facility.

Operational capacity reflects the number of inmates that can be housed in a facility and sustained indefinitely, given current conditions. Operational capacity plays a key role because it serves as a basis for assessing current facility conditions. In fact, nearly half of the states no longer report design capacity and only report operational capacity. Filing 316-27 at 25; Filing 316-44 at 7. One example of a project under construction at NDCS that will add few design capacity beds, but will increase operational capacity is the construction of Phase One of the Reception and Treatment Center ("RTC") at the LCC and DEC complex. Phase One of that project will connect the two facilities and address core infrastructure needs such as new healthcare clinic space, intake, visitation area and food services, as well as providing additional

11

housing for inmates with serious mental illness and educational, recreational, and rehabilitative programming space. *See* Filing 316-18. But adding these vital services that improve the operational capability of the complex will not significantly reduce the percent of design capacity. *See* Filing 316-44 at 7. This is just one example of why the operational capacity of NDCS is a key component in assessing conditions of confinement.

## III. Increased Investment in Staffing.

Part of the increased investment in NDCS includes staffing. NDCS conducted a staffing analysis after receiving training from the National Institute of Corrections. Filing 316-28 at 7. The final report was submitted in July 2016 and identified the need for an additional 138 custody staff, divided among the ten NDCS facilities. *Id.* To date, 48 positions have been funded by the Legislature. *Id.* Phase 2 of the Staffing Analysis would add 24 FTE in FY2020 and an additional 24 FTE in FY2021, for a total of 48 FTE in FY2021. *Id.* Phase 3 would address the remaining 42 custody positions from the staffing analysis and will be requested in the 2021 – 2023 Biennium Budget Request. *Id.*

Even though a recent order from the Nebraska Commission of Industrial Relations generally held wages flat for NDCS officers after finding that Nebraska pays correctional officers better than peer states, Filing 316-29, NDCS recognizes the importance of increasing its investment in staffing and has committed to a new pay plan. Filing 316-30. That plan includes merit raises for hitting career milestones and builds on previous initiatives to reduce turnover. *Id.* Those initiatives include:

12

## 2015

Expanded internship program

Hired agency recruiter

Increased advertising outreach through TV, radio, newspaper, billboards, video and online

Video series was launched highlighting internships, behavioral health, internal promotions, mentoring, tuition assistance and more

Streamlined hiring process for correctional officers

Victim Services and ADA became separate departments

Compensation increases for dually licensed behavoral health teammates

## 2016

60+ recruitment events

Reorganized Training, Professional Development and Emergency Preparedness

Training and Development Administrator position created

Agencywide culture study undertaken

Desert Waters – Corrections Fatigue to Fulfillment  - 500 staff trained in an eight hour course. Twelve NDCS staff became certified instructors and taught course across the agency

Compensation and retention strategies launched including bonuses, and pay increases.

Launched Process Improvement department

FranklinCovey All Access Pass created to for leader development

New hire referral pilot program launched

$1.5 million retention LB 657

## 2017

100 recruitment events including: colleges, high schools, various professions and interest groups

Use of iPad to assist individuals in signing up for job alerts and explaining the application process at recruiting events

Utilization of digital and regular billboards, targeted ads, bus wraps, movie theater ads for recruitment

Utilization of digital marketing (geo fencing / geo targeting)

Hired Staff Advocacy and Victim Services Coordinator

Pilot and launch Supervisor Sergeants at Nebraska State Penitentiary

Leadership Academy Launched. Eight cohorts completed during the year

FranklinCovey leadership trainings

Compensation strategies implemented including pay increases, merit incentives, a $2,500 recruiting bonus.

Start hiring corporals instead of officers

Special detail pilot - OCC hires for TSCI

Merit incentives at TSCI

$2,500 recruiting bonus - 96 new hires at NSP/TSCI

## 2018

Revised qualifications of the Unit Management classification series

120 recruitment events

Added award categories to recognize staff for excellence in mentoring, innovation and customer focus

FranklinCovey courses to enhance leadership development

Case Management Academy launched agency wide

SMART goals launched with focus on recognition of others, cultural engagement, and training

Family welcome event launched at each staff training graduation

Special detail pilot expanded to 60 officers

## 2019

Pilot permanent part time positions at Nebraska State Penitentiary

Gallup initiative launched focused on employee engagement and strengths

First Level Leader Academy launched

New Union contracts negotiated with pay increases for covered staff

Increased referral incentive and retention incentives including $3,000 hiring bonus, supervisor retention bonus and merit incentives.

Expand Supervisory Sergeants across the agency

13

Filing 316-61. On top of these investments, in FY2020, the Legislature is proposing another $4.2 million investment in staffing and programming at NDCS. Filing 316-28 at 4.

Like most prison systems, NDCS has vacancies. All ten facilities have minimum staffing levels that reflect the number of people required to safely supervise the level of inmate movement at any given time of the day. The minimum staffing level during the high movement times of the day (feeding, programming, clinical treatment, work) is significantly higher than 10pm to 6am where no scheduled inmate movement occurs. When vacancies result in a facility being below minimum staffing levels, off-duty staff are compensated at an overtime rate to fill the vacancies.

Specifically regarding health services staffing, NDCS acknowledges not every position is filled at this time. NDCS is not immune from Nebraska's shortage of nurses and other medical professionals. *See* Filing 316-31 at 7. NDCS is actively working to address this ongoing issue with new recruitment and retention efforts, including hiring international nurses, Filing 316-8 at 253:4-255:3, and increasing salaries. To maintain continuity and quality of care, NDCS utilizes contract services.

## IV.    Comprehensive Health Services.

Health services provided by NDCS include the practice of medicine and surgery; the practice of pharmacy, nursing care, dental care, optometric care, audiological care, physical therapy, and mental health care including substance abuse counseling and treatment. Filing 316-57 at 2. In administering health care services, NDCS provides a community standard of health care to all inmates. Neb.

14

Rev. Stat. § 83-4,155. It is the mission of NDCS to "provide humane, comprehensive and integrated health care; including program opportunities consistent with standards of quality and scope of services found in communities to promote health and well-being of individuals placed in [its] custody." Filing 316-57 at 3.

Inmates at NDCS are provided unimpeded access to health care. Filing 249-83. Inmates can access health care in several different ways. First, inmates can use an Inmate Interview Request ("IIR"). IIRs are printed forms used by NDCS inmates to communicate with staff (ask questions, communicate concerns, request medical treatment, request program information, request transfer, etc.). Filing 127-1 at 5. An IIR is utilized for accessing routine, non-emergent medical care. Filing 316-8 at 92:4-13. Upon completion of the IIR form, inmates place it in a designated box inside of his/her housing unit. Filing 316-8 at 93:1-25. If an inmate resides in a housing unit that does not have a designated box of IIRs, he/she can simply hand the completed IIR to custody or medical staff. Completed IIRs are reviewed by housing unit or custody staff. Filing 249-38 at 22, ¶ 46. If the IIR is related to medical services, it is provided to medical staff. Filing 316-8 at 94:7-15. IIRs are then triaged daily by a health professional, not custody staff as alleged by Plaintiffs' expert. Filing 316-31 at 12; *see* Filing 249-83. If an inmate's custody status precludes attendance at sick call or clinic, arrangements are made for a medical professional to provide services where the inmate is located. *See* Filing 249-83. Medical professionals make door-to-door visits to restrictive housing units on a daily basis. *Id.* Further, an inmate with more emergent health care needs (acute illness or unexpected health need that cannot be

deferred until the next scheduled sick call or clinic) may access care by notifying custody or medical staff. Filing 316-8 at 324:15-19.

At NDCS, medication may be administered by both custody and medical professional staff. All staff that administer medications are at least medication aide certified. Filing 316-8 at 126:2-127:5. All medications are blistered packed to the individual patient. Filing 316-31 at 10. Medication distribution is twice a day; however, if a medication was ordered to be given more frequently, then it is given more frequently, consistent with the orders of the provider. *Id.* In the summer of 2018, NDCS began implementing an electronic medication administration records system ("EMAR"). Filing 316-8 at 128:18-25; 239:22-240:2. Every facility, with the exception of NSP, currently utilizes an EMAR.

NDCS maintains health records for thousands of inmates. Currently, NDCS utilizes both electronic and paper medical records. Medical records from medical treatment, dental treatment and mental health treatment are separate files. However, NDCS is in the process of implementing a consolidated, electronic records system. Filing 316-28 at 7; Filing 316-8 at 102:10-103:3. The change to electronic health records will allow for improved tracking of transfers within the agency and outside of NDCS, allow record sharing with outside providers to ensure continuity of care, and allow NDCS to provide a more holistic approach to health care.

Mental Health Care

Access to mental health care starts at intake. At admission into NDCS custody (DEC for adult males; NCYF for male youth/adolescents and NCCW for all females),

16

all newly admitted inmates and parole violators, arriving directly from the community, are screened for mental health needs. Filing 316-57 at 15. The assessment is done by both custody and medical staff. Filing 316-38 at 17, ¶ 44; Filing 315-1 at 4, ¶ 15. If, during that time, it is determined that the inmate was receiving psychiatric and/or psychological services and/or psychotropic medication immediately prior to incarceration at NDCS, the inmate is referred to a psychiatrist or other mental health professional for an additional assessment to determine if continued mental health treatment and services are needed. Filing 316-14 at 4. Further, psychotropic medication is continued as prescribed upon placement in NDCS custody until the inmate is evaluated by a psychiatrist or other mental health professional. *Id*. Additionally, within 14 days of admission into NDCS custody, all inmates are seen by a licensed mental health professional for a comprehensive evaluation, which includes review of any prior screening, direct observation of behavior, compilation of the inmate's mental health history, and development of an overall treatment plan. *Id.*

Contrary to Plaintiffs' allegations, NDCS utilizes levels of care and is currently in the process of developing a written policy. Filing 316-8 at 160:23-161:23; Filing 316-38 at 17-18, ¶ 45; Filing 315-1 at 3, ¶ 11. Currently, NDCS has an Acute Mental Health Unit ("AMHU") and a Chronic Care Mental Health Unit ("CCMHU"), both of which are located at LCC, with similar beds at NCCW. Filing 316-25; Filing 316-26. AMHU is designed to provide controlled and highly structured housing for inmates in need of clinical mental health treatment, immediate intervention, and a higher

17

level of care. Filing 316-26. The AMHU at LCC is a 15-bed unit, consisting of 5 acute beds suitable for inmates on Plan A/B suicide watch as well as 10 subacute beds. Inmates in acute beds have daily contact with housing unit staff as well as medical professionals. Inmates in subacute beds have daily contact with housing unit staff as well as at least weekly contact with medical professionals. Placement in AMHU requires a consensus between a psychiatrist and/or psychologist from the initiating facility as well as LCC mental health unit staff.

CCMHU is a 15-bed residential mental health unit that serves inmates with chronic and unstable mental illness, developmental/intellectual disabilities, and traumatic brain injuries. Filing 316-25. Inmates in CCMHU get a minimum of four hours per day of out-of-cell time and individual treatment plans. Placement in CCMHU requires a recommendation from the CCMHU Multi-Disciplinary Team (MDT), consisting of a psychiatrist, psychologist, warden/designee, mental health practitioner, nurse, social worker, behavioral health caseworker and unit staff.

LCC also offers a continuum of residential and robust outpatient treatment. Specifically, LCC has an 88-bed residential mental health unit that serves inmates with serious mental illness that are struggling with medication/treatment compliance or have a need for on-going residential clinical treatment. Further, NDCS provides outpatient care to inmates with mild or minor impairment in mental health functioning or inmates with a serious mental illness who reside in general population. Filing 316-8 at 226:9-13. Placement at this level of care is done by a mental health

18

professional. Inmates receiving outpatient care are seen at least monthly by a mental health professional and are assessed at least every 90 days by a psychiatrist.

To the extent an inmate's mental health needs exceed the level of care NDCS provides, the inmate can be transferred to the Lincoln Regional Center ("LRC"). Filing 316-8 at 246:14-22. LRC is a 250-bed Joint Commission-accredited state psychiatric hospital that is located less than five miles from LCC. LRC is operated by the Nebraska Department of Health and Human Services. In the last two years, however, NDCS has not had to send any inmates to LRC. Instead, they have elected to work collaboratively with LRC by having one of LRC's psychiatrists visit an inmate and assist with developing a treatment plan. Filing 316-8 at 247:9-14.

For psychiatric services specifically, NDCS utilizes its own psychiatric staff as well as telepsychiatry. As addressed by Dr. Terry Davis, telepsychiatry has been used in Nebraska since the 1950s. Filing 315-1 at 6, ¶ 25. It is a "recognized and accepted method of performing psychiatric evaluations and treating psychiatric patients." *Id*. Telepsychiatric services are provided using a laptop in a medical treatment room. NDCS medical professionals attend telepsychiatric appointments along with the inmate.

Of note, none of the inmates addressed by the Plaintiffs' expert, Prisoners A through J, are Plaintiffs in this case. Filing 249-41. At least one of them is no longer in NDCS custody. Moreover, for the reasons addressed by Dr. Davis, a board certified psychiatrist licensed to practice in Nebraska, Plaintiffs' expert opinions are overly

broad, speculative, and lack adequate medical or psychiatric basis or foundation. Filing 315-1.

Moreover, contrary to what Plaintiffs allege, mental health care at NDCS is not haphazard or understaffed. As opined by Dr. Dean Aufderheide, a licensed clinical and forensic psychologist who is currently serving as the Director of Mental Health Services for approximately 100,000 inmates in Florida as well as the National Mental Health Expert for the ACA, "with about sixty clinical staff to provide and/or supervise mental health treatment and services, the ratio of clinical staff to the mentally ill population is about 1:40, which is well within the range of acceptable staffing levels." Filing 316-38 at 15, ¶39. Further, as discussed in Part III above, NDCS has invested heavily in new recruitment and retention efforts.

<u>Medical Care</u>

Like mental health care, access to medical care starts at intake. Medical screenings are performed by qualified health care personnel on all patients upon the patient's arrival at the facility. Filing 249-84 at 3. All findings are recorded on the Intake Medical Screening form and Patient Questionnaire and Health History form. *Id.* Patients who need immediate medical attention are referred. *Id.* at 4. A comprehensive health appraisal for each patient, including a medical examination, is also completed. *Id.* at 5. Clinical services are available to patients in a clinical setting at least five days a week and are performed by a physician or other qualified health care professional. Filing 249-83 at 4. Patients who need health care beyond the resources available in their particular facility are transferred to a facility where such

care is on call or available 24 hours per day. *Id.* Such care includes a physician on call or available 24 hours per day, and health care personnel on duty 24 hours per day. *Id.* at 5.

All medical matters involving clinical decisions are the sole province of the responsible physician and are not countermanded by non-clinicians. Filing 249-82 at 5. Arrangements are made with health care specialists as determined by need. Filing 249-83 at 4. There is no backlog or delay for specialty consultations. Filing 316-31 at 13.

Dr. David Thomas, a medical doctor and professor with extensive experience in institutional medical settings, including service as Deputy Secretary for Health Services for the Florida Department of Corrections, closely reviewed the relevant aspects of the healthcare system within NDCS. Filing 316-31. It is his opinion that "NDCS meets or exceeds the standard of care requirements for the delivery of healthcare in a correctional system." Filing 316-31 at 16. He "observed no deficiencies in NDCS' medical care policies or practices that place the inmate population at a substantial risk of serious medical harm." *Id.*

In developing his opinions, Dr. Thomas relied on his extensive experience, *id.* at 1-2, his review of thousands of pages of records, and his tours of seven NDCS facilities. *Id.* at 2-3. In his opinion, intake screening is conducted upon arrival at NDCS and is conducted by qualified personnel in a manner not only consistent with NDCS' own published policies for initial medical screening, but also with American Correctional Association standards. Filing 316-31 at 12, ¶55. While Plaintiffs' expert

offers myriad criticisms regarding the use of LPNs in NDCS—including at the intake stage—their utilization here is consistent with that of virtually every other correctional system in the United States. *Id.* Moreover, every incoming inmate is educated at intake as to the availability of, and how to access, medical care at NDCS. Filing 316-31 at 5, ¶17. Plaintiffs' medical records even include written acknowledgment *by Plaintiffs themselves* of their receipt of this information. *Id.*

Inmate access to care is "excellent" within NDCS. Filing 316-31 at 12, ¶56. Inmate requests for care are typically reviewed within 24 hours. *Id.* Chronic care is performed well, and electronic scheduling is utilized to ensure recurrent visits for patients with chronic conditions. *Id.* In all material respects, Plaintiffs' assertions of problems with regard to the delivery of chronic care to needy patients are "unsubstantiated" or at best, isolated and non-systemic. *See id.*

NDCS has taken aggressive steps to further improve the delivery of health services to inmates. Continuity of nursing staff, including with contract nurses to fill the inevitable nurse vacancies stemming from the nationwide nursing shortages, is a priority. Filing 316-31 at 8, ¶35. The recruitment of nurses from overseas is an innovative new initiative to address long-term nurse staffing needs. Filing 316-31 at 8, ¶36. Because of NDCS' efforts, Dr. Thomas states, "the staffing levels of providers to patients was rich by correctional standards." *Id.* at 9. Finally, he observed no barriers to providing medical care from security staff and "witnessed no signs of poor medical decision making, much less on a system-wide basis." *Id.* at 12.

Of the named class representatives, Plaintiffs' expert could identify only three whose charts showed what he perceived as deficiencies worth commenting on. Dr. Thomas has observed that these "deficiencies" are alternatively simply incorrect or unique to the respective patient's individual health situation, but in no event traceable to any system-wide policy or practice problem. *See* Filing 316-31 at 13-15, ¶¶61-65. In sum, the record is devoid of factual evidence that supports the notion of systemic substantial risk of serious harm to inmates. Each inmate is unique—even among the inmates discussed by the Plaintiffs' expert, the only nexus between them is their status as NDCS inmates, Filing 316-31 at 15, ¶67—and to the extent there have been shortcomings in individual care scenarios, they are unique to those cases. But overall, NDCS meets or exceeds the standard of care requirements for the delivery of healthcare in a correctional system. Filing 316-31 at 15, ¶ 68.

<u>Dental Care</u>

Under the direction and supervision of a licensed dentist, NDCS provides emergent, urgent, routine, and prosthodontic dental care to confined persons within its custody. Filing 249-83 at 6; Filing 249-81 at 2-3. All dentists employed or contracted by NDCS are licensed by the Nebraska Department of Health and Human Services. Filing 249-81 at 2. Dental matters involving clinical decisions are the sole province of the responsible dentist and are not countermanded by non-clinicians. Filing 249-82 at 5. NDCS is committed to providing dental services consistent with applicable federal and state laws governing dental care. Filing 249-81 at 2.

23

Dental screenings are conducted for inmates within seven days of their admission to NDCS. Filing 249-83 at 6. A full dental examination by a dentist is provided to new arrivals within thirty days. *Id.* Oral hygiene, oral disease education, and self-care instructions are provided by qualified health care providers within thirty days of an inmate's arrival at NDCS. *Id.* Consultations and referrals to outside dental specialists, including oral surgery, are also provided when necessary. *Id.*

Inmates at NDCS are allowed routine oral examinations and prophylactic cleanings once a year. Filing 249-81 at 3-4. In addition to routine dental care, if an inmate sends an Inmate Interview Request ("IIR") complaining of dental pain, the inmate will be seen by NDCS dental. Filing 249-80 at 319:18-23. NDCS also provides twenty-four hour emergency care. Filing 316-56 at 2. Inmates with dental emergencies at NDCS are seen within twenty-four hours or sooner depending on the acute nature. Filing 315-3 at 5. Pursuant to NDCS protocol, emergency dental care encompasses services to alleviate severe pain. Filing 249-81 at 3. Denture-related treatments are also provided when clinically indicated. *Id.*

Dr. Philip Rich, DDS, has practiced dentistry in Nebraska for over forty years. Filing 315-3 at 2. In addition to his dental practice, Dr. Rich has previously served as a clinical instructor at the University of Nebraska College of Dentistry. *Id.* at 1. At the Defendants' request, Dr. Rich has reviewed the quality of dental care provided at NDCS, and Dr. Rich explains in his declaration Plaintiffs' lack of proof regarding their allegations of inadequate dental care. *Id.* at 5-8. Dr. Rich also notes in his declaration that NDCS strives to take care of the dental needs of its inmates and is

24

reviewing ways to improve the delivery of its dental care. *Id*. at 8. Dr. Rich also notes that the dental care at NDCS is consistent with the level of care provided by dentists in the Nebraska community. *Id*.

## V.    Restrictive Housing, not Isolation or Solitary Confinement.

NDCS does not use isolation. While it is a convenient term for Plaintiffs' narrative, it does not exist in Nebraska. Solitary confinement, "the status of confinement of an inmate in an individual cell having solid, soundproof doors and which deprives the inmate of all visual and auditory contact with other persons," Neb. Rev. Stat. § 83-170(14), is prohibited under Nebraska law. Neb. Rev. Stat. § 83-4,114.

What NDCS does use is restrictive housing. Restrictive housing is defined as "conditions of confinement that provide limited contact with other offenders, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week." Neb. Rev. Stat. § 83-170(13). The use of restrictive housing is subject to extensive oversight from the public, Legislature, Governor, Ombudsman, Office of Inspector General, and the long-term restrictive housing work group. Neb. Rev. Stat. § 83-4,114. The long-term restrictive housing work group consists of NDCS personnel, two representatives from a nonprofit prisoners' rights advocacy group, including at least one former inmate, and two mental health professionals independent from NDCS with particular knowledge of prison and conditions of confinement. *Id*. All of which advise the department on policies and procedures related to the proper treatment and care of offenders in long-term restrictive housing. *Id*.

Nebraska law provides, "No inmate shall be held in restrictive housing unless done in the least restrictive manner consistent with maintaining order in the facility and pursuant to rules" adopted by NDCS. Neb. Rev. Stat. § 83-173.03. Those rules, at AR 210.01, "establish behavior, conditions, and mental health status under which an inmate may be placed in each confinement level as well as procedures for making such determinations." *Id.* They also "provide for individualized transition plans, developed with the active participation of the committed offender, for each confinement level back to the general population or to society." *Id.* Prior to placement in restrictive housing, every inmate receives a face-to-face health assessment including a review of any physical injuries, urgent mental health needs, or other emergent or urgent conditions. Filing 249-84 at 6.

The purpose of AR 210.01 is to provide policy to ensure that restrictive housing is "an alternative of last resort and will be utilized in the least restrictive manner possible for the least amount of time consistent with the safety and security of staff, inmates, and the facility."  Filing 316-53 at 2. More specifically, AR 210.01:

> "establishes specific levels of confinement outside of general population . . . defines behaviors, conditions, and mental/behavioral health statuses whereby an inmate may be placed in each confinement level; defines and mandates processes and procedures for making these determinations for each level of confinement; and describes and mandates individualized transition plans for promotion to less restrictive housing assignments at the earliest opportunity that maintains safety and security."

*Id.* AR 210.01 further provides that "[w]hen restrictive housing is used, the purpose shall be two-fold: short-term risk assessment and longer-term risk/needs intervention."  *Id.* It is not used as a disciplinary tool or a sanction, a fact which is

26

supported by Defendants' expert Eugene Atherton. *See* Filing 316-44 at 11 ("According to the Vera report, NDCS has gone above and beyond by eliminating restrictive confinement as a sanction for rules violations.").

Mr. Atherton has over forty years of experience in corrections. *Id.* at 1. He has held correctional positions including case manager, housing lieutenant, housing captain, manager for security and housing, chief of security, warden, and Regional Director of prisons in Colorado. *Id.* at 1-2. In addition, Mr. Atherton has served as an expert witness and consultant on correctional issues for over twenty years and has worked as an expert on correctional operations for the Department of Justice. *Id.* at 2. Mr. Atherton has also published corrections-related books and articles for the American Correctional Association and has lectured on correctional issues both nationally and worldwide. *Id.* Mr. Atherton's declaration provides numerous insights into restrictive housing and other operations of NDCS. *See* Filing 316-44.

The purpose of Immediate Segregation (IS) is so that NDCS has "time to assess the risk the individual poses to safety and security" while the focus of Longer-Term Restrictive Housing (LTRH) is "individualized goal planning, behavior change, and treatment that will facilitate the inmate's capacity to live successfully in general population and return successfully to the community."  Filing 316-53 at 5. The AR provides for six reasons that an inmate could be placed on IS status: (1) an incident of serious violent behavior (such as assault or attempted assault) directed at staff or other inmates; (2) recent escape or attempted escape; (3) threats or acts of violence that destabilize the institutional environment such that the facility's order and

27

security are significantly threatened; (4) active membership in a security threat group (prison gang) along with a finding, based on specific and reliable information, that the inmate has either engaged in or directs others to engage in dangerous or threatening behavior; (5) inciting or threatening to incite group disturbances inside a correctional facility; or (6) the inmate's presence in the general population would create a significant risk of physical harm to staff, themselves, and/or other inmates. *Id.*

The Warden must review and approve an inmate's continued placement on IS status within 24 hours. *Id.* at 6. If the Warden approves continued IS status, the decision is reviewed again within 15 days. *Id.* The inmate is also seen by mental health staff within 14 days. *Id.* at 6-7. If there is a request to leave the inmate on IS status for longer than 30 days, it must be recommended by the Warden and also approved by the Deputy Director – Prisons. *Id.* at 7. Any request to leave an inmate on IS status for longer than 45 days must be approved by the Director, and the maximum amount of time an inmate can be on IS status is 60 days. *Id.*

LTRH is used when an inmate needs more intensive supervision and behavioral intervention before going to an appropriate non-restrictive housing setting. *Id.* Like IS status, LTRH is not used as a disciplinary tool or a sanction. The focus of LTRH is on "targeted individualized intervention with a primary emphasis on pro-social behavior, interactions with others, life-view change, incentives for positive change, and successful transition to lower levels of security." *Id.* at 8. NDCS has implemented programming in recent years to help address the behaviors that

28

result in an inmate's placement in restrictive housing and help inmates make better choices in the future, and NDCS continues to look for improvements to be made. *See* Filing 316-7 at 177:24-178:19; *see also* Filing 316-8 at 332:2-7 ("Q: So individuals in restrictive housing can and do receive group therapy?  A: Yes. Q: Would you like to provide them more group therapy?  A: Yes, definitely.").

LTRH is a classification action, so all assignments to LTRH require a classification hearing. Filing 316-53 at 8-9. Decisions about LTRH are made by the Central Office's Multi-Disciplinary Review Team ("MDRT") and can be appealed to the Director. *Id.* at 9-10. An inmate's placement on LTRH is reviewed every 90 days, and every review is a new classification action that can be appealed. *Id.* at 10. Inmates held longer than 365 days receive a review every 30 days that includes the agency Director. As before, every classification review can be appealed. The Director answers all classification appeals for LTRH assignments.  Decisions and reviews of an inmate in LTRH must include consideration of the inmate's mental health needs. *Id.* at 8.

Every inmate in LTRH must have a Behavior/Programming Plan, which describes the steps and criteria for inmates to transition back to general population or another type of non-restrictive housing. *Id.* at 11. The Behavior/Programming Plan includes "an incentive-based system that encourages pro-social behavior and program engagement" and involvement by the inmate to help create the goals, areas for improvement, and incentives to be earned. *Id.* For example, every inmate in restrictive housing is provided with a television (one per cell), subject to

29

Behavior/Programming plan compliance once the inmate is assigned to LTRH. *Id.* at 16-17. Unit staff also monitors the inmate's behavior and notes his progress, and the Warden then reviews that information to make a recommendation as to whether or not the inmate should be moved to a less restrictive environment. *Id.* at 11.

AR 210.01 is consistent with national standards, as was found by Defendants' expert Dr. John Stoner, Ph.D. in his review of NDCS Administrative Regulations. *See* Filing 316-47 at 6. Dr. Stoner worked as a psychologist in high security prisons for most of the last 22 years of his career. *Id.* at 1. In 1993, he was the first psychologist in the newly created Colorado State Penitentiary, which was designed as a very high-security facility that also provided extensive programming. *Id.* at 4. In 2018, NDCS staff toured parts of that facility on a trip coordinated by the Vera Institute of Justice. Filing 316-7 at 159:2-12, 162:12-16. Dr. Stoner served as a Clinical Psychologist for Pelican Bay State Prison working largely with high security inmates in the Psychiatric Services Unit from 2009 to 2015 and was a psychologist for the Colorado Department of Corrections for seventeen years before that, where his primary focus was the treatment of "dangerous and disruptive offenders." Filing 316-47 at 1. He also helped redesign the intake screening process for inmates sentenced to the Colorado Department of Corrections and instituted "a research program to help identify the personality characteristics of incoming inmates that can be used to help provide more accurate placement and management strategies." *Id.* at 2.

As Dr. Stoner states in his declaration and AR 210.01 recognizes, "'[o]ne size fits all' does not work as an approach to what creates or contributes to mental illness.

30

It is also not an effective approach to the treatment of that mental illness." *Id.* at 8. Related to restrictive housing, Dr. Stoner finds that the "major mental variables distinguishing inmates in higher levels of custody from those at lower levels falls into the category of 'characterological' or personality problems." *Id.* at 12. Moreover, Dr. Stoner finds that "it is usually the personality disorders that produce the behaviors of concern . . . and not the problems known as mental illness." *Id.* at 14. He goes on:

> A good example of this is the inmates identified as having excessive placement in restrictive housing. These particular inmates, in addition to having various diagnoses of mental illness, also display significant personality disorders that have clearly contributed to the behavior that produced their incarceration, and which contributed to the behaviors that resulted in placement at higher levels of security.

*Id.* He also states, "The prison is required to keep this individual and manage them in a manner that strikes a balance between maintaining safety and order in the facility and responding to the various needs of the individual." *Id.* at 13.

Pursuant to AR 210.01, mental health staff conducts weekly cell-front visits for all inmates in LTRH, and requests for consultation can also be made by inmates or staff on their behalf. Filing 316-53 at 11. Being in LTRH does not affect an inmate's ability to have individual therapy. *See* Filing 316-8 at 252:16-19. If the inmate has a diagnosis of serious mental illness, and if the inmate agrees, mental health staff will conduct monthly one-on-one therapeutic assessments where the inmate is out of his or her cell. Filing 316-53 at 12. Depending on the inmate's needs and mental health diagnosis, an individual treatment plan might be developed by clinical staff, with inmate input, when the inmate is in LTRH. *Id.* An inmate's individual treatment plan

identifies at least problem areas, goals, interventions, and coping strategies, and is reviewed on a regular basis. *Id.*

AR 210.01 provides that where possible, NDCS should use alternatives to restrictive housing, such as short-term cell restrictions, loss of privileges, or changes in programming assignments. Filing 316-53 at 3. Mission-specific housing is also an alternative to restrictive housing. *Id.* The Challenge Program ("TCP") is mission-specific housing that is essentially a step-down program for restrictive housing. Filing 316-54 at 2. TCP "provides a controlled and highly structured alternative to restrictive housing for individuals who have demonstrated an institutional history of violent and/or [STG] behavior[.]" *Id.* TCP was officially launched in September 2017. Filing 316-55 at 2.

TCP consists of three phases, which are all currently located at TSCI. Filing 316-54 at 2. Phase I of TCP begins at the Special Management Unit ("SMU") at TSCI, while the inmate is still in restrictive housing. *Id.* at 2; Filing 316-55 at 2. Unit Managers/Unit Case Managers have at least weekly contact with all active TCP participants, and Behavior/Programming Plans for inmates in TCP include programming for Phase I. Filing 316-54 at 4.

TCP Phase I participants are first assigned programming including Orientation to TCP and Preparing for Change (in-cell interactive journal). *Id.* at 4-5. After completing Preparing for Change, Phase I participants begin Moral Reconation Therapy (MRT) in a small group format – no more than eight participants. *Id.* at 5. If an inmate fails to successfully complete the Phase I requirements, and his behavior

still creates a risk to the inmate, others, or the security of the institution, he remains in LTRH. *Id.* If an inmate finishes all Phase I programming and also demonstrates appropriate institutional behavior, he may be moved to Phase II. *Id.*

Phase II of TCP, on TSCI's Housing Unit #2B/upper gallery, is a slightly less restrictive environment: participants have a minimum of four hours out-of-cell time each day, including daily access to showers, dayrooms, scheduled programming, and outdoor recreation on a scheduled basis. *Id.* Participants can have dayroom time and recreation time in groups of no more than eight inmates, in the discretion of the Unit Manager and with input from facility intelligence staff and the Warden/Designee; and generally participants are able to move unrestrained within Housing Unit #2B. *Id.* For Phase II participants, televisions are an earned incentive item that they are provided when they start in Phase II, but can be taken from them. *Id.* GTL tablets are also earned incentive items with Phase II that are retained only with continued TCP participation. *Id.* Access to personally owned CD/MP4 players/JPay Tablets is a standard incentive but again may only be retained with continued TCP participation. *Id.*

Phase II participants also have required programming: seven interactive journals in the Challenge Series. *Id.* To complete Phase II, an inmate must complete the seven journals of the Challenge Series and also have appropriate institutional behavior for the preceding three consecutive weeks. *Id.* at 6-7. Inmates recommended for a clinical residential program might be moved after they have started TCP but

33

prior to completing TCP, if it is determined to be a viable option. *Id.* at 2; *see also* Filing 316-55 at 3.

Once an inmate moves to Phase III of TCP on Housing Unit #2B/lower gallery, he is housed in an even less restrictive environment. Filing 316-54 at 7. Phase III participants have at least five hours out-of-cell time per day, including daily access to showers, dayrooms, scheduled programming, and outdoor recreation on a scheduled basis. *Id.* Like Phase II, participants in Phase III can also have dayroom time and recreation time in groups of no more than eight inmates. *Id.* Phase III participants are also able to move unrestrained within Housing Unit #2B, but additionally can be unrestrained for movement outside of the housing unit. *Id.* at 7-8. The only restriction is that Phase III participants must be escorted by one staff member per every five participants, and no more than five Phase III participants can attend the same off-unit earned incentive activity at one time. *Id.* at 8.

In Phase III, meals in the dayroom are an earned incentive, as are contact visits: participants can have two week-day or one weekend-day contact visits per week (consistent with the facility schedule). *Id.* A GTL tablet is a standard incentive, as is access to e-messaging kiosks and personally owned CD/MP4 players/JPay Tablets, although these standard incentives require continued TCP participation. *Id.* Televisions are also earned incentive items. *Id.* Finally, Phase III participants are eligible for housing gallery work assignments. *Id.*

Phase III participants must complete two required programs, in no specific order. First, participants must complete group programming using Thinking for

Change, with groups of up to eight participants in secure programming chairs. *Id.* Second, participants must complete group programming using Getting it Right, again in groups of up to eight participants in secure programming chairs. *Id.* Once the participant starts the first of these programs, he receives an additional hour of out-of-cell time per day and is also given the opportunity to participate in one weekly general population off-unit activity or other available program at TSCI. *Id.* at 9.

Weekly group incentives such as access to movies, gym time, dayroom meals, snacks, and guest speakers are provided to Phase III participants who maintain compliance with program expectations. *Id.* To complete Phase III, an inmate must complete required programming and also maintain appropriate institutional behavior. *Id.* The inmate will be considered for transfer to a non-TCP NDCS housing unit such as general population after completing programming and meeting behavior expectations for the preceding four consecutive weeks. *Id.* at 10.

## VI.   Non-discrimination Toward all Individuals with Disabilities.

NDCS subscribes to a policy of non-discrimination toward all individuals with disabilities, whether they are employees, inmates, or visitors. Filing 316-51 at 2. With regard to inmates, NDCS is committed to providing "access to required or approved activities, services, and programs for which they are qualified."  *Id.* NDCS is also committed to housing inmates with disabilities in a way that provides for their safety and security while also providing for integration with other inmates and allowing access to programs and services at the facility where they are housed. *Id.* at 4.

35

NDCS' ADA policy, AR 004.01, governs the process for submitting a request for ADA accommodations or modifications. Filing 316-51. The current ADA policy was effective as of November 30, 2018. *Id.* at 1. But NDCS is revising its ADA policy based at least partly on the recommendations and suggestions of Defendants' expert Barry Marano. *See* Filing 316-34 at 4.

Mr. Marano is a 40-year veteran of the Virginia Department of Corrections who began his career as a corrections officer, became a counselor, then a facility ADA coordinator, and finally in 2015 became the agency ADA coordinator. *See id.* at 1-2. He has investigated and responded to allegations from the Department of Justice's Office of Civil Rights, gives presentations on ADA compliance to Virginia correctional staff, and assists the Virginia Attorney General's Office with settlement efforts in ADA cases. *Id.* Defendants asked Mr. Marano to come to Nebraska and make recommendations to help improve their ADA compliance, along with serving as an expert in this matter. *Id.* As noted in his declaration, Defendants have already begun implementing his recommendations. *Id.* at 3-4.

Those improvements include:

- An audit process to verify facilities provide captions and subtitles on all facility televisions;
- Use of UbiDuo2 machines at all intake facilities;
- Video relay interpreting;
- Videophones at OCC and DEC;
- iHeLP inpatient accessibility;
- ADA inmate survey and NICaMS survey form;
- Designated facility ADA contacts;
- Weekly ADA meeting with Executive team members;
- Increase in ADA training for staff; and
- Addition of an ADA Coordinator for Institutions position.

36

Filing 316-36 at 3.

NDCS has a dedicated agency ADA Coordinator who has the necessary training and qualifications on the issues and challenges that people with disabilities face in a prison environment. Filing 316-51 at 2. Lisa Mathews is the NDCS ADA Coordinator, and she assists NDCS in its efforts to comply with the agency's legal responsibilities as defined by the ADA. Filing 316-34 at 7; Filing 316-51 at 2. NDCS is also planning to hire another ADA Coordinator for Institutions, and has appointed Associate or Assistant Wardens as ADA coordinators at almost all facilities. Filing 316-34 at 3-4.

As laid out in the current ADA policy, a request for an ADA accommodation must be made in writing or via email. Filing 316-51 at 5. The request is generally made by contacting the ADA coordinator, but an inmate may also contact another staff member who will refer that inmate to the ADA coordinator. *Id.* After that first contact, an interactive process begins between the inmate and the ADA coordinator to confirm the disability if necessary, clarify the request, and try to identify the most appropriate reasonable accommodation or modification. *Id.* It is an individualized assessment, and is done on a case-by-case basis. Filing 316-34 at 9. What works for one person may not work for another. *Id.* When the ADA coordinator has received the necessary documentation and discussed with the inmate what his or her needs and wants are, NDCS makes a final determination of the accommodation to be provided and/or its reasonableness. Filing 316-51 at 5.

VII.   **The Importance of Parole.**

The State of Nebraska believes in the importance of parole as a program for the supervised release of inmates making the transition from confinement to responsible citizenship. Neb. Rev. Stat. § 83-187.01. This privilege is granted to individuals that have demonstrated they are appropriately prepared for transition back into the community. The Board of Parole ("BOP") leads this effort by working with and assessing inmates as they become eligible for release on parole.

An inmate becomes eligible for parole when he or she "has served one-half of the minimum term of his or her sentence as provided sections 83-1,107 and 83-1,108." Neb. Rev. Stat. § 83-1,110(1). As such, inmates serving a sentence of life imprisonment do not become eligible for parole. Consequently, Defendants Curtright, Griswold, and Gunther, all of whom are serving life sentences, are not and will not become eligible for parole. In contrast, Sabata was originally granted parole two days after she became parole eligible. Filing 42-5 at 2; Filing 316-3 at 54:13-23; Filing 316-67. Likewise, Sweetser was granted parole on the first day he became parole eligible. Filing 281-1; Filing 316-10 at 9:23-10:1.

The BOP meets with an inmate two years before he or she becomes eligible for parole for a "Key Review" to discuss the inmate's programming needs and parole plan. Filing 316-59 at 52; *see also* Filing 316-62. Thereafter, the BOP will continue to meet with that inmate annually. Filing 316-58 at 38:10-13. At these Key Reviews, BOP members advise the inmate of specific tasks, action steps, and recommendations that will give the inmate his or her best chance at being granted parole. Filing 316-59 at

38

52. This includes 1) completion of NDCS programming, 2) final risk and needs assessments, 3) behavior and reentry planning requirements, 4) maintaining a clean department discipline record, *id.*, and "whatever else that particular individual [inmate] would like to discuss with the board." Filing 316-58 at 44:19-20. The purpose of these Key Reviews is to "provide the dialogue, the conversation with [the inmate] so they understand the expectations of the board and what they're going to need to do to be considered a good candidate for parole." *Id.* at 49:20-23. An inmate may, however, waive these reviews, entirely. Filing 316-58 at 57:12-15.

In addition to Key Reviews, inmates who may become eligible for parole will be interviewed and have his or her record reviewed by two or more BOP members or a person designated by the BOP within 60 days before the expiration of his or her minimum term of imprisonment, less any other statutory reductions in sentencing. Filing 316-59 at 53. During these "Offender Reviews," if, in the opinion of the reviewers, the review indicates the inmate is reasonably likely to be granted parole, the BOP will schedule a public hearing before a majority of the BOP members where the inmate may present evidence, call witnesses, and be represented by counsel. *Id.*

By Nebraska law, the BOP must defer granting an inmate parole if, in the BOP's opinion, a) There is a substantial risk that he or she will not conform to the conditions of parole; b) His or her release would depreciate the seriousness of his or her crime or promote disrespect for law; c) His or her release would have a substantially adverse effect on institutional discipline; or d) His or her continued correctional treatment, medical care, or vocational or other training in the facility

39

will substantially enhance his or her capacity to lead a law-abiding life when released at a later date. Neb. Rev. Stat. § 83-1,114(1). Similarly, Nebraska law provides a number of factors the BOP considers when forming this opinion. *See* Neb. Rev. Stat. §§ 83-114(2) and 83-1,115. If an individual is granted parole, the BOP will set conditions which a parolee must adhere to, and may require the individual to adhere to additional special conditions tailored to that individual parolee. *See* Neb. Rev. Stat. 83-1,117.

After an individual is released on parole, the parolee will come under the supervision of the Division of Parole Supervision. The Division of Parole Supervision is responsible for: (a) the administration of parole services in the community; (b) the maintenance of all records and files associated with the Board of Parole; (c) the daily supervision and training of staff members of the division, including training regarding evidence-based practices in supervision; and (d) the assessment, evaluation, and supervision of individuals who are subject to parole supervision, including lifetime community supervision. Neb. Rev. Stat. § 83-1,100. The Division of Parole Supervision will generally continue to supervise the parolee while he or she is in the community until the time served in the custody of NDCS and the time served on parole equal the parolee's maximum prison term less good time. Neb. Rev. Stat. § 83-1,118(2). Additionally, the BOP may reduce the level of supervision for a parolee if he or she has shown suitable compliance with his or her parole programming plan, if reducing that supervision would be commensurate with the best interests of the

parolee and is compatible with the protection of the public. Neb. Rev. Stat. § 83-1,118(1).

The BOP relies on NDCS to arrange the logistics for "where it's going to be best convenient for everyone" to meet at a given facility for reviews and hearings. Filing 316-58 at 41:24-42:3. NDCS "facilities always accommodate the needs for [an] individual to get into the facility or get into the area where they will be visiting with [the BOP]." *Id.* at 114:6-9. These meetings also may occur via videoconferencing as well. *Id.* at 41:1-7. During Key Reviews, staff from NDCS, mental health, substance abuse, and social workers may be present to help the BOP members make sure they get the information they need, as well as to be there to accommodate the inmate present at the key review. *Id.* at 43:25-44-7. Indeed, the BOP works to accommodate individuals with disabilities by partnering with NDCS who provides those services for individuals who need an accommodation on a case-to-case basis. *Id.* at 85:2-5, 85:25-86:1.

If the BOP learns that accommodations are needed, they contact NDCS and alert them of such. *Id.* at 89:17-90:5. Indeed, the BOP works with the NDCS ADA coordinator to accommodate an inmate during such reviews and hearings if there is a need or a request. *Id.* at 90:18-24. Further, BOP Chairperson, Rosslyn Cotton, who has been on the BOP for over 10 years, is not aware of an inmate ever being denied an accommodation request that he or she made to NDCS as it related to an inmate meeting with the BOP. *Id.* at 108:11-17.

## LEGAL STANDARDS

Eighth Amendment

For an Eighth Amendment deliberate indifference claim, an inmate must show that he or she "suffered from an objectively serious medical need and the 'prison officials actually knew of but deliberately disregarded' that need." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008), *quoting Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006). The prison official's misconduct must be so egregious that it rises to the level of criminal recklessness. *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004).

The Eighth Amendment can be violated when prison officials, acting with "deliberate indifference," expose prisoners to "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The question then is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his or her future health. *Id.* "The deprivation alleged must be objectively, sufficiently serious," amounting to a "denial of the minimal civilized measure of life's necessities." *Id.* at 834. Deliberate indifference requires that the official knows of and disregards an excessive risk to inmate health or safety. *Id.* at 837.

Though there is no precise point when risk gains or loses the "substantial" and "imminent" characteristics, the Supreme Court has determined that merely being subject to an allegedly inadequate government system does not pose a cognizable "imminent" or "substantial" risk. *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996). *Lewis*

42

made the point unequivocally: "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* at 351. "That," the Court continued, "*would be the precise analog of the healthy inmate claiming constitutional violation because of the inadequacy of the prison infirmary*." *Id.* (emphasis added).

Substantial risk refers to risk that is so great that it is almost certain to materialize if nothing is done to remedy it. *Miller v. Fisher*, 381 F. App'x 594, 596–97 (7th Cir. 2010); *see Brown v. Budz,* 398 F.3d 904, 911 (7th Cir. 2005); *Billman v. Ind. Dep't of Corr.,* 56 F.3d 785, 788 (7th Cir.1995). Indeed, proving substantial risk requires a showing of "strong likelihood" and not a "mere possibility." *A.P. ex rel. Bazerman v. Feaver*, 293 F. App'x 635, 652 (11th Cir. 2008); *see Cook v. Sheriff of Monroe County,* 402 F.3d 1092, 1115 (11th Cir. 2005) ("[D]eliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the . . . harm will occur.") (internal quotation marks omitted). Substantial risk also refers to "excessive risk" of serious harm to inmate health or safety. *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998).

<u>Americans with Disabilities Act and Rehabilitation Act</u>

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. The term "public entity" in Title II of the ADA includes state prisons and prisoners within its coverage. *See*

*Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998); *see also Mason v. Corr. Med. Servs.*, 559 F.3d 880, 886 (8th Cir. 2009). Section 504 of the Rehabilitation Act similarly provides that an otherwise qualified individual with a disability cannot be "excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA and RA are similar in substance and except for the federal funding requirement in the RA, "cases interpreting either [the ADA or RA] are applicable and interchangeable." *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999).

To state a prima facie claim under the ADA, a plaintiff must meet three requirements: (1) that he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit (service, program, or activity) at issue; and (3) he was excluded from the benefit due to discrimination based on his disability. *Id.* (citations omitted). The RA includes those three requirements and also requires that the plaintiff show the program or activity at issue receives federal financial assistance. *Id.*; *see also Ortiz v. Neb Douglas Co.*, 8:17CV412, 2018 WL 2163625, at *3-4 (D. Neb. May 10, 2018).

<u>Class Certification</u>

Rule 23 of the Federal Rules of Civil Procedure governs class actions. Plaintiffs "must affirmatively demonstrate [their] compliance with [Rule 23.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class

satisfies each requirement of Rule 23[.]" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original). Every putative class must withstand a "rigorous analysis" of Rule 23(a)'s requirements: numerosity, commonality, typicality and adequacy. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted).

As part of this "rigorous analysis," the Court must "probe behind the pleadings." *General Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982). The evaluation of class certification "may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap with the merits of the case." *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005). "Going beyond the pleadings is necessary, as the court must understand the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues." *Costano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

## ARGUMENT

## I.   PLAINTIFFS' SUPERCLASSES ARE OVERBROAD, UNWORKABLE, AND CONTAIN MEMBERS WHO LACK STANDING.

"[A]n essential prerequisite of an action under Rule 23 is the existence of an identifiable class." *Colorado Cross-Disability Coalition v. Taco Bell Corp*, 184 F.R.D. 354, 356 (D. Colo. 1999). The plaintiff "must establish that a suitable method of identification is 'administratively feasible.'" *Luedke v. Delta Airlines, Inc.*, 155 B.R. 327, 330 (S.D.N.Y. 1993). Furthermore, each and every member of the class must have the right to make a claim for relief against the defendant. The class cannot be defined so broadly as to include putative members who have no claim for relief. *Miller*

45

*v. Krawsczyk*, 414 F. Supp. 998, 1000 (E.D. Wis. 1976); *Messner v. Northshore Univ.*
*Health System*, 669 F.3d 802, 824 (7th Cir. 2012), *citing Kohen v. Pacific Inv. Mgt,*
571 F.3d 672, 677 (7th Cir. 2009) ("if the [class] definition is so broad that it sweeps
within it persons who could not have been injured by the defendant's conduct, it is
too broad" and should not be certified)).

### A. The Proposed Superclasses are Overbroad and Unworkable.

The classes and claims Plaintiffs present could hardly be broader. Plaintiffs
seek certification of the following class and subclasses:

1. A NDCS Class of composed of all persons who are now, or will in the future,
   be subjected to the health care (including medical, mental health and dental
   care) policies and practices of NDCS;

2. An Isolation Subclass composed of all NDCS prisoners who are now, or will
   in the future be, subject to conditions of confinement that provide limited
   contact with other prisoners, strictly controlled movement while out of cell,
   and out-of-cell time of less than twenty-four hours per week; and

3. A Disability Subclass consisting of all persons with disabilities who are
   now, or will in the future be, confined at any NDCS facility.

Filing 247.

It would be impossible under Plaintiffs' proposed definitions to determine
objectively those inmates who have the claims that Plaintiffs make here. That is
because Plaintiffs' proposed definitions make the unsupportable presumption that all
inmates are injured or face substantial risk of injury by a wide range of challenged
conduct.[2] Not even Plaintiffs' experts assert that. *See* Part I(B)(lack of standing).

---

[2] When Defendants asked Plaintiffs to "identify with specificity each policy, by policy number, or
practice you contend subjects 'all Plaintiffs and the NDCS Class to a substantial risk of serious harm
from inadequate health care, including medical, mental health, and dental care,'" Plaintiffs responded
with what was essentially a table of contents. *See* Filing 316-52 at 5-32. A similar answer was provided

46

Such ill-defined classes would require the Court to conduct individual mini-trials of each class member just to determine if they should be members of the class. *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 446 (E.D. Pa. 2000) (stating that "[b]ecause it would be impossible to definitively identify class members prior to individualized fact-finding and litigation, the proposed classes . . . fail to satisfy one of the basic requirements for a class action. . . ."). Not every inmate will get sick, need mental health care, require dental care, be placed in restrictive housing, or have a disability accommodation denied.

The classes are no more ascertainable with the expert testimony than they are without it. For example, Plaintiffs' expert Eldon Vail stated it was his opinion not every individual who spends time in restrictive housing is injured. Filing 316-12 at 68:15-19. When asked how to determine who that may be, Vail responded, "That's the challenge." *Id.* "I'm not arguing that it occurs to everybody, but we don't have a good enough crystal ball to always know when segregation is contraindicated." *Id.* at 71:1-3. Vail doesn't know which Plaintiffs are in which class or subclasses of this case, *id.* at 42:1-3, and didn't address which issues applied to which Plaintiff. *Id.* at 43:8-11. Defendants' correctional expert Eugene Atherton agrees that "[b]ased on the breadth of the class they are seeking it would be difficult to determine which inmates fit within the class and which allegations to which inmates." Filing 316-44 at 18.

When Plaintiffs' expert, Craig Haney, was asked if any Plaintiffs *did not* develop complications as a result of being in restrictive housing, his response was

---

regarding restrictive housing. *Id.* at 32-41. If Plaintiffs cannot identify which specific policies apply to them and place each of them at a substantial risk of harm, it is not clear how they expect the Court to.

that it was difficult for him to tell because a number had not been in restrictive housing for a considerable period of time. Filing 316-17 at 200:18-25. So it was "really impossible for me to reconstruct the extent to which they have been harmed." *Id.* at 201:1-2. If such a scenario is "impossible" with only the named Plaintiffs, adding hundreds of class members will not help ascertain who is or faces a substantial risk of harm. Later, when asked if he ruled out other causes of inmates stating suicidal thoughts or self-harm, Haney again responded it would be "[i]mpossible to do so in a cell-front interview, and even looking at the files." Filing 316-17 at 206:4-19. Again when asked if he could quantify in any way his statement that "for some prisoners the resulting impairments [of solitary confinement] can be permanent and life-threatening," Filing 249-42 at 11, Haney responded, "I can't." Filing 316-17 at 183:19-184:3.

Plaintiffs' expert Pablo Stewart is not yet able to determine if all inmates at NDCS have been deprived of needed mental health treatment either because he has not "conducted that type of detailed analysis." Filing 315-10 at 224:24-225:3. Neither Pablo Stewart nor Margo Schlanger know which Plaintiffs are in which class or subclass either. Filing 315-10 at 109:6-12; Filing 316-15 at 109:20-22. And when asked if the ADA allegations affect every inmate in the proposed Disability subclass, Schlanger first responded, "I don't know the definition of the proposed subclass." Filing 316-15 at 109:23-110:2. Then after given a chance to explain, Schlanger vaguely responded the allegations affect "all the prisoners with disabilities who need reasonable modifications or effective communication." *Id.* at 110:3-5.

48

Defendants' expert Dr. David Thomas agrees "it does not appear reasonably possible to ascertain which, if any, NDCS inmates could be included in a class of inmates requiring medical care." Filing 316-31 at 16. Plaintiffs' expert Dr. Shulman opines on prosthodontic care, but when asked to quantify who may need that care, he could only speculate and "couldn't give you a number." Filing 316-13 at 81:1-19. And as Dr. Rich explained, that is because "a certain percentage of inmates will not require dental therapy. Because of this, determining which inmates would be in a dental class would be unmanageable." Filing 315-3 at 8.

Since Plaintiffs and their experts have failed to identify a workable class, it is unclear how they expect this Court to do so.

### B. The Proposed Superclasses Contain Numerous Members who Lack Standing.

Although not every member must "submit evidence of personal standing," *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013), "a class cannot be certified if it contains members who lack standing." *Id*. (citation omitted). A class "must therefore be defined in such a way that anyone within it would have standing." *Id.* "Or, to put it another way, a named plaintiff cannot represent a class of persons who lack the ability to bring a suit themselves." *Id.*

#### i. Eighth Amendment.

Inmates who have a medical condition, but little or no injury, simply cannot establish an Eighth Amendment violation. They are entitled neither "to demand specific care" nor "to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). They are entitled only to be free from serious health risks so "excessive"

that the knowing failure to intervene would rise to the level of criminal recklessness. *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015). And "standing is not dispensed in gross. If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review." *Lewis*, 518 U.S. at 358, n. 6. While Plaintiffs complain of many deficiencies at NDCS, no Plaintiff is affected by all alleged deficiencies, and many proposed class members are unaffected by any of the alleged deficiencies.

Plaintiffs' and Defendants' experts agree that members of these overbroad proposed classes face no injury. Expert forensic psychiatrist Dr. Terry Davis states the obvious: "While it is true that many individuals who are incarcerated have or would qualify for a mental illness diagnosis, or have other mental health issues, not all do." Filing 315-1 at 8. Eldon Vail agrees that not every inmate who spends time in NDCS restrictive housing is injured in some way. Filing 316-12 at 68:15-17. And Vail agrees that not all inmates who are double-celled in restrictive housing are harmed. *Id.* at 79:23-80:1 ("Some people like it.").

According to Dr. Jay Shulman, an inmate that has never had any dental issues, and is eligible for all routine care, is at no risk of treatment delay. Filing 316-13 at 143:11-144:6. And an inmate who can seek and receive a dental exam does not face the sort of risk of pain of those who cannot. *Id.* at 145:2-7. As Dr. Rich explained, that is because some inmates at NDCS will exhibit "no dental concerns at all." Filing 315-3 at 7. And "Dr. Shulman lacks proof that unnecessary pain is universal throughout

50

the NDCS dental system." *Id.* "For example, the policy regarding dentures or prosthetics does not impact all inmates because not all inmates will require denture or prosthetic dental care." *Id.* at 8.

Medical expert Dr. David Thomas expresses a similar opinion that "[n]ot all inmates have medical issues; thus, the Plaintiffs' proposed medical class would presumably include inmates with perfect health." Filing 316-31 at 16. Plaintiffs' medical expert Marc Stern agrees there is "some portion" of the inmate population that does not use medical services, Filing 316-16 at 18:6-13, and of the files he reviewed, he "did not observe deficiencies in every one of them." *Id.* at 22:9-20. And Pablo Stewart repeatedly acknowledges that not all inmates are harmed by the deficiencies he alleges. Filing 315-10 at 239:10-242:7. But he continues to assert all are subject to a "risk of harm" he does not quantify. *Id.* So Defendants asked Stewart if NDCS policy or practice affects each inmate the same. To which Stewart responded, "I can't answer that." *Id.* at 226:20-22; *see also id.* at 244:3-245:16 (further questions on risk Stewart was unable to answer).

None of these inmates, who Plaintiffs' and Defendants' experts acknowledge will not be injured, have standing to pursue this suit themselves but currently fall within Plaintiffs' overbroad class definitions.

The uninjured proposed class members do not automatically have standing because of the allegations of risk either. Despite Plaintiffs' claims of substantial risk of harm, they cannot show excessive risk to inmate health or safety but instead rely on conclusory allegations of substantial risk without showing more than a mere

possibility of future harm. As explained more in Part III(A)(i), proving substantial risk requires a showing of "strong likelihood" and not a "mere possibility." *A.P. ex rel. Bazerman v. Feaver*, 293 F. App'x 635, 652 (11th Cir. 2008); *see Cook v. Sheriff of Monroe County,* 402 F.3d 1092, 1115 (11th Cir. 2005) ("[D]eliberate indifference requires that the defendant deliberately disregard a strong likelihood rather than a mere possibility that the . . . harm will occur.") (internal quotation marks omitted). And for standing purposes, "[a]llegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

Here, Plaintiffs have failed to show a strong likelihood of harm. The burden of establishing standing lies with the Plaintiffs, but they have provided minimal factual information to the Court concerning each Plaintiff's right to equitable relief. And what they have provided shows that their individual claims are not tightly connected to their class-wide claims for equitable relief.

"The result is an unsettling disparity between the extraordinary breadth of the plaintiffs' claims, involving [ ] broad areas of alleged constitutional and statutory violations in [ten] different [NDCS] correctional facilities, and the amount of information which the plaintiffs have submitted concerning the alleged harm faced by the proposed class representatives." *Stevens v. Harper*, 213 F.R.D. 358, 367-68 (E.D. Cal. 2002). Plaintiffs do not purport to identify at least one named representative who has suffered each claimed injury at each of the facilities involved in this suit. "Rather, Plaintiffs are often content to simply allege one past violation at

52

one [NDCS] facility and then claim standing and imminent harm based upon a generalized allegation that the violation is systemwide, recurring, and similar to other problems that the Plaintiffs also seek to correct." *Id*. Plaintiffs then assert that the composite plaintiff they construct has standing to allege a substantial risk of all of these varied harms. Their approach does not meet their burden of showing that anyone within the proposed classes would have standing

Accordingly, even taking Plaintiffs' factual assertions as true, the proposed classes include hundreds of members who have suffered no injury or constitutionally cognizable *threat* of injury under *Lewis*, and the classes are fatally overbroad.

### ii. Americans with Disabilities Act and Rehabilitation Act.

The standing requirements do not disappear for claims under the Americans with Disabilities Act or the Rehabilitation Act. "Article III," the Supreme Court explained, "requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc v. Robins*, 136 S.Ct. 1540, 1549 (2016). A concrete injury must "actually exist," and it must be "real," not "abstract." *Id*. at 1548.

On standing Schlanger provides no clarity either. She asserts "prison officials must ensure that disability does not lead to unnecessary infliction of pain or deprivation of serious needs," Filing 249-50 at 7, but when asked if all NDCS inmates with disabilities have been subjected to this, she responds, "No. I don't know that." Filing 316-15 at 110:19-23. Even though Schlanger did not tour any NDCS facilities, she also claims in her declaration that "prisoners with disabilities frequently end up in restrictive housing." Filing 249-50 at 45. But she admits, "I don't know whether

53

that is happening in Nebraska." Filing 316-15 at 47:2-13. And Schlanger does not cite to any incidents where she could say that there was not a reasonable modification to a program or policy to accommodate a prisoner with a disability. Filing 316-34 at 8. Instead, as Barry Marano testified, "I didn't see any evidence of that problem when I toured NDCS facilities. I didn't see any inmates with disabilities who were housed in situations where they were denied most prison privileges, programs, activities, and services." *Id.*

Accordingly, even if Plaintiffs do identify some disabled inmates with standing, the proposed class presumably includes numerous members who have suffered no injury or constitutionally cognizable *threat* of injury under *Lewis*, and the class is fatally overbroad.

## II.  CLASS CERTIFICATION HERE WOULD VIOLATE ESTABLISHED PRINCIPLES OF FEDERALISM.

In *Elizabeth M. v. Montenez*, 458 F.3d 779 (8th Cir. 2006), the Eighth Circuit vacated a district court's certification of a class of patients at three Nebraska state mental health facilities. The Court reasoned that, by certifying the class, the district court "essentially conferred upon itself jurisdiction to assert control over the operation of three distinct mental health facilities, a major component of Nebraska state government." *Id.* at 784. It cautioned that "[a] federal court may not lightly assume this power." *Id.* The Court reasoned, based upon Supreme Court precedent, that "'[w]here . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.*, *citing*

54

*Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (federal courts enjoining state entities must give "appropriate consideration . . . to principles of federalism in determining the availability and scope of equitable relief"). This case presents the same problem of a federal court asserting control over state institutions, in this case the NDCS and BOP.

The Supreme Court recognizes that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987), *quoting Procunier v. Martinez*, 416 U.S. 396, 405 (1974); *see also Lewis*, 518 U.S. at 349 ("[I]t is not the role of the courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."). To certify a class with such broad and sweeping implications requires, at bare minimum, a clear and manifest showing that the requirements for class certification have been met. *See Elizabeth M.*, 458 F.3d at 784. In *Elizabeth M.*, the Court noted in particular:

> [T]his concern is heightened in the class action context because of the likelihood that an order granting class certification "may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." Consequently, before certifying a class seeking broad injunctive relief against a state agency, a district court must ensure that it has Article III jurisdiction to entertain each claim asserted by the named Plaintiffs. And the court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are satisfied.

*Id.* (citation omitted). Federalism concerns are likewise "heightened" here.

In upholding the constitutionality of the Prison Litigation Reform Act, as applied to a class action case challenging conditions of confinement, the Eighth

Circuit observed the "'legitimate interest in preserving state sovereignty by protecting states from overzealous supervision by the federal courts in the area of prison conditions litigation.'" *Gavin v. Branstad*, 122 F.3d 1081, 1090 (8th Cir. 1997), *quoting Plyler v. Moore*, 100 F.3d 365, 374 (4th Cir. 1996). "[U]nder the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan." *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). The "role of courts" is "to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm," *Lewis*, 518 U.S. at 349; it is not "to become virtually continuing monitors of the wisdom and soundness of" the other branches. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 577 (1992).

The Supreme Court described the respective roles of the courts and the legislative branch as follows:

> The requirement that an inmate . . . must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches . . . [T]he distinction between the two roles would be obliterated if, to invoke intervention of the courts, no actual or imminent harm were needed, *but merely the status of being subject to a governmental institution that was not organized or managed properly*. If . . . a healthy inmate who had suffered no deprivation of needed medical treatment were able to claim violation of his constitutional right to medical care . . . simply on the ground that the prison medical facilities were inadequate, the essential distinction between judge and executive would have disappeared: it would have become the function of the courts to assure adequate medical care in prisons.

*Lewis*, 518 U.S. at 349-50 (emphasis added; citations omitted).

56

The Supreme Court previously rejected similar attempts to seek relief that would directly interfere with state governmental operations, as requiring "continuous supervision by the federal court . . ." is improper; "such a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized . . . ." *O'Shea v. Littleton*, 414 U.S. 488, 501-02 (1974). This is the exact thrust of Plaintiffs' claims here – to intrude upon the operations of the State.

To do so, Plaintiffs rely heavily on legislative and executive materials, such as audit reports, critical incident reports, Ombudsman reports, Office of Inspector General reports, and legislative reports and oversight hearings by the Nebraska Legislature to support their claims and request for class certification. But "unless Plaintiffs establish a personal risk of imminent harm, they may not ask the court to supplant the primary reform and oversight responsibilities of state legislative and executive officials by making generalized complaints about institutional failures at" NDCS. *Stevens v. Harper*, 213 F.R.D. at 367, *citing Lewis,* 518 U.S. at 349-50; *see* Parts I(B) and III(C)(iii) (lack of standing).

This case is analogous to *Elizabeth M.*, where the Eighth Circuit found class certification improper. Like *Elizabeth M.*, the relief sought by Plaintiffs would require this Court to assume "control over the operation of" the NDCS with respect to all medical care, mental health care, dental care, placements in restrictive housing, disability accommodations, and over BOP parole decisions in "a major component of" Nebraska "state government." 458 F.3d at 784. This level of control and interference

in the administration of Nebraska's state prisons, without any showing of harm or the likelihood of harm, impermissibly and unnecessarily intrudes upon the State of Nebraska's sovereignty and violates principles of federalism.

## III.   FAILURE TO SATISFY RULE 23(a).

Plaintiffs "must affirmatively demonstrate [their] compliance with [Rule 23.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23[.]" *Halliburton*, 573 U.S. at 275 (emphasis in original).

### A. No Common Questions or Answers.

This case is not suitable for class certification because the Court will have to consider the unique medical, mental, dental, or disability circumstances of every member to determine whether each member has experienced or is at substantial risk of experiencing an Eighth Amendment or ADA violation.

Rule 23(a)(2) requires "questions of law or fact common to the class[.]" "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (brackets and quotations omitted).

In *Dukes*, the Supreme Court admonished the parties and the courts that Rule 23(a)(2) is "easy to misread" because "any competently crafted class complaint

literally raises common questions. . . . Reciting these questions is not sufficient to obtain class certification." 564 U.S. at 349 (citations omitted). Instead, to establish commonality, plaintiffs must prove that every plaintiff "suffered the same injury." *Dukes*, 564 U.S. at 350. Plaintiffs must raise questions that can "generate common answers" for each claim, *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015) (citation omitted), allowing the court to resolve each claim "in one stroke," *Dukes*, 564 U.S. at 350. "'What matters to class certification . . . is not the raising of common questions – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Powers*, 776 F.3d at 571, *quoting Dukes*, 564 U.S. at 350. This determination requires a "rigorous analysis" that necessarily "will entail some overlap with the merits of the plaintiff's underlying claim." *Id*. at 351-52.

The Supreme Court reiterated this point recently, remanding a case to "consider whether a Rule 23(b)(2) class action continues to be the appropriate vehicle for respondents' claims in light of [*Dukes*]" because "some members of the certified class may not be entitled to [relief] as a constitutional matter." *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018).

Plaintiffs' brief does exactly what *Dukes* warned against. It recites purportedly common questions without ever explaining how class certification will generate answers to these questions that are common to a class. Plaintiffs' claims will require them to present evidence that varies from member to member. Plaintiffs' "common questions" are silent on: (a) whether any of the Plaintiffs have suffered any injury;

(b) whether all of the proposed class members have suffered any injury; (c) whether all of the proposed class members have suffered the same injury; (d) whether any specific harm has occurred; (e) what specific harm has occurred; (f) whether any harm is "imminent" or "real and immediate;" (g) what conduct by each or any specific Defendant is involved; and (h) for Eighth Amendment claims, whether any action or inaction by any Defendant occurred with deliberate indifference that shocks the conscience with respect to each proposed class member. For each class, Plaintiffs pair a question of fact: "Does X occur?,"[3] with a putative question of law: "Does X mean Y?,"[4] with Y including a wholly generic invocation of the Eight Amendment or ADA. Nowhere do Plaintiffs look for proof, assess it and answer key fact issues – again, such as, causation, harm, imminence, and culpability. This strategy has the effect of evading rather than promoting a rigorous analysis.

Plaintiffs assert they can show commonality simply because they all asserted a violation of the Eighth Amendment, ADA, or Rehabilitation Act. Filing 250 at 40. But asserting that each plaintiff has "suffered a violation of the same provision of law" is not enough. *Dukes*, 564 U.S. at 350; *accord Ebert v. General Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) ("[M]erely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2).").

And Plaintiffs portray the class and subclasses as a large, unified group that is suffering a uniform, collective injury. They want to force Defendants to defend

---

[3] Such as "Is there a lack of monitoring of prisoners in isolation?" Filing 250 at 41.
[4] Such as "Do the NDCS Defendants lack of monitoring of prisoners in isolation expose prisoners in isolation to a substantial risk of serious harm?" Filing 250 at 41.

against this fictional composite that is much stronger than any Plaintiff's individual action would be. But Rule 23 cannot be used to expand the substance of the claims of class members. *See J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) ("We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements.").

That is why the Court needs to consider the disability and medical dissimilarities among members because "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 564 U.S. at 350 (citation omitted). The Supreme Court stressed in *Dukes* that plaintiffs cannot establish commonality if there arise material "[d]issimilarities within the proposed class." 564 U.S. at 350. Here, the proposed class contains individuals with widely varying medical conditions or disabilities, and many with none at all. This case, therefore, presents no "common contention . . . capable of classwide resolution."

### i. Eighth Amendment

Plaintiffs did not and cannot demonstrate that each proposed class member possesses an Eighth Amendment claim because the proposed class is replete with material dissimilarities among members. These class and subclasses span a wide, medically diverse gamut.

Each of the named Plaintiffs have different medical histories, different risk profiles based on their lifestyles, different street drug use, and different mental health histories. Filing 316-12 at 45:16-22 ("a psychologically diverse group"); *Id.* at

46:3-21; Filing 316-17 at 55:6-20; Filing 316-31 at 16 ("Just among the several named Plaintiffs who have ongoing medical issues, those medical issues are different in type and extent."); *see also* Filing 316-31 at 13-14 (individualized analysis of medical claims of some Plaintiffs); Filing 315-3 at 5-6 (individualized analysis of dental claims of some Plaintiffs); Filing 316-47 at 16-18 (individualized analysis of mental health claims of some Plaintiffs).

When plaintiffs seek injunctive relief, dissimilarities are critical to the liability phase for Eighth Amendment claims. Claims under that amendment "by their nature require individual determinations," because the level of care required to comply with constitutional standards "will vary depending on each [plaintiff's] circumstances." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893 (7th Cir. 2012). As then-Judge Alito stressed, an Eighth Amendment claim almost always "is one that obviously varies depending on the medical needs of the particular prisoner" and rarely can be asserted classwide for a "medically diverse group." *Rouse v. Plantier*, 182 F.3d 192, 199 (3d Cir. 1999) (Alito, J.).

Thus the Court "must examine the totality of an [individual's] medical care"—not just alleged deficiencies—"when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). "[T]he question of whether a particular policy or practice causes a constitutional violation necessarily depends on context—i.e., how that policy or practice is interacting with other . . . conditions." *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018).

As Dr. David Thomas points out, "[l]ike members of the general public, every inmate's individual medical needs are individualized and unique." Filing 316-31 at 16. Plaintiffs' medical expert Marc Stern agrees that every patient is different. Filing 316-16 at 21:5. For this reason, the following language is found in all of the Federal Bureau of Prisons Guidelines: "Proper medical practice necessitates that all cases are evaluated on an individual basis and that treatment decisions are patient-specific." Filing 316-31 at 4.

"Because of human nature, no two inmates are exactly alike by history and behavior in prison. For that reason . . . it involves individualized assessment and treatment." Declaration of Eugene Atherton, Filing 316-44 at 18. From Stern's perspective, even if two individuals have identical diagnoses, there are going to be differences between them. Filing 316-16 at 20:12-22. Similarly, dental expert Dr. Philip Rich states that each dental "patient has to be carefully diagnosed and all factors considered in establishing and providing care." Filing 315-3 at 2. Each exhibits different dental concerns and each individual's condition is unique. *Id.* at 7.

Plaintiffs' expert Craig Haney agrees that an individualized analysis should be used when assessing whether or not a prisoner should be in restrictive housing. Filing 316-17 at 199:18-22. So does Eldon Vail. Filing 316-12 at 167:4-11. That is because risk of harm can vary based on a number of factors. Filing 316-17 at 200:10-17. According to Dr. Terry Davis, "[a]mong those individuals who do have a mental disorder, their symptoms and treatment needs are widely diverse." Filing 315-1 at 8. There is "a wide diversity of symptoms and treatment needs even among individuals

63

with the same diagnosis." *Id.* "One cannot generalize and say that all psychiatric patients are alike or that they have identical or, in many cases, even similar treatment needs." *Id.* "[E]very potential psychiatric patient is an individual with individual needs for assessment and treatment based on his or her specific symptoms, diagnosis, treatment needs, and response to treatment." *Id.*

These vast dissimilarities within the proposed classes undermine the notion that a "common answer" exists to whether every single plaintiff suffered an Eighth Amendment violation from the various challenged policies. "Because of the uniqueness of the setting and its inhabitants, it is difficult to create universal policies affecting all incarcerated persons." Thomas Declaration, Filing 316-31 at 4. Each person's claim depends on medical circumstances that apply to him alone. When, as here, plaintiffs assert an Eighth Amendment violation for exposure to an "objectively intolerable risk of harm," they must establish, among other things, that the risk "give[s] rise to sufficiently imminent dangers." *Baze v. Rees*, 553 U.S. 35, 50 (2008) (citation and quotation marks omitted). Whether a class member faces "imminent dangers" depends on facts unique to each member.

The importance of examining the totality of an individual's care is highlighted when Plaintiffs' expert Pablo Stewart discusses some of the many factors that can exacerbate a person's mental illness:

> You know, you have the whole gamut. So whether or not they were properly diagnosed the first time, whether they were properly screened, whether they had a proper psychiatric evaluation and they made a correct diagnosis and then the appropriate medication was prescribed, and that whether or not that appropriate medication was delivered in a manner in which it could be sure that the patient were, in fact, taking

64

> the medication. Whether there were adequate follow ups to ensure that the medication was working, not working, causing side effects, which side effects were being addressed. Whether or not there was adequate psychosocial activities. Because psychiatric care isn't just meds. Meds are a part of it.

Filing 315-10 at 50:3-18. And the violations alleged by Plaintiffs necessarily depend on these other factors that the Court must examine. *See Gutierrez*, 111 F.3d at 1375. For his part, Stewart doesn't "have an opinion on that now," Filing 315-10 at 203:20-204:1, didn't discuss them in his declaration, Filing 249-38, and either didn't know or wasn't able to answer questions related to the Plaintiffs during his deposition. *See generally* Filing 315-10 at 243:5-21. For the inmates he chose to discuss in his declaration, Stewart picked inmates on potent antipsychotics, multiple medications, or outdated medications. Filing 315-10 at 116:16-22. They are hardly a representative sample of the proposed class of all inmates and more illustrative of the conditions that vary from member to member.

And not all of the challenged policies affect individuals in the proposed classes the same way. Many class members do not face "imminent danger" because they face no risk at all. "Pivotal to commonality" is "the effect" a policy has on each plaintiff. *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156 (8th Cir. 2017). "Even if [a] decision[] . . . can be considered uniform, the effect is not." *Id*.

As Haney acknowledges, outside of removing inmates from restrictive housing altogether, the answer for each inmate in restrictive housing "might very well involve a different kind of treatment modality for different kinds of symptoms that are being manifested or exacerbated." Filing 316-17 at 54:5-21. Forensic psychiatrist Dr. Terry

Davis notes, "the risk of harm for individuals experiencing symptoms of mental illness is different for each individual depending on his or her symptoms, diagnosis, need for treatment, type of treatment implemented, and response to treatment." Filing 315-1 at 8. "Individuals who may be experiencing some difficulties adjusting to incarceration may benefit from some counseling or brief therapy, but would most likely have no need for treatment with psychotropic medication." *Id.* Davis also notes that "medications that work for one patient with Schizophrenia may not work for another patient with the same diagnosis. Psychiatric patients are quite idiosyncratic in their response to medications and other treatments." *Id.* And for Stewart the ideal situation for the ratio of inpatient clinical staff "depends on the severity of the people." Filing 315-10 at 93:3-11. For the level of care required, it varies dependent upon an inmate's individual circumstances. *Id.* at 207:4-8.

For individuals housed in restrictive housing, Atherton notes that "NDCS uses a multidisciplinary approach to carefully and individually review the cases of inmates being committed to restrictive confinement and considering those to be eligible for release." Filing 316-44 at 11. And regarding any alleged harm related to double celling, Atherton states that such allegations must be "investigated and analyzed individually through competent investigative systems." *Id.* at 6. Whether a particular inmate faces "imminent dangers" depends on facts unique to each inmate. Eldon Vail agrees. Filing 316-12 at 167:8-11 (Q: "Is it your opinion that when assessing whether a prisoner has been harmed by restrictive housing in any way, that it should be an individual analysis?" Vail: "Person by person, you bet.").

66

According to dentist Jay Shulman, the formation of a treatment plan for a particular inmate, in their particular unique situation, is an important component in the treatment process. Filing 316-13 at 93:3-21. For example, Shulman has no reason to believe Galle's denture situation is the result of a policy deficiency and "it could be" a unique treatment consideration for him. *Id.* at 174:11-17. And not all tooth pain issues are urgent. *Id.* at 135:6-20. Dr. Rich agrees that "[n]ot all patients' dental needs are identical and treatment solutions are not identical." Filing 315-3 at 7. Similarly, Plaintiffs' expert Marc Stern is not able to offer an opinion as to what would be a system-wide solution for correcting the problems he alleges may exist in Nebraska. Filing 316-16 at 118:2-9.

The "answer" to alleged denial of dentures has nothing to do with tracking prisoner requests for mental health, and increasing restrictive housing out-of-cell time does nothing to provide disabled inmates auxiliary aids. This alone demonstrates the lack of commonality. *Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) (plaintiffs cannot "conflate a wide variety of practices and impute them to the class as a whole by collecting them under a single, unilluminating umbrella of 'systemic' failures"; "[u]nder Plaintiffs' approach, certification would be appropriate in virtually all actions . . . so long as the putative class, through artful pleading, states the challenged 'policy or custom' with sufficient generality[]"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) (plaintiffs cannot satisfy Rule 23(a) merely by "attempt[ing] to broadly conflate a variety of claims to establish commonality through amorphous allegations of 'systematic failures[]'"); *cf. M.D. ex*

67

*rel. Stukenberg v. Perry*, 675 F.3d 832, 844 (5th Cir. 2012) (classes which attempt "to aggregate several amorphous claims of systemic or widespread conduct into one 'super-claim'" "stretch the notions of commonality" and should not be certified unless it can be "precise[ly]" explained "how the resolution of those claims will resolve an issue that is central to the validity of each of the individual class member's claims in one stroke") (quotations omitted).

So even setting aside all other elements of an Eighth Amendment claim, these dissimilarities reveal that the question of whether every class member faces "imminent dangers" because of the challenged policies does not "generate common answers." The answer to this question depends on the individual characteristics of each person.[5]

For Eighth Amendment purposes, Plaintiffs say the class and subclasses share a common risk of future harm because these classes are "subject to the same deficient policies, procedures and practices." Filing 250 at 9. But the Supreme Court has expressly said that a person who is "subject to" allegedly inadequate policies does not necessarily have an injury. *Lewis*, 518 U.S. at 350 ("the status of being subject to a governmental institution" with "medical facilities" that are "inadequate" is not enough).

Substantial risk of future harm can be a viable injury, but only if Plaintiffs can show a policy is "sure or very likely to cause" serious medical harm in the imminent future. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("[in] the next week or month or

---

[5] And determining which policies Plaintiffs actually challenge. *See* Filing 316-52.

year"); *McGehee v. Hutchinson*, 854 F.3d 488, 492 (8th Cir. 2017) (applying *Helling*'s "sure or very likely" standard to claims of a "substantial risk"); *see, e.g.,* Filing 316-12 at 168:25-169:3 (Q: "Is it your opinion that double-celling is always the cause of a <u>substantial risk of harm</u> to an inmate in restrictive housing at NDCS?" Vail: "It creates a <u>risk of harm</u> for all prisoners. It doesn't mean that every prisoner is harmed.") (emphasis added). Under *Helling* and *Lewis*, Plaintiffs must prove a common injury, such that either all class members meet *Helling*'s substantial-risk standard or none of them do. The class does not have a common injury because it contains *Lewis*-like Plaintiffs facing a meaningfully lower risk.

Plaintiffs base their argument of substantial risk, in large part, on the assertions of their experts. Filing 250 at 14, *citing* Filing 249-58 (Stern Decl.) ¶¶ 13, 17-20, 44, 46, 61, 70, 86, 89, 92, 95, 116, 117, 137, 145. However, when considering their medical claims for example, neither Plaintiffs nor Stern submit evidence of any actual harm or "strong likelihood" of future harm to Plaintiffs or any other inmate. Instead, Stern addresses the probability of future harm by repeatedly stating that it "could" occur. *Id.* ¶¶ 18, 31, 35, 69, 70, 85, 86, 88, 89, 98, 116. The word "could" refers to that which is possible rather than that which is likely. *See Hoffman Homes, Inc. v. Adm'r, U.S. E.P.A.*, 999 F.2d 256, 260–61 (7th Cir. 1993) (finding that the use of "could" in a federal regulation meant "potential rather than actual, minimal rather than substantial"). When Haney was asked in his deposition if he could quantify the level of risk that those in restrictive housing face, he responded, "No way. I don't think anybody could quantify it." Filing 316-17 at 183:12-17. Accordingly, Plaintiffs

struggle to show a mere possibility of future harm to NDCS inmates much less a strong likelihood or risk that is so great that it is almost certain to materialize for all inmates if nothing is done to remedy it.

This does not mean that class actions would never be appropriate for Eighth Amendment claims. Although Eighth Amendment claims typically cannot satisfy certification requirements, *e.g., Kress*, 694 F.3d at 893, they can if the court assesses the medical dissimilarities and determines that those dissimilarities are immaterial. That happened in *Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017). Plaintiffs there challenged excessive heat conditions in a prison. *Yates*, 868 F.3d at 359. Before certifying the class, the court held a four-day hearing to consider whether the heat affected plaintiffs differently because of medical dissimilarities. *Id*. at 363. The court then found that the heat was so excessive that medical dissimilarities were immaterial: the heat-mitigation measures "were ineffective to reduce the risk of serious harm to a constitutionally permissible level for any inmate, including the healthy inmates," and "even the youngest, healthiest, and most acclimatized inmates face a substantial threat of serious harm." *Id*. In *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030 (8th Cir. 2018), the class was similarly limited to a single disease, a single class of drugs, a limited range of medical providers, a more limited injunctive remedy and a confined and comparatively uniform class of inmate.

The differences between *Yates*, *Postawko*, and this case are stark. *Yates* held a four-day evidentiary hearing to consider whether the medical dissimilarities in the class meant that liability on a single issue would require considering individual

70

circumstances. *Postawko* involved a single disease and single policy related to a single class of drugs. The classes here are far broader because they involve an unlimited range of all possible medical, mental, and dental conditions, multiple individualized treatment options, a wide range of providers, a much broader and more invasive injunctive remedy, and a diverse class of inmates. Plaintiffs' attempt to aggregate several amorphous claims of systemic conduct does not overcome the lack of common questions or answers.

### ii. ADA and Rehabilitation Act.

The same is true of the ADA and Rehabilitation Act claims behind the Disability subclass. To state a prima facie claim under the ADA, a plaintiff must meet three requirements: (1) that he is a person with a disability as defined by statute; (2) he is otherwise qualified for the benefit (service, program, or activity) at issue; and (3) he was excluded from the benefit due to discrimination based on his disability. *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (citations omitted).

The answer to the common questions could hardly be more individualized. Is the class member disabled? Did Defendants make the accommodation available to the class member? Did the class member request the accommodation? Was the accommodation actually provided? Was it provided in a timely manner? Or was there some reason beyond Defendants' control that caused the delay or denial? These questions cannot be resolved as to every single Disability subclass member in a single stroke.

71

Because of the wide variety of conditions that can rise to the level of a disability, "an answer for one may not work for another." Declaration of Barry Marano, Filing 316-34 at 9 ("Even when looking at two people with the same disability, one might need something very different than the other."). According to ADA expert Barry Marano:

> Responding to the needs of an inmate with a disability is done on a case-by-case basis, and an individualized assessment is key. One size does not fit all. The accommodations process requires an interactive process of communicating with the inmate to determine what he or she needs and wants, as well as whether anything hasn't worked for him or her in the past.

*Id.* Plaintiffs' expert Margo Schlanger agrees "[i]t is appropriate for prisoners with disabilities to be given the choice whether or not an accommodation is useful to them, and to have substantial input into what kind of accommodation/modification would be best." Filing 249-50 at 29. That is why "there is no 'typical' request for an accommodation or modification because it all depends on the inmate." Filing 316-34 at 10. And Schlanger agrees "that people with different disabilities have different needs for accommodations or modifications." Filing 316-15 at 109:14-17. What inmates with disabilities need "on the ground will vary across disability and across the need, and depending on what program they need access to." *Id.* at 110:12-14.

Again, dissimilarities within the proposed class will impede the generation of common answers, and Plaintiffs have not established commonality.

### iii. *Parsons*

Plaintiffs repeatedly rely on a Ninth Circuit opinion that exemplifies how a class can irrationally swell when a court fails to consider the effect of a policy on the

putative class members. Filing 250, *citing Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) (Reinhardt, J.)).[6] Judge Reinhardt, writing for the panel, affirmed certification of a class including every inmate in the Arizona prison system (more than 33,000) solely because the inmates challenged the system-wide policies regarding medical and mental health care. *Id*. at 678. The *Parsons* panel opinion disregarded that many inmates could not establish an Eighth Amendment violation; all that mattered was that every inmate was potentially "subject to the same . . . policies and practices." *Id*. Thus, the class included even healthy inmates who faced no current medical or mental health issues at all.

Six Ninth Circuit judges would have held that the *Parsons* panel opinion went too far and was "in defiance of . . . the Supreme Court's Eighth Amendment jurisprudence." 784 F.3d 571 (9th Cir. 2015) (Ikuta, joined by Kozinski, O'Scannlain, Callahan, Bea, & M. Smith, JJ., dissenting from denial of rehearing en banc) (citing Supreme Court decisions). The *Parsons* panel opinion was erroneous because, among many other reasons, it held that inmates exposed to a common policy had valid Eighth Amendment claims regardless of whether those individuals faced excessive health risks, or indeed any health risks at all. *Id*. at 573 ("[E]xposure alone does not give rise

---

[6] *Parsons* inappropriately relied instead on *Brown v. Plata*, 563 U.S. 493 (2011), as permitting class actions based on "systemic, future-oriented" claims challenging "systemwide deficiencies" in care. *Parsons*, 754 F.3d at 677. But "*Plata* involved the certification of two discrete classes: those prisoners with 'serious mental disorders,' and those with 'serious medical conditions.'" *Parsons*, 784 F.3d at 578 (Ikuta, J., dissenting)). "These discrete classes may have [had] sufficiently similar serious medical needs to meet the standard . . . in a way the" omnibus classes in *Parsons* (and the classes here) did not. *Id*. And *Plata* was not a class certification case. It addressed whether the lower court "exceeded its authority in issuing a remedial order under the Prison Litigation Reform Act . . . in two consolidated cases[,]" one "in which the state conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights." *Id*. (Ikuta, J., dissenting) (quotations omitted). *Plata* did not approve the classes certified there and therefore cannot support the certification analysis in *Parsons* or Plaintiffs' certification analysis here.

to an Eighth Amendment claim."). In other words, the *Parsons* dissenters believed the panel opinion was erroneous because it did exactly what Plaintiffs ask this Court to do here – certify a class based solely on alleged exposure to policies with no regard to the effects of those policies on individual class members.

In disregarding the "same injury" requirement from *Dukes*, the *Parsons* panel opinion created a circuit split with an opinion written by then-Judge Alito. *Id*. at 573. That opinion appropriately considered the effect a policy had on each class member. The inmates in *Rouse v. Plantier*, 182 F.3d 192 (3rd Cir. 1999) (Alito, J.), all had diabetes and all were incarcerated. *Id*. at 194-95. They asserted that the prison policies with respect to diabetes care had a class-wide unconstitutional effect. *Id*. The court rejected that argument because "the plaintiff class [wa]s a medically diverse group." *Id*. at 199 (holding that a common claim cannot be maintained where "it is possible that conduct that violates the Eighth Amendment rights of [some] Plaintiffs may not violate the constitutional rights of" other class members). A judgment in favor of the entire class could not stand because the constitutional right asserted "[wa]s one that obviously varies depending on the medical needs of the particular prisoner." *Id*. The same is true here.

Plaintiffs must prove that their proposed class satisfies the commonality requirement. Plaintiffs' attempt to broadly conflate a variety of claims to establish commonality through amorphous allegations of systematic failures does not explain how the resolution of those claims will resolve an issue that is central to the validity of each of the individual class member's claims in one stroke.

74

## B. No Plaintiff Could Typify Members of Such Sprawling Classes.

The circumstances that defy commonality also defy typicality. To establish typicality, a plaintiff must "possess the same interest and suffer the same injury as the class members." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, at 156, 157, n.13 (1982).

The extent of Plaintiffs' proof of typicality is Plaintiffs' statements that their claims are typical because they have been housed in most NDCS facilities, are generally subject to NDCS and BOP policies, and "collectively" "share a common injury of having these centralized policies applied to them." Filing 250 at 44-45. But longstanding Eighth Circuit precedent demonstrates that plaintiffs cannot establish typicality where an individualized inquiry into each class member's claim is required. *Elizabeth M.*, 458 F.3d at 787 (the "presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry"); *Parke v. First Reliance Std. Life Ins. Co.*, 368 F.3d 999, 1004-05 (8th Cir. 2004) (finding that typicality cannot be shown where the question of liability can only be determined on an individualized basis for each proposed class member). Rule 23 further requires Plaintiffs to "*prove* that the[y] are *in fact*" typical of the class, and a "mere pleading" standard is not sufficient. *Dukes,* 564 U.S. at 350-51 (emphasis added). "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Falcon*, 457 U.S. at 160 (quotations omitted).

75

Here, Plaintiffs cannot demonstrate that each class member suffered an injury at all, much less that they all suffered the "same injury:"

> In pursuing their own claims, the named Plaintiffs could not advance the interests of the entire . . . class. Each claim, after all, depend[s] on each individual's particular [medical history] and these . . . var[y] from person to person. A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). Plaintiffs' claims require individualized evidence showing that each putative class member's diagnosis and medical condition is sufficiently serious and that the purported deficient policies caused each proposed class member injury, or at least subjects each proposed class member to a substantial risk of serious harm.

Here too, Plaintiffs' expert Craig Haney agrees that an individualized analysis should be used when assessing whether or not a prisoner has been harmed by restrictive housing. Filing 316-17 at 199:23-200:4 ("In assessing whether or not they've been harmed or the degree to which they've been harmed, obviously it has to be an individual analysis in any individual case."). When asked if all inmates report all of the same alleged injuries, Haney responded: "No, not everybody experiences everything. Of course not." *Id.* at 204:19-25. "The dimensions of the suffering are different or the dimensions or the consequences are different." *Id.* at 52:21-25. As Dr. Davis explains, "the risk of harm for individuals experiencing symptoms of mental illness is different for each individual depending on his or her symptoms, diagnosis, need for treatment, type of treatment implemented, and response to treatment."

Filing 315-1 at 8. "For example, individuals with anxiety often have far different symptoms and treatment needs from those with psychosis." *Id.*

According to Plaintiffs' expert Eldon Vail, the alleged issues he identified do not apply to each Plaintiff. Filing 316-12 at 43:12-14. He does not believe that each Plaintiff faces the same risk of harm in restrictive housing. *Id.* at 45-9:11. And when asked if all inmates suffer from the exact same harm, Vail responded that "every person's not the same," *id.* at 44:21-25, and "everybody's different." *Id.* at 78:2-5. While Plaintiffs' expert Jay Shulman believes a delay in treatment can put anyone at risk, "the question is degree of risk." Filing 316-13 at 141:22-142:6. As Dr. Rich explains, "inmates do not all face the same risk of injury." Filing 315-3 at 8.

Margo Schlanger agrees that people with different disabilities have different risks of harm. Filing 316-15 at 109:9-13. Regarding whether every NDCS inmate with a disability faces the same risk of discrimination, Schlanger responds "for some of them" and "possibly not for others." *Id.* at 111:7-14. "[T]he risk is a similar risk across them, it's just then as events transpire it operates on different people differently." *Id.*

Because the Plaintiffs' claims depend on each individual's unique interactions with Defendants, the typicality requirement is lacking. *See Schilling v. Kenton County*, 2011 WL 293759 (E.D. Ky. Jan. 27, 2011). "[T]he likelihood that some significant proportion of class members experienced no injury at all defeat[s] the named plaintiff's representation that [his] claims were typical of the class." *Phillips v. Phillip Morris Co., Inc.*, 298 F.R.D. 355, 363 (N.D. Ohio 2014). Even as alleged, the ten Plaintiffs present medically diverse conditions, contraindications and status. *See*

Filing 1. Their claims therefore are not "typical" of all inmates in the custody of NDCS.

Plaintiffs must prove that their proposed class satisfies the typicality requirement. Plaintiffs have not demonstrated typicality because proof of a violation requires individualized inquiry, and class certification is therefore inappropriate.

### C. Inadequate Plaintiffs Who Lack Credibility, Knowledge of the Suit, and Standing.

In their zeal to proclaim "systemic deficiencies," Plaintiffs have overlooked the importance of Rule 23(a)(4) and entirely failed to prove it. "Seeking to represent a large group of people as a class representative is a very heavy responsibility . . . and the court should allow such representation only upon a firm foundation that the named plaintiffs are willing and able to shoulder that burden." *Clayborne v. Omaha Public Power Dist.*, 211 F.R.D. 573, 597 (D. Neb. 2002) (citations omitted). The adequacy requirement "is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff." *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir. 1986); *see Bishop v. Committee on Professional Ethics & Conduct of Ia. State Bar Ass'n*, 686 F.2d 1278, 1288 (8th Cir. 1982) ("The adequacy of the representation issue is now of critical importance in all class actions and the court is under an obligation to pay careful attention to the Rule 23(a)(4) prerequisite in every case."). Plaintiffs have not proven they will fairly and adequately represent the interests of the class. Rule 23(a)(4).

Plaintiffs' analysis is limited to the Supreme Court's statement that Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." Filing 250 at 39, *quoting Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). But nothing in either the Rule 23(a)(4) language or the *Amchem Products* decision suggests that analyzing the adequacy of the class representative is *limited* to identifying conflicts. Indeed, courts have also characterized the analysis as involving inquiries into (1) whether the class representative has abdicated his or her role as class representative to his or her attorney or attorneys, *see, e.g., Kassover v. Computer Depot, Inc.*, 691 F. Supp. 1205, 1213-14 (D. Minn. 1987), *aff'd*, 902 F.2d 1571 (8th Cir. 1990); (2) whether the class representative would vigorously prosecute claims on behalf of the class, *see, e.g., Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006); and (3) whether a unique defense would apply to the class representative, *see, e.g., Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006).

As it should, credibility also matters. As *Wright, Miller, & Kane* have observed:

> In order to assess the adequacy of the named representatives, courts have looked to factors such as their honesty, conscientiousness, and other affirmative personal qualities. If the representative displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied.

7A *Wright, Miller & Kane, Federal Practice and Procedure*, §1766 (April 2019 update); s*ee Robinson v. Gillespie*, 219 F.R.D. 179, 186 (D. Kan. 2003) ("Determining whether the named plaintiffs will be vigorous advocates for the class makes inquiry into various arenas appropriate.").

### i.  Plaintiffs Lack Credibility.

Any potential class would necessarily be forced to rely on a class representative's trustworthiness, reliability, integrity, and judgment to protect and advocate for the class's interests. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Gooch v. Life Inv'rs Ins. Co. of Am.,* 672 F.3d 402, 431 (6th Cir. 2012) (quoting *Savino v. Computer Credit Inc.,* 164 F.3d 81, 87 (2d Cir.1998)); *see also CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 727 (7th Cir.2011). As such, when looking to the adequacy of a named plaintiff seeking to represent an entire class of individuals, it is not only prudent, but imperative to conduct a preliminary examination into the credibility of the allegations made by those potential representatives.

In this case, even a cursory glance at many of the Plaintiffs' allegations reveal a host of credibility issues that call into question their adequacy to represent the classes they seek to stand for.

### 1.  Sabata

In their brief, Plaintiffs include Sabata as part of a "Disability Subclass composed of all persons with disabilities who are now, or will in the future, be confined to any NDCS facility." Filing 250 at 8. Likewise, Plaintiffs assert in the Complaint that Sabata is "is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B)." Filing 1 at 7, ¶ 13. Yet, when asked during her deposition if she has a disability, Sabata responded, "I don't think so." Filing 316-3 at 45:18-19. Indeed, after stating that she was able to care for herself, perform manual tasks, see,

80

hear, does not have trouble eating, sleeping, walking, standing, lifting things, bending, speaking, breathing, reading, concentrating, thinking, and communicating, Sabata affirmed that she had never been denied participation in a program because of a disability. *Id*. at 46:17-48:10.

In her declaration, Sabata also states, "While placed in restrictive housing at NCCW, I have had delusions, hallucinations . . . ." Filing 249-15 at 4, ¶ 10. Yet, when asked during her deposition whether she had ever experienced delusions of any kind, Sabata responded, "I don't think so. They say I do, but I don't think so." Filing 316-3 at 39:10-13. Likewise, when asked whether she had ever experienced any hallucinations, Sabata stated, "No. Well, when I was–no." *Id*. at 39:25 – 40:2.

Sabata has further stated in multiple declarations that she was unware that she could have a lawyer or ask that a lawyer be appointed to assist her during the parole revocation process. *See* Filing 237-4 at 2, ¶ 13; Filing 249-15 at 5, ¶ 13. Yet, during the parole revocation process, Sabata was provided with and signed a "Parole Violation Advisory of Rights, Waivers, and Notification" form on December 28, 2017, which informed her she could retain an attorney, or request one be appointed to her during the revocation process. Filing 237-5 at 4. During her deposition, Sabata affirmed that she signed the advisory of rights and, though she didn't remember, she believed she probably read it before signing it. Filing 316-3 at 61:15-18. Likewise, on January 4, 2018, Sabata was provided with and signed a "Notice of Review of Parole Hearing" which again explained that she could retain an attorney, or request one be appointed to her during her revocation hearing. Filing 237-5 at 10. Though Sabata

claimed in her deposition that she did not remember the document, she acknowledged she did, in fact, sign it. Filing 316-3 at 64:15-17.

The foregoing highlight a number of serious discrepancies between Sabata's allegations in the Complaint, her declaration, and her deposition testimony. Yet, this is not an inquiry into Sabata's credibility as it relates to her past or personal character. Rather, these discrepancies relate directly to the allegations Sabata herself made in this case.

### 2. Reeves

Reeves, like Sabata, is seeking to be a class representative in this case. In his declaration signed on February 13, 2019, Reeves stated, "The conditions in solitary confinement at NCYF, NSP and TSCI are miserable." Filing 249-2 at 5, ¶14. On October 14, 2018, however, Reeves was overheard stating, "Tuesday night we need to make a big ass mess because my lawyer said they have an inspection on Wednesday morning to inspect the conditions of segregation." Filing 316-5. When assessing the credibility of a proposed class representative, "the inquiry . . . into the representative's personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 160 (S.D.N.Y. 2010). Reeves' conduct not only calls into question his statements and assertions regarding restrictive housing, generally, it demonstrates a deliberate and concerted effort to control and alter substantive facts for the purpose of advancing his own interests in this suit.

82

### 3. Griswold

In his February 13, 2019 declaration, Griswold refers to "problems obtaining items to assist me with issues related to my vision disabilities." Filing 249-3 at 4, ¶ 15. Specifically, Griswold refers to "audio formats of the bible, a tapping cane, talking books, large print books, large print playing cards, talking watch, talking clock, and assistance with obtaining my GED." *Id*. During his deposition, however, a mere five weeks after signing his declaration, Griswold admitted that he had not asked for any help regarding his vision in the last few years. *Id*. at 16:16-18.

When asked what assistance he has received for his vision issues while in the custody of NDCS, Griswold responded that he had "received a magnifying glass at one time, a talking clock, and a watch." Filing 316-6 at 17:12-19. Griswold remarked that those items had been helpful when he had them, but that he did not have them anymore. *Id*. at 17:20-21, 18:2-3. When asked if he knew why he didn't have them anymore, Griswold's counsel objected and said, "I am going to raise a Fifth Amendment privilege here, and I am ordering Mr. Griswold not to answer." *Id*. at 18:4-7. Griswold affirmed he was declining to answer the question based on the advice of his legal counsel. *Id*. at 18:8-11. Subsequently, Griswold was asked, "Those items you previously listed to assist in your vision issues, did NDCS take those items away from you?" *Id*. at 18:12-14. Griswold replied, "No." *Id*. at 18:15. It was then asked, "Who took those items away from you?" *Id*. at 18:16. Griswold's counsel again objected and said, "I'm going to raise a Fifth Amendment objection and instruct Mr. Griswold

not to answer." *Id*. at 18:17-19. Griswold affirmed he was refusing to answer that question based upon advice of counsel. *Id*. at 18:20-23.

Griswold alleges NDCS withheld and delayed providing him with auxiliary aids for his vision such as a magnifying glass, a talking clock, and a watch. Yet, when questioned during his deposition about why he no longer possesses those aids, Griswold refused to answer. In his declaration, Griswold stated, "I would like to represent other prisoners who have had problems similar to what I have experienced while in NDCS custody." Filing 249-3 at 6, ¶ 25. But in order to represent other prisoners in a class action, Griswold must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). However, a named plaintiff "who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 726, 79 Fed. R. Serv. 3d 244 (7th Cir. 2011).

Here, Griswold refused to answer questions about his own allegation which goes to the heart of his ADA claim. Focusing on his own interests, as opposed to the class he seeks to represent, necessarily precludes Griswold from fairly and adequately protecting the interests of others in a potential class.

### 4. Norris

Norris did not submit a declaration in support of Plaintiffs' motion for class certification. It is therefore difficult to know the factual basis for her allegations and claims. As such, the scarce factual allegations in the Complaint constitute the only

source available to look to. Those allegations, however, do not often track with Norris'
deposition testimony.

The Complaint alleges that Norris "has frequently been housed in isolation
because of her intellectual and psychiatric disabilities and as punishment for
behaviors related to her blindness." Filing 1 at 16, ¶ 44. However, Norris stated in
her deposition testimony that while she had been placed in restrictive housing
"[q]uite a few times for fighting and for [protective custody,]" Filing 316-4 at 18:15-
19, she denied being placed in restrictive housing for any other reason.  Indeed, when
specifically asked if there were any other reasons she was placed in restrictive
housing, Norris responded, "Not really. I just was afraid of roommates. I was afraid
of being in north hall." *Id*. at 19:4-7.

Norris further testified that even when she was in restrictive housing, she "got
out" two hours a day and was housed "in [a] big handicap room." *Id*. at 19:16-20.
Norris even remarked, "They treated me pretty good . . . ." *Id*. at 19:21. Norris later
described how she "PC'd" herself which lead to her being placed in the STAR unit. *Id*.
at 20:10-12. While in the STAR unit, Norris was able to work, *id*. at 20:12-25, would
be taken "to the gym every day and do exercises in the morning[,]" *id*. at 22:11-13,
"did groups in the afternoons[,]" *id*. at 22:15-16, and participated in treatment
recommendations. *Id*. at 29:13-16.

Once again, Norris did *not* submit a declaration in support of Plaintiffs' motion
for class certification. The allegations in the Complaint related to Norris are sparse

and it is difficult to ascertain the factual basis for what is alleged. Still, it is clear that those allegations in the Complaint are not consistent with her deposition testimony.

### 5.      Cardeilhac

In his declaration, Cardeilhac said, "There was no programming in solitary." Filing 249-1 at 3, ¶ 14. Despite this assertion, Cardeilhac himself participated in an out-of-cell program called *Succeeding in Less Restrictive Settings* on 8/7/2017, 8/28/2017, 9/5/2017, 9/11/2017, and 9/25/2017. Filing 315-8 at 9-10.

Cardeilhac also asserts, "Mental health care in solitary at NCYF and TSCI both only happened briefly at cell front. Occasionally at TSCI when I was I solitary, I was removed from my cell to visit with mental health staff in a small room with glass between us[.]" Filing 249-1 at 4, 14. On multiple occasions, however, Cardeilhac has told mental health providers that he would actually prefer to have those sessions cell-front instead of out-of-cell. Filing 315-8 at 10 (Cardeilhac indicated that he preferred to meet through cell-front visits for future sessions.); *id.* at 6 (Cardeilhac was offered an individual out-of-cell session to discuss his psychological evaluation results. Cardeilhac refused that out-of-cell session and indicated he wanted to discuss his results cell-front.); *id.* at 5 (Cardeilhac requested to meet with mental health and noted he wanted to talk cell-front.).

Further, in an 18 month period between June 5, 2017, and January 9, 2019 mental health providers had documented contact with Cardeilhac on approximately 140 separate days. Filing 315-8 at 4-12. These contacts included follow-ups, referral meetings, evaluation sessions, group sessions, or meetings at Cardeilhac's request.

86

*Id*. Such contacts lasted anywhere from a few minutes, up to several hours. *Id*. This count does not include multiple contacts in a single day. Despite this frequent contact, Cardeilhac often refused to speak with, acknowledge, or work with mental health assistance. Indeed, during this 18-month time period, Cardeilhac declined out-of-cell physical review eight times. Filing 315-8 at 6-10.

Whether intentional or not, Cardeilhac's statements are misleading to the point of complete falsehood. At best, Cardeilhac's description of the mental health care provided in restrictive housing is unreliable. The lack of credibility of his statements are indicative of his inability to fairly and adequately represent any potential class.

### 6.      Galle

Galle repeats his disability-related allegations of failure to accommodate in his declaration. Filing 249-26. But when asked about it in his deposition, Galle stated that following his August of 2017 surgery to repair his femur, he received physical therapy, he was placed in a handicap accessible housing unit with handrails, a handicap accessible shower with handrails and a shower chair, and "basically everything that a handicapped person is supposed to be afforded." *Id*. at 34-13-21; *see also* Filing 294.

Regarding his pain management, Galle's chief complaint appears to be that NDCS took him off the high doses of Vicodin that the Douglas County Jail prescribed to him for nearly two years. Filing 249-26 at 5, ¶ 14; Filing 316-2 at 11:22-12:17. Galle, however, has a troubled history with drug abuse. Galle admitted that, prior to

87

his incarceration, he had abused drugs such as methamphetamines, marijuana, cocaine, and prescription pills on a daily basis for most of his life. *Id*. at 8:15-9:13. Galle also admitted that he continued to abuse drugs such as meth and marijuana throughout his incarceration with NDCS. *Id*. at 23:15-24:13. Galle admitted to purchasing additional prescription pills from other inmates on the yard. *Id*. at 27:22-28:1. Galle also affirmed that he had overdosed on Wellbutrin—possibly twice. *Id*. at 24:14-23. Additionally, Galle has tested positive for illegal substances while at NDCS, as well as refused labs for drug screening. *Id*. at 24:24-25:4.

In the Complaint, Galle alleges that he has stopped seeking mental health treatment due to an incident in which he was previously placed in five-point restraints. Filing 1 at 11-12. Galle asserts that this incident was so traumatic that he now avoids seeking mental health treatment out of fear of being restrained again. Filing 1 at 12. However, when asked at his deposition why he was not currently participating in mental health treatment, Galle did not refer this alleged traumatic incident. Instead, Galle intimated that he stopped participating in mental health treatment because he was dissatisfied with his prescribed medications. Filing 316-2 at 85:5-86:2 ("[I]t was pretty easy for me to determine that my own well-being was better when I was being told that these were – the prescription pills I was on before weren't going to be allowed to be given to me here and these are the pills I needed to take.").

Galle's entrenched history of a destructive drug dependency seriously undermines his credibility and fitness to represent the interests of the proposed class. *See also* Filing 294, Brief in Support of Motion for Partial Summary Judgment.

### ii. Lack of Knowledge and Abdication of Role as Class Representative.

Plaintiffs have also displayed a lack of knowledge or understanding about the case. This Court must consider whether the class representatives are truly acting in a representative capacity or whether they have impermissibly ceded that role to the attorneys. *See, e.g., Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010) ("One of this Court's duties is to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney.") (quotation marks and citation omitted), *denial of class cert. aff'd*, 476 Fed.Appx. 154 (9th Cir. 2012); *Unger v. Amedisys Inc.*, 401 F.3d at 321 ("Class representatives must satisfy the court that they, and not counsel, are directing the litigation."); *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470, 484 (5th Cir. 1982) ("The adequacy requirement mandates an inquiry . . . into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees."); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000) (concluding that class representatives are inadequate if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys").

On this point, Plaintiffs Sabata, Norris, Galle, and Sweetser stand out. They have insufficient basic knowledge about the case, do not understand their role as the class representative, have not actively participated in prosecuting the litigation, have split claims, or no right to relief at all. The class is entitled to a representative who is more than "a key to the courthouse door dispensable once entry has been effected." *Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972).

### 1. Sabata[7]

Like most of the Plaintiffs, Sabata submitted a declaration in support of class certification that contained a paragraph purporting to show her adequacy as a class representative. Filing 249-15 at 6. Her deposition testimony shows otherwise.

Sabata does not know, but thinks the ACLU decided to pursue a class action in this lawsuit. Filing 316-3 at 30:21-25. She does not remember whether she was asked whether she wanted to pursue the lawsuit as a class action or individual lawsuit. *Id.* at 31:1-3. Indeed, the record is silent on Sabata's participation in any of the crucial litigation decisions in this case or that Sabata selected or ratified the selection of the numerous attorneys involved in this case. *See Ballan v. Upjohn Co.,* 159 F.R.D. 473, 486 (W.D. Mich. 1994).

Her lack of participation in such significant litigation decisions is not surprising since Sabata does not mind either way if the lawsuit is pursued as an individual or class action. Filing 316-3 at 31:21-23. Sabata simply "lacks the desire to

---

[7] To the extent Plaintiffs may assert an underlying mental health condition prevented a Plaintiff from answering basic questions about their lawsuit, the answer is appointment of a guardian ad litem and an individualized analysis of that Plaintiff's condition, not certification of an inadequate class representative.

vigorously pursue the interests of the potential class members" and, accordingly, cannot be "a fair and adequate representative of the class." *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 436 (8th Cir. 1999). "A potential class is entitled to more than blind reliance upon even competent counsel by uninterested and inexperienced representatives." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987).

When asked if she knew what some of her duties as a class representative were, she responded, "I don't know." Filing 316-3 at 32:23-25. She had "no clue" what the proposed class or subclasses are, or which classes she is trying to represent. *Id.* at 33:1-7. Given her testimony, it is difficult to fathom how Sabata could fairly and adequately represent such classes she admittedly has "no clue" about. *See Price v. United Servs. Auto. Ass'n*, 2012 WL 2847821 (W.D. Ark. Mar. 16, 2012), *report and recommendation adopted by* 2012 WL 2847916 (W.D. Ark. July 11, 2012) (plaintiff inadequate where plaintiff had no understanding of the responsibilities of a class representative to the unnamed class members and did not know the class definition or who was in the class).

Compounding her lack of desire to pursue the class action and her lack of knowledge about the classes or her duties is Sabata's lack of knowledge about her own claims. Sabata does not remember reading the Complaint, Filing 316-3 at 33:18-20, and is not aware if any claims have been dismissed. Filing 316-3 at 31:13-16. She does not know which allegations relate to which Defendants. *Id.* at 35:3-7. While she can recite a few topic areas involved in the case, Sabata asserts her personal

complaints are related to restrictive housing and an involuntary medication order. *Id.* at 35:8-14. She asserts she does not have a disability, *id.* at 45-48, and has never been denied participation in a program because of a disability. *Id.* at 48:8-10.

Even if the record did show Sabata is aware of, and wanted to maintain each claim she alleged in the Complaint, the potential for Sabata to abandon some claims and engage in claim splitting supports finding her an inadequate representative.[8] For example, Plaintiffs seek certification of a disability subclass including Sabata. Filing 250 at 8. Yet Sabata asserts she does not have a disability. Filing 316-3 at 45-48. And for the disability subclass claims against the BOP Defendants, Sabata is already indicating she does not want to pursue them. She does not know if she wants to be paroled again, may only possibly seek parole in the future, Filing 316-3 at 64:12-16, and has told her mother and caseworker she does not want to be paroled. Filing 316-3 at 65:4-8. If Sabata follows through with her testimony and abandons her parole and/or ADA and Rehabilitation Act claims, her new desire to seek only partial relief makes her an inadequate class representative. *See Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224 (3d Cir. 2009).

---

[8] As another example, Sabata has previously expressed appreciation and satisfaction for NCCW medical saying, "I really do appreciate you, answering my stupid inmate k[i]tes that may or may not be valid . . . I acknowledge your various discretion regarding some of my various k[i]tes . . . . And then every morning you give me my medicine, rain or shine . . . and you take very good care of me!!!" Filing 316-65.

## 2.  Norris

Norris knows less about this lawsuit than Sabata. Norris did not submit a declaration in support of class certification and her deposition testimony confirms she is not an adequate class representative.

According to Norris, she does not know what a class action lawsuit is and the ACLU decided to pursue it in this case. Filing 316-4 at 44:11-19. She believes she was asked if she wanted to pursue an individual lawsuit. *Id.* at 44:20-23. Just like the other Plaintiffs, the record is silent on Norris' participation in any of the crucial litigation decisions in this case or that Norris selected or ratified the selection of the numerous attorneys involved in this case. Norris has also refused or declined to meet with her attorneys in this case six times since the case was filed. Filing 316-63 at 2.

Outside of knowing she is a Plaintiff in this lawsuit, Norris lacks even minimal knowledge regarding the litigation and claims asserted.

> Q. Are you aware if a motion for a class certification has been filed on your behalf?
> A. No.
> Q. Do you know what a class certification is?
> A. No.
> Q. So did you review a class certification motion?
> A. No.
> Q. Did you agree to be a class representative?
> A. No.
> Q. Do you know what a class representative does?
> A. No.
> Q. Do you know if there are different classes or subclasses in this lawsuit?
> A. No.
> Q. What class are you trying to represent in this lawsuit?
> A. I don't know. No, don't know.

Filing 316-4 at 47. Since no one has read the Complaint to her, *id.* at 47:25-48:1, Norris can identify only one other Plaintiff and one possible defendant. *Id.* at 46:5-13. She does not know the specific allegations in the lawsuit, which allegations pertain to which Defendant, *id.* at 48:11-16, or the complaints of other Plaintiffs. *Id.* at 49:8-10. And she is not aware if any claims have been dismissed. *Id.* at 46:23-25.

Based on Norris' testimony, she cannot satisfy Rule 23(a)(4) since she is "startlingly unfamiliar" with the case. *Rolex Employees Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 665 (D. Or. 1991).

### 3. Galle

Galle submitted a declaration in support of class certification that contained two paragraphs purporting to show his adequacy as a class representative. Filing 249-26 at 1, 10. He states wants to "change the system" and "help others and help myself," *id.*, but does not know what the proposed class or subclasses are, or which classes he is trying to represent. *Id.* at 39:16-20. And he only knows what his "allegations are personally." *Id.* at 41:15-17. He is not aware if any claims have been dismissed, *id.* at 37:24-38:1, and does not know what the allegations of the other Plaintiffs are. *Id.* at 41:25-42:3.

Plaintiffs seek certification of an Isolation subclass including Galle, but when asked what sort of relief he was requesting or what his allegations were, Galle never identified restrictive housing. Filing 316-2 at 41:18-25; Filing 316-2 at 43:1-7. This is likely because Galle testified it has been "four or five years" since he was last in

94

restrictive housing, *id.* at 72:11-16, and "a lot of those things have changed since then." *Id.* at 87:13. According to Galle:

> [T]hey've cut it back a lot. They – you know, they – they've got programs now to keep guys coming in that – you know, they keep getting write-ups and stuff, now they've got a program to where you go in. Instead of just throwing everybody in the hole, they put you in a program that kind of modifies your behavior or whatever. I know there's things like that they do offer now.
>
> . . .
>
> They are afforded privileges, but they're offered programming, which is something good because it's trying to modify their behavior. And then, you know, a couple months later you'll see them. They'll come right back to the same gallery. And that's something they never -- they never did that before.

*Id.* at 88:4-25.

### 4. Curtright

Plaintiffs seek certification of a NDCS subclass including Curtright, but when asked what sort of relief he was requesting or what his allegations were, Curtright stated his personal claims are limited to disability claims related to "deaf rights." Filing 316-11 at 53:6-12. He is not alleging any mental health related claims, *id.* at 20:21-24, and his medical claims are actually related to disability accommodations while at medical appointments. *Id.* at 30. Like Sabata, Curtright either never had, or no longer wishes to pursue, many of his claims.

### 5. Gunther

Gunther submitted a declaration in support of class certification that contained a paragraph purporting to show his adequacy as a class representative. Filing 249-4 at 7. His deposition testimony shows otherwise.

Gunther is aware that a motion for class certification was filed on his behalf and he has some understanding that as a class representative he "would testify on behalf of not just 11 people that were in the lawsuit." Filing 316-9 at 12:1-3. But he is not aware that his duties as a class representative extend beyond testifying in front of a judge. *Id.* at 12:8-12.

Some parts of the Complaint were read to him, but other parts he "didn't pay any attention to." *Id.* at 13:9-12. He does not know what the proposed class and subclasses are. *Id.* at 12:13-15. And he is not aware if any claims have been dismissed. *Id.* at 11:16-20.

### iii.  Plaintiffs Failed to Provide Proof of Standing.

In addition to the flaws described above, Plaintiffs failed to carry their burdens to affirmatively prove their own standing. Without standing, Plaintiffs cannot adequately represent the class.

Plaintiffs had "an affirmative obligation to support [their] jurisdictional allegations with proof" they suffered an injury fairly traceable to the violations they alleged. *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 614 (9th Cir. 2016); *see also Lewis*, 518 U.S. at 357 ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (quotations and citation omitted).

First, as outlined in the Partial Motion for Summary Judgment at Filing 294, Curtright, Griswold, and Gunther are not eligible for parole and do not face past, current, or future injuries related to the parole process. And neither Galle nor Rena can demonstrate a current or ongoing violation related to the medical care for his femur or her skin rash. *Id.* The comprehensive response Defendants submitted to Galle and Rena's allegations shows both the individualized nature of the inquiry and the lack of proof from the Plaintiffs. Further, as outlined in Filings 225 and 246, Plaintiffs appear to have no claims against Defendant Micek, or at least no evidence Micek is in violation of the ADA or Rehabilitation Act.

Second, Sweetser is no longer in prison and he has no substantive right to injunctive relief. *See* Filing 282 and Filing 301. Sweetser has no right to declaratory or injunctive relief and he cannot seek to certify a class to obtain those rights. *Elizabeth M.*, 458 F.3d at 784–85 (holding the district court abused its discretion by including former residents of residential mental health facilities in a class seeking declaratory and injunctive relief for allegedly harmful state practices and policies). His continued presence in the class "poses a substantial risk to the 'efficiency and economy of litigation which is a principal purpose' behind the class action device." *Id.*, *citing Falcon*, 457 U.S. at 159. Since Sweetser cannot be a member of the class he seeks to represent, he cannot be a class representative. *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 511 (D. Neb. 2007).

Third, in order to establish standing to assert the injuries that Plaintiffs allege here, Plaintiffs must prove causation. *See Hampton v. Mouser*, 701 F.2d 766, 767 (8th

97

Cir. 1983) (causation is an element of every 1983 action). Such proof requires an examination of each Plaintiffs' medical history, including pre-existing conditions and an evaluation of potential alternate causes for the alleged injury. "Proof of causation by expert testimony is required when a plaintiff is complaining about treatment of a sophisticated injury." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Medical causation experts must perform a "differential diagnosis" to render a reliable opinion about the cause of an alleged injury. *Bland v. Verizon Wireless, L.L.C.*, 538 F.3d 893 (8th Cir. 2008). This technique identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated. *Id., citing Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202 (8th Cir. 2000). Without an expert performing a differential diagnosis, Plaintiffs cannot shown causation.

The absence of this proof is particularly noticeable for Plaintiffs' alleged mental health injuries. Haney cannot diagnose a patient and never has. Filing 316-17 at 16:1-6; *Id.* at 17:18-21. Haney is not a clinical psychologist and has never received any training in conducting clinical assessments of psychiatric disorders for the purposes of rendering a diagnosis. *Id.* at 17:24-18:8. Even more, Haney acknowledges that when "talking about whether or not being in restrictive housing significantly contributes to or exacerbates any preexisting condition," "it's unclear to [him] how you would go about ruling it out any other - - any other cause." *Id.* at 206:18-25.

Stewart did not perform any differential diagnoses either. Filing 249-38; Filing 315-10 at 184:24-185:12. Instead, he made conclusory statements about multiple prisoners that were not based on adequate medical or psychiatric bases. Filing 315-1

at 4; Filing 316-38 at 19. On multiple occasions, Stewart forms conclusions solely based on correlation, not causation. Filing 316-38 at 16, 23. For example, when asked how he knew a prisoner had "decompensated," Stewart tried to offer an explanation and then said, "You're right, I don't know because I didn't have a baseline prior to that." Filing 315-10 at 216:18-20. In addition, he said he "would only be guessing" about the subject of a prisoner's kite before he committed suicide, but he still offered a conclusion about NDCS' response to that kite. *Id.* at 171:3-172:13. As mentioned earlier, Stewart was unable to form an opinion on whether the deficiencies he pointed out in his report applied to the named Plaintiffs in the case. *Id.* at 203:20-204:7. Additionally, Stewart has never been licensed in the State of Nebraska to practice psychiatry and has never been board certified in forensic psychiatry in any state. *Id.* at 24:17-25:7.

For Plaintiffs to properly determine a cause of their alleged injuries, careful and controlled observations would need to be conducted. Filing 316-47 at 9. Plaintiffs' experts conducted no such observations. Simply put, most, if not all, of the experts' conclusions regarding the cause of mental health issues were mere speculation and not based on adequate medical, psychological, or psychiatric bases.

### D. Failure to Prove the Proposed Class and Subclasses are Sufficiently Numerous.

Plaintiffs' assertion of numerosity is erroneous for the same reasons as their assertions of commonality and typicality. Plaintiffs assert they have established numerosity because "the NDCS Class includes all 5,358 current prisoners, and an untold number of future prisoners." Filing 250 at 37. However, a finding of

numerosity "requires examination of the specific facts of each case." *Jackson v. Crawford*, No. 2015 U.S. Dist. LEXIS 60501, at *5 (W.D. Mo. May 8, 2015), *quoting General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission*, 446 U.S. 318, 330 (1980).

And a plaintiff must ordinarily demonstrate some evidence or a reasonable estimate of the number of purported class members. In addition to sheer numbers, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

Instead of establishing numerosity through the presentation of admissible evidence, Plaintiffs rely upon blanket estimates of inmates in NDCS custody. Plaintiffs do not establish how many of those inmates actually possess an Eighth Amendment claim – *i.e.*, are subject to a substantial risk of serious harm because of NDCS policies – or how many of those inmates actually possess an ADA claim. Thus, Plaintiffs failed to satisfy their burden of demonstrating that the proposed class, properly defined, is sufficiently numerous to satisfy Rule 23(a)(1).

## IV.   THE PROPOSED CLASS AND SUBCLASSES FAIL TO MEET THE REQUIREMENTS OF RULE 23(b).

Plaintiffs assert that, in addition to meeting the requirements of Rule 23(a), their proposed class and subclasses satisfy the additional requirements of either Rule 23(b)(1) or 23(b)(2), or both. Filing 250 at 48. Their argument is without merit, chiefly because it fails to account for this Court's capacity to adjudicate the myriad, diverse

claims presented by the Plaintiffs, and NDCS' demonstrated ability to comply with legal requirements established in the decisions of this Court, even if such decisions involve only a single plaintiff. Even if the Plaintiffs could somehow satisfy the requirements of Rule 23(a)—which they cannot, as the foregoing argument comprehensively established—they cannot satisfy any subsection of Rule 23(b) and therefore cannot maintain a class action.

If a proposed class meets the requirements of Rule 23(a), it must additionally satisfy one of the subsections of Rule 23(b). Relevant here, subsections (1) and (2) respectively provide for class certification if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> [or]
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

### A. Failure to Satisfy Rule 23(b)(1).

Plaintiffs argue that they satisfy both subsections of Rule 23(b)(1). With respect to Rule 23(b)(1)(A), Plaintiffs make the stunningly inaccurate claim that "there are over 5,000 individual prisoners incarcerated in NDCS facilities at any given time who are affected by the challenged policies *and each one could file suit for*

*injuries arising from these systemwide policies*." Filing 250 at 48. From this unsupported premise, the Plaintiffs suggest that "certification is appropriate under 23(b)(1)(A) because if each member of the proposed class litigated their claims individually there would be a risk that each individual case would impose a different standard on Defendants." *Id.*

As an initial matter, as established above, Plaintiffs have categorically failed to show that their own diverse medical, dental, and disability-related issues are the result of deficient systemic policies, if such injuries even exist. Many inmates are in perfect health and have never made use of NDCS healthcare facilities, rendering absurd any suggestion that they could presently "file suit." Thus, the notion that these thousands of theoretical "individual claims" could be bound together by a common issue—which is, indeed, the root of Plaintiffs' argument—is specious. Plaintiffs' own respective issues are individualized and most appropriately adjudicated on a case-by-case basis. Their example, therefore, cannot serve as a basis to infer that thousands of others share the same or even similar issues.

Moreover, Plaintiffs' argument ignores the relative consistency of this Court's decisions regarding the constitutional principles governing prison conditions and NDCS' steadfast compliance with those decisions. NDCS is a regular litigant before this Court and the overwhelming majority of the civil rights claims brought against it (more specifically, its officials) are brought here. Plaintiffs' argument is notably devoid of any examples of divergent or inconsistent decisions of this Court in cases where different inmates have separately alleged injury stemming from the same

102

policy or practice. That is unsurprising, since few, if any, such examples exist
(Defendants are aware of none).

For example, Judge Kopf recently granted NDCS officials summary judgment
in a case concerning the legality of the procedures for the placement and maintenance
of an inmate in restrictive housing. *See Landers v. Frakes*, No. 8:17-CV-371, 2019 WL
1517122 (D. Neb. Apr. 8, 2019). The case was brought by an individual plaintiff, but
the policies he challenged generally apply to any inmate placed in restrictive housing.
Defendants would be hard-pressed to imagine a scenario in which a different judge of
this Court would diverge from Judge Kopf's legal reasoning in a case with a different
inmate plaintiff but similar facts.

Here, in the prison healthcare context, different Nebraska inmate plaintiffs—
or, indeed, the Plaintiffs themselves—may obtain differing outcomes before this
Court, but those outcomes may differ because of the *factual* differences in their cases,
certainly not because different and inconsistent legal standards are being applied.

Likewise, Plaintiffs cannot achieve certification under Rule 23(b)(1)(B). Their
sole argument that they satisfy that subsection is that "[i]f Plaintiffs do not succeed
on their claims, the ability of future plaintiffs to challenge the same practice will be
inhibited under stare decisis." This is incorrect. "The possible stare decisis effect of
an individual adjudication, however, is not enough as a practical matter to be
dispositive of other members' interest, and does not create a right to a class action."
*McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 879-80 (D.S.D. 1982); *see also* 7AA
Wright & Miller Fed. Prac. & Proc. § 1774 (3d ed.) ("[T]he party seeking class

certification must be able to allege more than that an individual adjudication may be given stare-decisis effect in other lawsuits; some greater practical effect must be shown. If it is not, certification under Rule 23(b)(1)(B) must be denied."). Plaintiffs have shown no "greater practical effect" on subsequent litigants and therefore cannot maintain a class action under this rule.

### B. Failure to Satisfy Rule 23(b)(2): Single injunction element.

A putative class satisfies Rule 23(b)(2) "only when a single injunction or declaratory judgment would provide relief to each member." *Dukes*, 564 U.S. at 360. If any member's ability to prove his claim depends at all on facts unique to him or her instead of common to the whole class, then the court cannot certify a class. *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) ("[The conduct must be] such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (citation omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360.

Plaintiffs cannot satisfy this element because all their claims depend in part on facts unique to each member. Although they all challenge "health care policies and practices," "health care policies and practices" affect them differently. Even if there were any individual class member who were entitled to an injunction, which Defendants dispute, the same is not true for the members who have not been harmed by "health care policies and practices." Those members suffered no harm, so they "obviously [are] not entitled to an injunction." *Denton v. Mr. Swiss of Mo., Inc.*, 564

104

F.2d 236, 242 (8th Cir. 1977). In this situation, the Court cannot issue a single injunction granting relief to all class members.

Plaintiffs assert they can satisfy the single injunction requirement simply because "Defendants' policies" apply to every person. Filing 250 at 51. But even if it were true that those policies and practices imposed an objectively intolerable risk of harm as applied to one plaintiff, it would not follow that the policies and practices were inadequate as applied to every plaintiff. "Even if [a] decision[] . . . can be considered uniform, the effect is not." *Webb*, 856 F.3d at 1156. To hold otherwise would allow courts to issue injunctions in favor of parties simply because the policy affected those parties, regardless of whether the effect was unlawful.

Just last term, the Supreme Court remanded a case because the Court of Appeals "ha[d] already acknowledged that some members of the certified class may not be entitled to [relief]." *Jennings*, 138 S. Ct. at 852. The Court determined that if any member were not entitled to relief, it would "no longer be true that the complained-of 'conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* (citation omitted).

## V.    THE REQUESTED RELIEF WOULD VIOLATE RULE 65(d).

The injunction contemplated by Plaintiffs' request, to the extent discernable, necessarily violates Rule 65 because no injunction could address every permutation and still comply with Rule 65(d), which requires "[e]very order granting an injunction" to "state the reasons why it issued," "state its terms specifically," and

"describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

"Movants may not make an end-run around this rule by requesting an injunction that operates at some stratospheric level of abstraction." *Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) (quotations omitted). Plaintiffs must "give content" to the requested equitable relief, *id.*, and a request for "a bare injunction to follow the law" is insufficient. *Civil Rights Educ. & Enforcement Ctr. v. Hospitality Props. Trust*, 867 F.3d 1093, 1103 (9th Cir. 2017). "Rule 23(b)(2)'s bottom line, therefore, demands at the class certification stage [that] plaintiffs describe in reasonably particular detail the injunctive relief they seek such that the district court can at least conceive of an injunction that would satisfy [Rule 65(d)'s] requirements, as well as the requirements of Rule 23(b)(2)." *D.G. v. Devaughn*, 594 F.3d 1188, 1200 (10th Cir. 2010)) (quotations and citations omitted).

Plaintiffs did not even attempt to explain what such an injunction would look like. Plaintiffs merely ask this Court to enjoin Defendants "from subjecting Plaintiffs and the class and subclasses they represent to the illegal and unconstitutional conditions, acts, omissions, policies, and practices" and to compel Defendants to "develop and implement" "policies and procedures" to meet constitutional standards. Filing 1 at 85. That does not carry their burden. *See Lakeland Reg'l Med. Ctr. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014) (plaintiff failed "to affirmatively demonstrate that class certification was appropriate under Rule 23(b)(2)" because "it never identified exactly what injunctive or declaratory relief it

was seeking" and instead merely requested "such declaratory and injunctive relief as appropriate in order to compel and ensure [defendant's] future compliance with law.") (quotations omitted); *Brown v. Kerkhoff*, 279 F.R.D. 479, 500 (S.D. Iowa 2012) (generic request for "sweeping reform" is insufficient).

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for class certification should be denied.

Submitted May 13, 2019.

> **NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, SCOTT FRAKES, HARBANS DEOL, NEBRASKA BOARD OF PAROLE, and JULIE MICEK, Defendants.**
>
> By:   DOUGLAS J. PETERSON
>          Attorney General of Nebraska
>
>          *s/ Ryan S. Post*
>          RYAN S. POST, #24714
>          DAVID A. LOPEZ, #24947
>          DANIELLE L. ROWLEY, #25505
>          KATHERINE O'BRIEN, #25993
>          BEN GOINS, #26034
>          SCOTT R. STRAUS, #26475
>          Assistant Attorneys General
>
>          OFFICE OF THE ATTORNEY GENERAL
>          2115 State Capitol
>          Lincoln, Nebraska 68509
>          (402) 471-2682
>          Ryan.Post@nebraska.gov
>
>          Attorneys for Defendants.

107

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2019, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, causing notice of such filing to be served upon all parties registered on the CM/ECF system.

By:    _s/ Ryan S. Post_