UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | |
|---|---|
| **HANNAH SABATA, et al.,** | **Case No. 4:17-cv-03107-RFR-MDN** |
| **Plaintiffs,** | **CLASS ACTION** |
| **v.** | **BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| **NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al.,** | |
| **Defendants.** | |

## INTRODUCTION

Defendants move for partial summary judgment on the basis that (1) three Named Plaintiffs have life sentences and therefore lack standing to challenge the lack of accommodations provided for their disabilities in Board of Parole reviews and (2) with respect to two factual allegations supporting Plaintiffs' Eighth Amendment medical care claim, there is no genuine dispute of material fact either that Defendants were not deliberately indifferent to Plaintiffs' serious medical needs or, if they were in fact deliberately indifferent, that those claims are now moot. Defendants misunderstand the nature of the claims against them: (1) prisoners with disabilities are entitled to participate in the parole process regardless of whether they are entitled to any particular parole outcome and (2) the medical care claims are based on the substantial risk of serious harm that all people in the custody of the Nebraska Department of Correctional Services (NDCS) are exposed to due to the systematic deficiencies in the provision of health care. Defendants also fail entirely to support their allegations about the adequacy of health care provided to the Named Plaintiffs with expert testimony, whereas Plaintiffs provide unrebutted expert testimony that the care provided fell below the relevant community standard of care and placed the Named Plaintiffs at substantial risk of serious harm. Defendants also

1

incorrectly allege that post-filing remedial measures directed at individual instances of harm may moot Plaintiffs' claims, without providing the evidence required under the voluntary cessation doctrine that the harms may not reasonably be expected to recur.

James Curtright, Richard Griswold, and Michael Gunther have standing to challenge the Board of Parole's violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act, notwithstanding their life sentences. The ADA and the Rehabilitation Act exist to ensure that individuals with disabilities have meaningful access to programs and activities, including those that are parole-related. *See Armstrong v. Davis*, 275 F.3d 849, 864-65 (9th Cir. 2001) (against "the Board's contention that the deprivation of a fair parole hearing can not in itself constitute [actual] injury" holding that plaintiffs had standing because denial of the benefit of a parole hearing "by virtue of the Board's failure to make accommodations that would enable them to attend or comprehend parole . . . hearings . . . constitutes 'actual injury'"). Curtright, Griswold, and Gunther are injured due to their exclusion from the parole process, including three currently scheduled reviews before the BOP, in which they have a statutory right to participate. *See* Inmate Locator Profiles, Ex. 6 A—C; Filing 1 at 72[1] (listing "key reviews" and "prisoner interviews" among the programs, services, and activities offered by BOP that must be accessible to prisoners with disabilities pursuant to the ADA), 80 (explaining that "BOP Defendants have no process in place for allowing prisoners with disabilities to request or receive . . . reasonable modification of BOP programs services and activities," in contravention of the Rehabilitation Act).

Under Nebraska law, the Board of Parole (BOP) may "review[] a committed offender's case at any time" regardless of the sentence the offender is serving. NEB. REV. STAT. § 83-192(f).

---

[1] Page numbers of filings refer to the page number on the document itself, not the number generated by the filing system, when available.

The BOP chooses to review the cases of individuals serving life sentences, including Curtright, Griswold, and Gunther: Curtright and Gunther each appeared before the Parole Board for review in 2016 and were not provided necessary accommodations for their disabilities. Griswold was last scheduled to see the Parole Board in January 2019, and although that meeting did not take place he is currently scheduled to see the Parole Board in January 2029. Filing 42-10 (previously scheduled to see the Parole Board in January 2019); Inmate Locator Profile for Richard Griswold, Ex. 6-A (scheduled to see the Parole Board in January 2029). Additionally, Curtright and Gunther are scheduled to appear before the Parole Board in 2026, and Griswold in 2029.

The BOP is not entitled to deny accommodations to prisoners with disabilities on the basis that those prisoners are not eligible for a particular outcome of the hearings—release. Under the ADA and the Rehabilitation Act, prisoners with disabilities must be provided the accommodations necessary to participate in the parole process, which includes these reviews, regardless of what the outcome of the process is. Each of the listed Named Plaintiffs has therefore suffered an injury from lack of meaningful access to parole reviews in the past, and, because each has parole reviews scheduled, stands to suffer more injury in the future. *See Bahl v. County of Ramsey*, 695 F.3d 778, 788 (8th Cir. 2012) (recognizing that "discrimination in the provision of services as outlined in the ADA is an injury in itself").

Zoe Rena and Jason Galle both provide evidence sufficient to defeat summary judgment that Defendants have placed and continue to place them, and the class of all people in NDCS custody, at substantial risk of serious harm due to their health care policies and practices. Although Defendants treat Plaintiffs' Complaint as a litany of separate and discrete medical complaints, each consisting of a single factual allegation, the true claim at issue is that Defendants "subject all Plaintiffs and the NDCS Class to a substantial risk of serious harm from inadequate health care . . . ." Filing 1 at 70. Defendants are repeating the error of the Missouri

prison officials in *Postawko v. Missouri Dep't of Corrs.*, who also tried to atomize a systemic medical case into individual complaints: "In contrast to Defendants' characterizations, Plaintiffs are not merely aggregating many claims of *individual* mistreatment. Instead, they are alleging that the policies and practices in place for . . . treatment generally expose all inmates [in the class] to a substantial risk of serious harm in violation of the Eighth Amendment." 2017 WL 3185155, at *8 (W.D. Mo. 2017) (*aff'd*, 910 F.3d 1030 (8th Cir. 2018)) (emphasis in original).

Even if this were a case just about Galle's broken leg and Rena's skin condition, both Galle and Rena have presented evidence sufficient to defeat summary judgment that they had serious medical needs and that Defendants were deliberately indifferent to those needs by providing inadequate and delayed treatment. To the extent that Defendants contend that their medical needs were insufficiently serious to raise constitutional questions, Rena's and Galle's medical records and declarations, together with Dr. Marc Stern's expert affidavit, raise triable issues of material fact; summary judgment is therefore not appropriate on this question. Defendants also contend that the medical care provided to both Rena and Galle was adequate, Filing 294 at 15, 17; but this claim is not supported by expert testimony on what the relevant standard of care is or whether the care provided met that standard; the mere fact that *some* care was provided does not defeat a claim that Defendants were deliberately indifferent to Plaintiffs' serious medical needs. *See Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005).

Finally, Defendants argue that Rena's and Galle's allegations are moot because, since the filing of the lawsuit in this case, their conditions have at least temporarily improved. Filing 294 at 11. Both Galle and Rena remain at substantial risk of serious harm to their health, regardless of the status of any particular physical ailment. Rena continues to suffer flare-ups of her skin condition and Galle continues to suffer pain from a complex fracture repair. Both remain subject to harm due to the same deliberate indifference to their needs shown by Defendants in the past.

4

Finally, because Galle's femur surgery and the temporary improvement of Rena's skin condition

occurred after the filing of the lawsuit in this case, Defendants' mootness argument runs afoul of

the voluntary cessation doctrine. The post-filing resolution of any allegation does not moot

Plaintiffs' claims unless Defendants show "that the challenged conduct cannot reasonably be

expected to start up again." *Americans United for Separation of Church and State v. Prison

Fellowship Ministries, Inc.*, 509 F.3d 406, 421 (8th Cir. 2007) (citation omitted). They do not

even attempt to argue that they have irreversibly altered their policies such that substantial risk of

serious harm to health cannot recur; therefore, these claims are not moot.

## RESPONSES TO STATEMENT OF UNDISPUTED MATERIAL FACTS

| | Defendants' Facts | | Plaintiffs' Response |
|---|---|---|---|
| 1. | James Curtright, Richard Griswold, and Michael Gunther are each serving sentences of life to life. Filing 42-10 at 2; Filing 42-11 at 2; Filing 42-12 at 2. | 1. | Undisputed. |
| 2. | Jason Galle is currently incarcerated at the Nebraska State Penitentiary. Filing 249-26 at ¶ 3. | 2. | Undisputed |
| 3. | In 2008, prior to his arrival at NDCS, Galle's right femur was fractured as a result of a gunshot wound which he sustained during his arrest. Filing 293-2 at 28. | 3. | Undisputed |
| 4. | While housed at the Douglas County jail, Galle underwent three surgeries, between 2008 and 2009, to treat his fractured femur. Filing 293-2 at 19, 22, 27. | 4. | Undisputed that Galle underwent three surgeries on his femur between 2008 and 2009. |
| 5. | On March 1, 2010, upon his arrival at NDCS, Galle received an initial intake medical screening. Filing 293-2 at 27-28. | 5. | Undisputed that a licensed practical nurse conducted an intake screening questionnaire. |
| 6. | The intake medical screening noted Galle's history of a fractured femur and concomitant surgeries. Filing 293-2 at 27-28. | 6. | Undisputed |
| 7. | An x-ray of Galle's right pelvis and femur was taken the next day, on March 2, 2010. Filing 293-2 at 26. | 7. | Undisputed |
| 8. | The x-ray impression indicated the presence of an intramedullary rod with fixation screw and a healing mid shaft fracture. Filing 293-2 at 26. | 8. | Undisputed |

| **Defendants' Facts** | **Plaintiffs' Response** |
|---|---|
| 9. During his intake medical screening, Galle acknowledged using methamphetamine and cocaine intravenously on a daily basis prior to his incarceration. Filing 293-2 at 27. | 9. Undisputed that during his March 2010 intake medical screening, Galle acknowledged using methamphetamine and cocaine intravenously until May of 2008. Filing 293-2 at 27. |
| 10. Galle testified that before entering NDCS he used methamphetamines, marijuana, cocaine, and prescription pills on a daily basis. Filing 293-6 at 8:19-9:8. | 10. Disputed. Galle's testimony establishes he used various illicit substances on a daily basis. It does not establish he used each of the illicit substances on a daily basis. Filing 293-6 at 8:19-9:8. |
| 11. While incarcerated at the Douglas County jail, Galle received Vicodin to manage the pain associated with his femur. Filing 293-2 at 24, 27. According to Galle, he "was on high doses of Vicodin." Filing 293-6 at 12:3. | 11. Undisputed that Galle received Vicodin to manage pain associated with his femur while incarcerated at Douglas County jail. |
| 12. At NDCS, Galle requested Vicodin. Filing 293-2 at 20, 21, 25. | 12. Disputed. Galle did not directly request Vicodin in any of the documents Defendants cite to here. At filing 293-2 at 20, Galle requested hydrocodone. At filing 293-2 at 21, Galle requested to "go back on meds I was on in Douglas County." At filing 293-2 at 25, Galle asks to "be put on something stronger." |
| 13. NDCS medical staff declined to prescribe narcotics for Galle's chronic pain. Filing 293-2 at 22-23. | 13. Undisputed that on March 10, 2010, NDCS medical staff declined to prescribe narcotics for Galle's chronic pain. Filing 293-2 at 22-23. |
| 14. Dr. Dwight Rickard of NDCS medical discussed drug-seeking behavior with Galle and advised of the risk associated with replacing illicit street drugs with prescription drugs. Filing 293-2 at 17. | 14. Disputed. The medical notation relied upon cannot establish what Dr. Rickard did or did not do or say. What he might have said, is, in any event, inadmissible hearsay. |
| 15. Dr. Rickard noted that due to Galle's past history of methamphetamine and cocaine use, he would have significant potential problems related to his perception of pain and recovering from his femur fracture. Filing 293-2 at 15-16. | 15. Disputed. The medical notation relied upon cannot establish what Dr. Rickard did or did not do or say. What he might have said, is, in any event, inadmissible hearsay. |
| 16. NDCS medical staff discussed appropriate pain management regimens with Galle and the need to avoid relying on narcotics. Filing 293-2 at 14. | 16. Disputed. The medical notation relied upon cannot establish what medical staff did or did not do or say. What they might have said, is, in any event, inadmissible hearsay. |
| 17. NDCS medical staff also notified Galle and discussed with him the Centers for Disease Control guidelines that narcotics and opioids are not indicated for treating chronic pain. Filing 293-2 at 5-6. | 17. Disputed. The medical notation relied upon cannot establish what medical staff did or did not do or say. What they might have said, is, in any event, inadmissible hearsay. |

| **Defendants' Facts** | | **Plaintiffs' Response** | |
|---|---|---|---|
| 18. | NDCS medical staff provided Galle multiple other pain management medications. Filing 293-6 at 17:25-19:1. | 18. | Undisputed |
| 19. | Galle has used methamphetamine and marijuana during his incarceration at NDCS. Filing 293-6 at 23:15-23. | 19. | Undisputed |
| 20. | At various times during his incarceration Galle has reported that his medications were helping him, that he did not need to rely on his cane as much, and that he only rated the pain in his right leg as a 3 on a 0-10 scale. Filing 293-2 at 11-13; Filing 293-6 at 25:13-26:2. | 20. | Undisputed that Galle reported a pain intensity in his right upper leg as a 3 on a 0-10 scale on August 14, 2014, that NDCS notes indicate that Galle stated "medication is helping him and he has not had to use the cane as much" on August 6, 2012, and that NDCS notes indicate Galle stated he "has been walking more without his cane" and "actually feels a little better" on November 14, 2011. Filing 293-2 at 11-13. Undisputed that Galle testified in the affirmative when asked "prior to your fourth femur – surgery on your femur in 2017, did your walking ability ever improve while housed at NDCS," "prior to your fourth surgery on your femur, did your pain management ever improve while housed at NDCS," and "did you ever report to medical staff that you did not have to use your cane as much to move around." Filing 293-6 at 25:13-26:2. Temporary improvements in pain management do not negate the overall pattern on inadequate pain management. |
| 21. | A September 15, 2010, x-ray of Galle indicated a healed mid shaft femoral fracture with no evidence of acute fracture or dislocation. Filing 293-2 at 18. | 21. | Undisputed that these were the findings of Andrew Gelbman, D.O. of Creighton University Medical Center. |
| 22. | An x-ray of Galle on April 25, 2016, indicated a healing mid femoral diaphyseal fracture. Filing 293-2 at 10. | 22. | Undisputed that these were the findings of Johanna Schubert, M.D. of Radiology Consultants of the Midwest, P.C. |
| 23. | A June 3, 2016, x-ray of Galle indicated a healing mid shaft femoral fracture with no evidence of hardware failure or significant change. Filing 293-2 at 9. | 23. | Undisputed that these were the findings of Mary Davey, M.D. of Radiology Consultants of the Midwest, P.C. |
| 24. | A March 9, 2017, x-ray of Galle indicated there was a healed mid shaft femoral fracture with no acute fracture or dislocation, and the hardware in Galle's leg was intact with no evidence of loosening. Filing 293-2 at 7-8. | 24. | Undisputed that these were the findings of Andrew Gelbman, D.O. of Radiology Consultants of the Midwest, P.C. |

| Defendants' Facts | | Plaintiffs' Response | |
|---|---|---|---|
| 25. | A femoral fracture was not indicated until an x-ray of Galle's right femur on July 21, 2017, noted the development of a fracture of the mid shaft intramedullary rod. Filing 293-2 at 4. | 25. | Disputed. A "healing" femoral fracture was indicated in x-rays on April 25, 2016 and June 3, 2016. Furthermore, risk of an "occult fracture" was indicated by Dr. Samani in March 2017. Galle Medical Records, Ex. 4-B at 79. |
| 26. | Galle testified that after his July 21, 2017, x-ray indicated a femoral fracture, NDCS medical staff were "communicating with people to try to get them to take me to the emergency room and get surgery performed" and "Creighton, who originally had did my surgery, and Creighton didn't want me there or couldn't get it done or something." Filing 293-6 at 37:6-15. | 26. | Undisputed |
| 27. | Galle underwent his fourth surgery to repair his fractured femur on August 25, 2017, at Bryan Medical Center in Lincoln, Nebraska. Filing 293-2 at 2-3. | 27. | Undisputed that the surgery took place 10 days after the Complaint in this action was filed. |
| 28. | Galle received post-surgical physical therapy rehabilitation treatment for his femur. Filing 293-2 at 40-42. | 28. | Disputed. Documents defendants cite to do not support the alleged fact. The cited pages are radiology reports that say nothing about physical therapy. Galle has not received physical therapy for the past six months despite continuing problems with his leg. Galle Decl., Ex. 3 at 1-2. |
| 29. | Post-surgical x-rays were taken of Galle's femur on October 3, 2017; November 7, 2017; December 18, 2017; and March 21, 2018. Filing 293-2 at 1, 33, 36, 41-42. | 29. | Undisputed |
| 30. | The December 18, 2017, and March 21, 2018, x-rays both indicate a healed fracture of the mid femur. Filing 293-2 at 33, 36. | 30. | Undisputed that these were the findings of Dr. David Samani, M.D. and Dr. John Haggstrom, M.D. |
| 31. | After his fourth surgery, Galle has "received physical therapy for six months" at the Diagnostic and Evaluation Center, and at the Nebraska State Penitentiary he continues to receive physical therapy. Filing 293-6 at 33:20-34:14. | 31. | Disputed. Galle's testimony did not establish that he "continues to receive physical therapy" presently at the Nebraska Statue Penitentiary. Rather, he testified he was "brought back to NSP" following his August 25, 2017 procedure and at that time NDCS "continued to keep me on physical therapy." Filing 293-6 at 33:20-34:14. Physical therapy ceased despite ongoing problems. Galle Decl. Ex. 3 at 1-2. |

| **Defendants' Facts** | | **Plaintiffs' Response** | |
|---|---|---|---|
| 32. | Galle has seen "quite a few" health care practitioners "multiple times" and received a CT scan. Filing 293-6 at 35. | 32. | Undisputed that Galle testified to seeing "quite a few" health care practitioners "during [his] rehab" and received a CT scan sometime after his operation—after long delays even after a specialist had ordered the scan. Filing 293-6 at 35. |
| 33. | Zoe Rena is currently incarcerated at the Nebraska Correctional Center for Women ("NCCW"). Filing 249-12 at ¶ 2. | 33. | Undisputed |
| 34. | Rena served a prior prison sentence at NCCW from May of 2011 to April of 2014. Filing 293-7 at 39:9. | 34. | Undisputed |
| 35. | Rena's current incarceration at NCCW began in July of 2015. Filing 293-7 at 9:2. | 35. | Undisputed |
| 36. | When Rena returned to the custody of NDCS in 2015, Rena reported to NDCS medical that she had not been to a doctor since she left NDCS in April of 2014. Filing 293-4 at 13. | 36. | Undisputed |
| 37. | During her incarceration, Rena has been prescribed hydrocerin cream, clindamycin 1% gel, doxycycline, clobetasol cream, Aveeno Active Naturals soap, minocycline, hydroxyzine, and adapalene gel to treat her skin conditions. Filing 293-4 at 8. | 37. | Disputed. During Rena's incarceration she has also been prescribed Nortrel, a type of birth control, which she was told would also help her skin condition. Rena Medical Records, Ex. 4-A at 2. |
| 38. | According to Rena, "there was at least two different pill forms. They gave me a shot one time . . . Aveeno soap, which I still use today, some kind of steroid cream, and there's been some other kind of cream. And then there was some kind of – I don't know if it's like a lotion, moisturizer-type cream stuff." Filing 293-7 at 16:19-17:6. | 38. | Undisputed |
| 39. | NDCS medical staff have informed Rena that her skin condition does not warrant a referral to a dermatologist. Filing 293-4 at 3. | 39. | Disputed. Instead of exercising professional judgment, the provider simply wrote on Rena's form that NDCS would not allow inmates to see dermatologists: "We do not have a dermatologist that will see inmates. Nor will the new director approve it." Rena Medical Records, Ex. 4-A at 3 (Response to Rena's Inmate Interview Request dated Jan. 26, 2017.) |
| 40. | Rena testified that medical staff have met with her frequently and prescribed several medications for her skin rash. Filing 293-7 at 14:21-15:15. | 40. | Undisputed |

| Defendants' Facts | Plaintiffs' Response |
|---|---|
| 41. Rena testified that when a particular prescription did not work, medical staff tried another. Filing 293-7 at 15:16-22. | 41. Undisputed |
| 42. Rena testified that when she refused a treatment option, NDCS medical staff tried another. Filing 293-7 at 18:10-17. | 42. Undisputed that Rena testified that she refused to get a second shot because she "had already been given it and it didn't do anything." |
| 43. Rena has chronically failed to comply with her skin-related treatment plan. Filing 293-4 at 2, 4-5, 10-11. | 43. Disputed. Rena has complied with a variety of treatment plans offered to her to address her skin condition, has communicated with her providers about discontinuing her ineffective medications or harmful medications, and has contemporaneously documented her understanding of the verbal directions given to her by medical staff to discontinue medications at NDCS in writing. Rena Medical Records, Ex. 4-A at 4 (April 27, 2017 Inmate Interview Request: "All of the things medical has given me in the past year to try I did try for the amount of time <u>you</u> told me it would take to work, and when that time passed, and it didn't work, I kited medical as <u>you</u> recommended that I do."; Rena Medical Records, Ex. 4-A at 5 (May 3, 2017 Inmate Interview Request: "You gave me adapelene gel and told me to let you know <u>right away</u> if it wasn't working. And it was burning my dang face off terrible—it was ridiculous!") |
| 44. Rena's medical chart from December 31, 2018, indicates her skin condition has improved. Filing 293-4 at 14. | 44. Undisputed that the notation on the chart states that her skin condition had improved. |
| 45. In her March 19, 2019, deposition when asked how her skin rash was that day, Rena testified "[i]t's fine" and that she no longer had the rash. Filing 293-7 at 17:23-18:9. | 45. Undisputed |

## ADDITIONAL MATERIAL FACTS

46.     The BOP may review any committed offender's case at any time. NEB. BOARD OF PAROLE RULES § 4-204(B); NEB. REV. STAT. § 83-192(f).

47.     James Curtright's next Parole Board Review Date is scheduled for August 2026.

Inmate Locator Profile for James Curtright, Ex. 6-B.

48.     James Curtright is serving a life sentence but has met with the parole board once every ten years. Filing No 249-21 ¶ 29.

49.     James Curtright's last parole review date was in 2016. Filing No 249-21 ¶ 29.

50.     When James Curtright arrived at the parole review in 2016 there was no ASL interpreter present and the review had to be postponed for a month until NDCS could arrange for an ASL interpreter. Filing No 249-21 ¶ 29.

51.     James Curtright has never been informed of his rights with respect to parole hearings and has not been offered any assistance in preparing for them. Filing No 249-21 ¶ 29.

52.     Michael Gunther's next Parole Board Review Date is scheduled for October 2026. Inmate Locator Profile for Michael Gunther, Ex. 6-A.

53.     Michael Gunther has participated in the parole process and previously appeared before the Board. Filing No 249-4 ¶ 20.

54.     Michael Gunther has suffered harm due to lack of accommodations for his disability in the context of parole. Filing No 249-4 ¶ 20.

55.     In prior hearings, Michael Gunther had trouble walking to the location for the hearing and getting into the chair due to his mobility disabilities. Filing No 249-4 ¶ 20.

56.     Michael Gunther is unable to read any documents provided to him by the Board of Parole or NDCS because they are not provided in Braille or audio format. Filing No 249-4 ¶ 20.

57.     In order to effectively participate in his review before the Board in 2026 Michael Gunther intends to ask for accommodations in reading parole related documents and in physically getting to his seat. Filing No 249-4 ¶ 20.

58.     Richard Griswold's next Parole Board Review Date is scheduled for January

2029. Inmate Locator Profile for Richard Griswold, Ex. 6-C.

59.     Richard Griswold's last Parole Board Review Date was scheduled for January 2019. Filing 42-10.

60.     As of February 13, 2019 Richard Griswold had not yet gone before the BOP for his Review but had been told he was scheduled to see the parole board the following month, in March of 2019. Filing No 249-3 ¶ 24.

61.     Richard Griswold has vision and mobility-related disabilities which require accommodations. Filing No 249-3 ¶¶ 4, 15.

62.     Richard Griswold has never been instructed on the parole process or how to prepare for a parole hearing and does not know what the BOP expects of him. Filing 249-3¶¶ 23-24.

63.     On March 1, 2010, Galle transferred from Douglas County Corrections to the Diagnostic and Evaluation Center (DEC). Galle Medical Records, Ex. 4-B at 2. During the intake medical screening, an LPN at NDCS noted his shattered femur was a "current health problem." Galle Medical Records, Ex. 4-B at 3. Without documentation of a medical examination by a doctor, Galle's pain medication was stopped. Galle Medical Records, Ex. 4-B at 4; Stern Decl., Ex. 1 at 6.

64.     On March 4, 2010, Galle submitted an Inmate Interview Request Form ("IIR") informing NDCS medical staff that he was "in extreme pain 24/7" and asking for stronger medication and an extension on his lower bunk pass. Galle Medical Records, Ex. 4-B at 5. Four days later, NDCS medical staff responded, telling Galle he would be evaluated at an "intake exam" but did not provide a date or time, nor did they respond to his inquiry about a lower bunk pass extension. *Id*.

65.     On March 10, 2010, Galle was examined by a physician for the first time in

NDCS custody. Filing 293-2 at 22-23.

66.     On March 15, 2010, Galle told NDCS medical that he had pain and weakness in his right leg since the initial rod placement in 2008. Galle Medical Records, Ex. 4-B at 6.

67.     On March 18, 2010, Galle submitted an IIR explaining that his current tramadol prescription was not working, that he was in constant pain, and that he is unable to do the exercises given to him by a physical therapist because of the pain. He asked if he could have his tramadol prescription changed or be put on a different medication. Galle Medical Records, Ex. 4-B at 7. NDCS responded "you are on ibuprofen as well. Will not increase tramadol." *Id*. They did not schedule him for a medical visit.

68.     On May 1, 2010, Galle submitted an IIR asking to be seen by a doctor as soon as possible because his pain medication was not working. He informed NDCS that he feels his hip "grinding" and his knee "constantly throbbing." Galle Medical Records, Ex. 4-B at 8. NDCS did not date or sign their response, so it is unclear whether a medical professional responded or if they responded timely, but the response read "no change in treatment is recommended if the tramadol is not helping you can stop taking." NDCS did not schedule Galle for a medical visit. *Id.*

69.     On May 16, 2010, Galle submitted an IIR to a Dr. Casebolt asking for a doctor to examine his leg due to being in constant pain. Galle Medical Records, Ex. 4-B at 9. NDCS' response is largely unreadable, but includes "no change in treatment recommended at this time." NDCS did not schedule Galle for a medical visit. *Id.*

70.     On August 5, 2010, Galle submitted an IIR informing NDCS that the different pain medications he had been prescribed in the preceding months were not working. He indicated he was in constant, unbearable pain all day and night and requested that NDCS work with him "and adjust my meds appropriately." Galle Medical Records, Ex. 4-B at 10. NDCS

scheduled him for sick call eight days later. *Id*.

71.     On August 22, 2010, Galle submitted an IIR informing NDCS he continued to experience worsening pain in his right leg and grinding in his hip and asked for a medication to help with the "bone pain." Galle Medical Records, Ex. 4-B at 11. NDCS responded that Galle could "take ibuprofen as needed for additional pain" and that he was scheduled to see a doctor on September 14. *Id.*

72.     On September 14, 2010, Galle submitted an IIR informing NDCS he had not been receiving a pain medication "for the last three med passes" and asked they check to see if the prescription expired and renew it if so. Galle Medical Records, Ex. 4-B at 12. NDCS responded two days later that the medication had been "ordered." Galle had to remind NDCS via IIR to order a pain medication that he missed for several med passes. *Id.*

73.     On October 18, 2010, Galle submitted an IIR saying NDCS had discontinued his prescriptions over the weekend and that he had tried to see a doctor but "was told to return to my unit" and would have to be rescheduled. Galle Medical Records, Ex. 4-B at 13. He requested his meds be refilled because it was not his fault the doctor was unable to see him. *Id*. NDCS responded "will refill."

74.     On October 25, 2010, Galle submitted an IIR saying he was still having a lot of pain in his leg and it was impacting his ability to sleep through the night. He asked for a change in his pain medication. NDCS responded two weeks later saying they are not changing pain medication at this time. Galle Medical Records, Ex. 4-B at 14.

75.     On November 5, 2010, Galle submitted an Internal Grievance Resolution Form ("IGRF") about the severe pain in his leg. He informed NDCS the medications he was prescribed were not working to control his pain. NDCS responded by saying "medical staff reviewed your treatment plan and do not recommend any changes in your current prescriptions" and directed

Galle to submit an IIR to NSP medical. Galle Medical Records, Ex. 4-B at 15.

76.     On November 13, 2010, Galle submitted an IIR saying his leg pain is continuing, reminding NDCS medical they indicated they would consider changing his medication and stating he was not being treated fairly. Galle Medical Records, Ex. 4-B at 16. NDCS sent a long delayed response on December 2, 2010 saying they would not increase his pain medications but would "review current multiple pain meds." *Id.*

77.     On June 6, 2011, Galle submitted an IIR saying he received a "last dose" sticker at noon on his prescription of a pain medication, but the prescription had recently been renewed and asked that NDCS "straighten this out ASAP." NDCS responded "done for 1 month with three refills." Without Galle's prompting, he would have been denied the pain medication. Galle Medical Records, Ex. 4-B at 17.

78.     On October 10, 2011, Galle submitted an IIR saying the pharmacy returned an IIR to him saying his pain medication would be decreased, and that for the last several days he had not been getting his medication, despite the fact he had seen a doctor a month prior who had said nothing about decreasing medication. Galle informed NDCS he was in a lot of pain and needed his medications back. NDCS responded by scheduling Galle for sick call. Galle Medical Records, Ex. 4-B at 18.

79.     On September 29, 2013, Galle submitted an IIR informing NDCS he was "having some serious issues with my right leg" and he feels like "something is loose in my hip" and asking for an x-ray "to be sure it's OK." NDCS responded by telling Galle to refrain from playing sports, take ibuprofen, and re-kite if no improvement in two weeks. Galle Medical Records, Ex. 4-B at 19.

80.     On December 14, 2013, Galle submitted an IIR informing NDCS he continues to experience a lot of pain in his right leg and hip and asking what his medication options were.

NDCS responded by saying "some of the increase in pain is because of the colder weather. No further changes in medication." Galle Medical Records, Ex. 4-B at 20.

81.     On January 10, 2014, Galle submitted an IIR informing NDCS of severe pain in his leg. NDCS scheduled him for sick call seventeen days later on January 27. Galle Medical Records, Ex. 4-B at 21. On January 28, 2014, Galle submitted an IIR asking why he had not been seen on January 27. NDCS responded the following day that "security was unable to set you escorted that day" so he had been rescheduled. Galle Medical Records, Ex. 4-B at 22.

82.     On June 9, 2014, Galle submitted an IIR informing NDCS of continued pain in his leg, and asking to change from his current medication to a different medication that "other guys in here" said helped them with their pain. NDCS responded by scheduling Galle to see medical on June 18. Galle Medical Records, Ex. 4-B at 23.

83.     On January 31, 2016, Galle submitted an IIR saying he was taken off his pain medication and did not know why, and informing NDCS that he was in a lot of pain. Galle asked "if you won't change my meds can you at least put me on Gabapentin again?" NDCS responded "your drug screen for Lyrica was negative. No new meds." NDCS cut off his pain medication and refused to prescribe a new pain medication. Galle Medical Records, Ex. 4-B at 24.

84.     On April 16, 2016, Galle submitted in IIR saying he was in a lot of pain and that there may be something wrong with the rod and his leg. Galle Medical Records, Ex. 4-B at 25.

85.     NDCS scheduled Galle to receive an x-ray of his right femur on April 25, 2016. Galle Medical Records, Ex. 4-B at 26.

86.     The impressions from the April 25, 2016 x-ray of Galle's right femur indicated the fracture line remained visible as a lucency. As of that date, NDCS medical staff was aware that Galle's fracture had not fully healed. Galle Medical Records, Ex. 4-B at 27.

87.     On May 11, 2016, Galle submitted an IIR asking for the results of his April 25,

2016 x-ray as well as additional pain management. Galle Medical Records, Ex. 4-B at 28. NDCS staff responded "your fracture is healing but not fully healed." *Id.*

88.    On May 25, 2016, an NDCS medical staff person identified in the medical records as "Machuca" submitted an internal consultation request form seeking an orthopedic consult for Galle's right leg. Galle Medical Records, Ex. 4-B at 29. The following day, then medical director Dr. Randy Kohl denied the request and suggested waiting to "see the response to physical therapy before referral" and suggested "x-rays if not already done." *Id.*

89.    On June 3, 2016, Galle underwent another x-ray on his right femur. The x-ray showed "the fracture line remains visible without significant change" compared to the April 25, 2016 x-ray. Galle Medical Records, Ex. 4-B at 30. NSP medical staff person Margaret Chipendo signed the findings on June 6, 2016. *Id.*

90.    On June 17, 2016, NDCS medical staff noted they "read x-ray today re: non-healed femur fracture." Galle Medical Records, Ex. 4-B at 31.

91.    On June 28, 2016 Galle visited with telepsychiatry provider Premier Psychiatric, reported significant pain in his leg and spoke about the recent x-ray showing his femur was still fractured. Galle Medical Records, Ex. 4-B at 32.

92.    On July 1, 2016, Galle submitted an IIR asking for the results of his last x-ray (June 3, 2016). Despite NDCS medical staff person Margaret Chipendo's June 6, 2016 signature on the results, NDCS staff responded to the IIR by saying "x-ray not back." Galle Medical Records, Ex. 4-B at 33. Additionally in the response NDCS staff stated "you are set up to see ortho." *Id.*

93.    On July 19, 2016, Galle submitted an IIR stating he was "supposed to see a ortho specialist" [sic] and that he was in constant pain. Galle Medical Records, Ex. 4-B at 34. NDCS staff responded on July 25, 2016 stating "ortho consult not approved by Dr. Kohl." *Id.*

94.     On July 22, 2016, NDCS medical staff noted they were "looking into ortho consult ordered 5/25/16." Galle Medical Records, Ex. 4-B at 31.

95.     On August 16, 2016, NDCS medical staff person requested an orthopedic consult for Galle, stating "patient has a femoral fracture." Galle Medical Records, Ex. 4-B at 35. Then medical director Dr. Randy Kohl approved this request on August 17, 2016. *Id.*

96.     On August 25, 2016, orthopedic specialist Dr. Samani indicated Galle's fractured femur "will require surgery" and a bone graft. Galle Medical Records, Ex. 4-B at 80. On the same day, NDCS medical staff confirmed they read Dr. Samani's note regarding surgery for the "non union" in Galle's right femur "including bone graft" and indicated they sent the information to then medical director Dr. Randy Kohl. *Id.*

97.     After waiting several months for his surgery to be scheduled, Galle submitted an IIR on January 2, 2017 asking how much longer he would have to wait before the operation and explaining he was in extreme pain that sometimes prevented him from walking to eat meals. Galle Medical Records, Ex. 4-B at 36. NDCS responded nine days later, saying "surgery has been approved but not scheduled yet." *Id.*

98.     A month later, still waiting for the surgery to be scheduled, Galle submitted another IIR again asking when the surgery would be scheduled and stressing that he has been waiting for more than 6 months and is in extreme pain. Galle Medical Records, Ex. 4-B at 81.

99.     On December 5, 2016, NDCS medical staff person Dr. Che noted "please make sure patient is scheduled for surgery with Dr. Samani as scheduling permits." Galle Medical Records, Ex. 4-B at 37.

100.     On March 2, 2017, Galle was still waiting for the surgery to be scheduled. He submitted an additional IIR stressing that he was in extreme pain, that his pain was impacting his mental health, that he was "suffering like an animal," and pleading for the surgery to be

scheduled. Galle Medical Records, Ex. 4-B at 38.

101.  On March 3, 2017, Galle submitted an IIR to NDCS medical saying he lost

feeling in his right foot, his toes had changed colors, and he could hardly walk. Galle Medical

Records, Ex. 4-B at 39.

102.  On March 7, 2017 NDCS medical staff noted Galle "has a right femoral fracture."

Galle Medical Records, Ex. 4-B at 40.

103.  On the same day (March 7, 2017), NDCS medical staff person Dr. Che noted

"schedule patient for femoral fracture repair with Dr. Samani as soon as resources permit." Galle

Medical Records, Ex. 4-B at 41.

104.  On March 10, 2017, NDCS medical staff noted to hold the surgery and that Galle

needed a CT scan of the right femur instead of surgery due to "new healing of fracture." *Id*.

105.  On March 21, 2017, NDCS medical staff submitted an internal consult request

form for "femur surgery per Dr. Samani" and physical therapy after surgery. Medical Director

Deol denied the request saying surgery was "clinically not indicated at this time." Galle Medical

Records, Ex. 4-B at 42.

106.  NDCS did not communicate this decision to Galle. On April 12, 2017, Galle filed

an IIR asking for the status of his surgery and asking for medication to deal with his pain. Galle

Medical Records, Ex. 4-B at 43.

107.  On June 6, 2017, Galle submitted an IIR indicating NDCS stopped all of his pain

medications. He informed NDCS he had "repeatedly kited medical," and that he "has a fractured

femur bone and [he's] being forced to walk on it without pain meds." Galle Medical Records,

Ex. 4-B at 51.

108.  On June 9, 2017, June 20, 2017, June 26, 2017, June 27, 2017, and June 28, 2017

Galle asked about treatment for his leg. The responses and medical notes all indicated NDCS

was waiting for Dr. Samani to return to discuss his treatment. Galle Medical Records, Ex. 4-B at 44-48.

109.    On July 4 or 9, 2017, Galle submitted an IIR saying he needed to be seen ASAP, that he felt "a pop" in his leg and "it feels like the bone has come apart." He described the pain as "unbearable" and said the last time this happened "immediate surgery was needed." Galle Medical Records, Ex. 4-B at 50. On July 10, NDCS responded by saying "sick call sch." *Id*.

110.    On July 21, 2017, Galle received an x-ray that showed "interval development of fracture of the midshaft of the intramedullary rod" and "persistent lucency along the area of previous femoral fracture." Galle Medical Records, Ex. 4-B at 52.

111.    On July 21, 2017, NDCS scheduled Galle for CT scan (as requested by Dr. Samani in March). Galle Medical Records, Ex. 4-B at 53. NDCS scheduled the CT scan for July 28, 2017. Galle Medical Records, Ex. 4-B at 54.

112.    On July 24, 2017, NDCS medical staff submitted an internal consult request form for Galle to see orthopedic specialist Dr. Samani for the refracture of surgically repaired right femur. Dr. Deol approved the request on July 26, 2017. Galle Medical Records, Ex. 4-B at 55.

113.    On August 15, 2017 NDCS notes show Galle was scheduled for surgery to occur on August 25, 2017. Galle Medical Records, Ex. 4-B at 56.

114.    Throughout his incarceration, Galle has had to police his own medication administration, frequently having to remind NDCS when medications ran out, report issues receiving medication, and reminding them to provide certain medication he needs. Instances of this include:

    a.    4-2-10. Galle Medical Records, Ex. 4-B at 57.

    b.    5-1-10. Galle Medical Records, Ex. 4-B at 58.

    c.    5-31-10. Galle Medical Records, Ex. 4-B at 59.

  d.  6-13-10. Galle Medical Records, Ex. 4-B at 60.

  e.  6-28-10. Galle Medical Records, Ex. 4-B at 61.

  f.  9-14-10. Galle Medical Records, Ex. 4-B at 12.

  g.  9-26-10. Galle Medical Records, Ex. 4-B at 62.

  h.  10-18-10. Galle Medical Records, Ex. 4-B at 13.

  i.  11-6-10. Galle Medical Records, Ex. 4-B at 63.

  j.  12-14-10. Galle Medical Records, Ex. 4-B at 64.

  k.  1-12-11. Galle Medical Records, Ex. 4-B at 65.

  l.  2-5-11. Galle Medical Records, Ex. 4-B at 66.

  m.  3-3-11. Galle Medical Records, Ex. 4-B at 67.

  n.  4-6-11. Galle Medical Records, Ex. 4-B at 68.

  o.  5-16-11. Galle Medical Records, Ex. 4-B at 69.

  p.  6-6-11. Galle Medical Records, Ex. 4-B at 17.

  q.  6-25-11. Galle Medical Records, Ex. 4-B at 70.

  r.  9-21-11. Galle Medical Records, Ex. 4-B at 71.

  s.  10-26-11. Galle Medical Records, Ex. 4-B at 72.

  t.  12-5-11. Galle Medical Records, Ex. 4-B at 73.

  u.  9-25-13. Galle Medical Records, Ex. 4-B at 74.

  v.  6-12-15. Galle Medical Records, Ex. 4-B at 75.

  w.  7-8-15. Galle Medical Records, Ex. 4-B at 76.

  x.  7-22-16. Galle Medical Records, Ex. 4-B at 77.

  y.  8-18-16. Galle Medical Records, Ex. 4-B at 78.

115.  On September 2, 2015, Rena submitted a request for medical care indicating that she wanted to be placed on a topical antibiotic that she had been on during her previous

incarceration. Six days later, she received a written response instructing her to purchase acne wash from the canteen at NCCW. Rena Medical Records, Ex. 4-A at 6.

116.     On November 10, 2015, NDCS medical staff recognized the need to treat Rena's skin condition medically and provided her with the antibiotic. Rena Medical Records, Ex. 4-A at 7.

117.     On January 26, 2016, Rena submitted a request for medical care indicating that she had developed a rash on her face and was getting worse. She was not seen until 02/08/16. Rena Medical Records, Ex. 4-A at 8-9.

118.     On July 19, 2016, Rena communicated to NDCS medical staff about seeing a dermatologist, about her belief that the skin condition she was suffering from was not merely acne, that the rash was also on her armpits, that the rash burned, and that the steroid cream she had been prescribed for her skin condition was causing her to grow long, thick and dark facial hair. Rena Medical Records, Ex. 4-A at 10.

119.     NDCS medical staff later communicated to Rena that, "We do not have a dermatologist that will see inmates. Nor will the new director approve it." Rena Medical Records, Ex. 4-A at 3.

120.     On November 30, 2018, an LPN employed by NDCS directed Rena to file an Inmate Interview Request to see a qualified health professional. Rena Medical Records, Ex. 4-A at 12.

121.     Rena was seen on by an RN on December 20, 2018, and requested to be put on the steroid cream that she had previously utilized. The RN's note does not document any follow up by medical staff, but instead documents the RN telling Rena to file another request to get care. "Encouraged to write IIR." Rena Medical Records, Ex. 4-A at 12.

122.     When NDCS providers prescribed a special non-formulary soap for Rena's skin

condition, they took no action to ensure that the soap would remain available, requiring another Inmate Interview Request when the item ran out, which received the response: "Your non-formulary ran out and a new one had to be requested. If not approved will let you know." NCCW has been unable to consistently ensure that Rena's prescriptions were filled in a timely manner. Rena Medical Records, Ex. 4-A at 14.

123.     During Rena's incarceration, she has also sought treatment for prolonged periods of what appeared to be menstrual bleeding, for continuous periods of as long as three months. Rena Deposition, Ex. 4-C at 20:3-21:15. To Rena's knowledge, NDCS medical staff have not diagnosed the cause of the bleeding, but have prescribed birth control pills to reduce the symptoms. *Id.* at 21:5-10. Rena testified that the birth control pills have not resolved the problem. *Id.* at 21:13-15.

124.     Availability of the birth control pills used to treat Rena's unexplained bleeding has been inconsistent. NCCW has been unable to consistently ensure that Rena's prescriptions were filled in a timely manner which has caused her prescriptions to lapse, requiring her to file numerous Inmate Interview Requests to restart the medication. Rena Medical Records, Ex. 4-A at 17, 21, 31.

125.     Rena has complied with a variety of treatment plans offered to her to address her skin condition and her unexplained bleeding, has communicated with her providers about discontinuing her ineffective medications or harmful medications, and has contemporaneously documented her understanding of the verbal directions given to her by medical staff to discontinue medications at NDCS in writing. Rena Medical Records, Ex. 4-A at 4-5.

## **LEGAL STANDARDS**

Summary judgment is warranted only when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking

summary judgment bears the burden of establishing that no genuine issue of material fact exists and the undisputed facts establish the movant's right to judgment as a matter of law. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). "This burden remains with the moving party regardless of which party would have the burden of persuasion at trial." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (citation omitted). The duty of the court is not to weigh the evidence and determine the truth of the matter, but to determine whether there are issues to be tried. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248.

In making that determination, the court is to draw all inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits and depositions in the light most favorable to the party opposing the motion. *Id.* at 255. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson*, 477 U.S. at 255). "[I]f…there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain summary judgment.…" *Aman*, 85 F.3d at 1081 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986)).

"Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment." *Brown v. Plata*, 563 U.S. 493, 510 (2011). For that reason, "[i]t is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Prison conditions may be "restrictive and even harsh," but they must also be humane. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (citations omitted). The Eighth Amendment "establish[es] the government's

obligation to provide medical care for those whom it is punishing by incarceration. . . . [D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency" and therefore, "deliberate indifference to serious medical needs of prisoners . . . [is] proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (citation omitted).

In *Farmer*, the Supreme Court set out a two-part test for whether a prison official has violated a prisoner's Eighth Amendment rights. First is an "objective" component, which requires a showing that the official's actions or omissions have caused a prisoner, or class of prisoners, to be "incarcerated under conditions posing a substantial risk of serious harm." 511 U.S. at 834. The relevant inquiry is not whether a plaintiff has actually suffered harm but rather whether she faces a "substantial *risk* of harm." *Id.* at 842 (emphasis added); *see also Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

The second component of the *Farmer* test, a "subjective" component, inquires into the prison official's state of mind, and asks whether the official's state of mind demonstrated "'deliberate indifference' to inmate health or safety . . . ." 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 302–03 (1991)). It is not necessary to prove that a defendant "believ[ed] that harm actually would befall an inmate," but only that "the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. Deliberate indifference is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ." *Id.* Prison officials are obligated to respond "reasonably to the risk" of harm presented. *Id.* at 844. The fact that prison officials may have responded in some way to a risk of harm is not enough: "patently ineffective gestures purportedly directed towards

remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it." *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995).

Among other things, the Court may conclude that officials are deliberately indifferent to conditions that are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," or based on "the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal quotations omitted); *see also Schaub v. VonWald*, 638 F.3d 905, 916 (8th Cir. 2011) ("The factual determination that an official had the requisite knowledge of a substantial risk may be inferred . . . from the very fact that the risk was obvious."). In a case for prospective injunctive relief, knowledge is never an issue: if "the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness. . ." *Farmer*, 511 U.S. at 846 n.9; *see also Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) (evidence sufficient to satisfy objective prong of *Farmer* test "would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials").

The ADA is a comprehensive mandate designed to eliminate both "outright intentional exclusion" and the discriminatory effects of "barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices . . . ." 42 U.S.C. § 12101(a)(5). The ADA and RA prohibit persons with disabilities from being "excluded from participation in or be[ing] denied the benefits of the services, programs, or activities of a public entity, or be[ing] subjected to discrimination [due to their disabilities] by any such entity." 42 U.S.C. § 12132; *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) ("The ADA and the RA are similar in substance and, with the exception of the RA's federal funding requirement, cases interpreting either are applicable and interchangeable.") (internal quotation marks and citations omitted). State prisons are among the public entities subject to the ADA. *Pennsylvania Dep't of Corr. v.*

*Yeskey*, 524 U.S. 206, 209-210 (1998).

To state a claim under the ADA and the RA, a plaintiff must allege that

> 1) he is a qualified individual with a disability; 2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability.

*Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998); *Randolph*, 170 F.3d at 858. The "ADA and RA require that otherwise qualified individuals receive 'meaningful access' to programs and activities." *Randolph*, 170 F.3d at 858 (finding no "credible evidence to support a finding that [deaf plaintiff] enjoyed meaningful access to the prison's internal disciplinary process, even if he was capable of limited participation" due to lack of sign language interpreter.) ADA and RA claims based on a failure to make reasonable accommodations are "framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Cotton v. Douglas Cty. Dep't of Corrs.*, No. 8:16-cv-153, 2016 WL 5816993, at *5 (D. Neb. Oct. 5, 2016) (quoting *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004)).

## ARGUMENT

### I. PLAINTIFFS CURTRIGHT, GRISWOLD, AND GUNTHER HAVE STANDING TO CHALLENGE THE BOARD OF PAROLE'S FAILURE TO COMPLY WITH THE ADA AND REHABILITATION ACT

Defendants do not dispute that Plaintiffs Curtright, Griswold, and Gunther are persons with disabilities, nor do they attempt to controvert the evidence that they were denied the benefits of the public entity's services, programs or activities. They argue only that as a matter of Nebraska law, Plaintiffs Curtright, Griswold, and Gunther are not qualified, as life prisoners, to participate in the BOP's services, programs or activities. Defendants' argument is contradicted by the plain evidence that BOP has held parole proceedings for all three of these plaintiffs, and has scheduled them for future ones. The three men thus have standing to raise their parole-related

claims because, regardless of their eligibility for *release* on parole, they have each suffered harm

and/or are subject to harm in the future as a result of the BOP's failures to accommodate them in

the parole *process* – including all programs, services, and activities. To establish standing,

> [A] plaintiff must have suffered an injury in fact, meaning that the injury is
> (a) concrete and particularized and (b) actual or imminent, not conjectural or
> hypothetical. Second, the injury must be traceable to the defendant's challenged
> action. Third, it must be "likely" rather than "speculative" that a favorable
> decision will redress the injury.

*South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 591 (8th Cir. 2003) (quoting *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks

omitted). Plaintiffs Curtright, Griswold, and Gunther meet all three requirements.

Plaintiffs Curtright and Gunther have each appeared before the BOP in the past and

suffered concrete harms on those occasions due to the lack of disability-related accommodations.

Specifically, Curtright's last Parole Board Review occurred in 2016 and had to be rescheduled

due to the lack of a sign language interpreter.[2] Additional Material Fact (AMF) No. 50. Gunther

has previously participated in the Parole Board Review process. AMF No. 53. At that review he

had difficulty walking to the location for the hearing and getting into the chair for the hearing as

a result of the BOP's failure to accommodate his mobility disabilities. AMF Nos. 56-57. He was

also unable to read any parole related documents because they were not provided in Braille or

---

[2] In response to changes to Nebraska State Law, effective on July 19, 2018, the Board of Parole
revised its rules in October of 2018. Prior to these changes, prisoners sentenced to life sentences
had their records reviewed "during the first year of incarceration and every ten years thereafter
until such time as the sentence is commuted." Neb. Board of Parole R. § 4-204(A)(5) (2017)
(superseded). While the July 2018 statute removes that obligation, it does not prohibit the BOP
from reviewing the case of a committed offender at any time, which the BOP has chosen to do in
scheduling future reviews for Curtright, Griswold, and Gunther. Neb. Rev. Stat § 83-192(f)
("Nothing in such schedule shall prohibit the board from reviewing a committed offender's case
at any time"); *see also* Neb. Rev. Stat. § 83-170 (defining "Committed offender" to mean any
person who, under any provision of law, is sentenced or committed to a facility operated by the
department or is sentenced or committed to the department other than a person adjudged to be as
described in subdivision (1), (2), (3)(b), or (4) of section 43-247 by a juvenile court).

audio format. AMF No. 56. Neither Curtright, Gunther, or Griswold has been offered any disability-related assistance to help them understand the purposes of these reviews or prepare for them. AMF Nos. 50-51, 54-56, 62; *Armstrong*, 275 F.3d at 865 (finding denial of benefits "by virtue of the Board [of Parole]'s failure to make accommodations that would enable them to attend or comprehend parole and parole revocation hearings…in itself, constitutes 'actual injury.'").

Additionally, each of these plaintiffs are currently scheduled for Parole Board Reviews in the future. AMF Nos. 47, 52, 58. Curtright's next Parole Board Review is scheduled for August 2026, Gunther's next Parole Board Review is scheduled for October 2026. Griswold was previously scheduled for a Parole Board Review in January 2019, and his next Parole Board Review is scheduled for January 2029. AMF Nos. 47, 52, 58. As a result, each of these plaintiffs face an imminent risk of additional injury if their disabilities continue to go unaccommodated in these reviews. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief."); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) ("Immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months.")  (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995)). These injuries can be redressed through the injunctive relief requested in the Complaint. Filing 1 at 84.

Pursuant to the ADA and Rehabilitation Act, Curtright, Griswold, and Gunther have a right to have meaningful access to all of the BOP's programs, services, and activities, which includes any meetings or other reviews scheduled by the BOP regardless of their purpose. 42 U.S.C § 12132; *Randolph v. Rodgers*, 170 F. 3d 850, 858 (8th Cir. 1999) ("ADA and RA require

that otherwise qualified individuals receive 'meaningful access' to programs and activities."). The fact that Curtright, Griswold, and Gunther are ineligible for *release* on parole, unless their sentences are commuted, is immaterial. What matters is that the BOP offers services, programs, and activities – as part of the parole *process* – consisting of reviews, which they have appeared for in the past and are scheduled to do in the future. In practical terms, this means that, regardless of their eligibility for *release* on parole, Curtright, Gunther, and Griswold have a right to reasonable modifications and auxiliary aids, including a right to mobility-related modifications for Gunther and Griswold, vision-related modifications for Gunther and Griswold to allow them to read documents, and hearing-related modifications for Curtright, including provision of ASL interpreters. The BOP cannot choose to meet with prisoners who are sentenced to life and then deny them the accommodations those prisoners need to participate in those meetings on the basis they are not technically eligible for release on parole.

## II.    MERE ARGUMENTS REGARDING MEDICAL CARE ARE NOT SUFFICIENT FOR SUMMARY JUDGMENT.

As a threshold matter, Defendants offer no expert testimony in support of their arguments that Galle's and Rena's medical conditions were either not serious, or did not place them at risk due to NDCS' inadequate health care systems. Because of the fact-intensive nature of the inquiries in prison medical care cases, it is essential that the record before the Court at the summary judgment stage include sufficient evidence to make the determinations, such as expert affidavits. *See Dulany v. Carnahan*, 132 F.3d 1234, 1238-40 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided *and physician affidavits indicating that the care provided was adequate*, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.") (emphasis added). Indeed, summary judgment on a medical care claim is proper when it is based on "unrefuted expert testimony [provided by the movants] describing the prisons' medical and mental health care policies as appropriate." *Id.*

at 1241. In contrast, the Eighth Circuit has overturned summary judgment where, as here, the movant had failed to develop the factual record, concluding that "the district court erred as a matter of law in ruling that mere proof of medical care by a doctor consisting of diagnosis only sufficed to disprove deliberate indifference." *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990). The court was also "particularly troubled" that the lower courts had not reviewed the plaintiff's medical records and noted further that "the record contains virtually no evidence of the appropriate standard of care nor any indications whether [the defendant doctor's] actions amounted to deliberate indifference as measured by that standard." *Id*.

Here, in contrast to *Dulany* and similarly to *Smith*, Defendants make arguments about the quality of NDCS medical care, but provide no competent expert testimony in support of those arguments. For example, they assert that "[t]he undisputed facts show NDCS medical staff repeatedly saw, treated, and evaluated Galle for his complaints" and therefore that "Galle cannot show any *intentional* delay in obtaining medical care. Instead, the NDCS medical staff made efforts to address each problem that arose in a *reasonable and sensible* manner." Filing 294 at 15 (emphases added). However, they do not provide a single expert who can attest that Galle's care was not unreasonably delayed or that the care was indeed provided in a "reasonable and sensible" manner by an appropriate medical provider.[3] Despite asserting that reasonable care was provided, "the defendants have introduced no evidence. . . . These arguments must be supported by proof. . . ." *Miller v. Schoenen*, 75 F.3d 1305, 1310 (8th Cir. 1996). Given the lack of expert testimonial evidence provided by the movants in this case, it would be "mere speculation" to conclude that Galle, Rena and the class they represent do not face unreasonable risks of serious

---

[3] Defendants reference "intentional" delay without providing any citation; as explained more fully below, that is not the standard for proving a violation of the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (explaining that "purposeful or knowing conduct is not . . . necessary to satisfy the *mens rea* requirement of deliberate indifference for claims challenging conditions of confinement . . . .")

harm due to the nature of the NDCS medical care system. *Id*.

To the extent that Defendants claim that the mere fact that medical staff saw Galle and Rena and provided some treatment to them over the course of their incarceration prior to the filing of the Complaint precludes an Eighth Amendment claim, they misunderstand both Plaintiffs' claims and Eighth Amendment law. Plaintiffs have never alleged that their claims of constitutionally inadequate access to health care are based on a complete lack of care altogether; rather they allege that they are "consistently deprived of *adequate* health care," which violates their Eighth Amendment rights. Filing 1 at 1 (emphasis added). Courts may find that "the course of a physician's treatment of a prison inmate's medical . . . problems can . . . manifest the physician's deliberate indifference to the inmate's medical needs" even when some medical care was provided. *Smith*, 919 F.2d at 93. "[T]o prevail on an Eighth Amendment claim a prisoner is not required to show that he was literally ignored." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (internal quotation marks and citation omitted).

Defendants allege that "Rena has sought and received frequent medical attention concerning her skin complexion [sic]" and, because "NDCS medical staff have informed Rena that her skin condition does not warrant a referral to a dermatologist[,]" the denial of this request "does not equate to deliberate indifference." Filing 294 at 17-18. Again, they do not provide a single piece of expert testimony asserting that the care provided exceeded deliberate indifference or that the failure of medical staff to refer her to a specialist – or *any* physician – was reasonable or sensible. Moreover, in the example they picked—lack of access to a dermatologist— Defendants try to depict what happened to Rena as some kind of exercise of medical judgment, ignoring the clear record evidence that NDCS simply refused to provide access to the necessary resources, regardless of medical judgment. As a clinician candidly wrote in Rena's medical file: "We do not have a dermatologist that will see inmates. Nor will the new director approve it."

AMF Nos. 39, 119.

Plaintiffs have provided an expert declaration by Dr. Marc Stern, who reviewed portions of the medical records of Rena and Galle, as well as Defendants' brief and supporting exhibits. Dr. Stern, a board certified internist specializing in correctional care, has already provided his qualifications in conjunction with his declaration in support of class certification. Filings 249-58 and 249-59. Dr. Stern was able to provide an expert opinion regarding whether the care provided to Rena and Galle for the particular medical issues before the Court now has met the community standard of care and whether it evidences the systematic flaws described in his earlier declaration.

Dr. Stern's declaration stands unrefuted. He found that both Galle and Rena were provided care that "did not meet the community standard of care" and both "remain exposed to many, if not all, of the systemic deficiencies in the provision of health care which I described in my previous declaration, and therefore are exposed to an ongoing significant risk of . . . serious medical harm." Declaration of Mark Stern, May 15, 2019 [hereinafter Stern Decl.], Ex. 1 at 12. The evidence before the Court is that "[t]he care provided by NDCS to Ms. Rena for her multiple skin conditions did not meet the community standard of care, and put Ms. Rena at substantial risk of harm" and, likewise, "the medical care provided to Mr. Galle related to his fractured femur does not meet the community standard of care, and put Mr. Galle at a substantial risk of serious harm." Stern Decl., Ex. 1 at 2, 5. Without providing any expert testimony supporting the allegations that medical care provided to Rena and Galle exceeded deliberate indifference, Defendants' motion is fatally flawed and must be denied for that reason alone.

III.  **GALLE AND RENA HAVE STANDING TO SEEK SYSTEMIC INJUNCTIVE RELIEF FOR THEMSELVES AND OTHER PRISONERS IN JEOPARY DUE TO NDCS' INADEQUATE MEDICAL CARE SYSTEM**

A.  **DEFENDANTS' MOTION ATTEMPTS TO TURN THIS CASE INTO A**

SERIES OF INDIVIDUAL PERSONAL INJURY ACTIONS.

Defendants treat this case as though Plaintiffs assert separate claims for each of the many factual allegations that each individual put forth in the Complaint. Filing 294 at 1. This is untrue. Rena and Galle do not seek an injunction or damages as compensation for Defendants' past deliberate indifference to medical needs at discrete points in time; rather, they seek to change Defendants' future behavior so as to abate the risk of harm to themselves and the putative class. *See Postawko v. Missouri Dep't of Corrs.*, 910 F.3d 1030, 1038-39 (8th Cir. 2018) ("Plaintiffs assert that the failure of the Defendants to . . . provide appropriate treatment exposes all inmate [in the class] to the *same* unconstitutional injury. . . . [T]he Named Plaintiffs are exposed to the same alleged risk under the Defendants' policies as all other inmates [in the class].") (emphasis in original).

The particular factual allegations of Rena and Galle serve to illustrate and support a broader claim of unconstitutional health care. Filing 1 at 39-41. Paragraph 135 of the Complaint specifies that the Named Plaintiffs' experiences are only some of the "many examples" of substandard medical care evidencing deliberate indifference to NDCS prisoners' serious medical needs and placing those prisoners at substantial risk of serious harm. Filing 1 at 41. This broader claim in turn underlies the need for injunctive and declaratory relief that "will apply as a whole to all members of the NDCS class" rather than only to Rena or Galle. Filing 1 at 65. Defendants' past conduct is relevant not to a particular factual allegation in the Complaint but instead as evidence of the substantial risk of serious *future* harm to which the entire class of prisoners in NDCS custody remains subject. *See Postawko v. Missouri Dep't of Corrs.*, 2017 WL 3185155, at *8 (W.D. Mo. July 26, 2017) (*aff'd*, 910 F.3d 1030 (8th Cir. 2018)) ("In contrast to Defendants' characterizations, Plaintiffs are not merely aggregating many claims of *individual* mistreatment. Instead, they are alleging that the policies and practices in place for . . . treatment generally

expose all inmates [in the class] to a substantial risk of serious harm in violation of the Eighth Amendment.") (emphasis in original).

Dr. Stern, in his expert declaration, explains how the individual instances of inadequate medical care at issue are representative of broader systemic deficiencies in NDCS' provision of health care. For example, Galle was not administered medication as ordered, "plac[ing him] at significant risk of serious harm from exacerbation of the condition being treated." Ex. 1 at 11. The instance of non-administration of necessary medication is an example of "NDCS's systematic problems with medication administration . . . ." *Id.* at 12. The failure of NDCS to provide a "timely examination and assessment" to Rena after she developed and reported a new skin condition on her face illustrates a broader failing of NDCS to provide access to care for non-urgent episodic care. *Id.* at 3. Dr. Stern's entire declaration points to other instances of deficient care with respect to Rena's skin conditions and Galle's broken femur that illustrate system-wide deficiencies in health care provision to prisoners in the custody of NDCS.

Defendants' deliberate indifference to Rena's serious skin condition and Galle's serious pain and ongoing complications from a broken femur supports Count I, "By their policies and practices described herein, Defendants FRAKES and DEOL subject all Plaintiffs and the NDCS Class to a substantial risk of serious harm from inadequate health care, including medical, mental health, and dental care." Filing 1 at 70. They need not assert that each individual past instance of deficiency in medical care violated the Constitution:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay . . . would violate the Constitution . . . if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical . . . health care that, taken as a whole, subject sick . . . prisoners . . . to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society.

*Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011) (citation omitted). Even those with no current medical needs remain subject to harm by an unconstitutional system of medical care. "Prisoners

35

who are not sick . . . [are] in no sense . . . remote bystanders . . . . They are that system's next potential victims." *Id.* at 532.

Furthermore, even if Defendants attempt to rectify or have rectified individual instances of their past misconduct with respect to particular Plaintiffs, the substantial and unconstitutional risk of serious harm to which the class of all persons in NDCS custody, including the Named Plaintiffs, are subject due to Defendants' policies and practices is not alleviated. The claim of risk in this case requires systemic changes to reduce the risk of harm to all people who are or will be in the custody of NDCS; Defendants cannot obviate this claim by belatedly seeking to redress individual instances of harm that their past conduct caused to Plaintiffs. *See Postawko*, 910 F.3d at 1038-39 ("Here the physical symptoms eventually suffered by each class member may vary, but . . . the relevant policy [is] alleged to pose an unconstitutional risk of serious harm to *all* class members . . . .") (citing *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017)) (emphasis in original).

## B. SUMMARY JUDGMENT ON INDIVIDUAL ALLEGATIONS WOULD BE IMPROPER

Defendants appear to seek summary judgment on individual facts in the Complaint, without regard to the actual nature of the claims in this case. Such a motion does nothing to move toward resolution of the claims in this case, which are about NDCS's decisions to understaff, under-resource, and overcrowd its prisons beyond the carrying capacity of their life-sustaining medical care systems. "[A] motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief." *Air Express Int'l v. Log-Net, Inc.*, 2016 WL 5334659, at *6 (D.N.J. 2016) (not reported) (quoting *Collins v. Cottrell Contracting Corp.*, 733 F.Supp. 2d 690, 698 (E.D.N.C. 2010)) (citing cases). Here, "Defendant's motion essentially seeks to strike certain allegations from the complaint as unsupported, rather than to establish as undisputed any element of plaintiffs' . . . claims. Even if

these allegations were stricken, the entirety of plaintiffs' claims would still go to trial and no

'judgment' could be entered as to those portion of the claims on which defendant received a

favorable ruling." *Collins*, 733 F.Supp.2d at 698. *See also DeVona v. Zeitels*, 2016 WL 4926413,

at *5 (D. Mass. 2016) (not reported) ("Where the 'part of a claim' that is the subject of the

motion for partial summary judgment is too narrowly drawn, even the absence of a disputed

material fact may not entitle the movant to entry of judgment . . . ."). Even if the Court were to

grant partial summary judgment on the factual allegations on which the Defendants move, it

would not dispose of any entire count or claim of the Complaint and thus would not promote

judicial efficiency.

Both Rena and Galle have suffered other instances of deliberate indifference to serious

medical needs, as outlined in the Complaint, on which Defendants have not moved for summary

judgment. As to Galle, Defendants move for summary judgment solely on the narrow factual

allegation that they "ignored [his] medical needs for eight years." Filing 294 at 11. However,

Galle's contentions about his treatment went much further: he has suffered such "severe" pain in

his leg "that he [was] unable to exercise, and he frequently skip[ped] meals in order to avoid

walking on his leg. This has caused him to lose an alarming amount of weight." Filing 1 at 8.

Furthermore, his placement in a cell "without grab bars and without access to a shower with grab

bars or a shower chair to allow him to bathe safely" placed him at substantial risk of future harm

due to falls or exacerbation of his existing injury. *Id.* Defendants do not even attempt to dispose

of Galle's claims about dental care or psychiatric treatment, *Id.* at 8-9, and therefore do not

attempt to dismiss him as a Named Plaintiff or, to the extent that his collected factual allegations

constitute a claim, to dispose of that claim.

In addition to the dermatitis that is the subject of the motion for summary judgment, Rena

contends that she "experienced a menstrual cycle that lasted for three consecutive months; she

was given an ultrasound of her ovaries and uterus, but was never told the results and was never informed of a treatment plan." *Id.* at 17. Furthermore, she complains of specific instances of unconstitutional conduct by Defendants related to isolation and dental care. *Id.* at 16-17. To the extent that Rena's factual allegations constitute a claim, Defendants do not move for summary judgment on this claim; nor do they attempt to dispose of Rena as a Named Plaintiff.

### C.   GALLE'S AND RENA'S INDIVIDUAL HISTORIES SHOW DANGEROUS FAILURES IN NDCS'S SYSTEM OF CARE.

Should the Court attempt to subdivide the counts of the Complaint into discrete and separate claims, each consisting of a single factual allegation by a single Named Plaintiff, Defendants' motion still necessarily falls short. Both Rena and Galle have adequately alleged that Defendants have shown deliberate indifference to their serious medical needs. "To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). A "serious medical need," in turn, is defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). Whether a medical need is "serious" is a "fact-intensive" inquiry. *See Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).

### D.   RENA

As to Rena, the choice of Defendants to delay diagnosis and treatment for her skin condition placed her at substantial risk of serious harm. Defendants appear to argue that no type of skin condition could ever be considered a serious medical need, Filing 294 at 16, but this is inaccurate. A skin condition can constitute a serious medical need. *See Case v. Bixler*, 518 F.Supp. 1277, 1280 (S.D. Ohio 1981) (boil could constitute a serious medical need). A prison that delays the diagnosis and treatment of a skin condition places the people in its custody at

38

substantial risk of serious harm. *See Scott v. Clarke*, 61 F. Supp. 3d 569, 578-79 (W.D. Va. 2014) (using the example of a prisoner with the skin condition of "painful sores and boils on the back of her leg" who "made numerous sick call visits" but "received no effective treatment" for an unspecified amount of time as an illustration of "systematic failures in medical care" that place prisoners at the defendant prison "at risk of serious harm, deterioration in their health, and even death").

The only Eighth Circuit case Defendants cite to in support of their position upholds the lower court determination that the medical treatment of that plaintiff's skin condition was appropriate because the plaintiff had not submitted evidence showing that daily treatment of his boils was a serious medical need. *See Jackson v. Douglas*, 270 Fed. Appx. 462, 463 (8th Cir. 2008). Importantly, the lower court ruled that summary judgment was appropriate "[i]n the face of medical records indicating that treatment was provided, *and physician affidavits indicating that the care provided was adequate*," and when the plaintiff "merely stat[ed] that he does not believe he received adequate treatment." *Jackson v. Douglass*, 2007 WL 778607, at *3 (E.D. Ark. 2007) (emphasis added) (citation omitted). Here, it is Defendants who fail to provide any physician affidavit even attempting to establish that the care provided to Rena was adequate or that her medical need was not serious.[4]

_____

[4] Nor do any of the other, non-binding, cases that Defendants cite hold that skin conditions can never be serious medical needs: *Gonzalez-Reyna v. Ellis*, an unreported case from the Eastern District of Virginia, "assum[ed] aguendo [sic] that plaintiff's rash could be considered sufficiently serious to satisfy the first element of an Eighth Amendment claim" but concluded based on the plaintiff's "own account" that the medical treatments were not deliberately indifferent to it. 2009 WL 2421482, at *3 (E.D. Va. 2009) (not reported); *Hamm v. Riley*, an unreported case from the District of South Carolina, found "that an unspecified rash does not rise to the level of a serious medical condition." 2007 WL 1377611, at *3 (D.S.C. 2007) (unreported); *Brown v. Pierce*, an unreported case from the Central District of Illinois, collects cases—none of which are from the Eighth Circuit—in which courts denied Eighth Amendment claims for denial of care for rashes, but does not itself claim or hold that a skin condition cannot support an Eighth Amendment claim. 2008 WL 619288, at *5 (C.D. Ill. 2008) (unreported).

By contrast, Plaintiffs provide an expert affidavit from Dr. Stern regarding the medical care provided to Rena. As Dr. Stern explains in his expert declaration, "the skin conditions [Rena] has manifested can be the first sign of a spreading infection, or the manifestation of a systemic infectious or immunological disease. Until diagnosed and determined to be benign, medical staff must treat the skin condition with the same care and urgency as any other potentially serious condition." Ex. 1 at 2. Once Rena alerted NDCS that she had a new skin condition and requested to be seen, they were obligated to see her and determine whether the skin condition was serious. On January 26, 2016, she told medical staff that she had developed a new and worsening facial skin condition, but she was not seen by medical staff until nearly two weeks later. Rena Medical Records, Ex. 4-A at 8-9. Defendants cannot simply cite to a number of factually different cases for the proposition that, because her medical need presented as a skin condition, it must not have been sufficiently serious to support an Eighth Amendment claim. Rena has presented sufficient evidence that she suffered from a serious medical need.

Defendants claim that Rena has not established "an obvious need for a specialist . . ." Filing 294 at 19. Although prisoners may not establish deliberate indifference solely based on a disagreement with their doctor about the course of treatment, failure to refer a prisoner to a specialist can support an Eighth Amendment medical care claim. *See Hammett v. Cofield*, 597 Fed. Appx. 393, 393 (8th Cir. 2015) (holding that Correctional Medical Services employees "failed to meet their burden as summary judgment movants" on, *inter alia*, a claim that the doctor was deliberately indifferent to the plaintiff prisoner's serious medical needs by not referring him to a specialist); *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (overturning grant of summary judgment when prison employees, including a doctor and a nurse, delayed sending prisoner to dentist for six weeks); *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (overturning grant of summary judgment in part based on the question of whether a doctor

with "no specialized training in the field of mental health" was qualified to treat the plaintiff himself).

In Rena's case, referrals were not made even as her condition worsened. For example, on July 19, 2016, Rena informed staff that the rash burned, that her skin condition was not merely acne, that she was growing long, thick, and dark facial hair, and that the condition had spread to her armpits. Rena Medical Records, Ex. 4-A at 10. Defendants provide no evidence that failure to refer to a specialist in *this* case met the appropriate standard of care, unlike in the cases cited above. Furthermore, the justification Defendants provided as to why they would not refer Rena to a specialist does not indicate that her condition did not warrant a referral; rather, Defendants told Rena that the dermatologist would not "see inmates," and the "new director would not approve" referral to a dermatologist. AMF No. 119; Rena Medical Records, Ex. 4-A at 3.

### E.      GALLE

Galle has suffered from "continued, un-evaluated and un-controlled pain" from the time of his intake screening at NDCS in March 2010. Stern Decl., Ex. 1 at 7. "The discontinuation of necessary medication for pain relief" at that time, "coupled with failure to evaluate Mr. Galle after being notified of a complication, resulted in significant harm . . . as well as significant risk of harm" of further dangerous complications. *Id.* Over the course of Galle's incarceration in NDCS, Defendants have been repeatedly made aware of his pain and possible complications related to his broken femur and have failed to provide treatment that meets the appropriate standard of care. Despite the egregious mistreatment of Galle's pain and broken femur, Defendants state, without providing any expert testimony, that they treated his problems "in a reasonable and sensible manner." Filing 294 at 15. This blithe statement, which contradicts Galle's medical records and the only expert testimony on the record in connection with this motion, is insufficient to support a summary judgment motion.

Galle's "continued, un-evaluated and un-controlled pain" is a serious medical need, a fact that Defendants do not deny. Stern Decl., Ex. 1 at 7. This "pain and suffering which no one suggests would serve any penological purpose" resulting from "denial of medical care" is exactly the type of "infliction of such unnecessary suffering" that the Supreme Court has held "inconsistent with contemporary standards of decency . . . ." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The "wanton infliction of pain," whether evidenced through denial of, delay of, or interference with medical care, violates the Eighth Amendment. *Id.* at 104-05.

Defendants attempt to reduce Galle's suffering to "allegations of delay . . . ." Filing 294 at 14. But, although the systematic delays of medical care for his femur have been egregious, this is not Galle's only complaint. Rather, he has consistently articulated significant and untreated pain during his incarceration. Defendants were aware of this pain, evidenced by the very medical records they cite, but did not appropriately treat it. Just in the medical records presented by Defendants, Galle's doctors wrote down concerns about his leg pain in 2017, Filing 293-2 at 5-6 and 33; 2011, 293-2 at 14-17; and 2010, 293-2 at 19. Galle also alerted NDCS to significant pain several times during 2016 after the April 25, 2016, x-ray indicating a new fracture. Galle Medical Records, Ex. 4-B at 28, 32, and 34. Galle also submitted IIRs about his "constant" and "severe" leg pain throughout his incarceration. AMF Nos. 100-08. This sort of severe and unmanaged pain is a serious medical need. *See, e.g.*, *Ellis v. Butler*, 890 F.2d 1001, 1003 (8th Cir. 1989) (failure to deliver pain pills for a non-emergency condition could state Eighth Amendment claim); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (denial of pain medication for five days could constitute an Eighth Amendment violation despite the fact that the wound healed normally because the plaintiff could have endured "physical pain and mental anguish" during the delay).

Despite this serious medical need, Defendants cut off Galle's pain medication upon

intake on March 1, 2010, even though a physician had not yet examined him. Filing 293-2 at 27-28 (intake screening consisted of questionnaire); Filing 293-2 at 23 (physician's examination on March 10 acknowledging that Vicodin had already been discontinued). As Defendants themselves acknowledge, they continually declined to prescribe him pain medication that had worked for him in the past. Filing 294 at 12-13. They provide no expert testimony that a blanket prohibition on prescribing narcotics for pain management meets the community standard of care or that it rises above the level of deliberate indifference. The only – unrefuted – expert testimony on record is that the pain medication Galle had been on was "necessary . . . for pain relief" and its discontinuation "coupled with failure to evaluate Mr. Galle . . . resulted in significant harm . . . as well as significant risk of harm . . . ." Stern Decl., Ex. 1 at 7.[5] Despite an IIR submitted on March 4, 2010, complaining of the pain, no physician examined Galle until March 10. "It violates the standard of care to categorically refuse to provide a medication or a class of medication without first making an adequate determination of the clinical appropriateness and safety of such a treatment plan, including" sufficient review and examination. *Id.* at 6.

At another point, Galle was denied prescribed pain medication for three days without any justification, causing "unnecessary pain . . . ." *Id.* at 12; Galle Medical Records, Ex. 4-B at 12. The evidence demonstrates that Galle was deprived of appropriate pain management, despite Defendants' knowledge of his pain; Defendants do not provide the Court with sufficient evidence to meet the summary judgment standard as to those allegations.

Defendants move for summary judgment on the treatment of Galle's femur on the basis

---

[5] Defendants state that medical records indicate that doctors told Galle that they would not prescribe him narcotics and that narcotics are not indicated for treating chronic pain. Filing 294 at 12. In addition to being inadmissible hearsay under Fed. R. Evid. 801(c), the underlying contentions about the suitability of narcotics treatment for chronic pain, which are unsupported by expert testimony, are rebutted by Dr. Stern's expert testimony. To the extent that the appropriateness of treating Galle with non-opioid pain medication is a question of fact, it is not ripe for summary judgment.

that he was obligated to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." Filing 294 at 14. As a preliminary matter, Defendants confuse the evidentiary standard for establishing an objectively serious medical need – which may require verifying evidence only if not obvious to a layperson – with the legal standard under which Eighth Amendment claims of delay are measured. *See Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004)* (explaining that "verifying medical evidence" is unnecessary when "a need for medical attention . . . would have been obvious to a layperson"). Defendants do not deny that, at least during the times when his femoral fracture was healing, his pain was a serious medical need.

As stated above, the Eighth Amendment protects against risk of harm even if that harm ultimately did not come to pass. Evidence that Defendants "ignored an acute or escalating situation" is sufficient, even without evidence of adverse effects of such delay. *Dulany, 132 F.3d at 1243*. *See also Hartsfield v. Colburn, 371 F.3d at 457* (overturning summary judgment that had been granted because the plaintiff had not presented "verifying medical evidence" of the harm of delay on the basis that he had presented evidence that he "suffered extreme pain from loose and infected teeth, which caused blood to seep from his gums, swelling, and difficulty sleeping and eating. This constituted a need for medical attention that would have been obvious to a layperson, making submission of verifying medical evidence unnecessary"). As Dr. Stern explains, Defendants ignored an acute situation when they failed to follow up on a new femoral fracture that they became aware of due to an x-ray on April 25, 2016. They not only failed to act of their own initiative despite the fact that this finding "likely require[ed] surgical invention[,]" but failed to send the x-rays to a surgeon even after Galle submitted multiple IIRs on May 11, 2016, July 1, 2016, and July 19, 2016. Stern Decl., Ex. 1 at 7. In fact, Galle did not receive the necessary surgery until August 25, 2017. By refusing to provide appropriate treatment to Galle's

fractured femur, Defendants ignored a situation that was not only acute, but "may [have] put the ultimate outcome [of the surgery] at serious risk." *Id.* at 10.

Finally, Plaintiffs have now placed verifying medical evidence in the record establishing the detrimental effect of delay on Galle. Expert testimony qualifies as "verifying medical evidence" in the Eighth Circuit. *See Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997). Dr. Stern's unrefuted expert testimony is that "delays in receiving definitive care for his serious condition" subjected Galle to "harm (unnecessary pain) and risk of harm by possibly lowering the chances of successful repair." Ex. 1 at 11.

## IV.   DEFENDANTS' VOLUNTARY CESSATION OF CONSTITUTIONAL VIOLATIONS DOES NOT MOOT PLAINTIFFS' CLAIMS

The relevant claim in this case is that Defendants' policies and practices "subject all Plaintiffs and the NDCS to a substantial risk of serious harm from inadequate health care. . ." Filing 1 at 70. Defendants contend that Rena's and Galle's "claims" are mooted because they believe that, after the Complaint was filed, Rena's dermatitis has improved and Galle's broken femur has been repaired. Filing 294 at 11. Even if they were correct that particular past injuries have been resolved since the filing of the Complaint, which Plaintiffs do not concede, the risk of harm remains and the claim itself of constitutionally inadequate medical care does not thereby become moot.

Furthermore, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and citation omitted). The Supreme Court has reaffirmed this bedrock principle for at least 75 years. *See, e.g., Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944) ("Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633

(1953) (". . . voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case . . . [unless] the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated. The burden is a heavy one.") (Internal quotation marks omitted).[6]

Rather, if Defendants wish to moot Plaintiffs' claims because they believe they have fixed the system of substandard health care, they "face[] a heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Americans United for Separation of Church and State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 421 (8th Cir. 2007) (quoting *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006)) (internal quotation marks and citation omitted). This standard is "stringent," and the burden is "formidable." *Laidlaw*, 528 U.S. at 189-90. Defendants must prove that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation marks omitted). Otherwise, a wrongdoer would be "free to return to his old ways." *W.T. Grant Co.*, 455 U.S. at 632; *see also Lankford*, 451 F.3d at 503 (noting that courts are not "compelled to allow the defendant to return to its old practices without fear of reprisal").

A recent case in the Fourth Circuit highlights the stringency of the burden. There, in

---

[6] The requirements of the Prison Litigation Reform Act (PLRA) do not vitiate this essential principle. Under the PLRA, prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs" and the court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). These constraints do not include a requirement that Defendants' conduct as to any particular factual allegation be ongoing after the filing of the Complaint. *See Porter v. Clarke*, -- F.3d --, 2019 WL 1966780, at *12-13 (4th Cir. 2019) for a comprehensive explanation as to why the court did "not construe Section 3626(a)(1) as displacing courts' equitable authority to *initially* impose prospective relief, even when a violation is not 'current and ongoing.'"

response to a claim that conditions for prisoners sentenced to death were unconstitutional, the Virginia Corrections Department "adopted revised procedures and regulations that provide death row inmates with several new privileges," that in combination "Plaintiffs concede . . . do not violate the Eighth Amendment." *Porter v. Clarke*, --F.3d.--, 2019 WL 1966780, at *10 (4th Cir. 2019). Defendants argued that an injunction was not warranted because there was "no cognizable danger of recurrent violation" in the case. *Id.* at *11 (internal quotation marks omitted). The Circuit Court nonetheless upheld the injunction, agreeing with the District Court that the change "was influenced, although not entirely dependent on, the current litigation" and that Defendants refused to commit the Corrections Department to nonrevision in the future. *Id.* at *11-12 (quoting the district court decision). "Given that State Defendants have shown no repentance— they continue to argue, as they are entitled, that the challenged conditions comply with the Eighth Amendment—State Defendants' professed *intent* not to return to the challenged practices did not preclude the district court from exercising its discretion to award injunctive relief." *Id.* at *12 (emphasis in original) (internal quotation marks omitted).

The Plaintiffs in this case—Rena, Galle, and the class of NDCS prisoners of which they and the other Named Plaintiffs are a part—allege constitutionally inadequate medical care and delays thereof that amount to deliberate indifference to serious medical needs. The post-filing resolution of one or more specific injuries, to the extent that it exists, does not moot their broader claim; nor does it relieve Defendants from their burden of establishing a constitutionally adequate system of care applicable to the entire class. As in *Porter*, Defendants in this case do not concede that their past conduct or policies were unconstitutional; nor have they irreversibly altered any policies or practices so as to prevent future recurrence of unconstitutional conditions.

Defendants also argue that Galle's "claim" about his femur is "likely moot" because he "has received his surgery and admits he continues to receive physical therapy following surgery .

47

. . ." Filing 294 at 14. Despite knowing that the femur had re-fractured no later than April 25, 2016, Defendants failed to provide necessary surgery to Galle until August 25, 2017—10 days after the instant litigation was filed, and after numerous attempts by Galle to get the attention of medical staff regarding worsening pain. AMF Nos. 85-113. In addition, the assertion that Galle "continues" to receive physical therapy is not true. Galle Decl., Ex 3 at 1-2. Galle's exposure to NDCS's dangerous medical system is not moot. He is still a person with a complex leg fracture, with a metal rod in his femur and bullet fragments throughout his leg. Filing 293-2 at 36. He continues to have pain, and may have future complications from this complex repair. That he succeeded in getting NDCS's attention by numerous written demand for treatment over a period of years, and finally got surgery after this case was filed, does nothing to moot his claims.

Galle remains at substantial risk of serious harm due to the systematic failures in the NDCS health care system. He continues to suffer daily pain, sometimes as much as an eight on a scale of one to ten, as he recovers from his surgery. Galle Decl., Ex. 3 at 2. Because he has stopped receiving physical therapy and other follow-up care, and the medical supplies he needs to protect his fragile leg have been taken away, *id.* at 1-2, he remains at risk of re-fracturing his leg and suffering the systemic problems with the NDCS system that Dr. Stern has identified. For example, Dr. Stern identifies in his expert declaration two systemic problems with what he terms "discoordinated care, delayed care and a failure to follow orders": an unreliable system for implementing medical orders and lack of coordination among medical staff. Ex. 1 at 7. Dr. Stern explains how these two systematic problems placed Galle at substantial risk of serious harm and caused him serious harm in the form of uncontrolled severe pain.

Two different doctors ordered CT scans of Galle's fractured femur but medical staff failed to execute these orders for many months: the first CT scan order was placed on March 10, 2017, and the second on July 17, 2017, but Galle never received them, and only received a new

x-ray on July 21, 2017, four and a half months later. Galle Medical Records, Ex. 4-B at 41, 52, 53. Dr. Stern explains that "[t]hese orders were written because of concern for possible development of a new serious condition (e.g., fresh fracture, infection, cancer), and therefore failure to execute these orders put the patient at risk of serious harm." Ex. 1 at 10. In fact, the x-ray taken on July 21, 2017, showed that Galle's femur was fractured and required surgical intervention. Not only did the harm of severe, uncontrolled pain materialize, but he also remained at risk for the conditions Dr. Stern notes as long as NDCS failed to execute the CT scan orders.

Dr. Stern also describes how systematically poor decision-making on the part of NDCS healthcare providers places Galle and all other class members at substantial risk of serious harm. An April 25, 2016, x-ray showed that Galle's femoral fracture was no longer healed but instead healing—"a very notable and adverse finding, likely requiring surgical intervention." Ex. 1 at 7. However, at a subsequent appointment on May 25, 2016, an NDCS physician failed to even review the results of the x-ray and therefore provided an inaccurate consultation request to the orthopedic surgeon, who denied the request and suggested "x-rays if not already done." The apparent decision not to even review the x-ray, and instead to continue to decline to treat Galle's serious medical need, amounts to "doggedly persist[ing] in a course of treatment known to be ineffective, behavior that we have recognized as a violation of the Eight Amendment." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). The unrefuted expert testimony that this example is emblematic of a systematic problem of discoordinated care that "subject[ed] [Galle] to harm (unnecessary pain) and risk" is sufficient to defeat summary judgment. Ex. 1 at 7.

Even to the extent that the femoral fracture was properly repaired this time around, Galle remains at substantial risk of serious harm due to Defendants' repeated failure to provide appropriate access to care, including to medical staff who will review the necessary records and

49

follow medical orders.

Similarly, Rena's conditions—her skin condition, and her unexplained bleeding—are recurrent. Although her skin condition had cleared up at the time of her deposition, it has since returned and she still suffers from pain and a lack of clarity about what her condition is or how to treat it effectively. Rena Decl., Ex. 2 at 1-2. Her vaginal bleeding, sometimes for continuous periods of three months, remained unexplained. Rena Deposition, Ex. 4-C, at 20:3-21:15. She remains at substantial risk of serious harm due to the systematic problems that Dr. Stern has identified in his declaration. For example, Dr. Stern notes that she was placed on medication that one of her skin conditions had previously been unresponsive to; this was not only "clinically unreasonable" but also is illustrative of a broader problem of failing to provide adequate access to care for chronic conditions. Stern Decl., Ex. 1 at 3-4. Because Rena's conditions are recurring, she remains at substantial risk of serious harm due to Defendants' repeated failure to provide appropriate access to care.

## <u>CONCLUSION</u>

For the foregoing reasons Defendants' Motion for Partial Summary Judgment should be denied.

DATED:  May 17, 2019           Respectfully submitted,

**ACLU NATIONAL PRISON PROJECT**
**ACLU OF NEBRASKA**
**DLA PIPER LLP (US)**
**NATIONAL ASSOCIATION OF THE DEAF**
**NEBRASKA APPLESEED**
**ROSEN BIEN GALVAN & GRUNFELD LLP**

By:   */s/ Lauren Kuhlik*
     Lauren Kuhlik (Va. Bar Number 92349)*
     *Admitted Pro Hac Vice*
     ACLU NATIONAL PRISON PROJECT
     915 15th Street, NW, 7th Floor
     Washington, DC 20005-2313
     Telephone: (202) 548-6618
     Facsimile: (202) 393-4931
     Email: lkuhlik@aclu.org

     *Not admitted in DC; practice limited to federal
     courts.
     Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2019, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, causing notice of such filing to be served upon all parties registered on the CM/ECF system.

This the 17th day of May 2019.

By: *  /s/ Lauren Kuhlik* _____