# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

| | |
|---|---|
| HANNAH SABATA, et al., | Case No. 4:17-cv-03107-BCB-MDN |
| Plaintiffs, | CLASS ACTION |
| v. | EXPERT DECLARATION OF MARC F. STERN, M.D., M.P.H. |
| NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al., | |
| Defendants. | |

I, Marc F. Stern, M.D., M.P.H., declare:

1. I am a board certified internist specializing in correctional health care. I have managed health care operations and practiced health care in multiple correctional settings. Most recently, I served as the Assistant Secretary of Health Care for the Washington State Department of Corrections. Additional detail regarding my qualifications can be found in my Declaration in Support of Class Certification, Filing 249-58 at 3, and my *curriculum vitae*, Filing 249-59.

2. From November 5 through November 9, 2018, in the course of my role as Plaintiffs' expert in this litigation, I visited five NDCS facilities, including Nebraska Correctional Center for Women ("NCCW"), Diagnostic and Evaluation Center ("DEC"), Lincoln Correctional Center ("LCC"), Nebraska State Penitentiary ("NSP"), and Tecumseh State Correctional Institution ("TSCI"). I spent a total of 53 hours touring these facilities.

3. During each visit, I toured the facility. Generally the tour included: one or more general population housing units; the isolation housing unit; specialized housing units, if they

1

existed, such as mental health housing; the Skilled Nursing Facilities ("SNF"; located at DEC, NSP, and TSCI); the observation of medication administration ("pill line") at all facilities except NSP; and the health care unit.

4. In my role as an expert in this litigation, I have also reviewed chronic care lists, the medical records of approximately 50 NDCS patients, and the records of the Named Plaintiffs.

5. COVID-19 is a serious disease and has reached pandemic status.

6. At least 1,464,852 people around the world have received confirmed diagnoses of COVID 19 as of April 8, 2020, including 395,011 people in the United States. At least 85,397 people have died globally as a result of COVID-19 as of April 8, 2020, including 12,754 in the United States. These numbers will increase, perhaps exponentially.

7. COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. It is very easily spread from person to person, and people can become infected by simply touching surfaces with the virus after the person with the virus has left the area. There is increasing evidence that transmission occurs when patients are either asymptomatic or presymptomatic. The only way to control the virus is to use preventive strategies, including social distancing.

8. The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that.

9. The risk of severe complications (requiring hospitalization) from COVID-19 rises dramatically from 2.5% for the 18-49 year old age group to 7.4% for the 50-64 year old age group to 13.8% for the 65+ age group.[1] The number of deaths also rises dramatically between

---

[1] Data as of March 28, 2020, the latest available data as of April 8, 2020; https://gis.cdc.gov/grasp/COVIDNet/COVID19_3.html

age groups. As of April 8, 2020, there were 29 deaths in the 25-34 year old age group; 79 deaths in the 35-44 year old age group; 201 deaths in the 45-54 year old age group; 400 deaths in the 55-64 year old age group; and 763 deaths in the 65-74 year old age group.[2] It must be noted that this data are drawn almost exclusively from individuals in the community. It is well known in correctional health sciences that individuals in jails and prison are physiologically comparable to individuals in the community several years older.

10. The effects of COVID-19 are very serious, especially for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as – but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.

11. NDCS contains large numbers of patients, including several of the Named Plaintiffs, who are particularly vulnerable to the effects of COVID-19 due to their age or underlying medical conditions. For example:

   a. Hannah Sabata has HIV, which puts her at a heightened risk of serious harm should she contract COVID-19.

   b. James Curtright is 55 years old. His risk factors for COVID-19 include his age and a history of asthma.

   c. Jason Galle has Hepatitis C and a history of hypertension, which puts him at heightened risk of serious harm from COVID-19.

   d. Richard Griswold is 55 years old. His risk factors for COVID-19 include his age and history of hypertension.

---

[2]Data as of March 28, 2020, the latest available data as of April 8, 2020; https://www.cdc.gov/nchs/nvss/vsrr/COVID19/index.htm

    e. Michael Gunther is 64 years old. He is at high risk of serious harm if he contracts COVID-19 due to his age, diabetes, and hypertension.

    f. Angelic Norris has hypertension, which puts her at a heightened risk of serious harm should she contract COVID-19.

    g. Brandon Sweetser has Hepatitis C, which puts him at heightened risk of serious harm if he contracts COVID-19.

12. Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs. Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support.

13. Prisons are congregate environments, i.e. places where people live and sleep in close proximity. In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread. This therefore presents an increased danger for the spread of COVID-19 if and when it is introduced into the facility as already evidenced by spread of COVID-19 in other congregate environments: nursing homes and cruise ships. This basal risk is inherent to a congregate environment like a prison and cannot be eliminated even in a prison that fully implements CDC's guidelines to reduce the spread of virus.

14. Given the ubiquitous shortage of personal protective equipment (PPE) – a critical component of the aforementioned CDC guidelines – full implementation of the guidelines is hamstrung, further increasing the risk of viral spread.

15. Social distancing in ways that are recommended by public health officials can be difficult, if not impossible in prisons, placing people at risk, especially when the number of prisoners is high.

16. Beyond the basal risk inherent in prison environments, to the extent that prisoners are housed in more crowded quarters, the risks are further increased. In overcrowded facilities, where prisoners are unable to control their distance from others, or having to often share or touch objects used by others, the basal risks of spread are greatly, if not exponentially, increased.

17. This increased risk, above and beyond the basal risk inherent in all prison environments, applies to NDCS. With one exception (Nebraska Correctional Youth Facility) NDCS facilities are overcrowded to severely overcrowded (104% to 336%, average 169%). As a result, incarcerated individuals are forced to live in even closer proximity to one another than in a typical prison environment. In facilities with mostly cells, I observed that nearly all cells house two people to a cell. The cells are not large enough for each resident to maintain a reasonable distance from his or her roommate. In facilities with dorm-style housing, I observed that rows of bunk beds are lined up just a few feet from one another with narrow walkways in between. Again, residents in these units cannot practice social distancing in order to protect themselves and mitigate the spread of the virus. In addition, throughout NDCS, residents must share sinks, toilets, showers, tables, chairs, and engage with other high-touch surfaces, which increases the risk of the spread of the disease.

18. When and if correctional staffing challenges arise due to the need for staff to quarantine, seek treatment, or care for dependents, managing internal safety in carceral settings becomes even more challenging. Understaffing in the correctional setting is dangerous for staff as well as incarcerated people, and the stress and fear of the current crisis only serve to increase those risks. This risk is amplified in NDCS because even before any such challenges arise, NDCS's security force is already seriously understaffed.

5

19. COVID-19 has already reached NDCS prisons. A staff member recently tested positive for COVID-19. This is likely just the tip of the iceberg, given what we know about the virus and how it spreads.

20. In the context of a pandemic like the one we currently face, public health and public safety interests are closely intertwined. Because vulnerable populations are at the highest risk of severe complications from COVID-19, and because when they develop severe complications they will be transported to community hospitals—thereby using scarce community resources (ER beds, general hospital beds, ICU beds)—avoiding disease in this population is a critical contribution to public health overall. Reducing the spread and severity of infection in a prison slows, if not reduces, the number of people who will become ill enough to require hospitalization, which in turn reduces the health and economic burden to the local community at large.

21. For incarcerated individuals who are at high risk of serious illness or death should they contract the COVID-19 virus, release from incarceration is a critically important way to meaningfully mitigate that risk. Additionally, the release of incarcerated individuals who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of incarcerated individuals in a facility. Combined, this has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of prison staff such that they can continue to ensure the safety of incarcerated individuals.

22. The release of incarcerated individuals, especially those with increased health-related vulnerability, also supports the broader community because carceral settings, regardless of the level of government authorities that oversee them, are integral parts of the community's public health infrastructure.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct, and that this declaration is executed at Tumwater, Washington this 9th day of April, 2020.

_____
Marc F. Stern, M.D., M.P.H.