IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HANNAH SABATA, et al, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, et al,<br><br>Defendants. | 4:17CV3107<br><br>ORDER |

This matter is before the Court on Plaintiffs' Emergency Motion Seeking Disclosure of Defendants' Plan for the Prevention, Management, and Treatment of Covid-19 (Filing No. 447). Plaintiffs request that the Court order Defendants to disclose the Nebraska Department of Correctional Services' ("NDCS") plans for the prevention and management of the novel coronavirus ("COVID-19") in NDCS facilities, including its pandemic plan and any facility-specific quarantine plans ("COVID-19 Plans"). The Court held a telephone conference with counsel on April 14, 2020, regarding Plaintiffs' request for expedited briefing, which the Court granted. The matter is now fully submitted to the Court. For the following reasons, the Court will deny the motion.

### BACKGROUND

Plaintiffs, inmates within the custody and control of the NDCS, filed this proposed class action on August 15, 2017, against Defendants, NDCS and its administrators and medical staff, asserting violations of Plaintiffs' civil and constitutional rights. Plaintiffs' claims arise out of their allegations that Nebraska state prisons are "overcrowded, under-resourced, and understaffed, and that prisoners are "consistently deprived of adequate health care, including medical, dental, and mental health care, and denied accommodations for their disabilities." (Filing No. 1 at p. 4). In their Complaint, the individually named plaintiffs allege specific instances of concrete and personalized injuries that they allege were caused by NDCS's substandard isolation/medical/dental policies and practices. For example, Plaintiff Hannah Sabata alleges she is HIV positive and experiences lapses and delays in receiving prescription medication for that disease; she also has

schizophrenia and has spent a total of two years in isolation during her incarceration, which exacerbates her psychiatric condition. (Filing No. 1 at pp. 6-7). Plaintiff Michael Gunther alleges he became blind while incarcerated from Defendants' mismanagement of and failure to treat his diabetes. (Filing No. 1 at p. 14). Plaintiff Jason Galle alleges he is diagnosed with paranoid schizophrenia, depression, and anxiety, and that Defendants abruptly discontinued his medication for his psychiatric conditions causing severe physical withdrawal. (Filing No. 1 at p. 12). Based upon these types of allegations in their complaint, Plaintiffs have asked the Court to certify an "NDCS Class" comprised of "all persons who are now, or will in the future, be subjected to the health care (including medical, mental health and dental care) policies and practices of NDCS," as well as two subclasses for any NDCS prisoner subject to isolation or any prisoner with a disability. (Filing No. 247). Plaintiffs request several forms of relief, including a Court order requiring the Defendants to develop a plan "to eliminate the substantial risk of serious harm" caused by Defendants' policies and practices, as stated above. (Filing No. 1 at pp. 84-87). To date, substantial discovery has taken place and several substantive issues are pending before the Court. See Filing Nos. 125, 176, 223, 247, 270, 280, 292, 395, 420, 429.

Plaintiffs have filed the instant "emergency" motion asking that the Court order the NDCS to disclose its plans for the prevention and management of COVID-19, including its pandemic plan and any facility-specific quarantine plans. Although the NDCS has disclosed to Plaintiffs and/or publicly disclosed on its website the "vast majority of NDCS' plan for the operational preparedness, prevention, and management of COVID-19" (Filing No. 456-2 at pp. 33-37), the NDCS has not publicly disclosed, or disclosed to Plaintiffs, facility-specific information regarding where inmates placed in quarantine or medical isolation will be housed. (Filing No. 457 at pp. 1, 7). Plaintiffs assert all such documents are relevant to their Eighth Amendment claims for inadequate medical care arising out of Defendants' insufficient policies and practices leading to chronic overcrowding, inadequate intake policies, and insufficient numbers of health care professionals. Plaintiffs maintain that they cannot determine at this time whether the NDCS' plans "sufficiently meet its duty to protect Plaintiffs and plaintiff class members from a imminently dangerous and infectious disease" without disclosure of the COVID-19 plans. (Filing No. 448 at pp. 16-17).

The NDCS argues that the NDCS' response to COVID-19 is not relevant to any claim in this action. The NDCS contends that Plaintiffs did not raise pandemic response in their Complaint

2

and their generic claims regarding "medical policies" do not make the NDCS' current pandemic response relevant in this case. (Filing No. 457 at pp. 2-3). The NDCS also argues Plaintiffs could not have exhausted any COVID-19 grievances prior to filing this lawsuit in 2017, as COVID-19 is a novel virus that had not been transmitted to humans when this case was filed. (Filing No. 457 at p. 3).

## ANALYSIS

Plaintiffs are asking the Court to order Defendants to produce additional documents Plaintiffs contend are responsive to their requests for production regarding health care policies and procedures. (Filing No. 460 at p. 8). Plaintiffs' motion, although not titled as such, is a motion to compel discovery pursuant to Rule 37(a)(3) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 37(a)(3)(B)(iv)("A party seeking discovery may move for an order compelling . . . production" if "a party fails to produce documents . . . as requested under Rule 34."). Plaintiffs did not request a telephone conference with the Court prior to filing this motion as required by this district's Civil Case Management[1] practices and the prior orders of the Court. See Filing No. 289 ("A motion to compel . . . shall not be filed without first contacting the chambers of the undersigned magistrate judge to set a conference for discussing the parties' dispute."). Regardless of the subject matter of Plaintiffs' motion, Plaintiffs were not excused from complying with the Court's rules requiring them to request a conference with the Court prior to filing a motion to compel. Therefore, the Court could deny Plaintiffs' motion to compel on that basis alone. Nevertheless, the Court will also deny Plaintiffs' motion to compel because the documents sought by Plaintiffs are not relevant to this action.

It is true that the scope of relevant discovery is broad; however, "this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Although the COVID-19 issue was before the court in *Coleman v. Newsom*, No. 01-CV-01351-JST, 2020 WL 1675775 (E.D. Cal. Apr. 4, 2020)("*Coleman II*") at a very different procedural juncture, the court's discussion of the nature of the COVID-19 pandemic as it relates to inmates' claims for constitutionally deficient health care is helpful when assessing the relevance of the requested documents in this case. Similar to the claims in this case, the *Coleman II* case began as two separate cases filed by California inmates

---

[1](https://www.ned.uscourts.gov/attorney/judges-information/civil-case-management)

in 1990 and 2001 seeking redress for the state's failure to provide constitutionally adequate mental and health care services. Those cases culminated in a court order in 2009 requiring the California prison population to be reduced by 137.5% within two years. *Coleman II*, 2020 WL 1675775, at *1-2. Disease control was found to be one of the state's constitutionally deficient areas, including the "woefully inadequate" prison intake process "designed to allow medical staff to identify inmates' medical issues, including communicable diseases[.]" *Id.* (quoting *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal./N.D. Cal. 2009) ("*Coleman I*"). The plaintiffs in *Coleman II* were before the Court to ask for a further reduction in the prison population due to COVID-19. Similar to Plaintiffs' argument in this case, the *Coleman II* plaintiffs argued that the potential harm posed by COVID-19 was attributable to the same constitutional harms underlying the court's prior order because "preventing the spread of a dangerous, contagious illness is plainly a requirement of an adequate medical care system." *Coleman II*, 2020 WL 1675775, at *5. Although the *Coleman II* court agreed "the Eighth Amendment requires Defendants to take adequate steps to curb the spread of disease within the prison system," it nevertheless found that the "specific harm" posed by COVID-19 "is not caused by constitutional shortcomings in Defendants' ability to provide medical and mental health services." Instead, the court concluded "that any constitutional violation in Defendants' current response to the COVID-19 crisis is different, in both nature and degree, from the [mental and health care] violations underlying the 2009 population cap order," which "was never intended to prepare Defendants to confront this unprecedented pandemic. Nor could it have, given that the entire world was unprepared for the onslaught of the COVID-19 virus." *Coleman II*, 2020 WL 1675775, at *5.

In this case, Plaintiffs filed their Complaint in 2017 seeking redress for what they allege is constitutionally inadequate mental, dental, and health care provided by Defendants. While the allegations in Plaintiffs' Complaint do encompass a wide range of claimed injuries, the Court finds that when the Plaintiffs filed this lawsuit in 2017, no party contemplated that this action would encompass a claim regarding a virus that did not exist. The COVID-19 crisis is different, "in both nature and degree" from the claims in Plaintiffs' Complaint. See *Coleman II*. The unprecedented and unanticipated nature of the COVID-19 crisis is evident from Plaintiffs' "emergency motion" requesting "immediate[]" disclosure of the NDCS' pandemic plans, which Plaintiffs specifically requested for the first time on March 19, 2020. (Filing No. 449-3 at p. 4). Notably, the NDCS has publicly disclosed many of its plans for the operational preparedness, prevention, and management

of COVID-19, and as of April 17, 2020, there were still no confirmed cases of COVID-19 among the inmate population, (Filing No. 457 at p. 6), yet Plaintiffs nevertheless state they are "unable to determine whether NDCS plans to sufficiently meet its duty to protect Plaintiffs and plaintiff class members from a imminently dangerous and infectious disease" – a statement that suggests that Plaintiffs are unsure if they have actually suffered an injury giving rise to a claim for relief. (Filing No. 448 at p. 17). Simply stated, the novel coronavirus and the NDCS' developing response to the current pandemic are just that: novel. Therefore, the Court will not order the NDCS to disclose its COVID-19 pandemic plan and any facility-specific quarantine plans to Plaintiffs in this action, as that information is not relevant to any claim or defense in this case. Upon consideration,

**IT IS ORDERED** that Plaintiffs' Emergency Motion Seeking Disclosure of Defendants' Plan for the Prevention, Management, and Treatment of Covid-19 (Filing No. 447) is denied.

Dated this 1st day of May, 2020.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge