IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HANNAH SABATA, on behalf of themselves and all others similarly situated; DYLAN CARDEILHAC, on behalf of themselves and all others similarly situated; JAMES CURTRIGHT, on behalf of themselves and all others similarly situated; JASON GALLE, on behalf of themselves and all others similarly situated; RICHARD GRISWOLD, on behalf of themselves and all others similarly situated; MICHAEL GUNTHER, on behalf of themselves and all others similarly situated; ANGELIC NORRIS, on behalf of themselves and all others similarly situated; R. P., a minor, on behalf of themselves and all others similarly situated; ISAAC REEVES, on behalf of themselves and all others similarly situated; ZOE RENA, on behalf of themselves and all others similarly situated; and BRANDON SWEETSER, on behalf of themselves and all others similarly situated; | **4:17-CV-3107** <br><br><br> **MEMORANDUM AND ORDER** |
| Plaintiffs, | |
| vs. | |
| NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, SCOTT FRAKES, In his official capacity as Director of the Nebraska Department of Correctional Services; HARBANS DEOL, In his official capacity as Director of Health Services of the Nebraska Department of Correctional Services; NEBRASKA BOARD OF PAROLE, JULIE MICEK, In her official capacity as the Board of Parole Acting Parole Administrator; and DOES, 1 to 20 inclusive; | |
| Defendants. | |

1

## I.     INTRODUCTION AND SUMMARY

This is a putative class action lawsuit in which Plaintiffs, inmates of various Nebraska Department of Correctional Services ("NDCS") facilities, seek redress for alleged violations of their civil and constitutional rights based on perceived deficiencies in the Nebraska prison healthcare system. Plaintiffs allege that Nebraska state prisons are "overcrowded, under-resourced, and understaffed," and that prisoners are "consistently deprived of adequate health care, including medical, dental, and mental health care, and denied accommodations for their disabilities." Filing 1 at 4. Plaintiffs file causes of action under 42 U.S.C. § 1983, the Eighth Amendment of the United States Constitution, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). Filing 1 at 73-84.

This case presents itself to the Court with eleven pending motions and over 1,300 pages of briefing, along with more than 15,000 pages of exhibits, expert reports, and documentation. This opinion addresses all outstanding motions.[1]

### Motion for Class Certification

The primary motion for the Court's consideration is Plaintiffs' Motion for Class Certification. Filing 247. Plaintiffs seek to certify a class of "all persons who are now, or will in the future, be subjected to the health care (including medical, mental health and dental care) policies and practices of NDCS." Filing 247 at 1. Plaintiffs further seek to certify two subclasses, a disability subclass defined as "all persons with disabilities who are now, or will in the future be, confined at any NDCS facility" and an "isolation" subclass defined as "all NDCS prisoners who

---

[1] This case was transferred to the undersigned judge on September 5, 2019, shortly after his confirmation by the United States Senate as a United States District Judge for the District of Nebraska. Filing 400. On November 26, 2019, in order to assist it in evaluating the considerable record and pending motions in this case, the Court ordered each party to submit twenty-page supplemental briefs outlining the major pending issues. Filing 423 at 4. On January 13, 2020, the Court held oral arguments on all pending motions. Filing 438; Filing 439.

are now, or will in the future be, subject to conditions of confinement that provide limited contact with other prisoners, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week." Filing 247 at 1-2.

The Court concludes that Plaintiffs' proposed class and subclasses do not meet the requirements outlined in Federal Rule of Civil Procedure 23 for the certification of a class-action lawsuit. The Court further concludes certification is not warranted pursuant to binding case law interpreting the class-certification requirements from the Eighth Circuit Court of Appeals and the United States Supreme Court.

Plaintiffs ask the Court to group together as a single class the entire Nebraska prison population for the purpose of redressing grievances regarding healthcare. This request is not suitable for class treatment for several reasons as outlined in this opinion, including the fact that inmates' individual medical needs run the gamut from no health issues at all to significant illnesses and conditions requiring frequent and considerable treatment. The proposed solutions to the alleged deficiencies in NDCS's healthcare system are likewise diverse, broad, and would require individualized rather than classwide application. Plaintiffs' claims simply do not satisfy the commonality required by the law.

In addition, the Court declines to exercise authority over the Nebraska prison system as Plaintiffs request because doing so would be contrary to the idea of federalism outlined in the United States Constitution. The Nebraska prison system is operated by the State of Nebraska, not the federal government, and certainly not by the federal courts. Although this Court stands ready to defend the civil rights inmates have under the federal Constitution, it will not exercise its authority to promote public-policy preferences that should be debated, funded, and if enacted, implemented through the legislative and executive branches of the State of Nebraska.

Plaintiffs' request for class certification in this case, if granted, would also likely lead to this Court overseeing a significant portion of the operation of Nebraska's prisons, including the healthcare provided to prisoners, the adequacy of procedures applicable to prison administration, and the grievance process for prisoners. Indeed, other federal district courts which have granted class certification in all-encompassing prison cases have retained jurisdiction over certain internal prison operations for years once the plaintiffs prevailed in the case, resulting in the parties filing motions related to the original claims for an extended period of time. *See, e.g.*, *Parsons v. Ryan*, 289 F.R.D. 513, 516 (D. Ariz. 2013) (reflecting repeated filings and on-going requests to the court dating from 2012 to 2020 in prison case with broadly certified class), *aff'd*, 754 F.3d 657 (9th Cir. 2014). Citing this concern, the Eighth Circuit Court of Appeals has already overruled a judge in the District of Nebraska for certifying an over-arching class in a lawsuit involving the Nebraska prison system. *See Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (finding the district court "conferred upon itself jurisdiction to assert control over the operation of three distinct mental health facilities, a major component of Nebraska state government"). For these reasons, and others as explained in greater detail below, the Court declines to certify the class and two proposed subclasses requested by Plaintiffs.

**Other Pending Motions**

In addition to Plaintiffs' Motion for Class Certification (Filing 247), the ten other motions presented to the Court address summary judgment, expert witnesses, discovery disputes, and the question of whether particular claims are moot based on certain Plaintiffs' release from Nebraska prison incarceration. For the convenience of those reviewing this lengthy opinion, the Court will briefly summarize these motions and the decision of the Court on each of these matters.

Defendants filed an Objection to Affidavits Submitted by Plaintiffs in Support of Summary Judgment on September 28, 2018. Filing 176 at 13. Therein, Defendants assert that the expert testimony of Plaintiffs' experts, Dr. Pablo Stewart, Eldon Vail, and Dr. Peter Leone, fails to "create any issues of material fact" regarding whether Plaintiffs exhausted all possible administrative remedies for their claims. Filing 176 at 1. Further, Defendants challenge the expert testimony as "inadmissible legal conclusions." Filing 176 at 1-2. Defendants ask the Court to strike these experts' declarations from the record. Filing 176 at 11.

The Court concludes that the expert declarations from Dr. Stewart, Dr. Leone, and Vail are admissible under Federal Rule of Evidence 702 to assist the Court in ruling on Defendants' partial summary judgment motion regarding Plaintiffs' exhaustion of administrative remedies. For reasons discussed further herein, the Court denies Defendants' Objection to Affidavits Submitted in Support of Summary Judgment. Filing 176.

Defendants filed an Objection to United States Magistrate Judge Michael D. Nelson's Order Regarding Expert Witnesses on September 3, 2019. Filing 395 at 8. After Magistrate Judge Nelson denied Defendants' motion to strike the declarations of Plaintiffs' experts, Margo Schlanger, Eldon Vail, Dr. Craig Haney, Dr. Pablo Stewart, "and portions of the declarations of [Drs.] Jay Shulman . . . and Marc Stern" submitted in support of their motion for class certification, the defendants objected and asked the undersigned judge to overrule the magistrate judge's ruling. Filing 395 at 1. Defendants argue that the magistrate judge inappropriately applied a "focused *Daubert* analysis" in determining these expert opinions are admissible at the class certification stage as instructed by *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604, 608 (8th Cir. 2011). Filing 395 at 2. Defendants request that the Court sustain their original objection and strike the expert testimony in question from the record. Filing 395 at 7.

The Court concludes that Magistrate Judge Nelson was correct in applying the focused *Daubert* analysis from *In re Zurn Pex* in finding certain expert declarations submitted by Plaintiffs in support of class certification are admissible. Defendants' Objection to the Magistrate Judge's Order Regarding Expert Witnesses (Filing 395) is accordingly denied.

Defendants filed a Motion for Partial Summary Judgment Regarding Exhaustion of Administrative Remedies on July 27, 2018. Filing 125 at 2. Defendants argue that most of Plaintiffs' claims should be dismissed because prisoners are required to exhaust their administrative remedies in making complaints regarding prison treatment prior to bringing an action in court and that requirement was not met for the majority of Plaintiffs' claims. Filing 128 at 4-5. Defendants ask this Court to dismiss all of Plaintiffs' claims except for the few they admit were properly exhausted. Filing 128 at 4-5.

The Court concludes there are genuine issues of material fact regarding whether the NDCS grievance process is "available" to Plaintiffs as required by United States Supreme Court precedent. The Court comes to this conclusion given the numerous and repeated challenges Plaintiffs claim they faced in following the NDCS administrative process when trying to file their grievances. Defendants' Motion for Partial Summary Judgment Regarding Exhaustion of Administrative Remedies (Filing 125) is therefore denied.

Defendants filed a Motion for Partial Summary Judgment Regarding Life Sentences and Eighth Amendment Claims on April 18, 2019. Filing 292 at 2. Defendants request summary judgment on three issues. First, Defendants request summary judgment on Plaintiffs' claims against the Board of Parole and Julie Micek for alleged problems with parole hearings. Defendants claim these plaintiffs lack standing to make claims regarding parole hearings because they are serving life sentences and therefore are not entitled parole hearings under Nebraska law. Filing

292 at 1. Second, Defendants request summary judgment on Jason Galle's Eighth Amendment claim relating to the treatment of his femur. Filing 292 at 1-2. Defendants argue that "[t]he undisputed facts show NDCS medical staff repeatedly saw, treated, and evaluated Galle for his complaints" and that his claim that NDCS acted with deliberate indifference in treating his ailment must therefore fail. Filing 294 at 15. Third, Defendants seek summary judgment on Zoe Rena's Eighth Amendment claim relating to the treatment of her skin rash. Filing 292 at 2. They argue that, because "NDCS medical staff took multiple steps to respond" to Rena's skin rash, her claim that the State acted with deliberate indifference in treating the rash must fail. Filing 294 at 17, 19.

The Court concludes that the inmates serving life sentences lack standing to assert their ADA and RA claims against the Board of Parole and Director Micek because they are not entitled to have parole hearings under Nebraska law. Defendants' Motion for Partial Summary Judgment Regarding Life Sentences and Eighth Amendment Claims (Filing 292) will therefore be granted as to the life-sentence plaintiffs. Summary judgement is denied as to the Eighth Amendment claims relating to Galle's femur and Rena's skin rash for the reasons outlined in this order.

Defendant Micek filed a Motion for Partial Summary Judgment, Filing 223 at 2, on January 7, 2019. She argues that Plaintiffs "fail[ed] to make a single allegation directed specifically at [her]." Filing 225 at 1. Micek notes that Plaintiffs' claims against the Board of Parole specifically focuses on issues surrounding parole hearings and the increased likelihood of being denied parole. Micek claims, however, that she "is not involved in the parole decision-making process" and plays no role in the parole process until after an inmate is granted parole. Filing 225 at 6.

The Court concludes that the undisputed facts show Defendant Micek plays no role in the part of the parole process pertinent to Plaintiffs' claims, namely parole determination for inmates

7

still in NDCS custody. The Motion for Partial Summary Judgment Regarding Defendant Micek (Filing 223) is granted and Micek is dismissed as a party to the lawsuit.

On May 15, 2020, Plaintiffs filed an Objection to the Magistrate Judge's Order denying their request for discovery related to NDCS's plan to address the novel coronavirus, COVID-19, pandemic. Filing 469 at 1-2. Plaintiffs ask the undersigned district judge to overrule Magistrate Judge Nelson's order finding that Plaintiffs' motion seeking to compel certain COVID-19-related documentation failed to comply with discovery procedures and was not relevant to the claims made in this lawsuit. Filing 470 at 17-20, 29-30.

The Court concludes that Plaintiffs failed to comply with discovery procedure which alone justified the denial of Plaintiffs' motion. The Court further concludes that Magistrate Judge Nelson's Order finding that the discovery request is not relevant to the present case is not "clearly erroneous or contrary to law." 28 U.S.C. § 636. Plaintiffs' Objection to Magistrate Judge's Order regarding COVID-19 Discovery (Filing 469) is denied.

Finally, Defendants filed four separate motions addressing whether certain of Plaintiffs' claims are moot due to individual Plaintiffs' release from custody, or their release and subsequent return to custody. In their Motion for Reconsideration, filed on March 11, 2019, plaintiff R.P. asked this Court to reconsider its grant of Defendants' Suggestion of Mootness and Motion to Dismiss his claims, which was originally entered on November 20, 2018. (Filing 260; Filing 204). Filing 270 at 1. The original motion and order were based on the fact that R.P. was no longer in custody. Filing 272 at 2. Because R.P. has since returned to custody, Plaintiffs argue his claims are no longer moot and that the Court should reinstate them. Filing 270 at 1; Filing 272 at 2-3. Defendants further filed Motions to Dismiss and Suggestions of Mootness on April 1, 2019, November 18, 2019, and December 10, 2019 respectively. Filing 280 at 2; Filing 420 at 2; Filing

8

429 at 4. Together, these three motions ask the court to dismiss three Plaintiffs: Brandon Sweetser, Zoe Rena, and Angelic Norris. Filing 280 at 1; Filing 420 at 1; Filing 429 at 1. Defendants argue that since all three of these Plaintiffs are no longer incarcerated, their claims are moot and should be dismissed. Filing 280 at 1; Filing 420 at 1; Filing 429 at 1-2.

R.P.'s Motion for Reconsideration regarding the mootness order (Filing 270) is granted. R.P.'s claims are allowed to proceed given he has returned to state custody. Defendants' Motions to Dismiss and Suggestions of Mootness regarding plaintiffs Sweetser and Norris (Filing 280, Filing 429) are granted because these Plaintiffs are no longer in custody. Defendants' Motion to Dismiss and Suggestion of Mootness regarding Rena is denied because she has been returned to custody and because issues of material fact exist which precludes summary judgment as to Rena.

## II.   ANALYSIS

The Court will address each of the pending motions in turn and will provide additional facts relevant to deciding each motion where appropriate.

### A.  Named Parties and Proposed Class Representatives

Plaintiffs in this case are of varying ages and are housed at several different NDCS facilities. They also allege that they suffer from a variety of health conditions.[2]

Hannah Sabata is a twenty-four-year-old female prisoner at the Nebraska Correctional Center for Women ("NCCW"). Filing 1 at 6. She suffers from schizophrenia and is HIV positive. Filing 1 at 7. Sabata was released on parole in November 2017. Filing 54 at 1. Her parole was revoked, and she was returned to NDCS custody in January 2018. Filing 54 at 1.

Dylan Cardeilhac is a nineteen-year-old inmate at Tecumseh State Correctional Institute ("TSCI"). Filing 1 at 7. He suffers from bipolar disorder and has been placed in what Plaintiffs

---

[2] The ages of Plaintiffs and their medical conditions recited herein are those alleged at the time of the filing of the Complaint, Filing 1, on August 15, 2017.

term "isolation" and what Defendants call "restrictive housing" on various occasions. Filing 1 at 7-8, 33; Filing 63 at 20-21.

James Curtright is fifty-two years old and incarcerated at the Lincoln Correctional Center ("LCC"). Filing 1 at 9. He is deaf. Filing 1 at 9-11.

Jason Galle is forty-two and is housed at the Nebraska State Penitentiary ("NSP"). He has chronic pain and mobility limitations stemming from a leg injury. Filing 1 at 11.

Richard Griswold is a fifty-three-year-old prisoner at TSCI who suffers from chronic hip problems, bipolar disorder, and post-traumatic stress disorder ("PTSD"). Filing 1 at 12-14. He is legally blind in one eye. Filing 1 at 12-14.

Michael Gunther is sixty-two years old and is incarcerated at NSP. Filing 1 at 14. He suffers from diabetes and has lost his vision as a result. Filing 1 at 14. He also uses dentures, is limited in what he can eat, and suffers from pain and discomfort in his mouth. Filing 1 at 15-16.

Angelic Norris is a forty-two-year-old female inmate at NCCW who is legally blind and suffers from a developmental disability, bipolar disorder, and hypertension. Filing 1 at 16. On November 20, 2019, Norris was released on parole. Filing 430-1 at 2-6.

R.P. is a seventeen-year-old male juvenile prisoner incarcerated at the Nebraska Correctional Youth Facility ("NCYF"). Filing 1 at 17. He suffers from severe paranoia. Filing 1 at 17. R.P. was discharged from the facility on November 20, 2018. Filing 207-1 at 2-3. Subsequently, on March 4, 2019, R.P. was returned to NDCS custody. Filing 271-1 at 1-2.

Isaac Reeves is nineteen years old and was housed first at NCYF and then at NSP. Filing 1 at 18. He suffers from depression, panic, and anxiety. Filing 1 at 18. He has also experienced tooth pain during his incarceration. Filing 1 at 19.

Zoe Rena is a thirty-year-old inmate at NCCW. Filing 1 at 19. She has experienced tooth, mouth, and jaw pain; has experienced inconsistent menstrual cycles; and suffers from a chronic skin condition. Filing 1 at 20. On November 15, 2019, Rena was released on parole, Filing 421-1 at 2; Filing 421-3 at 1-2, but was returned to custody in March 2020, Filing 442-2.

Brandon Sweetser is forty-five years old and incarcerated at NSP. Filing 1 at 20. He has hepatitis C, suffered a perforated bowel while in custody, struggles with mobility, and has been diagnosed with paranoid schizophrenia. Filing 1 at 20-22. On April 1, 2019, Sweetser was released on parole. Filing 281-1 at 2-4.

Defendants are the Nebraska Department of Correctional Services; Director of NDCS, Scott R. Frakes; Medical Director of NDCS, Harbans Deol; the Nebraska Board of Parole ("BOP"); and Julie Micek, an NDCS parole official. Filing 1 at 22-23.

### B. Objection to Affidavits Submitted in Support of Summary Judgment

#### 1. Additional Facts

Defendants have moved for partial summary judgment, alleging that several of the plaintiffs failed to exhaust their administrative remedies prior to seeking judicial redress. *See* Filing 125 at 1; *infra* Section II.D. In opposition to Defendants' partial summary judgment motion, Plaintiffs submitted the declarations of various expert witnesses. On September 28, 2018, Defendants filed an objection seeking to strike three of the declarations Plaintiffs submitted in opposition to Defendants' motion for partial summary judgment. Filing 176. Defendants argue all three declarations should be stricken because they are not based upon sufficient facts or data; will not assist the trier of fact; and are not the product of reliable principles and methods. Filing 176 at 4-11.

11

First, Defendants seek to strike the declaration of Dr. Pablo Stewart. Filing 160-38. Dr. Stewart is a board-certified psychiatrist with more than thirty years of experience in correctional mental healthcare. Filing 160-38 at 2. He reviewed several NDCS policies "as well as specific documents within the named plaintiffs' medical files." Filing 160-38 at 2. Dr. Stewart admits his "opinions at this early stage of the case are necessarily constrained by the limited amount of information" available through discovery. Filing 160-38 at 2. However, from his review of the policies and documents, Dr. Stewart was able to provide his opinion that "the NDCS grievance processes are complex, confusing, and overly stringent. So much so that prisoners suffering from Major Mental Illnesses ("MMI") would find it nearly impossible to complete, and therefore it is practically unavailable." Filing 160-38 at 3. Dr. Stewart also gave his opinion on how Cardeilhac, Sabata, Reeves, Galle, Norris, R.P., Sweester, Gunther, and Griswold would find it difficult to complete NDCS's three-step grievance process due to their mental health issues. Filing 160-38 at 5-14. Based on the evidence and information he had, Dr. Stewart was not able to opine that Rena or Curtright suffered from mental health issues which would preclude their ability to complete the grievance process. Filing 160-38 at 14-15.

Next, Defendants seek to strike the declaration of Dr. Peter Leone, a professor at the University of Maryland – College Park specializing in the treatment and experience of individuals with disabilities in institutional settings. Filing 160-41 at 2. Dr. Leone reviewed several documents regarding the NDCS-grievance and ADA-request processes. Filing 160-41 at 3. Dr. Leone compared U.S. prison population literacy levels with the reading levels required to understand the NDCS grievance and ADA request procedures. Filing 160-41 at 4-7. Based on his review, Dr. Leone opined "the grievance and request processes of the NDCS are so complex, opaque and confusing that for prisoners of average reading ability as well as for prisoners with additional

impairments arising from intellectual disability or learning disability, the proper procedures are essentially unknowable." Filing 160-41 at 3-4.

Lastly, Defendants seek to strike the declaration of Eldon Vail. Filing 160-35. Vail is a former correctional administrator with thirty-five years of experience working in and administering adult institutions. Filing 160-35 at 2. He reviewed the NDCS grievance and ADA policies as well as the affidavits of NDCS employees and approximately thirty of the grievances submitted by Plaintiffs in this case. Filing 160-35 at 5. According to Vail, the NDCS grievance processes include "a number of procedural roadblocks and barriers that (whether or not by design) have the effect of thwarting prisoners from successfully completing the grievance processes." Filing 160-35 at 5. He also concluded that NDCS staff rely on a hyper-technical application of the already-confusing procedures to thwart prisoners from successfully completing grievances. Filing 160-35 at 5. He concluded, "It is my opinion that, taken together, these fundamental flaws with the NDCS grievance system frustrate the ability of prisoners to use grievances to such an extent that the grievance processes are not actually available to address prisoners' legitimate concerns." Filing 160-35 at 6.

   2.  *Analysis*

Defendants object to Plaintiffs' proposed expert declarations on the basis of Federal Rule of Evidence 702. It provides that an expert witness may offer an opinion only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;

> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

"To satisfy the reliability requirement, the party offering the expert testimony 'must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid.'" *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)). "To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue." *Id.* (citing *Marmo*, 457 F.3d at 757). In making its determination, the Court may consider the following factors: "(1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *First Union Nat. Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005) (citing *Daubert*, 509 U.S. at 593–94, 113 S. Ct. 2786). However, "[r]egardless of what factors are evaluated, the main inquiry is whether the proffered expert's testimony is sufficiently reliable." *Id.* (citing *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005)).

The Court concludes Dr. Stewart's, Dr. Leone's, and Vail's declarations each meet the Rule 702 requirements and should be admitted as expert testimony in opposition to Defendants' summary judgment motion regarding exhaustion of administrative remedies. Defendants primarily take issue with what they characterize as a lack of reliance on sufficient facts or data. Filing 176 at 2-11. Defendants point out that these experts did not speak with or personally examine Plaintiffs. Filing 176 at 2-10. However, there is no requirement for personal contact in order to find an

expert's testimony sufficiently reliable and that it will assist the fact-finder. Each of the experts averred they had examined written materials specific to the plaintiffs and policies at issue in Defendants' motion. *See* Filing 160-38 at 2 (stating Dr. Stewart reviewed NDCS policies and specific documents from Plaintiffs' medical files); Filing 160-41 at 3 (stating Dr. Leone reviewed several documents regarding the NDCS grievance and ADA request process); Filing 160-35 at 5 (stating Vail reviewed the NDCS grievance and ADA policies as well as approximately thirty of the grievances submitted by Plaintiffs in this case). The Court is satisfied that each expert's testimony is based on sufficient facts and data and will assist the trier of fact as required by Rule 702.

Defendants also argue that the experts provide improper legal opinions by opining that the policies make the NDCS grievance process practically unavailable. Filing 176 at 10-11. While Defendants are correct that "expert testimony on legal matters is not admissible," *see S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003), that principle is not violated by the experts' testimony submitted on this motion. Dr. Stewart, Dr. Leone, and Vail do not testify "whether federal law was contravened," *id.*, but rather analyze the underlying facts and practices which might lead the Court to find that NDCS's grievance policy is practically unavailable. This testimony is permissible.

Lastly, although Defendants advance no specific argument in this respect, to the extent they allege the experts do not base their opinions on reliable scientific, technical, or specialized knowledge, such an argument also fails. Each of the experts stated their extensive educational and experiential backgrounds which provided them with the specialized insight and knowledge to analyze the information presented to them. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150,

119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) (noting that in some cases, "the relevant reliability concerns [of *Daubert*] may focus upon personal knowledge or experience").

Accordingly, the Court concludes Dr. Stewart's, Dr. Leone's, and Vail's expert declarations are admissible under Rule 702 to assist the Court in ruling on Defendants' partial summary judgment motion. Defendants' Objection, Filing 176, is overruled.

### C. Objection to Magistrate's Order Regarding Expert Witnesses

#### 1. Additional Facts

In support of its Motion for Class Certification, Filing 247, Plaintiffs submitted the expert declarations of Margo Schlanger (Filing 249-50), Eldon Vail (Filing 249-47), Dr. Craig Haney (Filing 249-42), Dr. Pablo Stewart (Filing 249-38), Dr. Jay Shulman (Filing 249-53), and Dr. Marc Stern (Filing 249-58). Defendants moved to strike the declarations of Schlanger, Vail, Dr. Haney, and Dr. Stewart in full, as well as portions of Dr. Shulman's and Dr. Stern's declarations. Filing 351. Magistrate Judge Nelson ruled on the objections and found the declarations admissible. Filing 389 at 4-6. He noted that at the class-certification stage, the Court's *Daubert* analysis is more "focused," in part because the evidence is not going to a jury and because the available evidence may be more limited. Filing 389 at 4-5 (quoting *In re Zurn Pex*, 644 F.3d at 614). Magistrate Judge Nelson concluded the experts' qualifications were adequately stated and that their opinions would assist the Court in making its determination under Federal Rule of Civil Procedure 23 . Filing 389 at 5-6.

Defendants object to the magistrate judge's order. Filing 395. They argue the Court erred in applying the focused analysis in *In re Zurn Pex*, 644 F.3d at 612-14, and that a full *Daubert* analysis requires the exclusion of the evidence. Filing 395 at 2. They point to the fact that, unlike in *In re Zurn Pex*, discovery has already commenced and thus, the experts had more information

16

available to them. Filing 395 at 2. They also point to cases from outside this Circuit that they claim

disagree with *In re Zurn Pex*'s holding. Filing 395 at 3-4.

   2.  *Analysis*

   A magistrate judge is permitted to rule on certain pretrial matters, like the motion to strike

in this case:

> (b)(1) Notwithstanding any provision of law to the contrary—
>
>    (A) a judge may designate a magistrate judge to hear and determine any
> pretrial matter pending before the court, except a motion for injunctive relief, for
> judgment on the pleadings, for summary judgment, to dismiss or quash an
> indictment or information made by the defendant, to suppress evidence in a criminal
> case, to dismiss or to permit maintenance of a class action, to dismiss for failure to
> state a claim upon which relief can be granted, and to involuntarily dismiss an
> action. A judge of the court may reconsider any pretrial matter under this
> subparagraph (A) where it has been shown that the magistrate judge's order is
> clearly erroneous or contrary to law.

28 U.S.C. § 636; *see also* Fed. R. Civ. P. 72 ("The district judge in the case must consider timely

objections and modify or set aside any part of the [magistrate judge's] order that is clearly

erroneous or is contrary to law.").

   Magistrate Judge Nelson relied on *In re Zurn Pex* in conducting a "focused" *Daubert*

analysis. Filing 389 at 5-6. He concluded the expert opinions offered by Margo Schlanger, Eldon

Vail, Dr. Craig Haney, Dr. Pablo Stewart, Dr. Jay Shulman, and Dr. Marc Stern were "sufficiently

reliable in light of the available evidence and purpose for which they were offered." Filing 389 at

5. The Court agrees that *In re Zurn Pex* applies in this case.

   The Eighth Circuit has applied *Daubert* in a more focused fashion when considering expert

testimony submitted at the class-certification stage. In *In re Zurn Pex*, the Eighth Circuit approved

the district court's use of what it called a "focused" or "tailored" *Daubert* analysis when addressing

expert testimony for purposes of class certification. *See In re Zurn Pex*, 644 F.3d at 612 (citing

with approval *Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005)). The Court noted that the plaintiff's "desire for an exhaustive and conclusive *Daubert* inquiry before the completion of merits discovery [could not] be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings." *Id.* at 613. It also stated that *Daubert*'s interest in protecting juries from being swayed by dubious scientific testimony "is not implicated at the class certification stage where the judge is the decision maker." *Id.* Accordingly, it concluded "a focused *Daubert* analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence" was appropriate. *Id.* at 614.

Defendants urge this court to depart from the holding of *In re Zurn Pex*, citing precedent from outside this Circuit. *See* Filing 395 at 3-4. However, this Court is bound by the decisions of the Eighth Circuit. Defendants have not cited to, nor has the Court located, any binding authority that would permit it to depart from settled precedent in this Circuit. Also unavailing is Defendants' argument that *In re Zurn Pex* involved a case with discovery bifurcated between the class-certification and merits stages, whereas no such bifurcation has occurred here. Filing 395 at 2. The Eighth Circuit's holding was based on the preliminary nature of the class-certification inquiry and the fact that the Court, rather than a jury, was evaluating the expert testimony. *In re Zurn Pex*, 644 F.3d at 612-14. Thus, the lack of bifurcated discovery in this case does not change the applicability of *In re Zurn Pex*'s holding. Accordingly, the magistrate judge was correct to rely on *In re Zurn Pex*.

The Court also agrees with the magistrate judge's focused *Daubert* analysis. As the magistrate judge's order noted, each declaration sets forth the expert's qualifications as well as the evidence and data upon which he or she relied in forming an opinion. Filing 389 at 5. The magistrate judge correctly noted that the experts provided opinions which would assist the trier of

18

fact in addressing various aspects of Rule 23 regarding class certification, including commonality and typicality. Filing 389 at 5-6. The magistrate judge also noted that, to the extent the declarations were general and not related to specific Nebraska correctional institutions, such a deficiency would go to the credibility of the testimony, not its admissibility. Filing 389 at 6 (citing *In re Zurn Pex*, 644 F.3d at 614). The Court agrees that the experts' declarations are admissible under the focused *Daubert* analysis required by *In re Zurn Pex*. To the extent portions of the declarations are based on the experts' personal and/or political opinions, the Court will afford those portions little or no weight and will instead focus on the fact-based analyses provided by the experts. The Court agrees with the magistrate judge's conclusion: "The Court will be capable of compartmentalizing its class certification analysis from its merits analysis when reviewing the evidence in support and in opposition to class certification, and therefore the expert declarations do not need to be stricken. . . ." Filing 389 at 6.

Accordingly, the Court concludes Magistrate Judge Nelson was correct in applying *In re Zurn Pex* and finding the declarations submitted in support of class certification are admissible. Because the magistrate judge's finding was not clearly erroneous or contrary to law, Defendants' Objection, Filing 395, is overruled.

## D. Motion for Summary Judgment Regarding the Exhaustion of Administrative Remedies

Defendants move for partial summary judgment on several of Plaintiffs' claims on the basis that those individual plaintiffs have failed to exhaust their administrative remedies prior to taking judicial action as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997 et seq. Filing 125; Filing 128. Plaintiffs argue that they have exhausted their administrative remedies or, in the alternative, that exhaustion was not required because the NDCS grievance system is unavailable.

Filing 162 at 51-73. For the reasons set forth herein, the Court concludes that questions of material fact exist as to whether the NDCS grievance system is practically unavailable. For this reason, the Court finds that summary judgment in NDCS's favor is inappropriate on the question of exhaustion of administrative remedies.

### 1. Standard of Review

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (citing *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude*

*Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

   *2. The PLRA*

Under the Prison Litigation Reform Act ("PLRA"), inmates cannot bring judicial actions regarding prison conditions until they have utilized available administrative remedies first:

   (a) Applicability of administrative remedies

   No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C § 1997e(a); *see also Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) ("An inmate must exhaust all available administrative remedies before bringing a § 1983 suit."). The benefits of requiring exhaustion "include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a

useful record." *Jones v. Bock*, 549 U.S. 199, 219, 127 S. Ct. 910, 923, 166 L. Ed. 2d 798 (2007)

(citing *Woodford v. Ngo*, 548 U.S. 81, 88-91, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)).

The question of exhaustion of administrative remedies under the PLRA is a question of

law. *See Ray v. Kertes*, 130 F. App'x 541, 543–44 (3d Cir. 2005) (noting "the proposition that the

availability of administrative remedies to a prisoner is a question of law"). However,

"[n]onexhaustion is an affirmative defense, and defendants have the burden of raising and proving

the absence of exhaustion." *Porter*, 781 F.3d at 451 (citing *Jones*, 549 U.S. at 211-12, 127 S. Ct.

910). "The question of whether administrative remedies are actually available requires a factual

inquiry." *See William G. v. Pataki*, No. 03 CIV. 8331 (RCC), 2005 WL 1949509, at *6 (S.D.N.Y.

Aug. 12, 2005).

### 3.   The NDCS Grievance Process

"[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper

exhaustion." *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014) (quoting *Jones*, 549 U.S. at 218,

127 S. Ct. 910); *see also Porter*, 781 F.3d at 451. Nebraska law provides, "All inmates shall be

informed of the grievance procedures established by the department and copies of such procedures

shall be available to all inmates." Neb. Rev. Stat. § 83-4,138 (Reissue 2014). The NDCS grievance

procedures are set forth in the Nebraska Administrative Code and NDCS's Administrative

Regulations ("ARs"). *See* 68 Neb. Admin. Code § 2-001 (providing that the grievance procedure

set forth in the ARs "applies to all institutions operated by the Department of Correctional

Services"); Filing 127-2 at 2 (stating the purpose of NDCS AR 217.02 is "[t]o establish procedures

for the implementation of Chapter 2 of the Nebraska Department of Correctional Services Rules

and Regulations, Title 68 Nebraska Administrative Code . . . for the effective and equitable

resolution of inmate grievances, and for the monitoring of the inmate grievance system"). Under

22

the administrative code, "[a]ny topic may be the subject of a grievance, except matters over which the Department has no control, classification actions, and inmate disciplinary actions." 68 Neb. Admin. Code § 2-002.02.

The administrative code provides a three-step procedure for inmate grievances. *See* 68 Neb. Admin. Code § 2-003. First, an inmate must submit an "Informal Grievance Resolution Form" to his or her "designated unit staff." 68 Neb. Admin. Code § 2-003.002. However, if a grievance is of a "sensitive nature," the inmate can file it directly with the Director or designee "by interoffice mail." 68 Neb. Admin. Code § 2-004.01. The informal grievance must be filed on a special form "obtained from unit staff" and "must be filed within three calendar days of the incident" being grieved. 68 Neb. Admin. Code §§ 2-005.02, 03. NDCS unit staff who receive an informal grievance are to respond in writing within ten working days. 68 Neb. Admin. Code § 2-005.04.

"If an inmate is dissatisfied with the response to the Informal Grievance, the inmate may file a Step-One Grievance with the Warden" on the required Step-One Grievance form which must be obtained from the inmate's case manager or other designee. 68 Neb. Admin. Code, §§ 2-003.03, -006.01. "The Step-One Grievance Form must be filed within 15 calendar days of the receipt of the informal grievance response, or if no response was received, within 20 calendar days of the incident giving rise to the grievance." 68 Neb. Admin. Code § 2-006.02. The other requirements of a Step-One Grievance are that it must address only one issue per form and that the inmate must attach the Informal Grievance Resolution Form and response, if received, to the Step-One Grievance Form. 68 Neb. Admin. Code §§ 2-006.03, .04. Upon receipt, the Warden's designee signs and dates the form and provides the inmate with a receipt. 68 Neb. Admin. Code § 2-006.06. The Warden or designee must send a written response to the inmate within ten working days, including a brief statement of reasons for the decision. 68 Neb. Admin. Code § 2-006.07.

If the inmate is dissatisfied with the results of the Step-One Grievance response, he or she must obtain a Step-Two Grievance Form from the case manager or designee and submit it to the Director by interoffice mail in a clearly marked envelope within ten calendar days after receipt of the Warden's response. 68 Neb. Admin. Code § 2-007.01. The inmate must attach copies of both the Informal Grievance Resolution Form and the Step-One Grievance Form, as well as NDCS's responses. 68 Neb. Admin. Code § 2-007.03. The Director or his or her designee must respond within twenty working days and can modify, affirm, or reverse the Step-One response of the Warden. 68 Neb. Admin. Code § 2-007.05.

The Nebraska Administrative Code also places a limitation on grievances. "An inmate may file no more than two Step-One Grievances per week (Monday through Sunday), except for valid emergency grievances." 68 Neb. Admin. Code § 2-008. "Emergencies" are defined as "those matters that must be resolved quickly because if the standard grievance time limits were used the inmate would be subjected to substantial risk of personal injury or other serious or irreparable harm." 68 Neb. Admin. Code § 2-009. An Emergency Grievance is to be filed on the same form as an Informal Grievance with unit staff. 68 Neb. Admin. Code §§ 2-009.01, .02. If the Warden's designee determines that an inmate files "frivolous, nuisance or duplicative grievances at any level," he or she may place "a reasonable limitation . . . on the number of grievances the inmate is allowed to file." 68 Neb. Admin. Code § 2-010.

Lastly, the Administrative Code contains a section entitled "Other Remedies." It states:

Inmates may communicate grievances to persons outside the Department.

011.01 An inmate may communicate a grievance to the Office of Public Counsel/Ombudsman, legislators, attorneys, courts or others.

011.02 Claims against the Department involving miscellaneous or tort claims for money may be filed pursuant to the State Tort Claims Act.

011.03 Each facility shall ensure that inmates have reasonable access to courts and to legal services and materials.

68 Neb. Admin. Code § 2-011.

NDCS's AR 217.02 "expands upon [the grievance] statutes and Chapter 2" of the administrative code. Filing 146-1 at 2. In addition to restating much of what is set forth in the administrative code, AR 217.02 requires that inmates and staff be given access to the grievance procedures. Filing 146-1 at 2, 5; Filing 127-1 at 2. It also requires NDCS to maintain copies of all grievances and maintain a log of all grievances containing the grievance's date, the grievant's name and inmate number, a statement of the nature of the grievance, and the date the appropriate official responded to the grievance. Filing 146-1 at 6.

AR 004.01 establishes the ADA policy for NDCS employees and inmates. Filing 146-2 at 2. According to the policy, "Inmates may follow grievance procedures for reporting ADA-related concerns." Filing 146-2 at 6. However, the regulation goes on to provide that "[i]nmates may also contact the NDCS ADA Coordinator directly to report an ADA-related concern." Filing 146-2 at 6. AR 004.01 states that if an inmate "is uncertain how to submit complaints of disability discrimination" he or she may "contact the NDCS ADA Coordinator, the State ADA Coordinator, or the Nebraska Equal Opportunity Commission for assistance." Filing 146-2 at 7. It continues, "No one is required to submit a complaint to NDCS before filing with the NEOC and/or EEOC." Filing 146-2 at 6. NDCS's ADA Coordinator stated that, in her opinion, "if an inmate believes he or she has been subject to disability discrimination or denied accessibility to an activity, service, or program . . . the proper way to complain about that [is] to follow the grievance procedure in [AR] 217.02." Filing 178-7 at 12, 289.

   4.  *Evidence Regarding the Availability of the Grievance Process*

25

While the PLRA requires administrative exhaustion prior to an inmate seeking judicial resolution of a complaint, an inmate is only required to exhaust those administrative remedies which are actually available. *See Townsend v. Murphy*, 898 F.3d 780, 783 (8th Cir. 2018) (citing 42 U.S.C. § 1997e(a)) ("The PLRA, however, requires exhaustion of only 'such administrative remedies as are available.'"). "The availability of a remedy, according to the Supreme Court, is about more than just whether an administrative procedure is 'on the books.'" *Id.* (quoting *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1859, 195 L. Ed. 2d 117 (2016)). Rather, a remedy is available only if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S. Ct. 1819, 1820, 149 L. Ed. 2d 958 (2001)).

The Supreme Court noted three specific instances in which a remedy would not be "available" for purpose of PLRA exhaustion. *See id.* at 1859-60. "First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859 (citing *Booth*, 532 U.S. at 736, 738, 121 S. Ct. 1819). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it." *Id.* "[W]hen a remedy is . . . essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable." *Id.* (citing *Goebert v. Lee Cty.*, 510 F.3d 1312, 1323 (11th Cir. 2007); *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008)). Finally, the third scenario in which the Supreme Court would find a remedy unavailable is "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.*

26

Defendants assert the NDCS grievance process was actually available to all inmates, Filing 179 at 147-54, but Plaintiffs introduced evidence from both individual inmates as well as experts showing that serious factual disputes exist regarding whether remedies are, in fact, "available" within the definition put forth by the Supreme Court in *Ross*, ____ U.S. at ____,136 S. Ct. at 1859-60.

    a.   Plaintiffs' Inmate Declarations Regarding Unavailability of Grievance Process

Cardeilhac filed a declaration detailing his knowledge of and experiences lodging grievances at TSCI. Filing 160-1. According to Cardeilhac, he participated in an inmate orientation when he arrived at TSCI but does not recall receiving an inmate rulebook or any information related to the grievance process. Filing 160-1 at 2. His understanding of how to complete the grievance process therefore comes largely from speaking with other inmates. Filing 160-1 at 3. He also does not have access to the library at TSCI due to his classification in segregation and he is not aware if TSCI has an "inmate resource center." Filing 160-1 at 2. Cardeilhac also detailed his difficulty in lodging grievances while housed in a segregation unit. Filing 160-1 at 1-2; Filing 160-2. According to Cardeilhac, when in segregation he is supposed to have access to grievance forms by requesting them at 2:00 P.M. "when the gallery corporal brings the supply cart past [his] cell." Filing 160-1 at 1. However, Cardeilhac has requested grievance forms in this manner and NDCS staff "have declined to provide [him] these forms within three days of [his] request." Filing 160-1 at 2. According to Cardeilhac, "[T]he only other way to access grievance forms outside of this time frame, from NDCS staff, in [his] housing unit is to cover [his] window and act like there is an emergent situation to draw NDCS staff attention to [his] cell." Filing 160-1 at 2.

Cardeilhac also describes other issues with the operation of the grievance procedure at TSCI. He has experienced NDCS staff encouraging him to utilize an Inmate Interview Request

(IIR), also informally known as a "kite," rather than the formal grievance process. Filing 160-1 at 2. Cardeilhac has also experienced NDCS staff delaying responses to his grievances, incorrectly dating the responses such that they do not correspond to the actual date he received an answer, or failing to respond to grievances at all. Filing 160-1 at 3. He has also witnessed NDCS staff losing or destroying grievance forms and refusing to submit them to the proper authority. Filing 160-1 at 3. He feels that a common sentiment among inmates is "that filing grievances is pointless due to the lack of tangible results from engaging in the process." Filing 160-1 at 2. Griswold reports similar issues at TSCI, including NDCS losing, intentionally destroying, or refusing to accept grievances. Filing 160-9 at 2-3.

Sabata and Rena both filed declarations detailing issues with perfecting grievances at NCCW. Filing 160-3; Filing 160-30. Both say they did not recall receiving information about grievances during their orientation, nor did the facility's inmate resource center provide information about the grievance procedure. Filing 160-3 at 1-2; Filing 160-30 at 2. They also express a sentiment among inmates at NCCW that the filing of grievances does not produce tangible results and takes an extended length of time to complete. Filing 160-3 at 1-2; Filing 160-30 at 2. They experienced NDCS staff refusing to accept grievances they attempted to file, inaccurately dating NDCS responses to grievances, and requiring more time to respond. Filing 160-3 at 2; Filing 160-30 at 2-3.

Curtright attested to grievance issues at the Omaha Correctional Center ("OCC"). Filing 160-4. Curtright has experienced "significant delays between when a grievance is marked as responded to by NDCS and when [he] actually receive[s] their response." Filing 160-4 at 2. He provided an example of Grievance 2017-5244, which he filed as a Step One Grievance on June 27, 2017. Filing 160-4 at 2. The form itself indicates NDCS responded on July 19, 2017, while the

grievance log states the response date as July 21, 2017. Filing 160-4 at 2; Filing 160-5. According to Curtright, he did not receive the response until July 24, 2017. Filing 160-4 at 2. When Curtright appealed the decision by filing a Step Two Grievance form on August 6, 2017, NDCS did not mark it "received" until August 9, 2017. Filing 160-4 at 2-3. While Curtright's attempted Step Two Grievance may have been untimely, the grievance nevertheless reveals significant issues on NDCS's part in incorrectly dating inmate grievances and responses.

Curtright also reported NDCS staff and unit managers telling inmates to report issues via a "kite," or IIR, rather than by filing a formal grievance. Filing 160-4 at 3. According to Curtright, NDCS staff would also incorrectly tell inmates that they must file an IIR in order to initiate the grievance process, in contravention of 68 Neb. Admin. Code, § 2-003.002 which states that only an Informal Grievance Resolution Form initiates the grievance process. Filing 160-4 at 3.

Gunther reported issues with the grievance process at NSP. Filing 160-10. While housed in isolation, Gunther had limited access to grievance forms, and NDCS staff told him grievance forms were completely unavailable on certain days. Filing 160-10 at 2. For example, on several occasions, Gunther attempted to submit a Step Two grievance regarding medical care, but NDCS rejected it because he did not attach a signed Step One response. Filing 160-10 at 4; Filing 160-14; Filing 160-15; Filing 160-16; Filing 160-17. However, staff refused to accept the initial Step One grievance at all, meaning Gunther had no response to attach. Filing 160-10 at 4. Gunther also reported NDCS failing to provide responses on the same date written on grievance forms or logs, thus resulting in Gunther's escalation of the grievance being untimely. Filing 160-10 at 5-6; Filing 160-20; Filing 160-21; Filing 160-22. Lastly, Gunther experienced NDCS responding that it would resolve issues to remedy a grievance, but then failing to take the promised steps. Filing 160-10 at 6; Filing 160-23.

Galle likewise experienced difficulty in submitting grievances while incarcerated at NSP, including correctional officers discouraging him from filing grievances and a unit manager repeatedly threatening to throw away Galle's grievances. Filing 160-6 at 3. Galle also experienced NDCS staff losing his grievances, and he was unable to submit grievances during a "lockdown" situation. Filing 160-6 at 3.

R.P. testified to a complete lack of information regarding the grievance process at the NCYF. Filing 160-26 at 1-2. He was not provided with any information about the grievance process during his orientation. Filing 160-26 at 2. He reports that NDCS staff at NCYF tell inmates to address any concerns or issues by filing an IIR and do not advise them to use the grievance process. Filing 160-26 at 2-3. He was unaware that an IIR was different from the grievance process until he was so informed during the course of litigating this case. Filing 160-26 at 3.

Reeves reported a similar lack of access to and information about the grievance process during his time at NCYF prior to June 2017. Filing 160-27 at 1. While housed in segregation, Reeves was denied access to pens and paper, including grievance forms. Filing 160-27 at 2. On other occasions, when Reeves asked for grievance forms, NDCS staff would express anger, tell him to wait because they were too busy, and tell him it was too late and he would have to wait for the next shift. Filing 160-27 at 2. He also experienced NDCS staff telling him to just "file a kite" rather than pursue a grievance because they claimed "the kites work better than grievances." Filing 160-27 at 2. As a result of this misinformation by NDCS staff, Reeves sent numerous IIRs directly to the Warden rather than pursuing the grievance process to exhaustion. Filing 160-27 at 3; Filing 160-28. He averred, "Each time I believed that the Warden's response completed the grievance because I followed staff's instructions and contacted the warden directly." Filing 160-27 at 3.

30

Sweetser detailed numerous barriers to exhausting the grievance process during his incarcerations at the Community Corrections Center in Omaha, NSP, and OCC. Filing 160-31 at 1. In 2017, Sweetser filed Grievance 2017-7212. Filing 160-31 at 3; Filing 160-32. NDCS indicated it responded to his Step One grievance on August 28, 2017, but Sweetser did not receive the response back until September 12. Filing 160-31 at 3; Filing 160-32. Sweetser filed his Step Two grievance on September 13, the day immediately after receiving NDCS's response, but NDCS rejected it on the grounds that it was untimely for being submitted more than ten days after the false response date of August 28. Filing 160-31 at 3; Filing 160-32. Sweetser was unable to exhaust another grievance, number 2017-4568, because NDCS dated its response May 31, 2017, but failed to return it until several weeks later. Filing 160-31 at 3; Filing 160-33. Sweetser's Step Two grievance form was consequently deemed untimely, despite him filing it immediately after receiving NDCS's Step One response. Filing 160-31 at 3; Filing 160-33. Sweetser also experienced NDCS losing three of his grievances and advising inmates to file IIRs instead of going through the grievance process. Filing 160-31 at 4.

    b.  Plaintiffs' Expert Declarations Regarding Unavailability of the Grievance Process

In addition to the various declarations from inmates documenting their first-hand experiences and frustrations with the NDCS grievance process, Plaintiffs also submitted evidence from three experts substantiating that the grievance process is not actually available to inmates. Filing 160-35; Filing 160-38; Filing 160-41.

Eldon Vail, whose qualifications are described at length above, *supra* Section II.B, submitted a declaration based on his extensive experience working in correctional facilities and his review of NDCS's grievance procedures and individual inmates' grievances. Filing 160-35 at

31

1-5. Vail identifies a number of procedural roadblocks built into the NDCS grievance policy which prevent inmates from utilizing it to exhaustion. Filing 160-35 at 5-6. First, Vail opines that the requirement that inmates file grievances within three days of the instance being grieved is problematic and exceptionally short when compared with other states' practices. Filing 160-35 at 8. In addition to such a quick turnaround time requiring prisoners to act with haste or before fully comprehending a situation, the policy is vague as to when the three-day period begins. Filing 160-35 at 8-9. "Because the NDCS policy does not define the term 'incident' or provide any guidance for when this 3 day time period begins, in most cases it will be unknowable by when the prisoner needs to file the Informal Grievance Resolution Form." Filing 160-35 at 9. According to Vail, he has reviewed numerous instances in which NDCS staff used the timing requirement to "dismiss[] grievances without consideration of their merits, by concluding the prisoner guessed wrong as to when the triggering incident occurred." Filing 160-35 at 9. For example, Vail reviewed one rejected grievance in which the inmate complained his new pain medication was not being properly managed. Filing 160-35 at 27. Because his medication had changed six weeks prior, NDCS staff rejected it as untimely. Filing 160-35 at 27. Vail calls it "incomprehensible" that NDCS would reject such a grievance when common sense would provide that an inmate might need time to see the effectiveness of a new medication before realizing it is not working and grieving the issue. Filing 160-35 at 27.

In Vail's opinion, requiring inmates to obtain the Step One and Step Two grievance forms in person from different NDCS staff also disincentivizes inmates from utilizing the grievance procedure if they fear the grievance could trigger retaliation. Filing 160-35 at 10, 13. Vail notes that the regulations allow an inmate to avoid the in-person requirement by mailing grievances "of a sensitive nature" but found that exception problematic because "sensitive nature" is not defined.

Filing 160-35 at 11. Accordingly, if NDCS disagrees with an inmate about a grievance being sensitive or not, it could result in rejection of the grievance beyond the three-day time limit and no remedy for the inmate. Filing 160-35 at 11. Similarly, Vail notes two instances in which grievances were rejected by NDCS because the inmate had marked them as an "emergency" and NDCS disagreed. Filing 160-35 at 22.

Likewise, the requirement that an inmate attach copies of the responses to each subsequent level of grievance report is "burdensome" and "nonsensical" in Vail's opinion because NDCS policy already requires it to keep copies of grievance responses. Filing 160-35 at 13. Vail's opinion in this respect is supported by the fact that six of the grievance examples he reviewed "were rejected by NDCS staff simply because the prisoner failed to attach the appropriate form." Filing 160-35 at 21. This was true even when the inmate attempted to indicate his or her inability to attach the prior forms "because unit staff had refused to accept the forms." Filing 160-35 at 21.

Vail also finds problems with the requirement that inmates file no more than two grievances per week, especially in conjunction with the requirement that inmates grieve separate incidents on separate forms. Filing 160-35 at 14-15. As an illustration of the latter problem, he reviewed one grievance which was rejected for containing multiple issues when the inmate complained about being housed in protective custody instead of general population despite being blind. Filing 160-35 at 23.

Vail identifies inconsistencies in the guidance to inmates of where and how they could lodge complaints. Filing 160-35 at 12-19. While NDCS seems to take the position that the Step One and Step Two procedure is the only manner for properly filing a grievance, Vail argues both the grievance and ADA regulations contain confusing language which seems to inform prisoners

33

they can pursue other avenues of filing a grievance, such as by contacting the ombudsman or filing a judicial complaint. Filing 160-35 at 15-19.

Vail also identifies instances of NDCS staff disincentivizing inmates from filing grievances and encouraging them only to file IIRs instead. Filing 160-35 at 27-28. Vail opines that "This misdirection of prisoners away from the formal grievance process by NDCS staff, instead telling them to file a form that Nebraska does not treat as part of its grievance process, obstructs prisoners from complying with the procedural requirements of the grievance system." Filing 160-35 at 27-28.

Based on the foregoing observations, Vail concludes that "the NDCS grievance processes are so opaque, confusing and contradictory that ordinary prisoners would find [them] unknowable and therefore unavailable." Filing 160-35 at 5.

Plaintiffs also submitted the declaration of Dr. Pablo Stewart. Filing 160-38. Based on his thirty-plus years of experience in correctional mental healthcare and his review of the NDCS grievance policies as well as materials from Plaintiffs' medical files, Dr. Stewart opines that the grievances processes are "complex, confusing, and overly stringent." Filing 160-38 at 3. Dr. Stewart finds the grievance process especially problematic for those inmates "suffering from Major Mental Illnesses . . . [who] would find it nearly impossible to complete." Filing 160-38 at 3. In particular, Dr. Stewart opines that individuals with mental illnesses would find it difficult to comply with the grievance policies' strict time limitations and technical requirements because mental illness tends to wax and wane over time. Filing 160-38 at 5.

Lastly, Plaintiffs submitted the declaration of Dr. Peter Leone, a professor specializing in educational disabilities and the experiences of disabled individuals in correctional institutions. Filing 160-41 at 2. Dr. Leone reviewed the NDCS grievance process and declarations from NDCS

officials. [Filing 160-41 at 3](#); [Filing 160-43 at 2](#). According to Dr. Leone, the grievance process is so complex and confusing for prisoners of average reading ability and for those with intellectual disabilities that it is essentially unknowable to them. [Filing 160-41 at 3-4](#). Dr. Leone evaluates the ARs governing the grievance procedure as ranging from a tenth-grade to a fifteenth-grade reading level, which he opines would be beyond the capacity of many inmates. [Filing 160-41 at 4-5](#); [Filing 160-44](#). Dr. Leone also finds it unlikely that inmates would self-identify as having intellectual disabilities in order to request an accommodation or assistance in completing the grievance process. [Filing 160-41 at 7](#).

c.   Defendants' Evidence Regarding Availability of the Grievance Process[3]

Defendants counter Plaintiffs' evidence by arguing that the grievance process cannot be considered "unavailable" because some of the plaintiffs have managed to successfully grieve certain issues. *See* [Filing 179 at 147-52](#). First, they claim the grievance process is not a dead end. [Filing 179 at 148](#). They point to the fact Sabata requested access to use the swing set at NCCW and was allowed to do so in Grievance 2017-499 and that Galle was granted relief at a Step-One grievance level when he requested to work in the Cornhusker State Industries shops and was permitted to do so. [Filing 179 at 148](#); [Filing 127-5 at 1-4](#); [Filing 127-44 at 59-62](#). Chief of Operations at NDCS, Diane Sabatka-Rine further states that even if a grievance is technically untimely, staff have the "discretion" to choose to still respond on its merits. [Filing 178-8 at 48-49](#). However, there is no guidance for staff on how or when to exercise this discretion and Sabatka-Rine admits that "staff would not be in error if they relied simply on the rule book" in strictly

---

[3] Plaintiffs purport to object to three of Defendants' affidavits submitted in support of their motion on the basis of lack of personal knowledge. [Filing 160-45](#). However, Plaintiffs did not properly file a separate motion or objection supported by a brief, but rather attached a document titled "Objection" as one of the exhibits in their index of evidence in opposition. [Filing 160-45](#). As the objection was not properly filed as required by NECivR 7.1, the Court need not address it. However, even if the objection had been properly filed, the Court still would have considered the affidavits in question as Defendants have established the affiants had adequate personal knowledge of the facts to which they attest.

denying all untimely grievances, even those based on circumstances such as delayed or incorrectly dated responses. Filing 178-8 at 48. Sabatka-Rine admits being aware of instances of "grievances not being processed within the timeframes" and claims NDCS took "corrective action" but that to the best of her knowledge, no staff have ever been disciplined for obstructing access to the grievance system, telling inmates to file an IIR instead of a grievance, destroying grievances, delaying grievance responses, or giving inaccurate information to inmates about the grievance process. Filing 178-8 at 54-56, 58.

Defendants further argue the grievance policy cannot be considered opaque or unknowable because some of the plaintiffs admit receiving a copy of the inmate rulebook and the grievance process is otherwise readily available via electronic means in each facility's law library, also known as its inmate resource center, and inmates have access to all grievance forms by asking for them from staff. Filing 178-8 at 22-24; Filing 179 at 150; Filing 160-1 at 2; Filing 160-3 at 2; Filing 160-4 at 3; Filing 160-9 at 2; Filing 160-24 at 1-2; Filing 160-26 at 2; Filing 160-30 at 2; Filing 160-31 at 2; Filing 178-12 at 2; Filing 178-14 at 2-3; Filing 178-15 at 2; Filing 178-16 at 2; Filing 178-17 at 2; Filing 178-18 at 2-3. Sabatka-Rine states that all individuals in the general population can go to the inmate resource centers and those in protective or restrictive housing have access to inmate resource centers in their respective units as well. Filing 178-8 at 26-27. She further states that all inmates are given a copy of the grievance process during their orientation and all inmates have access to printed grievance forms. Filing 127-1 at 3, 5. Sabatka-Rine agreed that per the ARs, NDCS staff is supposed to respond to an informal grievance within ten days, but "circumstances such as illness, injury or unavailability of a witness may lengthen the response time." Filing 127-1 at 3.

Finally, Defendants urge the Court to discount the evidence of NDCS officials preventing inmates from pursuing grievances because they call such evidence "merely subjective beliefs" and "unsupported allegations." Filing 179 at 152 (citation omitted).

### d.   Analysis Regarding Availability of the Grievance Process

The case of *Labounty v. Johnson*, 253 F. Supp. 2d 496 (W.D.N.Y. 2003) is instructive as to how this Court should address Defendants' motion for summary judgment on the question of administrative remedies. In *Labounty* the plaintiff filed a § 1983 claim for Eighth Amendment prison violations and the defendants moved for summary judgment on the basis that the plaintiff had failed to exhaust his administrative remedies under the PLRA. *Id*. 497. The court acknowledged that the question of "[w]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law." *Id*. at 504 (*citing Snider v. Melindez*, 199 F.3d 108, 113–14 (2d Cir. 1999)). However, the court found that as to one of the plaintiff's claims, "[t]he record as it exists at this time contains conflicting accounts regarding plaintiff's efforts to complete the exhaustion process." *Id*. at 504. The Court concluded that "[g]iven that the Court must draw all reasonable inferences in [the] plaintiff's favor, the Court must deny the defendants' motion for summary judgment at this time." *Id.*; *see also Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) ("[D]efendants must produce evidence proving failure to exhaust in order to carry their burden. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied . . . .").

Having considered all the pertinent evidence, the Court concludes that there are genuinely disputed facts regarding whether the grievance process is available to the named NDCS inmates within the meaning provided for by the United States Supreme Court. Plaintiffs' evidence, both in

the form of actual experiences of inmates and experts reviewing the rules and individual grievances, creates genuine questions about whether the NDCS grievance process is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738, 121 S. Ct. 1819). The Court finds genuine disputed facts regarding all three forms of unavailability enumerated in *Ross*: the NDCS grievance policy acting as a dead end; the process being so opaque and incapable of practical use such that no prisoner can navigate it; and NDCS administrators and staff undertaking overt actions to deter inmates from completing the grievance process. *See Ross*, ____ U.S. at ____,136 S. Ct. at 1859-60.[4]

"First, . . . an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859 (citing *Booth*, 532 U.S. at 736, 738, 121 S. Ct. 1819). Here, Plaintiffs presented evidence that inmates were routinely unable to obtain relief from the grievance process, with their grievances denied either based on failure to comply with the regulations or due to NDCS's lack of follow-through. Filing 160-1 at 3; Filing 160-4 at 3; Filing 160-10 at 2-6; Filing 160-14; Filing 160-15; Filing 160-16; Filing 160-17; Filing 160-23; Filing 160-31 at 3. Inmates also consistently reported feeling that the grievance process was futile. Filing 160-1 at 2; Filing 160-3 at 1; Filing 160-30 at 2. Vail opined that NDCS

---

[4] The Court acknowledges that even without considering the dispute as to the availability of the administrative remedies to the named plaintiffs, there are significant factual and legal disputes among the parties as to whether individual grievances have been exhausted. *See* Filing 128 at 35-98; Filing 162 at 71-81 (summary chart); Filing 179 at 165-184 (responsive summary chart). Indeed, Plaintiffs argue "there is at least one exhausted named plaintiff for each claim in the class action, with exhaustion either established by Defendants' concession, or with exhaustion as a triable issue of fact precluding summary judgment." Filing 162 at 81. The Court agrees that to be the case as of today. *See supra* Section II.D; *see infra* Section II.G.3. Plaintiffs further point out that if the Court were inclined to certify the class, there would be no need for all Plaintiffs to administratively exhaust every claim due to the theory of vicarious exhaustion. Filing 162 at 81-83. Given the Court concludes there is a question of material fact regarding the availability of the grievance process to the named plaintiffs that precludes summary judgment in favor of Defendants, the Court need not address every grievance filed nor address the question of whether certain actions taken outside the three-step grievance process constitute exhaustion under the PLRA.

staff routinely rejected grievances on procedural technicalities rather than addressing their merits. Filing 160-35 at 9, 10, 13, 27. Although Defendants point to instances of a few completed grievances which resulted in relief for inmates, Filing 179 at 147-52, Plaintiffs' evidence overwhelming disputes that the process was a viable means for obtaining relief on a consistent basis.

Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it." *Ross*, ____ U.S. at ____,136 S. Ct. at 1859-60. "[W]hen a remedy is . . . essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands—then it is also unavailable. *Id.* (citations omitted). Plaintiffs' evidence creates a factual dispute as to whether the NDCS grievance process is so complex and rife with technical requirements that the ordinary prisoner could not successfully navigate it. Inmates testified that even obtaining the numerous proper grievance forms can be difficult because it requires a specific procedure that is dependent on particular personnel acting or making the forms available within tight timeframes. Filing 160-1 at 1-2; Filing 160-3 at 2; Filing 160-6 at 3; Filing 160-10 at 2; Filing 160-27 at 2; Filing 160-31 at 4. Inmates also experienced difficulty complying with the strict timelines in filing grievances, either due to confusion over the proper procedure or due to NDCS responses themselves being untimely or incorrectly dated. Filing 160-1 at 3; Filing 160-3 at 2; Filing 160-4 at 2; Filing 160-5; Filing 160-10 at 4-6; Filing 160-27 at 3; Filing 160-31 at 3; Filing 160-32; Filing 160-33.

Plaintiffs' experts substantiated the opaqueness of the NDCS grievance scheme. Vail opined that the three-day turnaround for filing initial grievances was unworkable because the term "incident" was unclear, such as in the situation of the inmate who was told his grievance was untimely because he waited to see the effectiveness of a new medication. Filing 160-35 at 8-9; 27.

39

According to Vail, the classification of different grievances was also vague and unclear. Vail noted that the regulations allow an inmate to avoid the in-person requirement by mailing grievances "of a sensitive nature" but found that exception problematic because "sensitive nature" was not defined. Filing 160-35 at 11. If NDCS disagreed with an inmate about a grievance being sensitive or not, it could result in rejection of the grievance beyond the three-day time limit and there would be no remedy for the inmate. Filing 160-35 at 11. Vail also noted two instances in which grievances were rejected by NDCS because the inmate had marked them as an "emergency" and NDCS disagreed. Filing 160-35 at 22. Vail also found confusing the language in the grievance and ADA regulations which seemed to inform prisoners they could pursue other avenues of filing a grievance, such as by contacting the ombudsman or filing a judicial complaint, despite the fact NDCS maintains the formal grievance process is the only avenue for exhausting one's administrative remedies. Filing 160-35 at 12-19.

Dr. Leone evaluated the ARs governing the grievance procedure as ranging from a tenth to a fifteenth grade reading level, which he opined would be beyond the capacity of many inmates. Filing 160-41 at 4-5; Filing 160-44. According to Dr. Leone, the grievance process is so complex and confusing for prisoners of average reading ability—let alone those suffering from intellectual disabilities—that it is essentially unknowable to them. Filing 160-41 at 3-4. Dr. Stewart agreed that the grievance process is "complex, confusing, and overly stringent." Filing 160-38 at 3. Dr. Stewart found the grievance process especially problematic for those inmates "suffering from Major Mental Illnesses . . . [who] would find it nearly impossible to complete." Filing 160-38 at 3. Dr. Stewart opined that individuals with mental illnesses would find it difficult to comply with the grievance policies strict time limitations and technical requirements because mental illness tends to wax and wane over time. Filing 160-38 at 5.

Based on the Court's own review of the multi-step grievance process, its numerous technical requirements, and Plaintiffs' declarations and experts, the Court agrees that disputed issues of material fact exist regarding whether the NDCS grievance process is so confusing and opaque that it is incapable of use by the ordinary inmate.

Lastly, and perhaps most concerningly, Plaintiffs presented evidence that NDCS "administrators thwart inmates from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation." *See Ross*, ____ U.S. at ____,136 S. Ct. at 1860. Almost all of the inmates reported a dearth of information regarding the proper grievance procedure, despite Defendants' insistence that the policy is supposed to be readily accessible. *See, e.g.*, Filing 160-1 at 2-3; Filing 160-3 at 2; Filing 160-30 at 2; Filing 160-26 at 2. Inmates also reported NDCS staff dissuading them from filing grievances, losing or refusing to accept grievances, and telling inmates to file IIRs instead of grievances, knowing that IIRs were not a part of the formal grievance system. Filing 160-1 at 2-3; Filing 160-9 at 2-4; Filing 160-3 at 2; Filing 160-30 at 2; Filing 160-10 at 4-6; Filing 160-6 at 3; Filing 160-26 at 2-3. Curtright even reported NDCS staff incorrectly telling inmates that an IIR was required in order to initiate the grievance process, while NDCS staff told Reeves to just "file a kite" rather than pursue a grievance because they claimed "the kites work better than grievances." Filing 160-4 at 3; Filing 160-27 at 2. NDCS staff also took more overt actions to prevent successful inmate grievances, such as incorrectly dating responses, delaying answers, or refusing to submit grievances to the proper authority, thus all but ensuring they would be denied at the next level for failure to comply with the grievance procedures. Filing 160-1 at 2-3; Filing 160-3 at 2; Filing 160-30 at 2; Filing 160-4 at 2-3; Filing 160-5; Filing 160-31 at 3, 5.

Vail's review of the evidence revealed that NDCS staff employed a hypertechnical reading of the rules in order to deny inmate grievances based on lack of compliance. Filing 160-35 at 9, 21, 23. Vail found numerous instances in which NDCS staff used the timing requirement to "dismiss[] grievances without consideration of their merits, by concluding the prisoner guessed wrong as to when the triggering incident occurred." Filing 160-35 at 9. Vail also identified instances of NDCS staff disincentivizing inmates from filing grievances and encouraging them only to file IIRs instead. Filing 160-35 at 27. Vail opined, "This misdirection of prisoners away from the formal grievance process by NDCS staff, instead telling them to file a form that Nebraska does not treat as part of its grievance process, obstructs prisoners from complying with the procedural requirements of the grievance system." Filing 160-35 at 27-28. The Court finds Plaintiffs' evidence creates genuine disputes regarding whether NDCS officials and staff thwarted, misdirected, and confused inmate attempts at completing the grievance process.

Viewing the evidence in the light most favorable to Plaintiffs as the Court is required to do on a motion for summary judgment, there are genuine issues of material fact regarding whether the NDCS grievance process is available and whether inmates were therefore required to exhaust their administrative remedies.[5] *See Garrison*, 833 F.3d at 884; Fed. R. Civ. P. 56(c). Accordingly, Defendants' Motion for Summary Judgment for failure to exhaust administrative remedies must be denied.

e.   Statute of Limitations

Finally, the Court addresses Defendants' argument that certain of individual Plaintiffs' grievances should be barred by the statute of limitations for filing actions under § 1983. Filing 128

---

[5] The Court notes that Defendants' Motion for Partial Summary Judgment (Filing 125) was filed on July 27, 2018. Since that time, a vast number of additional filings along with additional discovery has taken place. The Court acknowledges that the parties in this case have agreed that some named Plaintiffs have indeed exhausted their administrative remedies for certain grievances. *See infra* Section II.G.3 in this opinion.

42

at 55-56, 61, 72-73. Because the Court has concluded that summary judgment is inappropriate due to disputes over whether Plaintiffs were able to exhaust their administrative remedies, it cannot grant summary judgment on the basis of the statute of limitations either. The PLRA, 42 U.S.C. § 1997(e), provides that no judicial action may be filed until a prisoner exhausts his available administrative remedies. If, however, the administrative remedies were not available to Plaintiffs, there is a question whether the statute of limitations was tolled during the time they attempted to exhaust their remedies but were unable to do so. *See, e.g.*, *Carney v. Walker*, No. 2:04CV92(SNL), 2005 WL 8165808, at *1 (E.D. Mo. Feb. 10, 2005) (finding "[w]hether and to what extent the statute of limitations for bringing a suit pursuant to 42 U.S.C. § 1983 is tolled while a prisoner pursues his available administrative remedies is an issue that has not yet been decided by the Eighth Circuit Court of Appeals" but remanding for the parties to present evidence regarding tolling); *Doe v. Selsky*, 948 F. Supp. 2d 306, 310-11 (W.D.N.Y. 2013) ("If plaintiff began actively pursuing, or attempting to pursue, his administrative remedies through the grievance process shortly after his . . . confinement began in 2004, but was prevented from doing so due to prison staff's refusal to process, or even their outright destruction, of his grievances, then the limitations period could have been tolled for virtually his entire period of . . . confinement."). Thus, the Court declines to determine the applicability of the statute of limitations at this time.

### E.  Motion for Summary Judgment Regarding Those Serving Life Sentences

Defendants move for partial summary judgment on Curtright, Griswold, and Gunther's claims relating to ADA and RA compliance during the parole-review process. Filing 292. Defendants argue that because these three Plaintiffs are serving life sentences, they have no standing to challenge the parole process. Filing 294 at 9. Plaintiffs counter that their life sentences

do not preclude them from receiving parole review hearings and they should thus be permitted to maintain their claims against the BOP. Filing 324 at 1-3.

　　1. *Additional Facts*

　　It is undisputed that Curtright, Griswold, and Gunther are committed to NDCS custody for terms of life imprisonment. Filing 42-10 at 2; Filing 42-11 at 2; Filing 42-12 at 2; Filing 324 at 5. Despite the fact he is serving a life term, the BOP afforded Curtright a parole review hearing in 2016. Filing 249-21 at 10. Gunther has participated in parole-review hearings in the past as well, although he did not provide specific dates when those reviews occurred. Filing 249-4 at 7. Griswold has not attended any previous parole hearings. Filing 249-3 at 6. However, he testified in a February 2019 declaration that he had a parole review hearing scheduled for March 2019. Filing 249-3 at 6.

　　NDCS provides an "Inmate Information Locator" website. Filing 323-9 at 1. It is a publicly available website which contains limited basic information about inmates in NDCS custody. Filing 323-9 at 1. On the Inmate Information Locator website, Gunther's "Total Sentence" is listed as "LFE" to "LFE," presumably meaning "life." Filing 323-10 at 2. Next to the spots for "Parole Eligibility Date," "Parole Discharge Date," "Parole Hearing Date," and "Parole Discharge Type," the entries are blank for Gunther. Filing 323-10 at 2. However, the Inmate Information Locator states Gunther is scheduled for his "Next Parole Review Date" in October 2026. Filing 323-10 at 2.

　　Curtright's Inmate Information Locator page likewise reflects a sentence of "LFE" and has no parole eligibility date, parole hearing date, parole discharge date, or parole discharge type description. Filing 323-11 at 2. According to the website, Curtright's next parole review hearing is scheduled for August 2026. Filing 323-11 at 2.

44

The Inmate Information Locator website also reflects Griswold is serving a "LFE" sentence, and has no parole eligibility date, no parole hearing date, no parole discharge date, and no parole discharge type description. Filing 323-12 at 2. According to the webpage, Griswold's next parole review date is January 2029. Filing 323-12 at 2.

The Inmate Information Locator website contains a disclaimer, which reads as follows:

> Neither the Nebraska Department of Correctional Services, nor any officer or employee of the Department of Correctional Services, nor the State of Nebraska makes any express or implied warranty regarding documents on this server. Although every effort has been made to ensure the accuracy of the information, neither the Nebraska Department of Correctional Services, nor any officer or employee of the Department of Correctional Services, nor the State of Nebraska assumes any liability for the accuracy of information contained herein. Any questions regarding the accuracy of the information contained on this website should be submitted to Records Administrator, Department of Correctional Services, PO Box 94661, Lincoln NE 68509.

Filing 323-10 at 2; Filing 323-11 at 2-3; Filing 323-12 at 2.

*2. Analysis*

Defendants seek summary judgment on the basis that those Plaintiffs serving life sentences lack standing to challenge the parole-review process. Standing is an element of the requirement that an actual controversy must exist at all stages of a case. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1054 (8th Cir. 2018). To show standing when seeking injunctive relief,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1149, 173 L. Ed. 2d 1 (2009) (quoting *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing,

present adverse effects[.]" *Pre-Filled Propane Tank Antitrust*, 893 F.3d at 1054 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974) (first alteration in original).

Prior to 2018, Nebraska law provided inmates serving a life sentence with a right to a parole review hearing. The statute in force at the time read, "If a committed offender is serving a minimum life sentence, his or her record shall be reviewed during the first year of incarceration and every ten years thereafter until such time as the sentence is commuted." Neb. Rev. Stat. § 83-192(1)(f)(v) (Reissue 2014) (repealed 2018). In accordance with this mandate, the Nebraska parole rules in effect at the time also required parole reviews for inmates serving life sentences. *See* Filing 324 at 28 n.2.

Effective July 19, 2018, however, the legislature ceased requiring inmates serving life sentences to receive parole review hearings. *See* Neb. Rev. Stat. 83-192 (Supp. 2018) (requiring only "review [of] the record of every *parole-eligible* committed offender annually" (emphasis added)). The Parole Board likewise revised its parole rules to no longer provide life-sentence inmates with parole-review hearings. *See* Neb. Parole Bd. R. § 4-204(D) ("The Board will not conduct offender reviews for inmates who are not eligible for parole.").

The parties do not dispute that Griswold, Gunther, and Curtright are serving life sentences and are therefore ineligible for parole. Filing 42-10 at 2; Filing 42-11 at 2; Filing 42-12 at 2; Filing 324 at 5. Defendants also do not dispute that these Plaintiffs have had past parole review hearings and that the Inmate Information Locator page still reflects they are scheduled for future hearings. Filing 335 at 10-14. But Plaintiffs' argument ignores the 2018 change to the Nebraska parole statute and the concomitant change to the Nebraska Board of Parole Rule. Formerly, life-sentence inmates were statutorily required to receive reviews by the Board of Parole every ten years despite

their ineligibility for parole. *See* Neb. Rev. Stat. § 83-192(1)(f)(v) (repealed 2018). Now, however, such reviews are no longer required, Neb. Rev. Stat. § 83-192, and the Board of Parole Rules therefore no longer provide for them, Neb. Parole Bd. R. § 4-204(D). Accordingly, while the life-sentence Plaintiffs may have received parole-review hearings in the past, they are no longer entitled to them nor will the BOP provide such hearings to them moving forward.

Plaintiffs point to the Inmate Information Locator as proof they will be afforded parole review hearings in the future. Filing 323-10 at 2; Filing 323-11 at 2; Filing 323-12 at 2. They claim the fact the inmate-locator website still lists parole review dates for these inmates means such hearings will, in fact, occur. Filing 324 at 2. But the inmate locator website itself contains a disclaimer stating that the information it displays is not necessarily accurate or updated. Filing 323-10 at 2; Filing 323-11 at 2-3; Filing 323-12 at 2. The pertinent statute and BOP rule state a clear prohibition on parole-review hearings for inmates serving life sentences. This is further supported by the fact that Griswold was scheduled for a parole review hearing following the 2018 change in the law and testified that the hearing did not occur. Filing 324 at 3.

Plaintiffs also argue that the parole-review statute still allows the BOP to review the sentence of any inmate if it so chooses. *See* Neb. Rev. Stat. § 83-192(1) ("Nothing in such [review] schedule shall prohibit the board from reviewing a committed offender's case at any time."). They argue the life-sentence Plaintiffs should still have standing because under this subsection, the Board of Parole could theoretically afford them parole review hearings at some time in the future. Filing 324 at 28 n.2. However, Plaintiffs present no evidence to contradict the BOP Rule stating that inmates serving life sentences will not receive parole review hearings. Thus, their argument is nothing more than speculation and conjecture, not the type of evidence which would create an actual dispute regarding their lack of standing.

47

Plaintiffs' allegations do not demonstrate those inmates serving life sentences are under threat of suffering an "actual and imminent" threat that is "not [merely] conjectural or hypothetical." *Summers*, 555 U.S. at 493, 129 S. Ct. at 1149 (citations omitted*). Furthermore, because Plaintiffs are seeking injunctive relief, Filing 1 at 82-88, their claim of violations of ADA and RA requirements at past parole-review hearings held for life-sentence inmates "does not in itself show a present case or controversy." *Pre-Filled Propane Tank Antitrust*, 893 F.3d at 1054 (quoting *O'Shea*, 414 U.S. at 495-96, 94 S. Ct. 669). Therefore, there is no disputed issue of material fact that Griswold, Curtright, and Gunther lack standing to assert their ADA and RA claims against the Board of Parole and Director Micek. For these reasons, Defendants' Motion for Partial Summary Judgment, Filing 292, is granted as it relates to the parole issue, and Curtright, Griswold, and Gunther's claims against the BOP Defendants are dismissed.

### F.  Motion for Summary Judgment Regarding Defendant Micek

Defendant Julie Micek moves for summary judgment on the basis that the undisputed facts demonstrate she plays no role in determining inmates' eligibility for parole nor holding parole-eligibility hearings, which Plaintiffs claim fail to comply with the ADA. Filing 223; Filing 225 at 2. Plaintiffs respond that summary judgment is improper because Micek plays a role in parole-revocation proceedings and in maintaining certain records on behalf of the Board of Parole. Filing 238 at 8-14. Because there is no genuine dispute of material fact that Micek is uninvolved in the BOP-functions relating to Plaintiffs' claims, the Court grants summary judgment in Micek's favor and dismisses her as a defendant from this lawsuit.

#### 1.  Additional Facts

Julie Micek is the Director of Supervision and Services for the Division of Parole Supervision. Filing 224-1 at 1. The Division of Parole Supervision is in charge of "[t]he

maintenance of all records and files associated with the Board of Parole." Neb. Rev. Stat. § 83-1,100 (Supp. 2018). The duties of the Director of Supervision and Services are outlined in Neb. Rev. Stat. § 83-1,102 (Supp. 2018) and § 3.404 of the Nebraska Board of Parole Rules. Filing 224-1 at 2. These duties encompass the oversight of "the field parole service and the community supervision of sex offenders" as well as the preliminary parole-revocation process. Neb. Rev. Stat § 83-1,102(2); Filing 224-1 at 2-3. Neither the Division of Parole Supervision nor its director, Micek, participate in hearings to determine an inmate's eligibility for parole. Filing 224-1 at 2-3; Filing 238 at 4.

In contrast to Micek's role as the Director of Supervision and Services for the Division of Parole Supervision, Rosalyn Cotton serves as the Chairperson of the Nebraska Board of Parole. Filing 245-2 at 1. The Chairperson presides over the Board's determinations regarding "the time of release on parole of committed offenders eligible for such release," and review of "every parole-eligible committed offender annually." Neb. Rev. Stat. § 83-192 (Supp. 2018). When the Board, under Cotton's supervision, conducts key reviews, prison interviews, and hearings to determine parole eligibility, it relies on NDCS records, including those which might indicate or track an inmate's disability for ADA purposes. Filing 245-2 at 2.

   *2. Analysis*

Plaintiffs do not dispute that Micek plays no role in determining whether an inmate is eligible for or should receive parole. Filing 238 at 4. The evidence shows such initial parole determinations are the purview of the Chairperson of the Board of Parole rather than the Director of Supervision and Services. Filing 245-2 at 2. Plaintiffs instead contend Micek's role overseeing parole-revocation proceedings and her oversight of BOP records should subject her to liability for their claims, but Plaintiffs' claims do not relate to the parole revocation process. *See* Filing 1 at

49

27-28 (describing Plaintiffs' claim relating to the BOP as involving notification of eligibility for parole, holding parole-determination hearings, and determining whether parole is warranted). Rather, Plaintiffs' claims relating to the Board of Parole apply exclusively to *prisoners* who are seeking or eligible for parole. Micek oversees parolees who have already been released into the community and no longer reside in NDCS facilities. *See* Neb. Rev. Stat. § 82-1,102; Filing 224-1 at 2 (describing the duties of the Director of Supervision and Services for the Division of Parole Supervision).

Micek's role overseeing BOP records likewise does not implicate Plaintiffs' allegations. The evidence shows that because initial parole hearings take place while an individual is still in NDCS custody, it is NDCS records—not BOP ones—that are relevant. Filing 245-1 at 2; *see also* Neb. Rev. Stat. § 83-197 (Reissue 2014) (granting to the BOP "the power to direct the Director of Correctional Services to keep records concerning committed offenders which the board deems pertinent to its functions").

Thus, the undisputed facts show Micek plays no role in the processes pertinent to Plaintiffs' claims: the parole determination process for inmates in NDCS custody. Accordingly, Micek's Motion for Summary Judgment, Filing 223, is granted and Micek is dismissed as a defendant from the case.

### G. Motion for Class Certification

Plaintiffs seek class certification under Federal Rule of Civil Procedure 23. Filing 247 at 1-2. They ask the Court to certify the following class: "all persons who are now, or will in the future, be subjected to the health care (including medical, mental health and dental care) policies and practices of NDCS." Filing 247 at 1. Plaintiffs further seek to certify two subclasses, a disability subclass described as "all persons with disabilities who are now, or will in the future be,

confined at any NDCS facility" and an isolation subclass consisting of "all NDCS prisoners who are now, or will in the future be, subject to conditions of confinement that provide limited contact with other prisoners, strictly controlled movement while out of cell, and out-of-cell time of less than twenty-four hours per week." Filing 247 at 1-2.

### 1. Standard of Review on Class Certification

"To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *Blades v. Monsanto Co.*, 400 F.3d 562, 568-69 (8th Cir. 2005)). "District courts must engage in a 'rigorous analysis' to determine whether the requirements of Rule 23 have been satisfied." *Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1036 (8th Cir. 2018) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). "Plaintiffs carry the burden of showing that they have met those requirements." *Id.* (citing *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013)).

"[A] decision to certify a class is far from a conclusive judgment on the merits of the case." *Id.* at 1037 (quoting *In re Zurn Pex*, 644 F.3d at 613). "For that reason, 'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.'" *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308 (2013)). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (quoting *Amgen Inc.*, 568 U.S. at 466, 133 S. Ct. 1184). Thus, in addressing a motion for class certification, the Court's "primary task is not to determine the final disposition of a

plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution." *Id.* (citing *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 613).

### 2. Additional Facts

The NDCS system consists of ten facilities and houses over 5,000 inmates. Filing 250 at 10, 20. Defendants are responsible for the operation of all NDCS facilities. Filing 250 at 10, 20. This includes providing medical care, dental care, mental healthcare, and disability-related accommodations for NDCS inmates. Filing 249-75; Filing 250 at 36-37.

### a. Administrative Regulations

Nebraska law requires the NDCS Director to "[e]stablish and administer policies and programs for the operation of the facilities in the department and for the custody, control, safety, correction, and rehabilitation of persons committed to the department" and "adopt and promulgate rules and regulations for the management, correctional treatment, and rehabilitation of persons committed to the department, the administration of facilities, and the conduct of officers and employees under his or her jurisdiction." Neb. Rev. Stat. § 83-173(3), (6). In addition, Neb. Rev Stat. § 83-181 mandates that each person committed to a NDCS facility shall have regular medical and dental care. In order to effectuate these statutes, NDCS promulgated the ARs, a system of centralized policies and procedures. Filing 250 at 10. NDCS's facilities are governed by the policies and procedures outlined in the ARs. Filing 249-77.

The ARs address a wide range of healthcare, dental, mental health, and isolation policies. For example, AR 115.01 serves to "protect the health of patients . . . by ensuring health care providers are properly licensed, trained and/or supervised" and requires that healthcare services be "provided by qualified health care personnel." Filing 249-82 at 3. It also places all clinical decisions squarely in the hands "of the responsible physician and dentist" and requires a healthcare

coordinator to oversee the provision of healthcare at each facility. Filing 249-82 at 5; *see also* Filing 249-84 at 3 (summarizing AR 115.05 which describes how NDCS healthcare providers are to conduct initial inmate screenings).

Another regulation, AR 115.04, "ensure[s] patients are provided unimpeded access to health care services and health education programs" and prescribes the various ways in which inmates must be able to request and access care. Filing 249-83 at 3-6. It also mandates that "[r]outine and emergency dental care" be "provided to each individual sentenced to NDCS under the direction and supervision of a licensed dentist." Filing 249-83 at 6. AR 115.05 requires that inmates in restrictive housing have access to healthcare as well. Filing 249-83 at 4; Filing 249-84 at 6 (requiring a medical assessment prior to placement in restrictive housing).

A related AR mandates that restrictive housing be used only as "an alternative of last resort" and in "the least restrictive manner possible." Filing 249-90 at 3. It defines restrictive housing as "[c]onditions of confinement that provide limited contact with other inmates, strictly controlled movement, and out-of-cell time less than 24 hours per week." Filing 249-90 at 3; *see also* Neb. Rev. Stat. § 83-170 (defining "restrictive housing" in the same manner). Restrictive housing is further divided into immediate segregation ("[a] short-term restrictive housing assignment of not more than 30 days") and longer-term restrictive housing ("[a] classification-based restrictive housing assignment of over 30 days"). Filing 249-90 at 3-4. Immediate segregation gives staff time "to assess the risk the individual poses to safety and security" while longer-term restrictive housing enables "behavior change, and treatment that will facilitate the inmate's capacity to live successfully in general population and return successfully to the community." Filing 249-90 at 6. Additionally, longer-term restrictive housing specifically requires "the development of a plan for transition back to general population or mission-specific housing."

Filing 249-90 at 4. With either form of restrictive housing, the regulation insists that staff employ "[a]lternatives to restrictive housing . . . in every case possible." Filing 249-90 at 4.

Prior to assigning an inmate to longer-term restrictive housing, a Unit Classification Committee (including, at least, a unit manager, case manager, and unit sergeant) must conduct an impartial classification hearing. Filing 249-90 at 9. The inmate must be notified of this hearing at least forty-eight hours beforehand and informed that "he or she may present a written appeal of the recommendation at the time of . . . [the] hearing." Filing 249-90 at 9. If the inmate cannot prepare a written request or if the issues are exceptionally complex, they must be provided staff assistance or a staff representative. Filing 249-90 at 9. Inmates may also submit written appeals, and they must receive assistance if their "English reading and writing skills don't support preparing" one. Filing 249-90 at 10. After the hearing, the Unit Classification Committee must present a recommendation to the Warden and the Institutional Classification Committee for review. Filing 249-90 at 10. The Warden then makes a recommendation to the Multi-Disciplinary Review Team, which makes the final placement decision. Filing 249-90 at 10. Inmates may appeal the Multi-Disciplinary Review Team's decision to the Director. Filing 249-90 at 11. This hearing process must be repeated at least every 90 days. Filing 249-90 at 11.

Finally, other ARs establish policies to implement the provisions of the ADA, Filing 249-87 at 3-7, and to ensure inmates have access to oral and written interpretation services, Filing 249-88 at 3-5.

The policies established in the ARs apply to every inmate housed in a NDCS facility including the eleven named Plaintiffs. Plaintiffs point to the ARs and other policies as evidence that healthcare is centralized at NDCS and that implementation and enforcement of healthcare-related policies falls entirely within Defendants' control. Filing 250 at 10-33.

b.  Individual Plaintiffs' Claims

The Court next turns to the individual named Plaintiffs' claims regarding inadequate healthcare, use of isolation, and lack of compliance with the ADA and RA in order to determine if these individuals will adequately represent the proposed class and subclasses and if they have claims appropriate for class treatment.

i.  *Hannah Sabata*

Hannah Sabata is housed in NCCW. Filing 1 at 6. She has been there since June 17, 2013.[6] Filing 1 at 6-7. According to her Declaration, Sabata suffers from bipolar type one disorder with psychotic features, PTSD, delusional disorder-erotomaniac type, and depression. Filing 249-15 at 2. During her time with NDCS, Sabata has experienced delays in accessing mental health services. Filing 249-15 at 3. According to Sabata, when she requests to see her therapist, it takes two or three weeks before she sees him. Filing 249-15 at 3. Sabata reports engaging in hunger strikes on at least four occasions. Filing 249-15 at 3.

With regard to dental care, Sabata has experienced months-long delays in seeing a dentist after requesting care. Filing 249-15 at 4-5. For example, on one occasion, Sabata needed to have her wisdom teeth removed. Filing 357-21 at 49. When she requested the procedure, the dentist said to "write a kite and he'll do x-rays on them." Filing 357-21 at 49. Sabata then submitted an IIR asking for dental care. Filing 357-21 at 49. As of the date of her deposition testimony, Sabata had not seen a dentist in over a year. Filing 357-21 at 49-50.

During her incarceration, Sabata reports six or seven interactions with the BOP. Filing 249-15 at 5. Relevant to the claims presented in this case, Sabata asserts that no one from either the

---

[6] Sabata was released on parole in November 2017. Filing 54 at 1. Her parole was revoked, and she was returned to NDCS custody in January 2018. Filing 54 at 1. Defendants agree that Sabata's reincarceration in NDCS custody makes any court ruling on its previously filed suggestion of mootness unnecessary. Filing 54 at 1.

BOP or NCCW asked if she had a disability and if she needed an accommodation for that disability. Filing 249-15 at 5. However, during her deposition on March 19, 2018, Sabata was asked if she had a disability to which she responded, "I don't think so." Filing 357-21 at 46. Sabata also testified that she was never denied participation in a program because of a disability. Filing 357-21 at 49.

Sabata has also been placed in restrictive housing. Filing 249-15 at 3-4. At one point, Sabata claims to have been in restrictive housing for a week short of a year. Filing 357-21 at 40. While in restrictive housing, Sabata could spend one hour out of her cell per day on weekdays and was locked down continuously on the weekends. Filing 249-15 at 4. In her declaration, Sabata claims placement in restrictive housing has exacerbated the symptoms and manifestations of her mental health issues. Filing 249-15 at 4. When she was asked why she had been placed in restrictive housing in the past, Sabata testified it was due to an "escape attempt," making phone calls about an escape attempt, being in an unauthorized area, and swinging on a swing set. Filing 357-21 at 28.

### ii.    Dylan Cardeilhac

Dylan Cardeilhac has been detained in NDCS facilities since 2014, most recently at TSCI. Filing 249-1 at 1. Prior to that he was housed at DEC and NCYF. Filing 249-1 at 1. Cardeilhac claims that when he first arrived at DEC for intake, he only received a brief medical screening and dental exam. Filing 249-1 at 2. Cardeilhac does not have any specific diagnosed medical issues. Filing 249-1. However, he has complaints about NDCS's response to isolated medical episodes. Filing 249-1. The only instruction he received on how to access medical care was to "file a kite". Filing 249-1 at 2. On one occasion when he felt sick, had trouble breathing, and had a severe nosebleed, Cardeilhac filed an emergency kite but did not receive medical care for three days. Filing 249-1 at 2. Cardeilhac also claims he waited several months before he received dental

treatment after he complained of pain from his wisdom teeth. Filing 249-1 at 5. Finally, Cardeilhac claims the BOP process was not well explained to him and that he was discouraged from attending the BOP hearing by his case manager and unit manager. Filing 249-1 at 5.

Cardeilhac's main complaint with the NDCS system centers around its mental healthcare. Cardeilhac alleges NDCS was inadequate in its responses to his suicidal episodes. Filing 249-1 at 2-3. According to his declaration, Cardeilhac was taken off his mental-health medications without being able to see an NDCS doctor. Filing 249-1 at 2. His ability to access mental healthcare is limited to filing an IIR, although he rarely receives a response unless he threatens suicide. Filing 249-1 at 3.

Cardeilhac further complains of NDCS's use of restrictive housing. Filing 249-1 at 3-4. Cardeilhac estimates that of his five years in prison, he has spent three and a half years confined to restrictive housing. Filing 249-1 at 3. During his time in restrictive housing, Cardeilhac is only allowed to exercise outside for one hour a day, five days a week. Filing 249-1 at 3. Cardeilhac alleges his time in restrictive housing has negatively impacted his existing mental health issues, making him "intensely angry" and leading to him going on a hunger strike. Filing 249-1 at 4.

### iii.   James Curtright

James Curtright has been in NDCS for more than thirty-two years. Filing 249-21 at 1. He is currently incarcerated at OCC.[7] Filing 249-21 at 1. In the past he has been housed at LCC and DEC. Filing 249-21 at 1. Curtright is deaf and relies on the use of American Sign Language ("ASL"). Filing 249-21 at 1. Curtright testified that he has asthma and "some heart-related issues." Filing 357-24 at 27-28. He claims he was not provided an interpreter during some of his interactions with doctors, which impacted his ability to effectively communicate with them. Filing

---

[7] Curtright is not included as a named Plaintiff for the isolation subclass so this Court will forgo any inquiry into the facts surrounding his time in restrictive housing. Filing 1 at 68.

357-24 at 28. Curtright further complains NDCS frequently denies him an ASL interpreter during dental appointments. Filing 249-21 at 10. Curtright reported an incident in 2017 where a dentist at LCC put a crown on one of his teeth without consulting him. Filing 357-24 at 40. The crown ended up causing him excruciating pain and had to be removed. Filing 357-24 at 40.

Curtright contends that during the intake process he did not receive any information from NDCS regarding accommodations for disabilities. Filing 249-21 at 2. In addition, Curtright expresses concerns about the phone systems, emergency-warning systems, and closed captioning for television. Filing 357-24 at 70, 71, 74-75. Finally, although he is serving a life sentence and is not eligible for parole, Curtright claims a 2016 parole hearing had to be postponed for one month so NDCS could locate an ASL interpreter. Filing 249-21 at 10.

iv.     <em>Jason Galle</em>

Jason Galle has been in the custody of NDCS for ten years, most recently at NSP. Filing 249-26 at 1. In the past, he was housed at DEC. Filing 249-26 at 1. Galle arrived at DEC in February of 2010 with a gunshot wound to his leg which required him to use crutches. Filing 249-26 at 2. Despite his need for crutches, NDCS did not make any accommodations for Galle. Filing 249-26 at 2. NDCS also discontinued Galle's prescription for the pain medications he had been taking for his leg and gave him ibuprofen and tramadol instead. Filing 249-26 at 2. Primary to Galle's complaint is the lack of treatment he received for his leg, specifically surgery to repair his broken femur. Filing 249-26 at 4-5. Galle alleges he filed numerous grievances requesting treatment for his femur which he claims were ignored. Filing 249-26 at 5. Galle claims he has repeatedly requested medical attention for his leg since 2010. Filing 357-23 at 96. In August of 2016, NDCS agreed Galle needed surgery to repair his leg, but the operation did not occur until August 25, 2017. Filing 249-26 at 5.

Galle has also been placed in restrictive housing. Filing 249-26 at 6. During his multiple experiences in restrictive housing, Galle had limited access to medical care. Filing 249-26 at 6. Galle states that his time in restrictive housing, "caused the deterioration of [his] mental health and led [him] to experience severe symptoms of paranoia, anxiety, depression, and inability to sleep." Filing 249-26 at 6. Galle has experienced mental-health problems such as paranoid schizophrenia, anxiety, and depression for most of his life and believes NDCS was ineffective in addressing his mental-health needs. Filing 357-23 at 60-87. Galle alleges the dental care provided by NDCS is inadequate and prone to delays. For example, Galle recalls an instance where he requested a dental appointment due to two of his fillings coming out but was not seen by a dentist for three months. Filing 249-26 at 8-9. Galle contends that filing IIRs is generally ineffective at addressing his medical needs. Filing 249-26 at 6-7. Additionally, Galle asserts there was a lack of information provided at the intake process and a lack of information regarding parole. Filing 249-26 at 9-10.

Finally, Galle complains about the accommodations provided to him for his injured leg. Filing 249-26 at 9. During his deposition, Galle states that when he first arrived at DEC, he was not given any accommodations for his broken leg and he was housed in a "normal housing unit." Filing 357-23 at 17. At NSP, Galle was provided a cane, a shoe lift, a lower bunk assignment, and, later in his incarceration, physical therapy. Filing 357-23 at 18.

### v.    Richard Griswold

Rischard Griswold has been in NDCS custody since June 11, 2008, and is currently incarcerated in TSCI. Filing 249-3 at 1. He was previously housed at DEC. Filing 249-3 at 1. According to Griswold, he has chronic hip problems and tremors which impact his mobility and require him to frequently use a wheelchair or a walker. Filing 249-3 at 1. Griswold is also legally blind in one eye. Filing 249-3 at 1.

59

Griswold claims NDCS's initial intake process is flawed and there is a lack of information and training regarding how to obtain medical, dental, mental health, and disability-related care. Filing 249-3 at 2. Griswold's list of concerns includes the confidentiality of the grievance process, discontinuation of medicines, and access to healthcare while in solitary confinement. Filing 249-3 at 2-3. Griswold's most pressing concern is the lack of accommodations provided to help him with his mobility and vision issues. Filing 249-3 at 3. However, according to his deposition testimony, Griswold has not sought help for his vision within the last few years. Filing 316-6 at 2. Griswold expresses concerns about the mental health treatment he received while on "suicide watch" and describes the conditions in restrictive housing at TSCI as "barbaric." Filing 249-3 at 4-5. Finally, Griswold states he does not know when his last dental appointment was or if anyone ever instructed him on the parole process. Filing 249-3 at 6.

### vi. Michael Gunther

Michael Gunther has been an inmate with the NDCS since April 15, 2005. Filing 249-4 at 1. He is currently housed at NSP. Filing 249-4 at 1. He has also been housed at DEC, Lincoln Regional Center, LCC, and TSCI. Filing 249-4 at 1. Gunther's health issues include diabetes, neuropathy, mood disorder not otherwise specified, and adjustment disorder. Filing 249-4 at 2. In addition, he is legally blind due to traumatic brain injury and suffers from diabetes-related complications. Filing 249-4 at 2.

Gunther's complaints against NDCS are wide-ranging. He claims that there was a lack of screening regarding his disabilities and medications he was taking when he first arrived at NDCS. Filing 249-4 at 1-2. He claims he has experienced delays in medical treatment necessary to treat his neuropathy, diabetes, and pain resulting from ill-fitting dentures. Filing 249-4 at 5-6. Gunther

also alleges poor dental care in the form of unnecessary tooth extractions and ill-fitting dentures. Filing 361-2 at 136-148.

Gunther further complains about his treatment in restrictive housing. He alleges that while in restrictive housing, he did not receive eye-drops for twenty-eight days to treat an eye infection. Filing 294-4 at 3. In addition, while in restrictive housing, the materials he used to assist him with his blindness were confiscated, he was not adequately fed, and his mental health deteriorated. Filing 249-4 at 2-3. In another instance, Gunther's dentures were confiscated while he was in restrictive housing for periods of two to three weeks. Filing 361-2 at 160. When Gunther was suicidal, NDCS isolated him which he alleges continued to damage his mental state. Filing 249-4 at 6.

Finally, Gunther asserts NDCS failed to accommodate his blindness. Filing 249-4 at 4. NDCS apparently confiscated his assistive materials multiple times, did not provide him with training on how to use his tapping cane, and did not provide porters to assist him in moving around the NDCS facility. Filing 249-4 at 4. Gunther also alleges on several occasions, NDCS has not assisted him in filling out grievance forms. Filing 249-4 at 3. According to Gunther, when he submitted some of his grievances, a case manager would throw them "in the garbage." Filing 361-2 at 68. He claims eleven to fifteen of his grievances have disappeared. Filing 361-2 at 67-68. This, plus a lack of training on how to fill out disability requests and prepare for BOP hearings, has made it difficult for Gunther to participate in NDCS programming and BOP hearings. Filing 249-4 at 2, 7.

### vii.    Angelic Norris

Angelic Norris is housed at NCCW. Filing 357-22 at 6. She is blind and has been diagnosed with a developmental disability, bipolar disorder, congestive heart disease, and diabetes. Filing

357-22 at 32. Filing 1 at 16. In addition, Norris suffers from high blood pressure. Filing 357-22 at 17. While at NCCW, Norris claims she has not received adequate mental-health services because the only doctor at the facility is "not a very good doctor" in her opinion. Filing 357-22 at 64.

In addition to her medical concerns, Norris complains about the use of restrictive housing. She has been placed in restrictive housing several times for fighting and as a form of protective custody. Filing 357-22 at 19-20. While in restrictive housing, Norris was given two hours of out-of-cell time and was treated "pretty good." Filing 357-22 at 20.

Norris claims she has been denied participation in activities and programs. Filing 357-22 at 33. However, when she was asked about these denials, she testified the programs were a waste of time. Filing 357-22 at 33-34. With regard to accommodations, Norris requested and received a braille block which she returned because she "didn't like it." Filing 357-22 at 38-39. NDCS has also provided her with a talking clock and a clear backpack. Filing 357-22 at 39. Norris has participated in classes and programming at NDCS. Filing 357-22 at 39. She was not provided audio or braille materials for those classes but admits she did not request them. Filing 357-22 at 39. Norris also claims to have "jaw problems" but does not report any deficiencies in dental treatment while at NCCW. Filing 357-22 at 55-59. However, she later claimed not to be receiving dental services while at NCCW. Filing 357-22 at 65.

*viii.*    *R.P.*

In support of their motion for class certification, Plaintiffs have not submitted a transcript of a deposition or a declaration from Plaintiff R.P.

*ix.*    *Isaac Reeves*

Isaac Reeves has been in NDCS custody since November 2013. Filing 249-2 at 1. He is currently at TSCI and has previously been in DEC, NSP, and NCYF. Filing 249-2 at 1. Upon

arriving at NCYF, Reeves claims he does not remember receiving any information about how to file a grievance or access services such as medical, dental, or mental healthcare. Filing 249-2 at 1-2. He does not remember receiving any sort of medical or dental examination. Filing 249-2 at 2. While in NDCS custody, Reeves has experienced tooth pain, bleeding, and tooth discoloration. Filing 249-2 at 5. According to Reeves, he waited months before his tooth was examined. Filing 249-2 at 5. There was another instance where the whites of Reeves' eyes turned yellow and he thought he had hepatitis. Filing 249-2 at 2. This caused Reeves to file an IIR requesting to be seen by a doctor and get tested. Filing 249-2 at 2. Reeves claims he waited six or seven months before he was tested. Filing 249-2 at 2-3. On several occasions, Reeves attempted suicide by opening a vein. Filing 249-2 at 2. During one of these attempts, Reeves alleges a correctional officer watched as Reeves cut himself. Filing 249-2 at 2. It took approximately an hour after Reeves cut himself before he was placed into an ambulance. Filing 249-2 at 2.

Reeves has suffered from mental-health issues during his time in NDCS custody. Filing 249-2. These issues are exacerbated by his placement in restrictive housing. Filing 249-2 at 3-4. Reeves estimates that he has spent a total of five years in restrictive housing. Filing 249-2 at 4. Reeves has been in restrictive housing at NCYF, NSP, and TSCI.[8] Filing 249-2 at 4. Filing 357-14 at 22. While in restrictive housing at NCYF, Reeves asked for mental health treatment, but it took "a couple months" to receive treatment. Filing 357-14 at 29. The privileges available in restrictive housing vary from one facility to another but Reeves described the conditions for restrictive housing at NCYF, TSCI, and NSP as "miserable". Filing 249-2 at 4-5. For instance, Reeves describes the conditions at TSCI's restrictive housing as follows:

> There [were] no windows. You had very little human contact. The only thing outside your door window to look at was a wall, and there's black mold everywhere.

---

[8] Reeves also characterized his time at DEC "in the skilled nursing facility on five-point [restraints]" as being restrictive housing. Filing 357-14 at 22.

> There was -- the first cell they put me in there was poop on the ceiling, and they didn't clean it before I came. There was poop on the little cement block where my mattress was. Under the mattress there was poop. And then there was like -- there was nasty stuff everywhere all over that room. It was disgusting.

Filing 357-14 at 83.

Reeves describes difficulty sleeping, hallucinations, and feelings of anxiousness and hopelessness while in restrictive housing. Filing 249-2 at 5. During his time in restrictive housing at TSCI, Reeves was only able to exercise one hour a day, five days a week. Filing 249-2 at 4. Due to being placed in restrictive housing, Reeves has not been able to participate in programming that would assist his parole eligibility. Filing 249-2 at 4.

x.   <em>Zoe Rena</em>

Zoe Rena has been incarcerated since July of 2015. Filing 249-12 at 1. She is currently housed at NCCW. Filing 249-12 at 1. She has also been housed at the Work Ethic Camp, Community Corrections-Omaha, and Community Corrections-Lincoln. Filing 249-12 at 1.

During her time with NDCS, Rena suffered from a chronic skin rash. Filing 249-12 at 2-3. Rena alleges that the rash was neither diagnosed nor treated properly. Filing 249-12 at 2-3. When she requested to see a dermatologist to treat her skin rash, she was told that NDCS does not employ a dermatologist and it would not send her to one. Filing 249-12 at 2. Rena claims that none of the various medications she was prescribed to treat her rash was effective. Filing 249-12 at 2-3. Rena also expressed concern over how medications are distributed. Filing 249-12 at 4.

In addition to her skin rash, Rena has repeatedly asked for treatment for tooth, mouth, and jaw pain. Filing 249-12 at 3. Rena notes that she has experienced long delays in receiving this care which has led to more pain and discomfort. Filing 249-12 at 3. Moreover, following one dental procedure, NCCW noted that she had two large abscesses in her mouth which it did not treat for

two months. Filing 249-12 at 3. Rena also alleges instances where the dental staff extracted her teeth unnecessarily. Filing 249-12 at 3.

Rena has been placed in restrictive housing several times. Filing 249-12 at 4. She claims that NDCS's observation of inmates' mental health while in restrictive housing is inadequate. Filing 249-12 at 4. Rena also expresses concerns about the confidentiality of the grievance system and the use of inmate medical porters. Filing 249-12 at 2. Finally, Rena describes inadequate screening procedures and BOP assistance. Filing 249-12 at 1, 5.

### xi.    Brandon Sweetser

Brandon Sweetser has been an inmate with NDCS for approximately five years. Filing 249-34 at 1. Prior to his current sentence, Sweetser was incarcerated from November 2003 through June of 2010 at NDCS facilities. Filing 249-34 at 1. He has experience living at Community Corrections-Omaha, NSP, and DEC. Filing 249-34 at 1.

Sweetser has been diagnosed with hepatitis C. Filing 249-34 at 3. NDCS has repeatedly denied Sweetser treatment for hepatitis C because his condition is not severe enough. Filing 249-34 at 3. In January of 2016, Sweetser began having severe stomach pain and cramping. Filing 249-34 at 4. He was taken to the Skilled Nursing Facility ("SNF") at NSP where a nurse accused him of faking his symptoms and sent him back to his housing unit. Filing 249-34 at 4. Between one to two days passed until Sweetser was reexamined and it was discovered he had a ruptured appendix. Filing 249-34 at 4. After waiting another twenty-four hours at the SNF, Sweetser was taken to a hospital where emergency surgery was performed. Filing 249-34 at 4. After the surgery, the doctor advised Sweetser that he needed to get up and walk every hour or two. Filing 249-34 at 4. However, due to being housed in "max custody," Sweetser was shackled to a bed and was unable to follow this medical advice. Filing 249-34 at 4. Due to not being able to get up and walk, Sweetser's legs

and ankles became swollen and he was forced to use a walker for fifteen months after his appendix surgery. Filing 249-34 at 5. Additionally, Sweetser reports NDCS suddenly stopped giving him his medications without a doctor's consultation. Filing 249-34 at 6. As a result, Sweetser suffered withdrawal symptoms such as hot and cold flashes, night sweats, inability to sleep, muscle aches, and diarrhea. Filing 249-34 at 6.

Sweetser has also had issues with dental care at NDCS. Filing 249-34 at 6. As of February 2019, Sweetser claims to have only seen the dentist once in four years. Filing 249-34 at 6. Sweetser also claims that mental healthcare is lacking at NDCS. Filing 249-34 at 6-7. According to Sweetser, he has experienced weeks long delays after he sends a kite requesting mental healthcare before he is seen. Filing 249-34 at 7. Sweetser also alleges deficiencies in the intake screening system and the grievance process. Filing 249-34 at 2-3, 6. Finally, Sweetser claims that no one at NDCS has adequately explained the parole process to him. Filing 249-34 at 8.

c.   Additional Evidence

In addition to the individual named Plaintiffs' claims as set forth above, Plaintiffs and Defendants have presented extensive evidence from expert witnesses and other supporting documentation regarding the main healthcare class and the isolation and disabilities subclasses. Plaintiffs' experts claim NDCS's healthcare-related practices and its implementation of the policies outlined above subject all putative class members to the same constitutional harm: a substantial risk of serious injury. *See generally* Filing 249, Filing 250. Defendants' experts attempt to refute Plaintiffs' experts' opinions and demonstrate that the constitutional harm, if any, is not a

66

proper issue for classwide resolution.[9] The Court summarizes the evidence presented with respect to each of the subclasses.

### i.   Healthcare

Plaintiffs submit thirteen expert declarations in support of their motion for class certification. *See generally* Filing 249. Like the named plaintiffs' claims, the expert opinions cover a wide range of issues relating to healthcare, including intake screening, inmate care while in custody, actions of NDCS healthcare staff, dental care, and mental healthcare.

### (1)   Intake Screening

Plaintiffs assert NDCS's intake procedures are the first of many ways in which NDCS improperly administers healthcare at its facilities. Intake screenings at all ten NDCS facilities are governed by AR 115.05. All male inmates are screened at DEC and all female inmates are screened at NCCW. Filing 249-58 at 24.

Plaintiffs' healthcare expert is Dr. Marc Stern, M.D., M.P.H. Filing 249-58 at 3. Dr. Stern is a board-certified internist specializing in correctional healthcare. Filing 249-58 at 3. Dr. Stern has previously served as a healthcare expert in several cases, including *Parsons v. Ryan*, 289 F.R.D. 513, *aff'd*, 754 F.3d 657 (9th Cir. 2014). Filing 249-58 at 3, 13; Filing 249-59 at 2. Plaintiffs urge the Court to find Dr. Stern's opinions persuasive based on his background and previous experience as an expert witness. Filing 250 at 15; Filing 249-59.

Dr. Stern's concerns regarding the Nebraska prison system's intake process are threefold: 1) the use of licensed practical nurses ("LPNs") to conduct intake screenings and other

---

[9] The Court reviewed the substantial material submitted by both sides purportedly in relation to class certification. The Court found much of it related to the merits of Plaintiffs' claims, not the narrower question of class certification. Accordingly, to the extent such materials are not appropriate for the Court to consider at this stage, the Court has not relied upon such information in deciding the question of class certification. The Court further has not included an analysis of certain purported expert opinions which the court does not find relevant or persuasive in deciding the certification question.

examinations; 2) NDCS policies and practices regarding tuberculosis ("TB") screenings; and 3) intake screenings not being performed in a timely manner. Filing 249-58 at 24-28.

Dr. Stern first contends that LPNs do not have the expertise, nor are they permitted under their licenses, to exercise the considerable clinical expertise and judgment needed for competent medical screenings. Filing 249-58 at 24. However, it is not clear whether LPNs regularly conduct intake screenings at NDCS facilities, or whether this happens only sporadically. *Compare* Filing 249-58 at 24 & n.18 (Stern deposition stating he reviewed three patient forms reflecting intake by an LPN), *with* Filing 249-80 at 75-76 (Deol deposition stating to his knowledge, RNs conduct intakes); *and* Filing 249-60 at 11-13 (showing the three instances identified by Stern were a small portion of the sixty-one records Stern reviewed). Further, to the extent LPNs are used to conduct intakes, Defendants' expert, Dr. David Thomas, M.D., J.D., EdD, states that use of LPNs at intake screenings is consistent with "virtually every other correctional system in the country" and thus does not support the notion that individual inmates suffer a uniform risk of harm from the practice. Filing 316-31 at 12

Dr. Stern next asserts NDCS's tuberculosis (TB) screening process is inadequate because screening nurses do not ask enough questions about possible symptoms, nurses fail to determine whether the inmate has previously tested positive for TB, and nurses improperly retest inmates for false-negative results. Filing 249-58 at 24-26. However, with respect to the screening questions, Dr. Stern does not address how checking for these other symptoms is not covered by other parts of the intake screening nor does he explain how the lack of additional questions places all inmates at a substantial risk of serious harm. Filing 249-58 at 25. With respect to previous TB tests, the ARs state, "At the time of entry into NDCS, all inmates shall be tested by facility medical staff for Tuberculosis unless there is documentation of a previous positive test result." Filing 249-58 at 26

n.20. Dr. Stern complains of, but provides no real-world incidents of, nurses automatically conducting a second test even where the patient self-reported a previous positive test. Filing 249-58 at 25-26. Finally, with respect to false-negative retesting, Dr. Stern writes that "[t]he practice at DEC is for nurses to [improperly] inject a second skin test if the first one is negative" and "*according to an Intake nurse*, they do so 3 to 5 days after arrival, which is too soon according to CDC guidelines and NDCS's own policy." Filing 249-58 at 26 (emphasis added).Stern's speculation and input from one unnamed intake nurse does not show a systemic breakdown of the NDCS policy regarding TB testing.

Dr. Stern's third broad area of concern is that inmates do not receive timely intake examinations after first entering an NDCS facility. Filing 249-58 at 26. AR 115.05 requires a screening to be performed "upon the patient's arrival at the facility." Filing 249-84 at 3. However, despite Dr. Stern's opinion, there is no evidence that intake screenings are usually, or even regularly, conducted in an untimely fashion. *See* Filing 249-80 at 38 (Deol deposition stating intake health screenings are completed within 24 hours of arrival in 90% of cases); Filing 316-31 at 12 (Dr. Thomas declaration concluding "[t]here is no 'delayed and flawed' intake screening"); Filing 357-23 at 15-17 (Galle describing intake upon arrival); Filing 361-2 at 27-32 (Gunther describing intake upon arrival); Filing 357-14 at 13-15 (Reeves describing intake upon arrival); Filing 357-21 at 23-26 (Sabata describing intake upon arrival); Filing 357-22 at 14-17 (Norris describing intake upon arrival).

(2)     Inmate Care While in Custody

Dr. Stern contends there are numerous problems with the healthcare inmates receive after their initial intake screening and while they are in NDCS custody. Filing 249-58 at 28. However, many of Dr. Stern's opinions are based on generalizations or isolated instances of allegedly

69

inadequate care rather than pervasive, systemic problems. For example, Dr. Stern finds fault with NDCS's handling of emergency situations because nurses do not always respond to the right location or in a timely manner, only LPNs might respond, staff might not have the proper medical equipment, and cardiac patients may be moved rather than treated on the spot, which he believes is preferable. Filing 249-58 at 28-35. However, Dr. Stern points to just two concrete examples and one practice at one facility wherein he found issues with failed nurse responses to medical emergencies. Filing 249-58 at 28-29. With respect to alleged delays, Dr. Stern points to a single example of an eighteen-minute delay to an inmate experiencing a seizure due to a lack of an on-call practitioner for emergencies. Filing 249-58 at 34. Dr. Stern's opinion regarding NDCS moving cardiac patients and increasing their risk of death is based on conversations with NDCS staff and "publicly available information"; Dr. Stern points to no specific policy or any known instance of this actually occurring. Filing 249-58 at 34-35.

Dr. Stern also expresses concern that inmates might not receive proper care for less serious situations, which he terms "urgent care" because they might not be able to gain access to the appropriate care, either because of problems getting the attention of the correctional officer, the officer failing to pass a medical request along, or improper medical responses to an urgent care request. Filing 249-58 at 35.

Dr. Stern also takes issue with the provision of non-urgent episodic care. Filing 249-58 at 42. According to Dr. Stern, the administration of such care at NDCS is flawed because inmates often request non-urgent episodic care via IIRs, which violates confidentiality, does not result in review by a medical professional, and can cause delays in care. Filing 249-58 at 42-45. However, Defendants' evidence demonstrates that IIRs are generally triaged daily by a health professional. Filing 249-80 at 96-97. Further, of the many IIRs reviewed by Defendants' expert, Dr. Thomas,

70

an "overwhelming majority of them" that dealt with medical care were answered in less than twenty-four hours. Filing 316-31 at 5.

Dr. Stern also criticizes the provision of day-to-day care at NDCS, which he terms "chronic care." Filing 249-58 at 51. Dr. Stern argues that NDCS's chronic-care system suffers from many inadequacies, including failure to see patients at appropriate intervals, failure to follow up, and discoordination of care. Filing 249-58 at 52. Dr. Stern also sees issues with provision of care to inmates in restrictive housing and those in need of interpreter services. Filing 249-58 at 60-61. As evidence of these shortcomings, Dr. Stern references five examples of perceived failures by NDCS to provide medical care involving significantly different health conditions and needs: asthma, Crohn's disease, breast cancer, hepatitis C, and an abnormality in a pap smear. Filing 249-58 at 52-56. Dr. Thomas opined that chronic care at NDCS is "performed well" and Dr. Stern's contention that there are problems in this area "cannot be substantiated." Filing 316-31 at 12.

(3)    Actions of NDCS Healthcare Staff

Plaintiffs also point to a number of ways in which NDCS staff fail to provide adequate medical care, including using inmates as porters, Filing 249-58 at 13-14; failing to follow orders, Filing 249-58 at 14-16; poor clinical decision-making; Filing 249-58 at 16-22; inaccurate medication administration, Filing 249-58 at 61-70; poor record-keeping, Filing 249-58 at 70-71; and failure to track and remedy problems in the system, Filing 249-58 at 70-78. However, the evidence shows these purported issues to be either speculation on Dr. Stern's part, or the isolated actions of individual staff members rather than policy mandates or routine practice on NDCS's part.

For example, Dr. Stern expresses concerns over inmate porters' lack of training and ability to see other inmates' medical information, Filing 249-58 at 13-14, but Dr. Thomas points out that

porters who engage in basic medical tasks, like taking an inmate's vital signs, receive training equivalent to a Certified Nursing Assistant, as opposed to those porters who merely assist with food and transportation needs who receive no such training. Filing 316-31 at 11.

With respect to other inappropriate actions by staff, Dr. Stern provides only isolated examples of allegedly insufficient healthcare. *See, e.g.*, Filing 249-58 at 15-16 (two examples of staff not following orders); Filing 249-58 at 17-22 (nine examples of allegedly poor clinical decision-making); Filing 249-58 at 64-65 (four examples of errors in medication administration). Dr. Thomas "witnessed no signs of poor medical decision making, much less on a system-wide basis. The physicians and mid-levels were all concerned for their patients and practiced modern correctional care." Filing 316-31 at 12. Thus, despite Dr. Stern's numerous concerns, he fails to demonstrate that inmates routinely suffer from the same deficiencies in healthcare or that NDCS staff act inappropriately on a system-wide, rather than isolated, basis.

(4)     Dental Care

Plaintiffs allege deficiencies in the dental care provided by NDCS as well. In support, they present the expert testimony of Jay D. Shulman, D.M.D., M.A., M.S.P.H. Filing 249-53 at 1. Dr. Shulman concludes that the dental care provided by NDCS is "consistently inadequate" and that the deficiencies are "attributable to systemic problems caused by inadequate dentist staffing and inadequate policies and procedures." Filing 249-53 at 3. He bases his conclusion on allegedly inadequate diagnosis and treatment of certain dental conditions, Filing 249-53 at 7, 40-43, 44-50; delayed or denied dental care, Filing 249-53 at 50-64 (illustrating delays in urgent care, denture fabrication, chewing difficulty); inadequate record-keeping, Filing 249-53 at 65-66; and inadequate dental staffing, Filing 249-53 at 28-30, 66. In support of his opinions, Dr. Shulman

points to examples from his interviews with two Plaintiffs and his review of the dental records of the named plaintiffs and a number of randomly selected prisoners.

In response, Defendants present the testimony of their dental expert, Philip R. Rich, D.D.S. Filing 315-3. There is a dispute between Dr. Rich and Dr. Shulman with regard to the referenced inadequacies. Filing 357-12 at 4. After reviewing charts and declarations from the named plaintiffs, Dr. Shulman's expert report, and a variety of other materials relating to this case, Dr. Rich determined that NDCS provides adequate dental care. Filing 315-3 at 3-4. He states that NDCS's "dental practice operates in a capable and efficient manner" and that the "staff is sufficient . . . to treat and schedule all dental procedures." Filing 315-3 at 4. Dr. Rich notes that "patients were seen on a timely basis including emergency needs" and that "[a]ccepted guidelines were followed and adhered to." Filing 315-3 at 4. After speaking with Dr. Eric Smith about chart reviews, Dr. Rich stated that "Dr. Shulman lacks proof of inadequate or failed treatment" and that "[m]any of his comments are inaccurate." Filing 315-3 at 5. Further, Dr. Rich criticized Dr. Shulman's concerns regarding delays, stating that "[e]ven in a well-managed private practice, a patient can have x-rays, treatment plan, chronic periodontal conditions, and extensive caries of teeth that can and do take up to 6 months to complete treatment." Filing 315-3 at 6. Additionally, Dr. Rich noted that "not all patients . . . complete dental treatment." Filing 315-3 at 6.

More broadly, Dr. Rich suggests that "[j]ust as the complaints of the Plaintiffs are different, their dental conditions are different. They lack a common theme." Filing 315-3 at 7. Thus, in Dr. Rich's opinion, each complaint should be taken individually because they lack the commonality necessary to reveal systemic problems. Filing 315-3 at 7. Specifically, he states "[t]he dental policies at NDCS do not impact all dental inmates the same way. Because of this, inmates do not all face the same risk of injury." Filing 315-3 at 8. For these reasons, Dr. Rich opines that NDCS's

73

dental care "is consistent with care provided by dentists in the Nebraska community," and that "the treatment of inmates is professionally adequate and does not place inmates at a substantial risk of harm." Filing 315-3 at 8.

(5)     Mental Healthcare

Plaintiffs identify mental healthcare as another deficient aspect of the healthcare provided by NDCS. Plaintiffs' expert, Dr. Pablo Stewart, identified eight problems with respect to mental healthcare: staffing shortages, Filing 249-38 at 13-16; inadequate identification/screening procedures, Filing 249-38 at 16; failure to differentiate between appropriate levels of mental healthcare, Filing 249-38 at 16-19; poor access to care through the use of IIRs and lack of NDCS response thereto, Filing 249-38 at 21-24; poor record-keeping including accessibility of records during telepsychiatry, Filing 249-38 at 24-26; inadequate mediation administration, Filing 249-38 at 27-33; the use of restrictive housing for those with mental illness, Filing 249-38 at 33-34, and inadequate suicide prevention, Filing 249-38 at 35.

According to Defendants, the issues Dr. Stewart identifies are speculative, not supported by evidence of widespread problems, or are otherwise refuted by Defendants' experts, Dr. Terry Davis (Filing 315-1) and Dr. Dean Aufderheide (Filing 316-38). For example, in support of his claim of staffing shortages causing harm, Dr. Stewart points to one example of an inmate who allegedly committed suicide after not receiving mental-health treatment. Filing 249-38 at 15-16. However, according to Dr. Davis, who reviewed Dr. Stewart's declaration, this inmate had been evaluated and treated several times by mental health treatment providers, including by a psychiatrist, and even refused mental health treatment prior to his death. Filing 315-1 at 4.

Similarly, Dr. Stewart's claim of poor mental-health screening is refuted by Dr. Davis's review of two intakes he observed at DEC which included an evaluation by a registered nurse who

performed a mental health assessment. Filing 315-1 at 4. Dr. Stewart's concerns about the use of records for telepsychiatry is refuted by Dr. Davis's statement that telepsychiatry is a recognized and accepted method of performing psychiatric evaluations and treating psychiatric patients and thus its use does not place all inmates at a serious risk of harm. Filing 315-1 at 6. In addition, NDCS apparently has a staff member present and the inmate's chart available during all telepsychiatry appointments in order to alleviate any concerns about incomplete information. Filing 315-1 at 6.

Overall, Dr. Stewart fails to demonstrate the concerns he expresses are commonly occurring in NDCS facilities and pose a common risk applicable to all patients with mental health concerns. Rather, taken with Defendants' evidence, Dr. Stewart expresses only general concerns and speculation about how processes might negatively impact individual inmates and should be improved.

### ii.    Additional Evidence Regarding Restrictive Housing

Plaintiffs present additional evidence in support of certifying their proposed isolation subclass. Restrictive housing units can be found in five of the ten NDCS facilities: LCC, NSP, NCCW, NCYF, TSCI. Filing 249-42 at 28. During the six-month period from January 1, 2019, to June 30, 2019, there was an average daily population of 335 inmates in restrictive housing. Filing 352-9 at 2. As of January 10, 2020, there were 295 inmates in restrictive housing. Filing 439 at 23.

Plaintiffs put forth the opinions of three experts to assess NDCS's policies and practices that deal with restrictive housing. Filing 250 at 23. The three experts conclude that the use of isolation is harmful to an inmate's mental health and sometimes harmful to their physical well-being as well, regardless of their underlying mental and physical health. Filings 249-47; 249-42; 249-38. The experts opine that isolation causes harm based on, among other things, lack of out-of-cell time, Filing 249-90 at 17; the lack of personal property, Filing 249-42 at 30; small cell sizes,

75

4:17-cv-03107-BCB-MDN   Doc # 476   Filed: 06/08/20   Page 76 of 124 - Page ID # 22107

Filing 249-42 at 29, 38; housing two inmates in one cell ("double celling"), Filing 249-42 at 40;

Filing 249-47 at 34; severe levels of idleness, Filing 249042 at 32; and lack of access to mental

healthcare, Filing 249-38 at 34.

However, much of this testimony pertains to isolation in general, not the specific use of

restrictive housing at NDCS. For example, Dr. Craig Haney, Ph.D., J.D., points to the fact that AR

210.01 does not require the exclusion of people with serious mental illness from restrictive

housing. Filing 249-42 at 28. However, Plaintiffs do not allege every member of the proposed

isolation subclass has a serious mental illness.[10] With respect to the harm of housing two inmates

in one restrictive-housing cell, there is no evidence that this practice happens to all inmates in

restrictive housing, or even that it occurs at all NDCS facilities. *See generally* Filing 249-42; Filing

249-47.

Defendants' expert on the issue of restrictive housing, Dr. John Stoner, reviewed the NDCS

policies and concludes they are consistent with national standards. Filing 316-47 at 6. According

to Dr. Stoner, this fact is illustrated by NDCS receiving accreditation by the American Correctional

Association. Filing 316-47 at 6. Dr. Stoner also finds fault with Plaintiffs' experts' opinions. For

example, Dr. Stoner opines that the studies cited by Dr. Haney do not adequately address other

variables that may lead to mental disorders in inmates and suggests the inmates selected as

representatives, namely Cardeilhac, Reeves, and R.P., are the "unusual and often extreme of the

inmate population." Filing 316-47 at 15-17. Dr. Haney himself also appears to concede the

individualized nature of potential harm resulting from isolation, noting the answer for each inmate

---

[10] Further, as of March 1, 2020, no inmate who is a member of a vulnerable population, including those with a serious medical illness, can be placed in restrictive housing, unless it is for placement in immediate segregation to protect the inmate, staff, or other inmates. Neb. Rev. Stat. § 83-173.03(3).

in restrictive housing "might very well involve a different kind of treatment modality for different kinds of symptoms that are being manifested." Filing 316-17 at 4-5.

iii.    *Additional Evidence Regarding Americans with Disabilities Act/Rehabilitation Act*

Finally, Plaintiffs present additional evidence in favor of certifying their proposed disability subclass. Plaintiffs contend that systemic deficiencies deny prisoners with disabilities meaningful access to programs, services, and activities, and NDCS fails to communicate effectively with prisoners with disabilities. Filing 432 at 11-13. Plaintiffs' expert, Margo Schlanger, believes NDCS policies and practices may lead to under-identification of inmates with disabilities at intake. Filing 249-50 at 19; non-identification of inmates already in custody, Filing 249-50 at 19-24; inaccurate tracking of inmates with disabilities resulting in inadequate accommodations and care, Filing 249-50 at 31-35; inadequate modifications and lack of auxiliary aids to those in need, Filing 249-50 at 35-39; inaccessibility of the grievance process to disabled inmates, Filing 249-50 at 44-45; placement of disabled individuals in restrictive housing, Filing 249-50 at 50; and lack of accommodations to disabled inmates during the parole process, Filing 249-50 at 51-52. She also takes issue with inmate porters being used to assist disabled inmates because of concerns about abuse, inmate privacy, inadequate porter training, unavailability of porters, and better alternatives to the use of porters. Filing 249-50 at 39-40.

Schlanger's concerns are based on speculation about how policies might impact inmates, not facts supporting that such violations occur or are widespread. Importantly, Schlanger provides few examples of the actual impact of NDCS policy and practice on disabled inmates and no evidence that such impacts affect *all* disabled inmates in NDCS custody. For example, Schlanger faults NDCS's system for tracking inmates but identifies no actual harm or substantial risk to

77

inmates, instead speculating that, "[w]ith this policy/practice in place, *it is only to be expected* that every cell or job change, or similar event, will pose significant difficulties for a prisoner with a hard-won modification." Filing 249-50 at 35. With regard to inadequate notice of an inmate's disability to staff, Schlanger points to one example where an inmate was unable to hear a correctional officer but was unable to prove that a hearing impairment created the issues. Filing 357-13 at 6. Likewise, Schlanger objects to NDCS's use of inmate porters to assist those with disabilities because she fears they may feel assisting disabled prisoners is not their job and refuse to do it. Filing 249-50 at 40.

Similarly, Schlanger expresses concerns about disabled inmates being discriminated against during the parole process by the issuance of parole plans that target their mental illness. Filing 249-50 at 35. Filing 357-13 at 12. However, her sole example of this allegedly occurring is plaintiff Sabata being terminated from her housing while on parole due to "her increased needs and [the program's] inability to address those needs." Filing 249-50 at 53 & n.53 (quoting Filing 237-5 at 6).

Schlanger opines NDCS has only a "very spare policy addressing" disabled inmate communication systems, but she fails to identify the policy or explain why it is insufficient for all inmates with disabilities. Filing 249-50 at 41. With respect to restrictive housing, Schlanger generalizes that prisoners with disabilities often end up in isolation. Filing 249-50 at 45. Relatedly, Schlanger expresses concern over disabled inmates being placed in special housing units where they have limited access to programs and may face accessibility issues including stairs. Filing 357-13 at 10-12. Schlanger fails to tie these concerns to a common risk of harm to all disabled inmates.

Accordingly, while the individual instances Schlanger identifies may or may not present valid claims under the ADA or RA, her testimony does not support that such alleged issues are

widespread, place all disabled individuals at NDCS at a substantial risk of harm, or are capable of resolution by uniform changes to policy or practice.

### 3.  *Analysis on Need for Exhaustion of Administrative Remedies*

As a preliminary matter, Defendants argue that the Court is obligated to determine whether Plaintiffs have exhausted their administrative remedies prior to deciding the Motion for Class Certification. Filing 433 at 2-3. In support of their contention, Defendants cite to the Eighth Circuit's opinion in *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000), stating that once a defendant raises the affirmative defense of failure to exhaust administrative remedies, "the court [i]s obligated to proceed to determine whether in fact [the plaintiff] ha[s] exhausted his administrative remedies."

Defendants' reliance on *Chelette*, 229 F.3d at 688, is misplaced. The portion of the opinion which Defendants quote did not impose an obligation on courts to determine exhaustion before all other pending motions. *See id.* Rather, the defendants argued that exhaustion of administrative remedies was a jurisdictional requirement. *Id.* at 686. The court found it was not jurisdictional but determined it would still address the defendants' argument regarding exhaustion, despite it being improperly raised as a motion under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. *Id.* at 687-88. Thus, the court concluded that despite the improper framing of the issue as a jurisdictional one, it was still "obligated" to address the exhaustion issue because it had been raised. *Id.* at 688

The Eighth Circuit has clarified that the district court must address the question of exhaustion of administrative remedies prior to proceeding to the *merits* of a case. *See Benjamin v. Ward Cty.*, 632 F. App'x 301 (8th Cir. 2016) (per curiam) ("[W]e conclude that the district court erred by proceeding to the merits of Benjamin's claims without first determining whether he had

exhausted administrative remedies that were available . . . .”). Given the analyses and language from the Eighth Circuit in *Chelette* and *Benjamin*, the Court doubts it is required to determine exhaustion of administrative remedies prior to denying class certification because such a determination is not one on the merits. *See Postawko*, 910 F.3d at 1037 (“Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.” (citations omitted)).

However, the legal conclusion on this issue is inapposite here. Defendants have conceded that there is at least one member of each class and subclass who has exhausted his or her remedies. Defendants admit the following Plaintiffs have exhausted at least one grievance each: Curtright (member of the main healthcare class, Filing 1 at 66, and disability subclass, Filing 1 at 70); Rena (member of the main healthcare class, Filing 1 at 66, and isolation subclass, Filing 1 at 68); Galle (member of the main healthcare class, Filing 1 at 66, isolation subclass, Filing 1 at 68, and disability subclass, Filing 1 at 70), and Reeves (member of the main healthcare class, Filing 1 at 66, isolation subclass, Filing 1 at 68, and disability subclass, Filing 1 at 70); Filing 179 at 183-84; Filing 439 at 106 (stating defendants “concede that plaintiff Reeves grieved removal from restrictive housing” for exhaustion purposes). The concededly exhausted grievances themselves relate to all three classes by grieving disability accommodations, a variety of healthcare issues, and isolation issues. *See* Filing 179 at 183-84; Filing 127-37 at 43-44; Filing 127-49 at 2; Filing 439 at 106.[11] The Court agrees with the parties that these grievances were appropriately administratively grieved. Thus, the class certification analysis can and should still proceed as to

---

[11] Defendants take issue with the fact that not every healthcare-related issue raised by Plaintiffs was individually grieved to completion. Exhaustion under the PLRA is not so narrow. *See McAlphin v. Toney*, 375 F.3d 753, 755 (8th Cir. 2004) (finding three incidents were part of inmate–plaintiff’s overarching claim regarding dental services and since one incident was exhausted, the others were not required to be); *see also Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (“A grievance also need not contain every fact necessary to prove each element of an eventual legal claim. The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.”) (citation omitted).

the main class and each subclass, regardless of the question regarding the order in which a court should address administrative remedies in relation to class certification.

In accordance with the foregoing, the Court turns to the question of class certification itself.

### 4. Analysis on Class Certification

Federal Rule of Civil Procedure 23(a) "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011). "Rule 23(a) requires plaintiffs to show that the class satisfies the requirements of 'numerosity, commonality, typicality, and fair and adequate representation.'" *Postawko*, 910 F.3d at 1037 (citing *Luiken*, 705 F.3d at 372); *see also* Fed. R. Civ. P. 23(a).

The Court will analyze the Rule 23(a) factors and their applicability to the class and sub-classes proposed by Plaintiffs.

#### a.    Numerosity

The numerosity prerequisite requires that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In *Postawko*, the Eighth Circuit affirmed the district court's conclusion that a class of at least 2,000 inmates suffering from chronic HCV would satisfy the numerosity requirement. *Postawko*, 910 F.3d at 1041. The Court concluded, "A class of that size would make 'joinder of all members . . . impracticable.'" *Id.* at 1037-38 (quoting Fed. R. Civ. P. 23(a)(1)) (citing *Paxton v. Union Nat. Bank*, 688 F.2d 552, 559-60 (8th Cir. 1982)).

The general proposed class in this case consists of over 5,000 individuals. Filing 250 at 10, 20. In addition, Plaintiffs seek to include in the class future inmates subject to NDCS custody. Filing 1 at 66; Filing 249-75. The proposed disability subclass consists of an estimated 750 inmates plus future disabled inmates, Filing 249-50 at 13-14, while the proposed isolation subclass

81

embodies nearly 1800 members plus future inmates who might be subject to isolation as well, Filing 249-92 at 10.

Given the requirements of Fed. R. Civ. P. 23(a)(1) and binding case law interpreting that provision, the Court concludes that the proposed class and subclasses are sufficiently numerous to satisfy Rule 23(a).

> b.   Commonality

"To satisfy Rule 23(a)(2) [regarding commonality], plaintiffs must show their claims involve a common question or contention 'of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Postawko*, 910 F.3d at 1038 (quoting *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016)). "The mere presence of one or more common questions is not enough; rather, the district court must examine the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quoting *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017)). According to the Supreme Court, this provision requires plaintiffs to "demonstrate that the class members 'have suffered the same injury,'" not merely violations of "the same provision of law." *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Plaintiffs claim the proposed class presents the common question of whether NDCS violated the Eighth Amendment by being deliberately indifferent to the substantial risk of harm posed by its healthcare policies. *See Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 1974, 128 L. Ed. 2d 811 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").

Here, Plaintiffs have not demonstrated the proposed class or either proposed subclass presents common issues capable of classwide resolution. With respect to the general class of "all persons who are now, or will in the future, be subjected to the healthcare (including medical, mental health and dental care) policies and practices of NDCS," Filing 247 at 1, the Court finds the class is too broad and that its members have such disparate medical needs that the questions are neither common nor resolved by a single classwide answer. Plaintiffs have not shown a single policy or question whose resolution would apply across the class. Plaintiffs' claims present individual instances of alleged indifference or lack of their preferred treatment for their particular medical needs, not classwide issues capable of common resolution.

First, the named plaintiffs suffer from a wide variety of medical issues and most do not have the same or even similar issues in common with other Plaintiffs. For example, Sabata suffers from bipolar disorder, PTSD, delusional disorder, and depression, while Cardeilhac has no diagnosed medical issues. Curtright is disabled, Galle has a broken leg from a gunshot wound, and Griswold suffers from mobility problems and is blind. Gunther has diabetes and mental health issues and is also blind. Norris is blind, has a developmental disability, and suffers from bipolar disorder, heart disease, diabetes, and high blood pressure. Reeves has tooth pain and is suicidal while Rena suffers from a skin rash and dental pain. Finally, Sweetser has been diagnosed with hepatitis C and suffered a ruptured appendix while in custody.

Even for those inmates with somewhat similar medical needs, they complain of different alleged inadequacies in the care they received. For example, while Sabata, Cardeilhac, Curtright, Galle, Gunther, Rena, and Sweetser all claimed to be in need of dental care, they presented with different dental problems requiring various forms of treatment. Sabata and Cardeilhac alleged they received delayed dental care while Curtright complained that the dental care he received was

improperly performed when a crown was put on wrong without his consent. Galle claims he had fillings that came out and Gunther asserted pain from his dentures as well as unnecessary tooth extractions. While others complained of being unable to receive dental care, Rena alleges she received excessive dental procedures and claimed to have had teeth extracted unnecessarily. She also experienced pain from an abscess in her mouth. Sweetser claims to have only seen the dentist once in four years of living at NDCS facilities. While these complaints can generally be categorized under the seemingly "common" heading of "dental care," a closer examination of the inmates' dental needs and the alleged inadequate treatment they each received shows that the issues presented are incapable of common resolution.

Second, the expert opinions also support that Plaintiffs do not present common questions that are capable of classwide resolution. First, as a whole, the experts take issue with a breath-takingly wide variety of policies and procedures at NDCS. As illustrated by the summary of the expert testimony included above, Plaintiffs' experts address issues ranging from intake screening, the use of LPNs, TB screening, emergent care, urgent care, non-urgent episodic care, chronic care, restrictive housing, interpreter services, inmate porters, medication administration, record-keeping, dental diagnosis, dental treatment, provision of dental X-rays, mental health identification and screening, mental health protection and care, identifying inmates with disabilities, tracking inmates with disabilities, accommodating inmates with disabilities, and the provision of parole hearings. Many of the expert opinions on these topics are directly disputed by Defendants' experts. Ultimately, this battle of the experts illustrates to this Court that these disputed areas regarding what is or should be the standards for prison healthcare policy are not capable of resolution in one fell swoop.

In addition to the breadth of policies and procedures identified by Plaintiffs' experts, the experts also fail to support the contention that any of the identified shortcomings are common issues. For example, while Dr. Stern identifies what he perceives as three main issues with NDCS's healthcare intake screening, he fails in many instances to provide examples of these problems actually occurring in NDCS facilities. The few real-world instances Dr. Stern does identify are isolated occasions of alleged inadequate treatment and do not demonstrate a pattern or common policy across the class or subclasses. For example, Dr. Stern points to three patient forms that allegedly show an LPN conducted the intake screening. Filing 249-58 at 24, n.18. However, Dr. Stern's own list of documents state that he reviewed all eleven of the named plaintiffs' medical records and fifty additional inmate records for a total of sixty-one records. Filing 249-60 at 11-13. The mere fact that three out of sixty-one medical screenings show the use of an LPN in contravention of NDCS policy does not reflect a wide-spread and systemic deficiency in need of class resolution.

Dr. Stern likewise takes issue with poor decision-making by nurses, medical officers, and other professionals. Filing 249-58 at 16-17. Dr. Stern cites nine different examples of this poor decision making, Filing 259-58 at 17-22, but fails to link these separate, isolated incidents to a common deficiency or theme rather than to poor decision-making by individual actors.

Dr. Stern's other assertions of supposed systemic inadequacies are not supported by the facts. For example, he asserts that nurses fail to properly screen inmates for TB because they only ask two questions about coughing rather than assessing by direct observation whether a patient has a cough or other symptoms at intake. Filing 249-58 at 25. Dr. Stern does not explain how a nurse conducting an in-person intake is not, by default, engaged in "direct observation." Dr. Stern also complains that intake examinations are not done in a timely fashion, but Plaintiffs present no

evidence that inmate screenings are routinely missed or conducted late on a systemic level. Furthermore, Plaintiffs' signed intake screening sheets appear to show they were screened upon entry to NDCS. *See, e.g.*, Filing 357-23 at 15-17 (Galle describing intake upon arrival); Filing 361-2 at 27-32 (Gunther describing intake upon arrival); Filing 357-14 at 13-15 (Reeves describing intake upon arrival); Filing 357-21 at 23-26 (Sabata describing intake upon arrival); Filing 357-22 at 14-17 (Norris describing intake upon arrival).

Dr. Shulman likewise selected from among many inmates' dental records to claim the prevalence of problems in dental care at NDCS. Filing 315-3 at 4. He claims a "majority" were picked at random with defense counsel present. Filing 357-12 at 3. This means Dr. Shulman agrees he picked some for review that were not a part of a random selection. Furthermore, as substantiated by Defendants' dental expert, Dr. Rich, each inmates' dental needs are different and require separate care. Filing 315-3 at 6-7. Plaintiffs have failed to demonstrate how the alleged deficiencies in the dental care afforded to individual inmates in factually different situations support commonality.

Dr. Stewart identifies issues in the mental healthcare provided to NDCS inmates, but his proposed solutions to these issues are not consistent or cohesive and the Court finds many of his contentions rebutted by Defendants' experts, Drs. Davis and Aufderheide. For example, Dr. Stewart takes issue with staffing shortages and blames an inmate's suicide on the lack of mental health staff. Filing 249-38 at 15-16. However, Dr. Aufderheide refutes this contention and highlights that Dr. Stewart does not convincingly link the inmate's death to staff shortages. Filing 316-38 at 16. Dr. Stewart also oversells the risks of telepsychiatry because of his belief that remote treatment-providers will not have reviewed an inmate's file. Filing 249-38 at 25. However, according to Dr. Davis, telepsychiatry is a recognized and accepted method of performing

psychiatric evaluations and treating psychiatric patients. Filing 315-1 at 6. In addition, NDCS apparently has a staff member present and the inmate's chart during all telepsychiatry appointments, thereby alleviating any concerns about incomplete information. Filing 315-1 at 6.

Plaintiffs' proposed disability subclass consisting of "all persons with disabilities who are now, or will in the future be, confined at any NDCS facility," Filing 247 at 2, suffers from the same overbreadth as the general class. Its members have different disabilities requiring unique and disparate accommodations, vitiating any commonality. For example, while Norris and Gunther are fully blind, Griswold is blind only in one eye and complains of mobility accessibility. Curtright is sighted but is deaf. Their issues with NDCS's accommodations also lack commonality. Curtright complained of having no sign language interpreter. Norris, on the other hand, did receive a talking clock and clear backpack and apparently rejected a braille block because she did not like it.

Schlanger identifies what she views as a number of deficient procedures with respect to disabled individuals, from intake, tracking of disabilities, provision of modification and aides, use of porters, communication systems, use of restrictive housing, and parole hearings. Filing 249-50. However, she fails to explain how this wide variety of policies affects all of the disability class members or how they would be capable of classwide resolution. For example, not all of the inmates in the disability subclass assert a lack of ADA accommodation in restrictive housing, nor do all of the disability subclass members assert problems with the parole process. The proposed disability subclass therefore fails to present common issues which could be resolved by a subclasswide solution.

Finally, Plaintiffs' isolation subclass also defies commonality. By including "all NDCS prisoners who are now, or will in the future be, subject to conditions of confinement that provide limited contact with other prisoners, strictly controlled movement while out of cell, and out-of-cell

time of less than twenty-four hours per week," Filing 247 at 1, Plaintiffs' proposed subclass encompasses a wide variety of inmates placed in isolation for varying reasons and who would not benefit from a single subclasswide solution. For example, while Sabata, Cardeilhac, Galle, Gunther, Norris, Reeves, and Rena all complained of restrictive housing, their complaints ranged from a general gripe about being placed in isolation to specific things that were lacking or unsatisfactory about the conditions of their confinement. Gunther complained of not having access to eye drops or adequate food. Rena complained about the lack of confidentiality from having to use porters while in restrictive housing. The reasons for the inmates being placed in restrictive housing also varied. For example, Norris was in restrictive housing at various times for either fighting or for his own protective custody.

Dr. Haney identifies problems with NDCS's use of restrictive housing, but he concedes that aside from completely stopping isolation in all prisons, fixing the alleged negative impact of restrictive housing in inmates' physical and mental health would require individualized solutions. Filing 316-17 at 5. Dr. Haney points to the tie between restrictive housing and mental illness. However, not every member of the proposed isolation subclass is alleged to have a serious mental illness. Dr. Haney and Vail also both point to the negative impact of double celling in restrictive housing. Filing 249-42 at 40; Filing 429-47 at 34. However, neither Dr. Haney nor Vail contend that double celling inmates is a practice or policy that is common to all inmates in restrictive housing or common to all NDCS facilities. The isolation Plaintiffs therefore also fail to present common issues or solutions that would apply across the subclass.

The case of *Wal-Mart v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, is instructive in demonstrating the overbreadth of Plaintiffs' proposed class and subclasses. In *Dukes*, the United States Supreme Court was "presented with one of the most expansive class actions ever." *Id.* at

88

342, 131 S. Ct. at 2547. The class that the plaintiffs sought to certify included "about one and a half million plaintiffs, current and former female employees of petitioner Wal-Mart who allege[d] that the discretion exercised by their local supervisors over pay and promotion matters violate[d] Title VII by discriminating against women." *Id.*, 131 S. Ct. at 2547. The Supreme Court considered "whether the certification of the plaintiff class was consistent with Federal Rules of Civil Procedure 23(a) and (b)(2)." *Id.* It concluded that certification was not warranted, in part because Plaintiffs had not demonstrated commonality under Rule 23(a).

Plaintiffs did "not allege that Wal-Mart ha[d] any express corporate policy against the advancement of women." *Id.* at 344, 131 S. Ct. at 2548. Rather, "they claim[ed] that their local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees." *Id.* "The basic theory of their case [was] that a strong and uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decision making of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 345, 131 S. Ct. at 2548. The plaintiffs "therefore wish[ed] to litigate the Title VII claims of all female employees at Wal-Mart's stores in a nationwide class action." *Id.* The plaintiffs "moved the District Court to certify a plaintiff class consisting of '[a]ll women employed at any Wal-Mart domestic retail store at any time since December 26, 1998, who have been or may be subjected to Wal-Mart's challenged pay and management track promotions policies and practices." *Id.* at 346, 131 S. Ct. at 2549 (internal quotation marks omitted).

The Supreme Court stated, "The crux of this case is commonality—the rule requiring a plaintiff to show that 'there are questions of law or fact common to the class.'" *Id.* at 349, 131 S. Ct. at 2550-51 (citing Fed. R. Civ. P. 23(a)(2)). The Court noted that the rule "is easy to misread,

since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Id.* at 349, 131 S. Ct. at 2551 (alteration in original). The Supreme Court went on, however, that "[r]eciting [common] questions is not sufficient to obtain class certification. Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]" *Id.* at 349-50, 131 S. Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157, 102 S. Ct. at 2364). "Their claims must depend upon a common contention . . . ." *Id.* at 350, 131 S. Ct. at 2551. The Court continued:

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (alteration in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The Court concluded that the plaintiffs had not raised such common questions capable of resolution by common answers. *Id.* at 359, 131 S. Ct. at 2556-57. It stated, "Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question." *Id.* It continued:

> In sum, we agree with [the dissenting judge below] that the members of the class "held a multitude of jobs, at different levels of Wal–Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed . . . . Some thrived while others did poorly. They have little in common but their sex and this lawsuit."

*Id.* at 359-60, 131 S. Ct. at 2557 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (dissenting opinion), *rev'd*, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)).

Similarly to the issues presented by the broad class in *Dukes*, here Plaintiffs' proposed class consists of inmates in a variety of institutions with a wide range of health issues and medical needs. They have little in common but their status as NDCS inmates and this lawsuit. Furthermore, while

in *Dukes* the plaintiffs sought to certify a class based only on a single policy relating to pay and promotion, here Plaintiffs argue there is commonality among all of NDCS's health-, dental-, mental health-, and confinement-related policies. Plaintiffs' proposed class is thus much broader than that rejected as overly broad in *Dukes*.

In contrast to the *Dukes* holding, Plaintiffs point to a Ninth Circuit case that certified a broad class similar to the one they propose. *See Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). In *Parsons*, inmates in the Arizona Department of Corrections' ("ADC's") custody challenged the prison system's "policies and practices governing medical care, dental care, and mental health care" on Eighth Amendment and other grounds. *Id.* at 663. The district court "certified a class consisting of '[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC.'" *Id.* at 672 (alteration in original). "It also certified a subclass consisting of '[a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in [certain housing units].'" *Id.* (alterations in original). The district court determined that "the problems identified in the provision of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm" and thus met the standard of commonality. *Id.* at 673.

The Ninth Circuit agreed that commonality was met. It stated, "After all, every inmate in ADC custody is necessarily subject to the same medical, mental health, and dental care policies and practices of ADC." *Id.* at 678. "The putative class and subclass members . . . all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm." *Id.* It concluded such issues were capable of common resolution

91

because "either each of the policies and practices is unlawful as to every inmate or it is not" and therefore they did not require an individualized inquiry. *Id.*

The Court finds Plaintiffs' reliance on *Parsons* unconvincing. First, the Court disagrees that the relevant inquiry can be reduced to a simple "yes or no" question on legality as the Ninth Circuit suggests. *See id.* at 678, 684. Rather, in determining whether a policy is unconstitutional or violates the ADA or RA, it is necessary to examine its application to individual inmates and the effect it has on them. How else is the court to assess, for example, whether a risk of harm is substantial? The Court believes it would be impossible to determine the effect of a policy or practice in a vacuum devoid of actual inmates with real medical needs. Under the Ninth Circuit's logic, almost any disparate group of plaintiffs could be certified as a class by reducing the relevant inquiry to an oversimplified question of "legality" and ignoring the pesky facts and details that might differentiate class members.

 Furthermore, the Eighth Circuit has never interpreted Rule 23(a) as broadly as the Ninth Circuit did in *Parsons*. For example, in *Postawko*, 910 F.3d 1030, the Eighth Circuit certified a prison healthcare-related class, but one much narrower in scope than either that in *Parsons* or the class Plaintiffs propose here. In *Postawko*, the plaintiffs "sought class certification for their claims alleging that the Missouri Department of Corrections ('MDOC') and various related defendants violated the Eighth Amendment and Title II of the Americans with Disabilities Act ('ADA') by providing inadequate medical screening and care for chronic Hepatitis C ('HCV') viral infections." *Id.* at 1033. "As a highly communicable disease, HCV often spreads among the incarcerated population" but is easily treated with direct-acting antiviral ("DAA") drugs which cure over 90% of patients. *Id.* at 1034-35. Despite this, "[t]he MDOC . . . provided DAA medications to less than one-half of one percent of inmates in their custody with a known HCV infection." *Id.* at 1035.

92

Plaintiffs sought to certify the following class of inmates:

All those individuals in the custody of MDOC, now or in the future, who have been, or will be, diagnosed with chronic HCV, as that term is defined medically, but who are not provided treatment with direct acting antiviral drugs.

*Id.* at 1036.

The Eighth Circuit Court of Appeals noted that at the class-certification stage, the Court's "primary task is not to determine the final disposition of a plaintiff's claims, but instead to examine whether those claims are appropriate for class resolution." *Id.* at 1037 (citing *In re Zurn Pex*, 644 F.3d at 613). With regard to the commonality requirement, "[T]he Defendants argue[d] that the unique medical condition of each member of the class" would require resolution involving "a 'highly individualized' inquiry." *Id.* at 1038. In finding the commonality requirement met, the district court noted that "[a]ll class members share the common question of whether the Defendants' policy or custom of withholding treatment with DAA drugs from individuals who have been or will be diagnosed with chronic HCV constitutes deliberate indifference to a serious medical need" under the Eighth Amendment. *Id.* While "the physical symptoms eventually suffered by each class member may vary, . . . the question asked by each class member is susceptible to common resolution." *Id.* at 1038-39. Thus, the court concluded that commonality was met and the class was properly certified under Rule 23(a). *Id.* at 1039; *cf. Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 570 (8th Cir. 2015) (finding commonality was not met in Fair Debt Collection Practices Act case where the question of whether the creditor improperly sought prejudgment interest would require individualized inquiry into each underlying debtor's transaction).

While Plaintiffs argue *Postawko* supports their position because it allowed a class action to proceed in the prison healthcare context, the breadth of Plaintiffs' proposed class distinguishes

it from the Eighth Circuit's holding therein. While in *Postawko* the class was based on a single disease and a single policy of non-treatment for that disease, Plaintiffs here seek to certify a class whose members suffer from a multitude of diseases, mental health conditions, and other alleged problems, and they challenge many dozens of NDCS's policies and practices related to these various conditions. The Court fails to see how Plaintiffs' vastly broader class presents common issues capable of common resolution like that in *Postawko*. Instead, Plaintiffs' proposed class and subclasses would require numerous changes to NDCS's policy and practice in order to rectify the broad range of issues the class members assert.

Aside from the Ninth Circuit as seen in *Parsons*, this more measured approach is supported by cases from other circuits as well. For example, the Fifth Circuit found a class presented common issues and was thus correctly certified in *Yates v. Collier*, 868 F.3d 354 (5th Cir. 2017). The plaintiffs were inmates at one facility in Texas who alleged violations of the Eighth Amendment, ADA, and RA "due to high temperatures in the prison housing areas." *Id.* at 358. Plaintiffs sought to certify a class consisting of "[a]ll inmates who currently are, or in the future will be, incarcerated at the [facility], and who are subjected to [the corrections department]'s policy and practice of failing to regulate high indoor heat index temperatures in the housing areas," as well as subclasses for those at increased risk and those with disabilities. *Id.* at 359. In upholding the district court's decision to certify the general class, the Fifth Circuit noted that all inmates were exposed to the same high temperatures and "every inmate . . . is at a substantial risk of serious harm due to the heat." *Id.* at 362. The district court noted that while "[n]o two individuals have the exact same risk" due to variations in age and health conditions, the extreme heat nevertheless posed the common question of "the adequacy of [the department]'s mitigation measures—as applied in practice—*in reducing the heat risk for all the inmates*." *Id.* at 363 (alteration and emphasis in

original). The Fifth Circuit agreed that the "[p]laintiffs have demonstrated the presence of a "question[ ] of law or fact common to the class." *Id.* at 365 (second alteration in original) (quoting Fed. R. Civ. P. 23(a)(2)).

Thus, more akin to the single health issue presented in *Postawko*, *Yates* presented the single question of high temperatures placing prisoners at risk. In contrast, Plaintiffs' proposed class does not focus on a single or even a few health conditions or policies, but instead purports to encompass a wide variety of health conditions and NDCS practices that affect inmates in disparate ways and are thus incapable of common resolution. The two broad proposed subclasses suffer the same deficiencies. To say such broad classes present common issues is to strain the meaning of Rule 23(a)(2). The Court thus finds most convincing the approaches taken by the Eighth Circuit and the other courts cited above rather than the overly broad approach in *Parsons*. Accordingly, Plaintiffs' proposed class and subclasses fail to meet the requirement of commonality and will not be certified.

   c. Typicality

A party seeking class certification must also show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The question is whether "other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) (citing *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982)). The Eighth Circuit has recognized that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Postawko*, 910 F.3d at 1039 (citing *Wal-Mart*, 564 U.S. at 349 n.5, 131 S. Ct. 2541). Having found that the proposed class and subclasses lack commonality, the Court likewise concludes that the named plaintiffs cannot and do not typify the class as a whole. As analyzed at length above, the proposed classes include a large group of

inmates, some with no health issues, others with a wide variety of physical, mental, and dental issues. The Court concludes the named plaintiffs do not typify this diverse group of class members for any of the proposed classes.

        d.     Adequacy of Representation

The adequacy requirement of Rule 23(a) requires the class representatives to fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "Adequacy of representation focuses on two issues: (1) whether the representatives have common interests with class members; and, (2) whether the representatives will vigorously prosecute the interests of the class." *Clayborne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 597 (D. Neb. 2002) (citing *Paxton*, 688 F.2d at 562-63). "The district court must decide whether Rule 23(a)(4) is satisfied through balancing 'the convenience of maintaining a class action and the need to guarantee adequate representation to the class members.'" *Rattray v. Woodbury Cty.*, 614 F.3d 831, 835 (8th Cir. 2010) (quoting *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1061 (8th Cir. 1975)). "The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Id.* (citing *Hansberry v. Lee*, 311 U.S. 32, 41, 61 S. Ct. 115, 85 L. Ed. 22 (1940)).

        i.     *Vigorous Prosecution*

> Seeking to represent a large group of people as a class representative in a lawsuit is a very heavy responsibility. It should never be undertaken lightly, and the court should allow such representation only upon a firm foundation that the named plaintiffs are willing and [ ] able to shoulder that burden.

*Clayborne*, 211 F.R.D. at 597 (quoting *Cervantes v. Dobson Bros. Const. Co.*, No. CV76-L-95, 1977 WL 89, at *3 (D. Neb. Mar. 1, 1977)).

There are eleven named Plaintiffs in this case. Of the eleven named Plaintiffs, ten of them submitted either a declaration or a transcript of their depositions in support of class certification. During their depositions, Plaintiffs showed a basic understanding of the claims, other Plaintiffs, Defendants, procedural history, and class certification process. "[C]lass representatives in complex cases are not required to have the detailed level of firsthand knowledge of facts or law that defendants seek to impose" but they must make some showing of personal commitment to and knowledge of the litigation. *In re Genesis Intermedia, Inc. Secs. Litig.*, 232 F.R.D. 321, 330-31 (D. Minn. 2005) (quoting *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 609 (D. Minn. 2001)).

The declarations submitted by Plaintiffs contain statements regarding their desire to be a Plaintiff in this suit and the relief sought. Filing 249-1 at 5 (Cardeilhac Declaration); Filing 249-21 at 10 (Curtright Declaration); Filing 249-3 at 6 (Griswold Declaration); Filing 249-4 at 7 (Gunther Declaration); Filing 249-2 at 6 (Reeves Declaration); Filing 249-12 (Rena Declaration); Filing 249-15 at 6 (Sabata Declaration). Many of the plaintiffs testified that they reviewed the materials submitted in this case. Filing 357-21 at 10 (Sabata Deposition); Filing 357-24 at 46-47 (Curtright Deposition); Filing 357-23 at 39, 44-45 (Galle Deposition); Filing 361-2 at 12, 22 (Gunther Deposition); Filing 357-14 at 68-69 (Reeves Deposition); Filing 249-34 at 9 (Sweetser Declaration); Filing 249-1 at 5 (Cardeilhac Declaration); Filing 249-12 at 5 (Rena Declaration). Several of the plaintiffs have a basic understanding of their role as class representative. Filing 357-24 at 50 (Curtright Deposition); Filing 357-23 at 40 (Galle Deposition); Filing 361-2 at 12-13 (Gunther Deposition); Filing 357-14 at 70-71 (Reeves Deposition); Filing 357-21 at 33 (Sabata Deposition).

Ten of the named plaintiffs articulate the overall concerns they seek to redress in this suit. Filing 249-1 at 5 (Cardeilhac Declaration); Filing 357-24 at 54 (Curtright Deposition); Filing 357-23 at 42-43 (Galle Deposition); Filing 249-3 at 6 (Griswold Declaration); Filing 361-2 at 16-21 (Gunther Deposition); Filing 357-14 at 69, 72 (Reeves Deposition); Filing 249-12 at 5 (Rena Declaration); Filing 357-21 at 35 (Sabata Deposition).

While the proposed class representatives do not display an in-depth understanding of the complexity of this case, they illustrate that they understand the broad strokes of this litigation and a commitment to it. The Court finds that the named plaintiffs are adequate representatives and exhibit a commitment to vigorous prosecution of their claims.

Plaintiffs have likewise retained competent and capable counsel to represent them in this case, which the Eighth Circuit Court of Appeals has also identified as a factor illustrating a willingness to vigorously prosecute the case on behalf of the proposed class. *See Paxton*, 688 F.2d at 563 (stating the proposed class representatives "have demonstrated a willingness to prosecute the interests of the class through qualified counsel").

### ii.    *Common Interests*

The "common interests" factor when considering adequacy of representation involves an inquiry into whether the interest of the proposed named plaintiff conflicts with the interests of proposed class members. *See Clayborne*, 211 F.R.D. at 597 (citation omitted) ("[W]here the interests of the named plaintiff conflicts with the interests of class members, that plaintiff is not an appropriate class representative.").

Courts note that conflicts of interest between proposed class representatives and a proposed putative class are rare where the proposed class representatives seek only declaratory and injunctive relief. *See Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 160 (N.D. Cal. 2015) ("Class

representatives have less risk of conflict with unnamed class members when they seek only declaratory and injunctive relief."); *see also New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) (citing Fed. R. Civ. P. 23(a)(4)) ("Conflicts of interest are rare in Rule 23(b)(2) class actions seeking only declaratory and injunctive relief.").

Here, the class and proposed subclasses seek only declaratory and injunctive relief. The Court concludes that the goals of the NDCS class, the isolation subclass, and the ADA subclass do not illustrate conflicts of interest that would preclude certification. Further, the Court likewise believes the due process rights of the proposed class and subclass members could be preserved if the class and subclasses were certified.

Although the Court outlines significant problems with Plaintiffs' proposed classes meeting the commonality requirement under Rule 26(a)(2) as outlined above, the Court believes the adequacy requirement under Rule 26(a)(4) would not prevent class certification.

e.      Factors under Fed. R. Civ. P. 23(b)

In addition to meeting all of the factors of Fed. R. Civ. P. 23(a), the proposed class must also satisfy at least one of the three requirements listed in Rule 23(b) in order to be certified as a class action.[12] Plaintiffs rely upon Rule 23(b)(1) and 23(b)(2) in their effort to meet the requirements under Rule 23(b). Filing 250 at 48. Rule 23(b)(1) applies where there is a risk that separate prosecutions would harm other class members or create inconsistent adjudications. Fed. R. Civ. P. 23(b)(1). Rule 23(b)(2) applies when "the party opposing the class has acted or refused

---

[12] The Court has concluded that the Fed. R. Civ. P. 23(a) requirements of commonality and typicality have not been met by Plaintiffs' proposed class and subclasses. A prerequisite of meeting the requirements of Fed. R. Civ. P. 23(b) is that Rule 23(a) requirements must be "satisfied." *Id.* Thus, pursuant to the text of Fed. R. Civ. P. 23(b), the requirements of Rule 23(b) likewise cannot be met. The Court will therefore not engage in a detailed analysis of all Rule 23(b) criteria for certifying a class action. It will, however, briefly address certain arguments on Rule 23(b) factors made by the parties.

to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.*

The *Dukes* Court determined that the requirement under Rule 23(b)(2) was not met. It said, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." 564 U.S. at 360, 131 S. Ct. at 2557. "Permitting the combination of individualized and class wide relief in a (b)(2) class is also inconsistent with the structure of Rule 23(b)." *Id.* at 2558 (citation omitted). *Dukes* also noted as problematic that "about half the members of the class approved by the Ninth Circuit have no claim for injunctive or declaratory relief at all." *Id.* at 2560.

The Court concludes that Plaintiffs have not satisfied the requirements of Rule 23(b). The Court believes that any potential differences in separate prosecutions resulting in different outcomes would be attributable to the wide factual variations in individual inmates' medical situations. Further, as in *Dukes*, the Court is concerned that many members of the proposed class and subclasses have no claim for the proposed injunctive relief. The Court also believes many of the factors discussed in detail in addressing commonality above also illustrate why Rule 23(b)(1) and (b)(2) cannot be met.[13]

      f.    Additional Concerns

In addition to finding that Plaintiffs' proposed class and subclasses fail to meet the requirements of Federal Rule of Civil Procedure 23 as set forth above, the Court also believes that certifying the requested class would present serious concerns under the established principles of federalism.

---

[13] In many class actions, the question of whether the requirement of predominance is met under Fed. R. Civ. P. 23(b)(3) is at issue. Here, Plaintiffs have argued that predominance arguments have no application to the present dispute given they are only seeking certification "pursuant to Rule 23(b)(1) and (b)(2)." Filing 358 at 88. Thus, the Court will not address predominance.

In *Elizabeth M. v. Montenez*, 458 F.3d 779, 788 (8th Cir. 2006), the Eighth Circuit reversed a grant of class certification by the District of Nebraska in part based on concerns that the class was too broad to be manageable. The plaintiffs were former and current female patients involuntarily confined in three of Nebraska's residential mental health facilities who complained of sexual assault and inadequate mental-health and disability treatment. *Id.* at 782. The district court certified the following class:

> All women who were subjected to rape, sexual assault, sexual harassment, sexual exploitation, and physical assault, while in the care and custody of Nebraska Health and Human Services System (NHHSS) as residents at one or more of the NHHSS residential mental health facilities; and all women who are currently, or in the future will be, in the care and custody of the NHHSS and placed as residents at one or more of the NHHSS residential mental health facilities.

*Id.*

In addition to standing issues, the Eighth Circuit expressed its concern that the "[p]laintiffs' class action complaint requests sweeping injunctive relief which, if granted, would require the district court to mandate and monitor detailed programs governing nearly every facet of the State's operation of the three residential facilities." *Id.* at 783. The Eighth Circuit disapproved of a federal court "certifying a single class action to litigate this broad array of claims and prayers for relief," thereby "essentially confer[ing] upon itself jurisdiction to assert control over the operation of three distinct mental health facilities, a major component of Nebraska state government." *Id.* at 784. The Court stated, "Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Id.* (quoting *Rizzo v. Goode*, 423 U.S. 362, 378, 96 S. Ct. 598, 607, 46 L. Ed. 2d 561 (1976)). The Eighth Circuit found such a concern was especially heightened in the class-certification context because of the likelihood a grant of class certification would force a defendant to settle. *Id.* Accordingly, the Court concluded

101

that the class had been improperly certified. *Id.* at 788. It stated, "[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Id.* (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996)).

The Court has similar concerns to those expressed by the Eighth Circuit in *Elizabeth M*. As in that case, here Plaintiffs ask the Court to certify a class so broad that it would "essentially confer[] upon itself jurisdiction to assert control over the operation" of Nebraska's prison system. *Id.* at 784. The Court agrees that it is not its role, but rather that of the executive and legislative branches of the state of Nebraska, to shape the policy of the correctional institutions. By asking the Court to undertake overseeing the management of nearly all aspects of the state prison system—from healthcare to isolation to disability accommodations—Plaintiffs are asking this Court to usurp the role conferred upon the political branches.[14] The Court declines to do so.

In *Postawko*, the Court found that "a single injunction or declaratory judgment would provide relief to each member of the class." *Postawko*, 910 F.3d at 1039-40 (quoting *Dukes*, 564 U.S. at 360, 131 S. Ct. 2541). The proposed injunction in *Postawko* would require the defendant correctional institutions to "formulate and implement an HCV treatment policy," provide the appropriate drugs to qualified class-members, and "provide members of the class an appropriate and accurate assessment of the level of fibrosis or cirrhosis they have, counseling on drug-drug interactions, and ongoing medical care for complications and symptoms of HCV." *Id.* at 1036.

---

[14] The overbreadth of the proposed class is also illustrated by the ambiguity of the relief Plaintiffs seek. When asked at the hearing how they envision the problems they identify being remedied, Plaintiffs were unable to articulate concrete, well-delineated injunctive terms that would provide relief. (Filing 439 at 58-60). The Court is therefore concerned that any injunctive relief ordered in this case would not comply with the requirement under Federal Rule of Civil Procedure 65 that such relief be sufficiently specific. *See* Fed. R. Civ. P. 65(d)(1) (requiring that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required").

Here, however, Plaintiffs have failed to propose an injunction that will provide relief to the proposed class or subclass members.

Based on the foregoing, the Court denies Plaintiffs' request to certify the proposed class and subclasses.

## H.  Motion for Summary Judgment Regarding Galle and Rena's Eighth Amendment Claims

Defendants move for summary judgment as to Galle and Rena's claims under the Eighth Amendment. Filing 292. They claim the undisputed evidence supports that the treatment Rena received for her skin condition and the treatment Galle received for his broken femur were constitutionally adequate. Filing 294 at 10-19. Plaintiffs counter that the evidence, especially the expert affidavit submitted by Dr. Stern, create material factual disputes which prevent summary judgment. Filing 324 at 5-10. Because disputed facts preclude summary judgment in Defendants' favor, the Court denies the motion.

### 1.    Additional Facts

#### a.    Jason Galle's Femur

In 2008, Galle sustained a gunshot wound to his right femur, resulting in a fracture. Filing 293-2 at 28. While housed at the Douglas County Correctional Center, a non-NDCS facility, Galle underwent three surgeries for his fractured femur and received Vicodin for pain. Filing 293-2 at 12, 19, 22, 27. Following his arrival at NDCS on March 1, 2010, Galle submitted an IIR dated March 4 informing NDCS staff he was in "extreme pain 24/7" and asking for stronger medication and permission to stay in a lower-level bunk. Filing 323-6 at 5. NDCS responded that Galle's requests would be addressed at his intake exam by a physician, which occurred on March 10, 2010. Filing 323-6 at 5; Filing 293-2 at 25. The intake screening noted Galle's medical history related to

his fractured femur and surgeries as well as his use of certain controlled substances. Filing 293 at 27-28. NDCS performed an x-ray of Galle's femur the day after his intake which revealed an intramedullary rod with a fixation screw and a healing mid-shaft fracture. Filing 293-2 at 26. NDCS refused to prescribe narcotics like Vicodin for Galle's chronic femur pain. Filing 293-2 at 22-23; Filing 293-6 at 17-19. He was prescribed Tramadol and physical therapy and assigned a lower-level bunk. Filing 334-3 at 1-5; Filing 293-2 at 24.

Over the next several months, Galle submitted numerous requests to NDCS indicating that he was in extreme pain but NDCS repeatedly responded that it would not change or re-evaluate Galle's treatment plan. For example, on March 15, 2010, Galle told NDCS medical that he had pain and weakness in his right leg. Filing 323-6 at 6. On March 18, Galle complained his tramadol prescription was not working and he was in constant pain. Filing 323-6 at 7. NDCS responded, "You are on ibuprofen as well. Will not increase tramadol" and did not schedule him for a medical visit. Filing 323-6 at 7. On May 1, Galle asked to be seen by doctors because he felt his hip "grinding bone on bone" and his knee was "constantly throbbing." Filing 323-6 at 8. NDCS did not schedule a medical appointment and responded only, "If the tramadol is not helping you can stop taking." Filing 323-6 at 8.

On August 5, 2010, Galle submitted an IIR again noting his constant, unbearable pain. Filing 323-6 at 10. Dr. John Casebolt evaluated Galle on August 13, 2010. Filing 334-3 at 6. He stated that he was unsure whether Galle's complaints were psychological or due to actual physical pain. Filing 334-3 at 6. He prescribed Galle a trial dose of Neurontin and scheduled a follow-up for one month later. Filing 224-3 at 6. On August 22, Galle informed NDCS his pain was worsening, including that he was experiencing a grinding in his hip. Filing 323-6 at 11. NDCS declined to see Galle again until his September 14 follow-up with Dr. Casebolt. Filing 323-6 at 11.

On that day, Galle submitted an IIR informing NDCS he had not received the Neurontin prescription for the "last 3 med passes" and asking for it to be renewed. Filing 323-6 at 12. It is unclear what transpired at the follow-up hearing with Dr. Casebolt, but Galle's Neurontin prescription was eventually renewed two days later. Filing 323-6 at 13.

On October 18, 2010, Galle asked to be seen by a doctor because his prescriptions had been discontinued. Filing 323-6 at 13. NDCS did not permit him to see a doctor and responded that it would plan to refill his prescriptions. Filing 323-6 at 13. Later that month, Galle again reported on-going pain in his leg and inability to sleep due to the pain but was told NDCS would not change his pain-management treatment plan. Filing 323-6 at 14. Galle submitted other subsequent IIRs complaining of on-going pain or decreased medication and NDCS repeatedly denied his requests to review his treatment plan. *See generally* Filing 323-6. NDCS's responses included references to the fact that Galle's "fracture is healing but not fully healed." Filing 323-6 at 28.

On September 15, 2010, an x-ray of Galle's femur indicated a healed mid-shaft femoral fracture with no evidence of acute fracture or dislocation. Filing 293-2 at 18. Subsequent x-rays on April 25, 2016, June 3, 2016, and March 9, 2017, also indicated that Galle's femoral fracture was healing. Filing 293-2 at 7-10. However, the April 25, 2016 x-ray indicated the fracture line remained visible as a lucency. Filing 323-6 at 27. In July 2016, NDCS denied Galle a consultation with an orthopedic specialist and instead continued physical therapy and the pain medications he had previously been prescribed. Filing 323-6 at 29, 34. In August 2016, following additional appointments and complaints, Galle was finally referred to an orthopedic specialist. Filing 334-3 at 24. The specialist, Dr. Samani, noted an atrophic non-union in Galle's femur and recommended surgery and a bone graft. Filing 323-6 at 80.

By January 2, 2017, Galle had not received surgery on his femur and reported extreme pain that prevented him from walking to eat meals. Filing 323-6 at 36. NDCS took nine days to respond to his inquiry regarding surgery and stated only that "surgery has been approved but not scheduled yet." Filing 323-6 at 36. NDCS added Naproxen to Galle's pain management regimen. Filing 323-6 at 36. Galle submitted another IIR inquiring about the status of surgery in February 2017. Filing 323-6 at 36.

In March 2017, Galle again reported extreme pain and loss of feeling in his foot as well as his toes changing color. Filing 323-6 at 38-39. NDCS responded that Galle had been unapproved for Lyrica and that he should take NSAIDs when needed and that NDCS would schedule another x-ray. Filing 334-3 at 25-26. On March 9, 2017, x-rays revealed a healing fracture, but upon reviewing them, Dr. Samani indicated a risk of an "occult fracture." Filing 323-6 at 79. NDCS staff noted it would be necessary to schedule Galle for femoral fracture repair surgery "as soon as resources permit." Filing 323-6 at 41. NDCS notes also stated the x-ray indicated, "The hardware is intact and shows no evidence of loosening. . . . There is a healed mid shaft femoral fracture. There is no acute fracture or dislocation. . . ." Filing 293-2 at 7-8. NDCS submitted an internal consult request form for Galle to have femur surgery on March 21, but Medical Director Deol denied the request, stating surgery was "clinically not indicated at this time." Filing 323-6 at 42.

Galle submitted inquiries about his leg from April through July 2017. Filing 323-6 at 43-51. On July 9, Galle submitted an IIR stating he felt a "pop" in his leg and he was in "unbearable" pain because it "feels like the bone has come apart." Filing 323-6 at 50. NDCS provided him with an x-ray on July 21, 2017, which confirmed the development of a fracture at the mid-shaft intramedullary rod in Galle's injured femur. Filing 293-2 at 4. According to Galle, after the July 2017 x-ray, NDCS medical staff were "communicating with people to try to get them to take me

to the emergency room and get surgery performed" at Creighton but the surgery did not immediately occur. Filing 357-23 at 38. Galle underwent a fourth surgery to repair his fractured femur on August 25, 2017, at Bryan Medical Center in Lincoln, Nebraska. Filing 293-2 at 2-3.

The care Galle received after this surgery is disputed. Defendants claim he received consistent physical-therapy rehabilitation but cite only radiology reports referencing physical therapy in support of this contention. Filing 294 at 5; Filing 293-2 at 40-42. Galle claims he has not received physical therapy for the past six months despite continuing problems with his leg. Filing 323-3 at 1-2. The parties agree that post-surgical x-rays have shown Galle's femur is healing. Filing 293-2 at 33, 36.

Dr. Stern, a board-certified internist specializing in correctional healthcare, submitted an expert declaration regarding the medical care Galle received at NDCS for his femur. Filing 323-1; Filing 323-1 at 1. He reviewed selected medical records relating to Jason Galle's treatment at NDCS. Filing 323-1 at 2. In Dr. Stern's expert opinion, Galle received inadequate healthcare and treatment for his injured femur. Filing 323-1 at 5. Dr. Stern stated, "In particular, NDCS staff failed to conduct appropriate intake screening of Mr. Galle; NDCS staff failed to follow and carry out orders from NDCS physicians; there were delays in access to care; there were problems with provision of medication; and there were deficiencies with medical record-keeping." Filing 323-1 at 5.

With respect to Galle's intake screening, Dr. Stern noted that without a physical examination, NDCS decided to taper Galle off the Vicodin he had been using to control his pain. Filing 323-1 at 6. Such a decision was based not on Galle's individual medical needs but was rather a categorical refusal "without first making an adequate determination of the clinical appropriateness and safety of such a treatment plan." Filing 323-1 at 6. In Dr. Stern's view, the

discontinuation of Galle's pain medicine "coupled with failure to evaluate Mr. Galle after being notified of a complication, resulted in significant harm (continued, un-evaluated and un-controlled pain), as well as significant risk of harm (in the event that the new complication signaled a second serious problem, such as bone infection)." Filing 323-1 at 7.

Dr. Stern also noted problems with "[d]iscoordinated [c]are," delayed care, and a failure to follow doctors' orders. Filing 323-1 at 7. According to Dr. Stern, NDCS was put on notice of ongoing issues with Galle's femur due not only to his self-reports of unmanaged pain but also when the x-ray performed on April 25, 2016, "showed, for the first time in several years, that his old femur fracture was no longer heal<u>ed</u>, but rather heal<u>ing</u>." Filing 323-1 at 7 (emphasis in original). Furthermore, Dr. Samani recommended surgery on August 25, 2016, but Galle did not receive it until August 25, 2017, despite numerous IIRs and additional x-rays. Filing 323-1 at 8-10. As a result of these "inexplicable failures of medical decision-making, execution of orders, coordination, and follow-up" Galle "undoubtedly suffered unnecessary pain during this year of delay. In addition, delaying surgery in this way may put the ultimate outcome at serious risk." Filing 323-1 at 10.

b.      Zoe Rena's Skin Condition

When Zoe Rena was initially incarcerated at NDCS in July 2015, she reported a skin rash and asked to be placed on a topical antibiotic that she had used during a previous term of incarceration at NDCS. Filing 323-5 at 6. NDCS responded six days later that she should purchase acne wash from the canteen instead. Filing 323-5 at 6. During her incarceration, she has been prescribed hydrocerin cream, clindamycin 1% gel, doxycycline, clobetasol cream, Aveeno Active Naturals soap, Minocycline, hydroxyzine, adapalene gel and a birth control pill by the name of Nortrel to attempt to address her skin condition. Filing 293-4 at 8; Filing 323-5 at 2. NDCS

contends the frequent changes in treatment were due to Rena's chronic failure to comply with the treatment plan. Filing 294 at 17-18; Filing 293-4 at 2, 4-5, 10-11. Rena testified, however, that she tried each of the prescribed treatments: "All of the things medical has given me in the past year to try I did try for the amount of time you told me it would take to work, and when that time passed, and it didn't work, I kited medical as you recommended that I do." Filing 323-5 at 4. NDCS medical records also reveal that on numerous occasions, Rena was unable or was not timely able to receive refills or continuation of the medications she had been prescribed. Filing 323-5 at 12, 14. Rena has not been referred to a dermatologist. Filing 293-4 at 3. NDCS forms dated January 26, 2017, stated, "We do not have a dermatologist that will see inmates. Nor will the new director approve it." Filing 323-5 at 3.[15]

Rena submitted a declaration stating that while her skin rash had improved at the time of her March 2019 deposition, it then worsened by May. Filing 323-2 at 1-2. Rena stated, "I have had periods where I have no visible rash, and then I will experience a new outbreak. The symptoms come and go without me being able to tell what the trigger is." Filing 323-2 at 1.

Dr. Stern evaluated Rena's medical records and provided an expert declaration determining "[t]he care provided by NDCS to Ms. Rena for her multiple skin conditions did not meet the community standard of care, and put Ms. Rena at substantial risk of harm." Filing 323-1 at 2. In particular, Dr. Stern opined that Rena experienced substantial delays in receiving care and received inadequate care to manage her chronic skin condition. Filing 323-1 at 3. According to Dr. Stern, Rena received deficient care when she submitted an IIR on January 26, 2016, indicating she had

---

[15] Rena has also reported prolonged periods of what appeared to be menstrual bleeding. Filing 323-7 at 1. Rena was given a prescription, but the cause of the bleeding remains unknown and Rena's symptoms persist. Filing 323-7 at 1-2. However, Defendants only appear to contend that the treatment of Rena's skin condition, not her menstrual bleeding, is appropriate for summary judgment. Thus, the Court will focus on Rena's skin condition for purposes of the Eighth Amendment analysis, just as the parties do.

developed a rash that was different from her previously existing condition and which was getting worse. Filing 323-1 at 3. Instead of a timely examination and assessment, NDCS took almost two weeks to evaluate Rena and finally discover she had, in fact, developed a new condition: dermatitis. Filing 323-1 at 3. Dr. Stern stated, "such a skin condition can be the first sign of a spreading infection, or could be a manifestation of a systemic infectious or immunological disease. This deficient care placed her at significant risk of harm." Filing 323-1 at 3.

In September 2015, Rena requested a topical antibiotic for her skin condition but was told to purchase acne wash from the canteen. Filing 323-1 at 4. According to Dr. Stern, "It was clinically unreasonable to expect, if her condition was unresponsive to non-prescription medications previously, that they would now be successful, especially in the absence of any examination to suggest otherwise." Filing 323-1 at 4. "Thus, care providers would know that this treatment had a high likelihood of failing to provide adequate care for this chronic condition." Filing 323-1 at 4. Dr. Stern stated, "Until diagnosed and determined to be benign, medical staff [should have] treat[ed] the skin condition with the same care and urgency as any other potentially serious condition." Filing 323-1 at 2.

   2.  *Analysis*

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (alteration in original) (quoting *Helling v. McKinney*, 509 U.S. 25, 31, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)). "To prevail on a claim of constitutionally inadequate medical care, the inmate must show that the prison officials' conduct amounted to 'deliberate indifference to [the prisoner's] serious medical needs.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237–38 (8th Cir. 1997)

110

(alteration in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976)).

An Eighth Amendment claim that prison officials were deliberately indifferent to the medical needs of inmates involves both an objective and a subjective component. *Id.* at 1239 (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997)). The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs. *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Schaub*, 638 F.3d at 914 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).

"Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs." *Dulany*, 132 F.3d at 1239 (citing *Estelle*, 429 U.S. at 104–05, 97 S. Ct. at 291–92). "Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." *Id.* (citing *Estelle*, 429 U.S. at 106, 97 S. Ct. at 292). "Deliberate indifference is equivalent to criminal-law recklessness, which is 'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Schaub*, 638 F.3d 914–15 (quoting *Farmer*, 511 U.S. at 839-40, 114 S. Ct. 1970).

### a.    Galle

First, Defendants do not dispute that Galle's broken femur and resultant pain constitute a "serious medical need." *See Dulany*, 132 F.3d at 1239. Thus, the question for the Court is whether summary judgment is appropriate based on NDCS officials allegedly showing no deliberate

4:17-cv-03107-BCB-MDN   Doc # 476   Filed: 06/08/20   Page 112 of 124 - Page ID # 22143

indifference in their handling of Galle's medical condition. *See id.* The Court concludes there are genuine disputes of material fact as to whether NDCS officials were deliberately indifferent to Galle's leg which preclude summary judgment.

Defendants argue there is no dispute that NDCS's treatment of Galle's leg and pain was medically appropriate and did not rise to the level of criminal-law recklessness such as could be called deliberate indifference. *See Schaub*, 638 F.3d 914–15. However, the evidence put forth by Plaintiffs calls into question the reasonableness of Defendants' actions. According to Galle's medical records, he repeatedly reported unmanaged pain, including indications of an aggravation to his preexisting femur injury. Despite his numerous requests for treatment, NDCS repeatedly failed to modify his pain-management treatment. Perhaps most concerningly, despite indications that he had re-fractured his femur and a recommendation from Dr. Samani that he receive surgery, Galle was left without surgical intervention for nearly a year. This evidence is supported by the expert opinion of Dr. Stern who found "inexplicable failures of medical decision-making, execution of orders, coordination, and follow-up," the result of which was Galle "undoubtedly suffered unnecessary pain during this year of delay. In addition, delaying surgery in this way may put the ultimate outcome at serious risk." Filing 323-1 at 10. This evidence precludes the granting of summary judgment on the question of whether Defendants were deliberately indifferent to Galle's serious medical needs.

b.    Rena

With respect to plaintiff Rena, Defendants argue summary judgment is appropriate both because her skin condition did not constitute a serious medical need and because NDCS's treatment did not rise to the level of deliberate indifference. Because Plaintiffs have put forth

112

evidence which disputes the seriousness of Rena's condition and the recklessness of Defendants' treatment, summary judgment is inappropriate on this claim.

First, Plaintiffs have put forth evidence to create a dispute as to whether Rena's condition was "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub*, 638 F.3d at 914 (quoting *Camberos*, 73 F.3d at 176). While Defendants portray Rena's condition as a mere rash, the evidence shows her condition escalated into dermatitis and required treatment beyond just over-the-counter facewash. Furthermore, Dr. Stern opined that Rena's condition, left untreated, was concerning enough to place her at a serious risk of harm and could represent "the first sign of a spreading infection, or could be a manifestation of a systemic infectious or immunological disease." Filing 323-1 at 3. Thus, there is a genuine dispute of material fact as to whether Rena's skin condition was an "objectively serious medical need[]." *Dulany*, 132 F.3d at 1239.

Second, Plaintiffs have also put forth evidence which disputes Defendants' contention that NDCS's treatment of Rena's skin condition did not rise to the level of deliberate indifference. Prison officials repeatedly ignored Rena's requests for changes to her treatment when her skin condition worsened, including recommending she purchase acne wash when they were already aware over-the-counter solutions were not working. According to Dr. Stern, "It was clinically unreasonable to expect, if her condition was unresponsive to non-prescription medications previously, that they would now be successful, especially in the absence of any examination to suggest otherwise." Filing 323-1 at 4. Defendants actions in this regard were "'more blameworthy than negligence,' yet less blameworthy than purposefully causing or knowingly bringing about a substantial risk of serious harm to" Rena. *Schaub*, 638 F.3d 914–15 (quoting *Farmer*, 511 U.S. at

113

835, 839-40, 114 S. Ct. 1970). Thus, Plaintiffs have demonstrated that genuinely disputed facts exist which preclude summary judgment on the question of whether prison officials were deliberately indifferent to Rena's skin condition.

In this motion, the State argues because Galle and Rena's conditions have improved, they cannot obtain prospective relief and the Court should grant summary judgment. Filing 294 at 11, 19. In response to Defendants' Motion for Summary Judgment, Plaintiffs argue that "Rena and Galle do not seek an injunction or damages as compensation for Defendants' past deliberate indifference to medical needs at discrete points in time; rather, they seek to change Defendants' future behavior so as to abate the risk of harm to themselves and the putative class." Filing 324 at 34. Plaintiffs further claim Defendants' motion as to Rena and Galle "attempts to turn this case into a series of individual personal injury actions." Filing 324 at 33-34. In their sixty-five-page reply brief, Defendants then seem to pivot to abandon the request that the Court rule on purported individual claims of Rena and Galle, but persist in asking this Court for a ruling as a matter of law that "NDCS['s] medical staff have not been deliberately indifferent in their treatment of Galle's leg or Rena's skin rash." Filing 335 at 49. The Court has thus construed this motion as such and concludes it will not issue the ruling Defendants seek.[16]

For the reasons outlined herein, Defendants' Motion for Summary Judgment regarding Galle and Rena's Eighth Amendment Claims, Filing 292, is denied.

## I. Motion for Discovery Related to COVID-19

Plaintiffs object to Magistrate Judge Nelson's order denying their request for discovery related to NDCS's plan to address the novel coronavirus (COVID-19) pandemic. Filing 469.

---

[16] The Court admits that it fails to understand the need to address this issue given the lack of individual claims by Galle and Rena in this case. However, the Court has dutifully provided a ruling on the question presented.

Plaintiffs argue Magistrate Judge Nelson was incorrect in requiring them to comply with discovery procedures and in finding the requested discovery was not relevant to the facts of this case. For the following reasons, the Court overrules Plaintiffs' objection.

On April 10, 2020, Plaintiffs filed an "Emergency Motion Seeking Disclosure of Defendants' Plan for the Prevention, Management, and Treatment of COVID-19." Filing 447. NDCS has publicly released information regarding its pandemic plan but has refused to turn over to Plaintiffs information regarding what it terms "restricted access plans" detailing how individual facilities would quarantine individuals and house or move inmates in response to the disease. Filing 457 at 7. Defendants claim the information Plaintiffs seek poses a security threat. Filing 457 at 7-9. Plaintiffs argue the information is relevant because their "class action already concerns issues of life and death for incarcerated individuals in NDCS facilities" and the COVID-19 crisis has placed purported class members at "a real and immediate risk of suffering or dying." Filing 448 at 10.

Magistrate Judge Nelson denied Plaintiffs' motion. He first noted that, despite styling it as an "emergency motion," what Plaintiffs had actually filed was a motion to compel discovery pursuant to Federal Rule of Civil Procedure 37(a)(3). Filing 466 at 3. The Court noted that Plaintiffs had failed to comply with this district's Civil Case Management practices and the Court's prior Order, Filing 289, requiring a party seeking discovery to first contact the Court to set a conference. Filing 466 at 3. The Court noted that while denial on that basis alone would have been warranted, it also determined that the documents sought by Plaintiffs are not relevant. Filing 466 at 3. Magistrate Judge Nelson determined that "[t]he COVID-19 crisis is different 'in both nature and degree' from the claims in Plaintiffs' Complaint." Filing 466 at 4 (citation omitted). When Plaintiffs filed suit in 2017, neither party could have "contemplated that this action would

encompass a claim regarding a virus that did not exist." Filing 466 at 4. Magistrate Judge Nelson also noted that NDCS had publicly disclosed significant information about its plan for addressing the pandemic and the fact Plaintiffs were still unable to determine whether Plaintiffs were harmed by the pandemic plan "suggests that Plaintiffs are unsure if they have actually suffered an injury giving rise to a claim for relief." Filing 466 at 5. Accordingly, he denied the motion.

Plaintiffs object to Magistrate Judge Nelson's determination. Filing 469. First, they argue their "emergency motion" was properly styled because they sought not just discovery, but public release of documents as well. Filing 470 at 29-30. They also argue the magistrate judge was incorrect in finding their request irrelevant because it falls within the scope of their broadly worded Complaint and previous discovery requests seeking all manner of healthcare-related information. Filing 470 at 17-20. Plaintiffs also contend Magistrate Judge Nelson misapplied the law because discovery should be broadly granted and the standard for Eighth Amendment claims contemplates future harm such as the novel coronavirus. Filing 470 at 23-24. Lastly, Plaintiffs argue Magistrate Judge Nelson misapplied the case of *Coleman v. Newsom*, No. 01-CV-01351-JST, 2020 WL 1675775 (E.D. Cal. Apr. 4, 2020) ("*Coleman II*"). Filing 470 at 25-28. In *Coleman II*, the plaintiffs asked the court to modify a preexisting remedial order to address COVID-19 concerns, which the court declined to do. Filing 470 at 26-28. Plaintiffs argue this procedural posture makes the case different from the present case where no governing order yet exists. Filing 470 at 26-28.

Defendants respond that Magistrate Judge Nelson was correct in denying Plaintiffs' motion based both on failure to comply with discovery procedures and because the request is not relevant to the case. Filing 475 at 2-5. Defendants argue that they have already disclosed "the vast majority of the information" Plaintiffs seek, and the remaining facility-specific information has no bearing on the issues presented in this case. Filing 475 at 2.

116

The Court agrees that Magistrate Judge Nelson was not "clearly erroneous or contrary to law." 28 U.S.C. § 636; *see also* Fed. R. Civ. P. 72. First, despite Plaintiffs' seeking public disclosure of documents, their request is nevertheless one for discovery and the Court agrees their failure to follow the prescribed procedure alone justifies denial of their motion. However, the Court also agrees with the magistrate judge that Plaintiffs' request is also irrelevant. Despite the different procedural postures, the Court also finds *Coleman II* persuasive. As Magistrate Judge Nelson discussed, plaintiffs in both *Coleman II* and the present case argued the risks posed by COVID-19 should fall into the same category of constitutional harm alleged to occur in deficient prison healthcare systems. Filing 466 at 4. In both cases, the COVID-19 crisis "is different 'in both nature and degree' from the claims" originally asserted. Filing 466 at 4 (citing *Coleman II*, 2020 WL 1675775, at *5).

As set forth above, the Court may reconsider a magistrate judge's pretrial ruling where it has been shown to be "clearly erroneous or contrary to law." 28 U.S.C. § 636; *see also* Fed. R. Civ. P. 72. Magistrate Judge Nelson's order is neither. While the Court does not diminish the severity of the COVID-19 pandemic, nor its potentially lethal effects on members of the population, including prison inmates, the present lawsuit is the incorrect vehicle for addressing such concerns.[17]

## J.  Mootness

Since the filing of the Complaint, four of the plaintiffs have been released from NDCS custody. Defendants contend that the claims of the released Plaintiffs are moot and should be

---

[17] Indeed, the lengthy and broad arguments Plaintiffs make in contending the COVID-19 crisis—which came to fruition in the United States only a mere three months prior to the date of this opinion and over fifteen months after their motion for class certification was filed—falls within the scope of their existing claims further illustrates to the Court why it is appropriate to deny class certification on the basis of commonality, typicality, and the Federal Rule of Civil Procedure 23(b) factors.

dismissed. Plaintiffs oppose mootness on various grounds, including that two of the released plaintiffs has been returned to custody. For the reasons stated below, the Court concludes the claims of those Plaintiffs not in custody are moot, but that those of the plaintiff released and returned to custody are not moot.

### 1. Additional Facts

Plaintiffs Rena, Sweetser, and Norris were in physical custody at the time of the filing of the Complaint. Filing 1 at 16-20. On April 1, 2019, Sweetser was released on parole. Filing 281-1 at 2-4. On November 15, 2019, Rena was released on parole. Filing 421-1 at 2; Filing 421-3 at 1-2. On November 20, 2019, Norris was also released on parole. Filing 430-1 at 2-6. Defendants moved to dismiss Rena, Sweetser, and Norris's claims, alleging they are moot because these plaintiffs have been released from NDCS facilities on parole. Filing 280, Filing 420, Filing 429. However, subsequently to these motions and briefing, Rena was returned to NDCS custody. Filing 442-1; Filing 442-2. Defendants informed the Court of her return to custody but argue Rena's claims are nevertheless moot. Filing 443.

Plaintiff R.P. was incarcerated at NCYF beginning in January 2016. Filing 1 at 17. R.P. was discharged from the facility on November 20, 2018. Filing 207-1 at 2-3. Based on his release from custody, Defendants moved to dismiss R.P.'s claims on mootness grounds. Filing 205. On February 27, 2019, the Court agreed R.P.'s claims were moot due to his release from custody and dismissed his claims without prejudice. Filing 260 at 1-2. Subsequently, on March 4, 2019, R.P. was returned to NDCS custody. Filing 271-1 at 1-2. On the basis of his return to NDCS custody, Plaintiffs moved to reconsider the Court's order dismissing R.P.'s claims. Filing 270.

### 2. Applicable Law

"The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." *Ringo v. Lombardi*, 677 F.3d 793, 796 (8th Cir. 2012) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975)). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Kennedy Bldg. Assocs. v. Viacom, Inc.*, 375 F.3d 731, 745 (8th Cir. 2004) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979). "It is of no consequence that the controversy was live at earlier stages in this case; it must be live when [the Court] decide[s] the issues." *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000) (quoting *South Dakota v. Hazen*, 914 F.2d 147, 150 (8th Cir. 1990)). "[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Ringo*, 677 F.3d at 796 (alteration in original) (quoting *Preiser*, 422 U.S. at 401, 95 S. Ct. 2330). "The 'heavy' burden of proving mootness falls on the party asserting the case has become moot. *Kennedy Bldg. Assocs.*, 375 F.3d 745 (quoting *Davis*, 440 U.S. at 631, 99 S. Ct. 1379).

Under Federal Rule of Civil Procedure 60, "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence." Fed. R. Civ. P. 60(b).

   *3.   Analysis*

Defendants argue that because these plaintiffs have been released from physical custody, their claims are moot. Filing 282 at 3; Filing 422 at 2-3; Filing 431 at 1-2; Filing 204. Plaintiffs counter that, despite their release, these plaintiffs remain subject to the custody and control of NDCS because they are on parole. Filing 298 at 8; Filing 427 at 7-8; Filing 434 at 8-9. They point to Nebraska case law stating that a parolee is classified as being "in custody under sentence." Filing

298 at 8; Filing 427 at 8; Filing 434 at 8 (citing *State v. Thomas*, 236 Neb. 553, 557, 462 N.W.2d 862, 866 (1990), which held that "[t]he restrictions imposed upon a prisoner who is paroled are sufficient to render that person 'in custody under sentence' for purposes of the [Nebraska] Postconviction Act"). They also analogize the released plaintiffs to parolees seeking habeas corpus relief after their sentence has been served. *See* Filing 298 at 9; Filing 427 at 9; Filing 434 at 9 (citing *Caton v. Nebraska*, 869 N.W.2d 911, 914-15, 291 Neb. 939, 941-42 (2015)), for the proposition that parolees can state a justiciable claim under Nebraska's habeas corpus statute.

The Court finds Plaintiffs' argument and analogies unpersuasive. The heart of Plaintiffs' claims is the inadequacy of treatment and medical care of inmates occurring *in* NDCS facilities. *See generally* Filing 1. While a parolee is subject to certain restraints on their freedom imposed by the State, they are not receiving medical care through NDCS nor are they being held in isolation or being subject to parole-eligibility hearings at NDCS facilities. Thus, the issues presented by the parolee–plaintiffs' claims "are no longer 'live' [and] the parties lack a legally cognizable interest in the outcome." *Kennedy Bldg. Assocs.*, 375 F.3d at 745.

Plaintiffs argue that the Court should not find Plaintiffs' claims moot because, as parolees, they can be returned to custody at any time.[18] Filing 298 at 8; Filing 427 at 7-8; Filing 434 at 10. While it is true that a parolee can be arrested and returned to custody, *see* Neb. Rev. Stat. § 83-1,121, that does not change the fact that there is no present, live controversy; the parolee–Plaintiffs are not currently subject to NDCS's healthcare system or policies regardless of what may happen in the future.

---

[18] Plaintiffs also argue that even if these individual plaintiffs' claims are moot, they should nevertheless be permitted to continue as class representatives. Filing 298 at 20-25; Filing 427 at 17-22; Filing 434 at 21-25. Because the Court has already determined that the requested classes should not be certified, this argument necessarily fails.

The Court therefore concludes the claims of those plaintiffs who have been released on parole are moot. The Eighth Circuit has addressed similar claims regarding prison conditions and has likewise found dismissal on mootness grounds warranted when the plaintiffs were no longer in custody. *See, e.g.*, *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (per curiam) (holding that as to an inmate seeking injunctive relief based on a particular facility's policies, his claim became moot upon his transfer out of that facility "[b]ecause [he] is no longer subject to the policies that he challenges, [and] there is no live case or controversy"); *Hickman v. State of Mo.*, 144 F.3d 1141, 1142 (8th Cir. 1998) ("Because plaintiffs have been released on parole and are no longer confined at [the defendant correctional center], their claims [of ADA violations] are moot."); *Watts v. Brewer*, 588 F.2d 646, 648 (8th Cir. 1978) (holding that as to an inmate's claims regarding prison conditions, "[h]is release has mooted his claims for declaratory and injunctive relief").

The Court also does not find that the parolee–Plaintiffs' claims fall under the "capable-of-repetition-yet-evading-review" exception to the mootness doctrine.[19] "This exception 'applies only in exceptional situations, where the following two circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again[.]'" *Hickman*, 144 F.3d at 1142–43 (alterations in original) (quoting *Spencer v. Kemna*, 523 U.S. 1, 118 S. Ct. 978, 988, 140 L. Ed. 2d 43 (1998)).

---

[19] Plaintiffs urge the Court to apply the "inherently transitory" exception to the mootness doctrine. Filing 298 at 20-25. That exception is exclusive to class-action cases. *See, e.g.*, *Sosna v. Iowa*, 419 U.S. 393, 402, 95 S. Ct. 553, 559, 42 L. Ed. 2d 532 (1975). ("The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."). Because the Court has determined class certification is not warranted, it will analyze the applicability of the general capable-of-repetition-yet-evading-review exception instead.

With respect to the duration prong, "the proper inquiry is whether the [challenged] activity is *by its very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully alive." *Id.* (alteration and emphasis in original) (quoting *Clark v. Brewer*, 776 F.2d 226, 229 (8th Cir. 1985)). Plaintiffs have not shown that the duration of the healthcare policies is "always so short as to evade review." *Spencer*, 523 U.S. at 18, 118 S. Ct. at 988. While these particular Plaintiffs have been released from incarceration, numerous other plaintiffs in this case are still serving sentences and subject to the same policies and systems complained of in this case and thus these issues will not go unaddressed due solely to certain inmates being paroled. Should the paroled Plaintiffs in fact be returned to custody and then subject to the same policies and practices, they can file an appropriate motion or complaint to address the issues at that time. Accordingly, the paroled Plaintiffs' claims are moot and no exception to the mootness doctrine applies. Defendants' Motions to Dismiss on mootness grounds for Sweetser and Norris are granted. Filing 280, Filing 429.

As to plaintiffs R.P. and Rena, Defendants do not deny that they are now back in NDCS custody. Filing 274 at 1-2; Filing 443 at 1. With respect to R.P., Defendants argue that dismissal without prejudice is nevertheless warranted based not on mootness but on R.P.'s alleged failure to exhaust administrative remedies. Filing 274 at 2. Because the parties agree that R.P. is back in NDCS custody, the Court concludes his claims are no longer moot. *See* Fed. R. Civ. P. 60(b)(2) (allowing the Court to reconsider its prior order based on new evidence). Furthermore, for the reasons set forth in Section II.D above, the Court determines R.P.'s claims should not be dismissed based on an alleged failure to exhaust administrative remedies.

With respect to plaintiff Rena, Defendants argue dismissal should be granted despite her return to custody because she was not subject to conditions amounting to an Eighth Amendment

violation and because she has not exhausted her administrative remedies. Filing 443 at 2-3. The Court has previously determined that genuine issues of material fact exist which preclude summary judgment in Defendants' favor as to both Rena's Eighth Amendment claim and her exhaustion of administrative remedies. Thus, because Rena has been returned to NDCS custody, her claims are no longer moot.

Accordingly, the Court grants Plaintiffs' Motion to Reconsider its prior dismissal order, Filing 260, and R.P.'s claims will be allowed to go forward. The Court denies the Motion to Dismiss Rena. Filing 420. The Court grants the Motions to Dismiss Sweetser and Norris. Filing 280, Filing 429.

### III.    CONCLUSION

For the foregoing reasons,

IT IS ORDERED:

1. Defendants' Objection to Affidavits Submitted in Support of Summary Judgment (Filing 176) is denied;

2. Defendants' Objection to the Magistrate Judge's Order Regarding Expert Witnesses (Filing 395) is denied;

3. Defendants' Motion for Partial Summary Judgment Regarding Exhaustion of Administrative Remedies (Filing 125) is denied;

4. Defendants' Motion for Partial Summary Judgment Regarding Life Sentences and Eighth Amendment Claims (Filing 292) is granted as to James Curtright, Richard Griswold, and Michael Gunther and is denied as to Zoe Rena and Jason Galle's Eighth Amendment claims;

5.  Defendants' Motion for Partial Summary Judgment Regarding Defendant Julie Micek (Filing 223) is granted and Micek is dismissed as a party to the lawsuit;

6.  Plaintiffs' Motion for Class Certification (Filing 247) is denied;

7.  Plaintiffs' Objection to Magistrate Judge's Order regarding COVID-19 Discovery (Filing 469) is denied;

8.  Plaintiffs' Motion for Reconsideration (Filing 270) regarding the mootness order on R.P. is granted;

9.  Defendants' Motions to Dismiss and Suggestions of Mootness regarding Brandon Sweetser and Angelic Norris (Filing 280, Filing 429) are granted and Sweetser and Norris are dismissed as parties to the case; and

10. Defendants' Motion to Dismiss and Suggestion of Mootness regarding Zoe Rena (Filing 420) is denied.

Dated this 8th day of June, 2020.

BY THE COURT:

Brian C. Buescher
United States District Judge